## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES, *et al.*, | |
| Defendants. | |

## SUMMONS AND NOTICE OF PRETRIAL
## CONFERENCE IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within thirty (30) days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within thirty-five (35) days.

Address of Clerk:

> United States Bankruptcy Court for the District of Delaware
> 824 Market Street, 3rd Floor
> Wilmington, Delaware 19801

At the same time, you must also serve a copy of the motion or answer upon the plaintiffs' attorneys.

Name and Address of Plaintiff's attorneys:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (*pro hac vice* pending)
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
        dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com
        kranzleya@sullcrom.com

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place.

| **Address:** | **United States Bankruptcy Court** | **Room:** |
| | **824 Market Street** | **5th Floor, Courtroom No. 5** |
| | **Wilmington, DE 19801** | |
| | | **Date and Time:** |
| | | **June 28, 2023 at 1:00 p.m. (ET)** |

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

**United States Bankruptcy
  Court for the District
    of Delaware**

Dated: May 18, 2023                                    _/s/ Una O'Boyle_____
                                                      *Clerk of the Bankruptcy Court*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES, *et al.*, | |
| Defendants. | |

## NOTICE OF DISPUTE RESOLUTION ALTERNATIVES

As party to litigation you have a right to adjudication of your matter by a judge of this Court.  Settlement of your case, however, can often produce a resolution more quickly than appearing before a judge.  Additionally, settlement can also reduce the expense, inconvenience, and uncertainty of litigation.

There are dispute resolution structures, other than litigation, that can lead to resolving your case.  Alternative Dispute Resolution (ADR) is offered through a program established by this Court.  The use of these services are often productive and effective in settling disputes.  **The purpose of this Notice is to furnish general information about ADR.**

The ADR structures used most often are mediation, early-neutral evaluation, mediation/arbitration and arbitration.  In each, the process is presided over by an impartial third party, called the "neutral."

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

In mediation and early neutral evaluation, an experienced neutral has no power to impose a settlement on you.  It fosters an environment where offers can be discussed and exchanged.  In the process, together, you and your attorney will be involved in weighing settlement proposals and crafting a settlement.  The Court in its Local Rules requires all ADR processes, except threat of a potential criminal action, to be confidential.  You will not be prejudiced in the event a settlement is not achieved because the presiding judge will not be advised of the content of any of your settlement discussions.

Mediation/arbitration is a process where you submit to mediation and, if it is unsuccessful, agree that the mediator will act as an arbitrator.  At that point, the process is the same as arbitration. You, through your counsel, will present evidence to a neutral, who issues a decision.  If the matter in controversy arises in the main bankruptcy case or arises from a subsidiary issue in an adversary proceeding, the arbitration, though voluntary, may be binding.  If a party requests *de novo* review of an arbitration award, the judge will rehear the case.

**Your attorney can provide you with additional information about ADR and advise you as to whether and when ADR might be helpful in your case.**

Dated:  May 18, 2023                              */s/ Una O'Boyle*                              
                                                                  Clerk of Court

Case 23-50380-JTD

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-_____(JTD) |
| MICHAEL GILES, *et al.*,[2] | |
| Defendants. | |

## AFFIDAVIT OF SERVICE

Filed on behalf of: The Plaintiffs

**Howard W. Robertson**
Landis Rath & Cobb LLP

919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE 19899
P 302.467.4426  F 302.467.4450
Email : robertson@lrclaw.com

I, David Robert Holland, Process Server of 170 Blackwood Park Road Rowville in the State of Victoria, Australia, make oath and say that I served:

1. Summons And Notice Of Pretrial Conference in an Adversary Proceeding; and
2. Complaint for Avoidance and Recovery of Transfers and Obligations Pursuant to 11 U.S.C. §§ 105, 544, 547, 548, and 550 and DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, and for Disallowance of Claims Pursuant to 11 U.S.C. § 502 ("the documents") on:

DEPONENT: ........................................

BEFORE ME ........................................

Case 23-50380-JTD

1. *__Kerr Investment Holdings Pty Ltd (The Kerr Family Trust)__*

   By personally delivering the documents to a male employee at Koustas & Co Pty Ltd, Level 14, 412 St Kilda Road Melbourne in the state of Victoria 3004, Australia

   on Thursday, 25 May 2023 at 9:30am

   At the time of service, I asked: "Is this the registered office of Kerr Investment Holdings Pty Ltd (The Kerr Family Trust) and are you authorised to accept service of documents on their behalf?" The male replied: "Yes". I handed the documents to the male. I asked: "Can I have your name please?" The male replied: "Damian Burke".

2. *__KV5 Pty Ltd (KV5 Trust)__*

   By personally delivering the documents to a male employee at Level 2, 7 River Street South Yarra in the state of Victoria 3141, Australia

   on Thursday, 25 May 2023 at 9:55am

   At the time of service, the given address was found to be a company called 'Inauro Wealth Management'. I asked: "Is this the registered office of KV5 Pty Ltd (KV5 Trust) and are you authorised to accept service of documents on their behalf?" The male replied: "Yes". I handed the documents to the male. I asked "Can I have your name please?" The male replied: "Geoff Morris".

3. *__KV5 Pty Ltd (KV5 Trust)__*

   By personally placing the documents in an envelope addressed to KV5 Pty Ltd (KV5 Trust) 1302/39 Coventry St Southbank VIC 3006 and affixing the envelope to the door of the Mail Room of 39 Coventry St Southbank in the state of Victoria 3006, Australia

   on Friday, 26 May 2023 at 10:20am

   At the time of service, the property was described as a residential apartment building with intercom/security access only. I was not able to access the front door of Unit 1302 without a security fob. I was able to gain access to the foyer of the building and located room signposted "Mail Room". I affixed the envelope to the door of the Mail Room.

   DEPONENT: ...........................

   BEFORE ME ...........................

Case 23-50380-JTD

**4.** **_Kerr Investment Holdings Pty Ltd (The Kerr Family Trust)_**

By personally placing the documents in an envelope addressed to Kerr Investment Holdings Pty Ltd (The Kerr Family Trust) 9/636 St Kilda Rd, Melbourne VIC 3006 and affixing the envelope to the front door of 636 St Kilda Rd, Melbourne in the state of Victoria 3006, Australia

on Friday, 26 May 2023 at 10:45am

At the time of service, the property was described as a commercial complex. I was unable to access Level 9. The directory board in the foyer did not have a listing for any business on Level 9. The directory board did not have a listing for Kerr Investment Holdings Pty Ltd (The Kerr Family Trust). I affixed the envelope to the front door of the building.

Exhibited hereto and marked with the letter "**A**" are true copies of the documents served.

Exhibited hereto and marked with the letter "**B**" is a true copy of a photograph taken at the time of service for KV5 Pty Ltd (KV5 Trust) for 1302/39 Coventry St Southbank VIC 3006.

Exhibited hereto and marked with the letter "**C**" is a true copy of a photograph taken at the time of service for Kerr Investment Holdings Pty Ltd (The Kerr Family Trust) for 9/636 St Kilda Rd, Melbourne VIC 3006

I believe the information contained in this affidavit is true and correct.

I am over the age of sixteen years.

SWORN AT Melbourne                    DEPONENT: ..............................
IN THE STATE OF VICTORIA
ON THE 8th DAY OF JUNE 2023
                                       BEFORE ME: ..............................

CHRISTOPHER ROBERT DAVIE
Notary Public
Melbourne, Victoria, Australia
My appointment is not limited by time

Case 23-50380-JTD

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-_____(JTD) |
| MICHAEL GILES, *et al.*,[2] | |
| Defendants. | |

## EXHIBIT "A"

Filed on behalf of: The Plaintiffs

**Howard W. Robertson**
Landis Rath & Cobb LLP

919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE 19899
P 302.467.4426  F 302.467.4450
Email :  robertson@lrclaw.com

## EXHIBIT "A"

These are true copies of the documents, marked with the letter "A", mentioned and referred to in the Affidavit of Service of David Robert Holland sworn on the _____ of June 2023.

DEPONENT: .....................

BEFORE ME: .....................

### Summons And Notice Of Pretrial Conference in an Adversary Proceeding

**Complaint for Avoidance and Recovery of Transfers and Obligations Pursuant to 11 U.S.C. §§ 105, 544, 547, 548, and 550 and DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, and for Disallowance of Claims Pursuant to 11 U.S.C. § 502**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES, *et al.*, | |
| Defendants. | |

## SUMMONS AND NOTICE OF PRETRIAL
## CONFERENCE IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within thirty (30) days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within thirty-five (35) days.

Address of Clerk:

> United States Bankruptcy Court for the District of Delaware
> 824 Market Street, 3rd Floor
> Wilmington, Delaware 19801

At the same time, you must also serve a copy of the motion or answer upon the plaintiffs' attorneys.

Name and Address of Plaintiff's attorneys:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (*pro hac vice* pending)
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted pro hac vice)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
      dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      dunnec@sullcrom.com
      kranzleya@sullcrom.com

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place.

| | | |
|---|---|---|
| **Address:** | **United States Bankruptcy Court**<br>**824 Market Street**<br>**Wilmington, DE 19801** | **Room:**<br>**5th Floor, Courtroom No. 5**<br><br>**Date and Time:**<br>**June 28, 2023 at 1:00 p.m. (ET)** |

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

**United States Bankruptcy
   Court for the District
      of Delaware**

Dated: May 18, 2023                      /s/ Una O'Boyle
                                      *Clerk of the Bankruptcy Court*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES, *et al.*, | |
| Defendants. | |

## NOTICE OF DISPUTE RESOLUTION ALTERNATIVES

As party to litigation you have a right to adjudication of your matter by a judge of this Court. Settlement of your case, however, can often produce a resolution more quickly than appearing before a judge. Additionally, settlement can also reduce the expense, inconvenience, and uncertainty of litigation.

There are dispute resolution structures, other than litigation, that can lead to resolving your case. Alternative Dispute Resolution (ADR) is offered through a program established by this Court. The use of these services are often productive and effective in settling disputes. **The purpose of this Notice is to furnish general information about ADR.**

The ADR structures used most often are mediation, early-neutral evaluation, mediation/arbitration and arbitration. In each, the process is presided over by an impartial third party, called the "neutral."

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

1

In mediation and early neutral evaluation, an experienced neutral has no power to impose a settlement on you. It fosters an environment where offers can be discussed and exchanged. In the process, together, you and your attorney will be involved in weighing settlement proposals and crafting a settlement. The Court in its Local Rules requires all ADR processes, except threat of a potential criminal action, to be confidential. You will not be prejudiced in the event a settlement is not achieved because the presiding judge will not be advised of the content of any of your settlement discussions.

Mediation/arbitration is a process where you submit to mediation and, if it is unsuccessful, agree that the mediator will act as an arbitrator. At that point, the process is the same as arbitration. You, through your counsel, will present evidence to a neutral, who issues a decision. If the matter in controversy arises in the main bankruptcy case or arises from a subsidiary issue in an adversary proceeding, the arbitration, though voluntary, may be binding. If a party requests *de novo* review of an arbitration award, the judge will rehear the case.

**Your attorney can provide you with additional information about ADR and advise you as to whether and when ADR might be helpful in your case.**

Dated: May 18, 2023                         */s/ Una O'Boyle*_____
                                            Clerk of Court

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>　　Debtors.<br><br>———————————————<br><br>ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC.,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　- against -<br><br>MICHAEL GILES, *et al.*,[2]<br><br>　　　　　　　　Defendants. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered)<br><br><br><br><br><br><br><br>Adv. Pro. No. 23-_____(JTD) |

## COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 547, 548, AND 550 AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, AND FOR <u>DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502</u>

Plaintiffs Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc.

("WRS"), and West Realm Shires Services, Inc. ("WRSS") (together, the "Plaintiffs"), through

their undersigned counsel, for their Complaint against Michael Giles and certain former holders

---

[1]　　The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]　　Due to the large number of Defendants (defined below) in this adversary proceeding, a complete list is attached hereto as **Exhibit A.**

of equity of Embed Financial Technologies Inc. ("Embed")[3] (together, the "Defendants"), state
as follows:

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 547, 548,

and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),

and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6,

§§ 1304(a)(1)-(2) and 1305, to avoid and recover from Defendants, or from any other person or

entity for whose benefit the transfers were made or obligations incurred, all transfers of property

of Plaintiffs and all obligations of Plaintiffs to Defendants made on or around September 30,

2022, prior to commencement of the above-captioned bankruptcy cases (collectively, the

"Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned debtors and debtors-

in-possession (collectively, the "Debtors" and each a "Debtor").

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the

Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court")

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been

appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to

operate their businesses and manage their properties as debtors-in-possession pursuant to

Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11

---

[3]      Defendants include former holders of Embed (a) shares, (b) options, and (c) simple agreements for future
equity ("SAFEs").  Although SAFEs are entitlements to receive equity upon the occurrence of a future
conversion event, Plaintiffs are categorizing SAFE holders as equity holders for purposes of this Complaint
for ease of reference.  Two separate adversary proceedings are being filed contemporaneously against the
following additional former Embed equity holders:  (i) Rocket Internet Capital Partners II SCS, Rocket
Internet Capital Partners (Euro) II SCS, GFC Global Founders Capital GMBH, GFC Global Founders
Capital GMBH & Co. Beteiligungs KG Nr. 1, William Hockey Living Trust, and 9Yards Capital
Investments II LP, and (ii) Samuel Bankman-Fried, Zixiao Wang, and Nishad Singh.

Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128].

Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to

prosecute, this adversary proceeding.

3.      Prior to the filing of the Chapter 11 Cases, Alameda was a cryptocurrency trading

firm owned by Samuel Bankman-Fried and Zixiao "Gary" Wang.  Caroline Ellison was initially

co-CEO and later the sole CEO of Alameda.  WRS is a Delaware holding company owned by

Samuel Bankman-Fried, Nishad Singh, and Gary Wang, with a number of subsidiaries, including

WRSS, which did business as FTX.US, the cryptocurrency exchange founded by Bankman-

Fried, Singh, and Wang to offer cryptocurrency trading services to U.S. customers.  Embed is a

stock clearing firm and FINRA licensed broker-dealer founded by Michael Giles.

4.      On or about March 15, 2022, WRS began discussions to acquire Embed,

ostensibly in order to provide FTX.US customers with the ability to trade stocks, in addition to

cryptocurrency, on the FTX.US exchange platform.  The contemplated product was to be called

FTX Stocks.

5.      Through a series of self-dealing transactions orchestrated by Bankman-Fried,

Ellison, Singh, and Wang (hereinafter, the "FTX Insiders"), WRS paid Defendants

$236,764,105.34 of misappropriated FTX Group[4] funds to acquire Defendants' equity interests

in Embed on or around September 30, 2022—mere weeks before the Petition Date.  WRS also

agreed, in "Retention Incentive Award Agreements" effective as of September 30, 2022, to pay

---

[4]      The FTX Group is comprised of four silos.  These silos include:  (a) a group composed of Plaintiffs and Debtors WRS, WRSS, and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda, Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

certain Defendants who were Embed employees retention bonuses totaling $63,550,000 over the course of two years, although Defendant Giles was paid his $55,000,000 retention bonus in full on the September 30, 2022 closing date of the transaction.

6.     Plaintiffs have determined, based on their analysis and investigation to date, that all of the aforementioned transfers and obligations, which are detailed in **Exhibit A**, are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code.

7.     Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to Plaintiffs all property that they received in transfers that are determined by the Court to be avoidable and/or recoverable.

8.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiffs intend to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Defendants or any other transferee and accordingly reserve the right to amend this Complaint.

## THE PARTIES

9.     Plaintiff Alameda is a British Virgin Islands company limited by shares.  It is a wholly-owned subsidiary of Debtor Alameda Research LLC, a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Wang.

10.     Plaintiff WRS is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.

11.     Plaintiff WRSS, doing business as FTX.US, is a Delaware corporation and a wholly-owned subsidiary of Plaintiff WRS.

12.     Defendant Michael Giles is the founder of Embed and served as CEO of the company until February 2023.

13.     The remaining Defendants are certain former holders of Embed equity and former employees of Embed.  A complete list of the Defendants and the transfers and obligations relevant to each of them is set forth in **Exhibit A**.

**OTHER RELEVANT PERSONS**

14.     Samuel Bankman-Fried is a co-founder of Plaintiff Alameda and was its sole director until September 6, 2022.  He is also a co-founder of Plaintiffs WRS and WRSS, and was previously the CEO and sole director of Plaintiff WRS.

15.     Caroline Ellison was the co-CEO of Plaintiff Alameda from August 2021 until September 2022, when she was named the sole CEO and director.

16.     Nishad Singh is a co-founder of Plaintiffs WRS and WRSS.

17.     Gary Wang is a co-founder of Plaintiffs Alameda, WRS, and WRSS.

**JURISDICTION AND VENUE**

18.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

19.     This adversary proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

20.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

-5-

21.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

22.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

23.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 544, 547, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

24.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

I.     **The FTX Insiders Defrauded Investors, Creditors, and Customers To Make Self-Dealing Transfers and Acquire Embed.**

25.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses. As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022. Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day*

*Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

26.     The FTX Insiders, among others, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, private homes and jets, political and "charitable" contributions, and various investments.  The acquisition of Embed was one such transaction.

27.     All of the funding for the Embed acquisition came from Alameda, which, at the FTX Insiders' direction, had surreptitiously and unlawfully diverted and transferred assets belonging to FTX.com, the principal international cryptocurrency exchange operated by the FTX Group, to spend on the FTX Insiders' pet projects.  By causing Alameda to take money belonging to FTX.com and spend it on the FTX Insiders' pet projects, the FTX Insiders defrauded FTX.com's creditors, including customers and investors.

28.     The FTX Insiders purportedly pursued the Embed acquisition because they believed it would help expand FTX.US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders.  In pursuing the Embed acquisition, the FTX Insiders prioritized speed above all else.  They performed almost no due diligence on Embed and accepted the significant terms proposed by Giles, Embed's founder, CEO, and sole representative during the negotiation, who personally received approximately $157 million in connection with the acquisition.  As a consequence, WRS paid far more than fair or reasonably equivalent value for Embed, and awarded Giles an extravagant and unwarranted retention bonus as an incentive to complete the acquisition quickly.

29.     All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the acquisition of Embed.  On December

19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy

to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit

securities fraud; Ellison also pleaded guilty to conspiracy to commit money laundering. *See*

Min. Entry, Dec. 19, 2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On

February 28, 2023, Singh pleaded guilty to the same felonies as Ellison and to conspiracy to

make unlawful political contributions and defraud the Federal Election Commission. *See* Min.

Entry, Feb. 28, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

      30.    In connection with his plea, Wang admitted that in 2019 he made "certain changes

to [the FTX.com] code" to give Alameda "special privileges on the FTX platform," including to

allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda

maintained negative balances in its own holdings of fiat (*i.e.*, government issued) currencies and

cryptocurrencies.  Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF

No. 21.  Using these "special privileges," the FTX Insiders frequently caused Alameda to

misappropriate funds from the FTX exchanges for their own benefit, including to make

acquisitions like Embed.

      31.    Bankman-Fried has repeatedly, and publicly, stated that Alameda operated as "a

wholly separate entity" from FTX.com. *See* Annie Massa et al., *Sam Bankman-Fried and*

*Alameda CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It Collapsed.*

*Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022, 5:58 AM),

https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-

flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison was quoted as saying that

"[w]e keep them [FTX and Alameda] quite separate in terms of day-to-day operations." *Id.*  In

reality, however, the FTX Insiders routinely, and secretly, used Alameda to loot "several billion

dollars" from FTX.com using the "special privileges," thereby defrauding FTX.com's creditors, including customers and investors. Plea Tr. 28:23-29:2, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102; Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

32.     Bankman-Fried also conspired with Ellison and others to divert funds to Alameda that were intended to be deposited at FTX.com before they reached the exchange, so that the FTX Insiders could use those funds to enrich themselves. Beginning in 2019 and continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank accounts controlled by Alameda, without disclosing to the banks that held those accounts or to FTX.com customers the nature of the arrangement between FTX.com and Alameda. *See* Superseding Indictment ¶ 15, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

33.     Bankman-Fried exposed this aspect of the fraud at FTX in the days leading up to the Petition Date, when he supplied potential investors with a purported Alameda balance sheet. *Id.* ¶ 56. This document included a liability of $8 billion in a "Hidden, poorly internally labled [sic] 'fiat@' account." *Id.* However, Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted into Alameda's bank accounts that had not been maintained for the benefit of customers or repaid to FTX[.]" *Id.* ¶ 57. These funds were used by the FTX Insiders "to make investments in the name of Bankman-Fried and his associates, rather than in the name of Alameda." *Id.* ¶ 26.

34.     By approximately July 2022, after the definitive agreement for the Embed acquisition had been signed, Ellison had conspired with Bankman-Fried to "provide materially misleading financial statements to Alameda's lenders," such as the above-referenced balance sheet, "that concealed the extent of Alameda's borrowing and the billions of dollars in loans that

Alameda had made to FTX executives and to related parties." Plea Tr. 28:9-16, *United States* v.
*Ellison*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 19.  Ellison also agreed with Bankman-Fried
and others "not to publicly disclose the true nature of the relationship between Alameda and
FTX, including Alameda's credit arrangement." *Id.* at 28:19-21.

35.     The FTX Insiders were aware at all relevant times of the "special privileges on the
FTX platform" that allowed Alameda to "borrow" (*i.e.*, loot) billions of dollars from FTX.com in
order to, *inter alia*, finance "loans" from Alameda to the FTX Insiders.  Ellison admitted that she
was aware of this arrangement from 2019 through 2022, which she described as "permitt[ing]
Alameda access to an unlimited line of credit without being required to post collateral . . . pay
interest . . . or being subject to margin calls or FTX.com's liquidation protocols." *Id.* at 27:11-
15.

36.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that
she "had an increasing dread of this day that was weighing on me for a long time, and now that
it's actually happening it just feels great to get it over with[,] one way or another." *See*
Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022),
ECF No. 115.

## II.     Minimal Due Diligence and Inflated Retention Bonuses Led to Severe Overpayment to Defendants.

37.     WRS began negotiations with Giles to acquire Embed at the end of March 2022,
when Giles visited the FTX headquarters in The Bahamas.  While there, Giles wrote to a senior
Embed employee that the President of FTX.US had told him that they were empowered to write
a check "tomorrow" if they agreed to deal terms.  Giles added:  "Obviously joking[,] but I think
they would move fast[.]"

38.     By April 15, 2022, WRS and Embed had signed the "Memorandum of Terms,"
which ascribed a $220 million enterprise value to Embed and provided for $75 million in
retention bonus payments to Embed employees, including $55 million to Giles.  The "Agreement
and Plan of Merger" containing substantially the same terms was signed as of June 10, 2022.
When the transaction closed on September 30, 2022, WRS paid Defendants $236,764,105.34 of
misappropriated FTX Group funds to acquire their interests in Embed, which included shares,
options, and SAFEs (as set forth in **Exhibit A**).  Just six weeks later, Alameda, WRS, and WRSS
filed for Chapter 11 after it came to light that the FTX Insiders were engaged in a scheme to
defraud creditors, including customers and investors.  Although the acquisition process spanned
approximately six months, from April 2022 through September 2022, most of that time was
spent securing regulatory approvals for the acquisition.  The essential terms of the transaction
were negotiated and agreed upon in only two weeks.

39.     The $220 million enterprise value of Embed that WRS agreed to for purposes of
the acquisition was proposed by Giles based on little more than his representation that it would
"enable [him] to get a deal over the line with investors."  WRS did not retain an investment bank
or any other outside advisor to conduct a valuation analysis of Embed, nor did it require Giles to
make detailed representations about Embed's value as a going concern or as a future subsidiary
of WRS.  WRS and Embed did not set up a "data room" for information sharing until weeks after
the term sheet had been signed and, even then, WRS did not perform any meaningful due
diligence concerning Embed's purported value or its crucial technology.

40.     When Giles was asked on April 19, 2022 by another senior Embed employee
about the expected diligence process with WRS, Giles responded, "I don't think they are too
worried."  According to Giles, WRS representatives had told him that they did not need to

perform due diligence because a WRS subsidiary was already an Embed customer, although that

relationship was barely a few months old and had not been fully implemented. On that same

day, Defendant Laurence Beal, Embed's Chief Technology Officer, asked another senior

employee whether she had "an idea of what [WRS] want to do for due diligence." After the

other employee replied, "No, not yet," Beal said that WRS "didn't do a ton of dd [due

diligence]" before its subsidiary became a customer of Embed. He then added: "I get a sense

that they are [cowboy emoji] over there[.]"

41.    The decision by WRS to forgo due diligence was extremely consequential. On

May 9, 2022, a senior Embed employee wrote to Defendant Brandon Mann, a software engineer

at Embed, that she was "so concerned with how many bugs" the President of FTX.US had

noticed in Embed's platform. On May 10, 2022, Giles wrote to the same senior employee that

"what will blow up the deal [with WRS] will be death by a thousand cuts issues with tech."

According to Giles, Embed's platform was "experiencing multiple issues per day." That

employee replied to Giles that "deep down, it's why I want to accelerate the signing of the DA

[definitive agreement with WRS] . . . more issues are inevitable." Giles replied that "there

shouldn't be this many issues."

42.    On June 27, 2022, just a few weeks after WRS and Embed signed the definitive

acquisition agreement, Beal and another senior employee exchanged messages regarding the

Embed platform's inability to handle approximately 600 new user accounts as part of the gradual

release of FTX Stocks, even though the "launch plan" called for Embed to handle 10,000 new

accounts by that time.

43.    Beal acknowledged that WRS would not "pony up money to buy [Embed] if they

thought we couldn't handle 1K accounts" and asked the other employee how many accounts

Embed could handle given the FTX Stocks "launch plan" target of 10,000 new accounts.  That

employee replied to Beal that the platform "can't really take ANY accounts . . . I get MG

[Michael Giles] has to basically lie to get the deals he gets, but there's fallout, and we aren't

managing it[.]"  Beal characterized the other employee's statement about Giles as "[f]air."  A

faulty technology platform that could not handle "any" new accounts, let alone the 10,000 that

WRS was anticipating, was not worth a fraction of what WRS got snookered into paying for

Embed.

44.     An unaudited statement of financial condition for Embed as of March 31, 2022,

which was included in the closing documents for the acquisition, reflects that Embed had total

assets of approximately $37 million and a mere $25,000 in net revenue.  Embed Clearing LLC, a

wholly-owned subsidiary of Embed, had never reported any revenue at all.  Although Giles

asserted that Embed was worth $220 million at that time, he revealed to a reporter at the *Wall

Street Journal* on May 19, 2022 that a WRS subsidiary was Embed's "first big client."  As a

multiple of revenue, the purchase price that WRS paid for Embed was astronomical, particularly

in view of Embed's minuscule customer base and the serious bugs plaguing its software platform

at the time of the acquisition.

45.     To incentivize speedy negotiations, WRS not only agreed to pay an inflated price

of $220 million for Embed, it also agreed in both the April 15, 2022 Memorandum of Terms and

the June 10, 2022 Agreement and Plan of Merger to pay Giles a retention bonus of $55 million—

one-quarter of Embed's purported value.  The stated purpose of that $55 million payment was to

retain Giles as CEO through the acquisition's closing, though he was not obligated to stay in his

role beyond that date.  The result was that, between the signing of the acquisition agreement on

June 10, 2022 and the closing of the acquisition on September 30, 2022, Giles was being paid

approximately $490,000 *per day*, assuming he worked seven days every week.  By contrast,

during 2022, Giles' salary as Embed's CEO was $12,500 *per month*.  And the $55 million

retention bonus awarded to Giles was on top of the approximately $103 million that Giles

received at closing as Embed's largest shareholder.

46.     This unusual arrangement did not go unnoticed by Embed's other shareholders; a

representative of Embed's second-largest shareholder, Defendant Propel Venture Partners, told

Giles directly that he "ha[d] never seen so much of a deal this size go to a founder . . . just

unusual proportions."  Another representative of Propel Venture Partners indicated that he hoped

Giles was getting paid in cash in light of turmoil in the cryptocurrency markets, stating:

"Hopefully[] there's limited risk to cash exchanging hands given what's going on in the

crypto/broader markets."

47.     Although numerous Embed employees were awarded retention payment

agreements, Giles was the only one who was paid his full retention bonus on the September 30,

2022 closing date.  The other employees, who were not involved in the negotiations, were

obligated to remain at Embed for two years after closing in order to receive their full bonuses.[5]

Giles knew that the deal he cut for himself was too good to be true, and he was afraid that the

other Defendants would notice.  On June 23, 2022, Giles asked a senior Embed employee

whether one of the documents provided to all Embed shareholders related to so-called "golden

parachute" payments "show[s] how much I am getting [under the retention payment

agreement.]"  She confirmed to Giles that the document reflected a $55 million bonus, due to

---

[5]     The Retention Incentive Award Agreements provide that the bonuses are to be paid in five installments
beginning on September 30, 2023.

-14-

him at closing, and then asked whether that was "what [he] was expecting."  Giles replied that it

was, but that "hopefully people don't read it in too much detail[.]"

48.     On June 24, 2022, another senior employee at Embed wrote to his supervisor that

he was concerned by the fact that the retention payment agreement stated that each Embed

employee had been "encouraged" to seek their own legal counsel but that Giles had told them

there was no need to consult independent counsel.  He wrote:  "Seemingly the only reason I can

come up with to [explain Giles] tell[ing] us to not get legal counsel is if there is some fast track

timeline he has that he's trying to rush through."  That same day, the employee's supervisor

asked Giles when employees "need to sign their docs."  Giles replied:  "[A]s soon as possible[.]"

## III.     The FTX Insiders Created Misleading Records To Obscure Alameda's Role in Funding the Embed Acquisition.

49.     The FTX Insiders acquired the funds to purchase Embed in a self-dealing, opaque

manner designed to obscure the malfeasance that ultimately led Plaintiffs to file a Chapter 11

Case.  Specifically, the FTX Insiders created false and misleading records suggesting that the

funding for the Embed acquisition by WRS had come personally from Bankman-Fried, Singh,

and Wang, even though the funds used to acquire Embed had been transferred from an Alameda

bank account to a WRSS bank account and ultimately to a WRS bank account.  The FTX

Insiders did this to justify transferring to themselves WRS shares, which they expected to

appreciate in value as a result of the Embed acquisition.

50.     On July 25, 2022, Ellison, as CEO of Alameda, signed promissory notes for $200

million in "loans" to Bankman-Fried (Alameda's sole director through September 6, 2022),

Singh, and Wang.  Although these notes purported to memorialize massive "loans" to each

individual, they did not include any repayment schedule or other detailed terms regarding

repayment.  In fact, each document is only slightly more than a page in length.  The notes simply

required repayment on the five-year anniversary of the loans, at an annual "simple interest rate of the mid-term AFR." To date, none of the FTX Insiders has repaid so much as $1 on these "loans." The one-sided, scant terms and lack of any accountability or repayment schedule demonstrate that these promissory notes were not intended to create meaningful or enforceable obligations. They were instead intended to paper over (however thinly) the FTX Insiders' theft of Plaintiffs' funds.

51.    One day later, on July 26, 2022, the FTX Insiders engaged in a series of transactions on the FTX.US exchange to create the appearance that Alameda had transferred a total of $200 million to Bankman-Fried, Singh, and Wang, who then transferred that same amount to WRS. In reality, these on-exchange transactions did not involve transfers of any fiat or cryptocurrency. Instead, they were simply designed to create the illusion that amounts corresponding to the $200 million in promissory notes had been transferred to WRS by Bankman-Fried, Singh, and Wang.

52.    In fact, on July 26, 2022, $200 million was transferred from a bank account controlled by Alameda at Signature Bank to a bank account controlled by WRSS at Signature Bank. That WRSS account, in turn, transferred $200 million to a bank account controlled by WRS at Signature Bank. This same flow of funds was repeated on September 29, 2022, this time involving a $50 million transfer made pursuant to a second round of "loans," with accompanying promissory notes, from Alameda to Bankman-Fried, Singh, and Wang. For unknown reasons, the on-exchange transfers related to the $200 million transfer involving Bankman-Fried's, Singh's, and Wang's accounts did not repeat for this $50 million transfer.

53.    All of the funds were transferred to Defendants and others to complete the acquisition. But no money used by WRS to acquire Embed originated with Bankman-Fried,

Singh, or Wang, notwithstanding the promissory notes purporting to reflect "loans" from
Alameda to those individuals and the on-exchange transfers to their personal accounts.  All of the
money came from Alameda, which by this time had been used by the FTX Insiders to
misappropriate billions of dollars from FTX.com.

**Misleading FTX.US Exchange "Transfers"**



**Actual Flow of Funds**

54.     Despite the fact that the funds used by WRS to acquire Embed came from
Alameda (via WRSS), Bankman-Fried, Singh, and Wang personally received SAFEs from WRS,
purportedly in consideration for the transfers, on both July 25, 2022 and September 30, 2022.
The SAFEs provided that each of Bankman-Fried, Singh, and Wang would "automatically"
receive an amount of WRS common stock in accordance with the size of their supposed capital
contributions to WRS no later than December 31, 2022, or upon an "earlier . . . Dissolution
Event[.]"  When WRS filed its Chapter 11 Case on November 14, 2022, the SAFEs
automatically converted into WRS common stock.  On information and belief, Giles knew that
the Embed acquisition was funded with cash that came from outside of WRS.

55.     Bankman-Fried, Singh, and Wang did not intend or have the ability to repay these
funds to Alameda, and Alameda did not intend or have the ability to repay the funds that it had

taken from FTX.com at the FTX Insiders' direction using the "special privileges" the FTX Insiders had created for Alameda.  In addition, it appears that neither Ellison nor anyone else at Alameda—other than Bankman-Fried acting as the sole (and interested) director of Alameda— ever considered whether the "loans" benefited Alameda as a corporate entity distinct from WRS. Any gains generated by the Embed acquisition above the amount of the "loans" (assuming they would ever be repaid) would have accrued directly to Bankman-Fried, Singh, and Wang via their equity stakes in WRS.

IV.    **A Mere Four Months After WRS's $220 Million Acquisition of Embed, No Bidder Is Willing To Pay More Than $1 Million for the Company.**

56.    On January 12, 2023, as part of the Chapter 11 Cases, the Court authorized certain procedures proposed by the Debtors with respect to running a sale process for Embed in an attempt to recover assets for the Debtors' estates.  [D.I. 487].

57.    Less than four months after the closing of the Embed acquisition, the Debtors received twelve non-binding Initial Indications of Interest ("IOIs") to purchase the company, submitted after limited financial and commercial due diligence, with an average value of approximately $35 million—far less than the $220 million that WRS had paid for Embed only a few months earlier.

58.    The highest IOI was valued at $78 million, only about one-third of the price that WRS had paid for Embed.  The lowest IOI was valued at $10 million, less than one-twentieth of the price that WRS had paid.

59.    Giles himself submitted an IOI to purchase Embed valued at $11 million, but his final bid for Embed, submitted to the Debtors on March 23, 2023, was for only $1 million and was subject to potential reductions at closing.

-18-

60.     Of the eleven other potential bidders, only one submitted a final bid after conducting more comprehensive due diligence, for a mere $250,000, and only for Embed's assets; the Debtors would have been left responsible for all of Embed's liabilities.

61.     The potential bidders who did not submit final bids cited the fact that Embed's platform and technology had limited scope and features, and that it would take several years and significant resources to build Embed into an enterprise-grade company.

62.     The result of the bidding process—including Giles' own bid of $1 million, or 0.45% of the purchase price that WRS had paid just a few months before—leaves no doubt that the $220 million paid by WRS to acquire Embed was wildly inflated relative to the company's fair value, which Giles well knew.  The bidders had figured out what the FTX Group and FTX Insiders did not bother to assess prior to the Embed acquisition, namely, that Embed's vaunted software platform was essentially worthless.

## V.     The Transfers Were Made When Plaintiffs Were Insolvent, and the FTX Insiders Knew It.

63.     At the time of the Embed acquisition, each of the Plaintiffs:  (1) was insolvent;  (2) became insolvent as a result of the transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

64.     On November 8 and November 9, 2022, Bankman-Fried and Wang attempted to produce a reconciliation of WRSS's assets and liabilities, the vast majority of which were customer deposits, at the urging of other FTX Group senior personnel.  Their reconciliation showed a shortfall of WRSS's assets below its liabilities of approximately $46 million.  The

-19-

Debtors' preliminary analysis indicates that this shortfall may have been as much as $128 million

as of the Petition Date. [D.I. 792-1].

65.     The other FTX Group entities involved in the acquisition of Embed were also

insolvent at all relevant times. As Singh admitted in his guilty plea, by "early September 2022,"

the same month the Embed acquisition closed, Alameda "could not repay what it owed." *See*

Plea Tr. 29:2-3, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102.

66.     Ellison made similar admissions in her guilty plea, stating that: (a) from 2019

through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from

July 2022 through at least October 2022, she agreed with Bankman-Fried and others to provide

materially misleading financial statements to Alameda's lenders; and (c) she had understood that

Bankman-Fried and others had made investments with funds from FTX.com in the name of

Alameda in order to conceal the true source of those funds.

67.     On December 13, 2022, Bankman-Fried was charged in the Southern District of

New York in an eight-count indictment with federal offenses during the period from 2019

through November 2022, arising out of, among other things, the FTX Insiders' use of Alameda

to misappropriate FTX.com funds and Bankman-Fried's misrepresentations to lenders and

investors about the financial condition of Alameda, FTX.com, and FTX.US. The United States

Attorney for the Southern District of New York filed a superseding indictment on March 28,

2023 that included an additional count for conspiracy to violate the anti-bribery provisions of the

Foreign Corrupt Practices Act.

VI.   **The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent To Hinder, Delay, or Defraud Creditors.**

68.    As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the transfers made and obligations incurred in connection with the acquisition of Embed, including that:

i.    The transfers were part of a scheme to enrich and otherwise benefit the FTX Insiders;

ii.    Numerous material facts relating to the transfers were concealed;

iii.    The FTX Insiders removed or concealed Plaintiffs' assets;

iv.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

v.    Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made; and

vi.    The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

## CAUSES OF ACTION

### COUNT ONE
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(A)

69.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 68 as if fully set forth here.

70.    Plaintiffs made the transfers and incurred the obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

71.    Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud present or future creditors.

-21-

72.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(B)**

73.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 72 as if fully set forth here.

74.     Plaintiffs made the transfers and incurred the obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

75.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers and obligations.

76.     Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

77.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT THREE
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)

78.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

79.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

80.     Plaintiffs made the transfers and incurred the obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

81.     Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims.

82.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FOUR
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
### DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)

83.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 82 as if fully set forth here.

84.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

85.     Plaintiffs made the transfers and obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

86.     Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations.

87.     Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

88.     Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

89.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FIVE**
**PREFERENTIAL TRANSFER PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST DEFENDANT MICHAEL GILES)**

90.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 89 as if fully set forth here.

91.     Plaintiffs transferred $55 million to Giles as a retention bonus on or around September 30, 2022.  This transfer was a transfer of property of Plaintiffs.

92.     This transfer was made to benefit Giles.

93.     With respect to this transfer, Giles was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternately, Giles received such transfer for the benefit of a creditor or creditors of Plaintiffs.

94.     This transfer to Giles was made on account of an antecedent debt—namely, Plaintiffs' obligation to pay Giles a $55 million retention bonus set forth in the final Memorandum of Terms dated as of April 15, 2022 and the Agreement and Plan of Merger dated as of June 10, 2022.

95.     This transfer was made within ninety (90) days of the Petition Date.

96.     This transfer was made while Plaintiffs were insolvent.

97.     This transfer enabled Giles to receive more than he would have received if: (i) Plaintiffs' Chapter 11 Case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) the amount paid to Giles on account of the debt were determined by the Bankruptcy Code.

98.     Giles has not returned any portion of the $55 million transferred to him as a retention bonus.

99.     Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence in the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe that this transfer is avoidable.

100.    Accordingly, this transfer should be avoided as a preference pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Giles the full amount of the transfer, plus interest from the transfer date, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT SIX
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)

101.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100 as if fully set forth here.

102.    As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 544, 547, and 548 of the Bankruptcy Code.

103.    Because Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

-26-

## COUNT SEVEN
### DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)

104.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 103 as if fully set forth here.

105.    As alleged above, Defendants are transferees of transfers and recipients of obligations avoidable under Sections 544, 547, and 548 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

106.    By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent that the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

107.   Enter an order that the transfers and obligations addressed herein are avoidable fraudulent transfers and obligations, and/or preferences, under 11 U.S.C. §§ 544, 547, and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

108.   Award Plaintiffs under 11 U.S.C. § 550 no less than $236,764,105.34 (plus the value of any additional avoidable transfers that Plaintiffs learn, through formal discovery or otherwise, were made to Defendants);

109.   Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants relinquish to Plaintiffs the amount ordered as an award for avoidable transfers;

110.   Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

111.   Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: May 17, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (*pro hac vice* pending)
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
      dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      dunnec@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

**EXHIBIT A**

**Transfers and Obligations to Defendants in Connection with the Acquisition of Embed**

| Defendant | Type of Interest | Amount of Transfer or Obligation |
|---|---|---|
| Harland Group LLC[1] | Shares | $101,130,330.50 |
| Propel Venture Partners, LLC Propel Venture Partners US Fund I, L.P. | Shares | $17,516,885.68 |
| LGF II, L.P. | Shares | $12,000,752.03 |
| Buckley Ventures GP, LLC Buckley Ventures, LP | Shares | $12,000,752.03 |
| Laurence Beal | Shares | $10,113,033.05 |
| Y Combinator ES20, LLC | Shares | $9,161,214.61 |
| Acrew Capital MGP, LLC Acrew Capital Fund, L.P. | Shares | $4,420,123.58 |
| Homebrew Ventures III, LP | Shares | $2,400,166.59 |
| Propel Venture Partners, LLC Propel Venture Partners US Fund I LP | Shares | $2,400,166.59 |
| SWS Holding Company, LLC | Shares | $2,400,166.59 |
| Treasury Fund I, LP | Shares | $2,379,556.22 |
| Harland Group LLC | Shares | $1,475,329.71 |
| SWS Holding Company, LLC | Shares | $1,347,460.52 |
| Bain Capital Venture Fund 2019 LP | Shares | $1,253,914.97 |
| Fund I, a series of 20VC, LP | Shares | $1,200,093.41 |
| Soma Capital Fund III Partners LLC SOMA Capital Fund, III, LP | Shares | $960,070.68 |
| Kerr Investment Holdings Pty Ltd atf The Kerr Family Trust | Shares | $951,818.44 |
| The 2016 Karkal Family Trust | Shares | $951,818.44 |
| SWS Holding Company, LLC | Shares | $951,818.44 |
| YCC20, L.P. | Shares | $943,222.37 |
| Bain Capital Venture Fund 2019, L.P. | Shares | $828,783.28 |
| Yaselleraph Finance Pty Ltd atf Yaselleraph Finance Trust | Shares | $761,470.94 |
| S20, a series of Chris Golda Investments, LP | Shares | $720,047.95 |
| Launchpad Capital Fund I LP | Shares | $683,560.13 |
| Buckley Ventures GP, LLC Buckley Ventures, LP | Shares | $673,730.26 |
| LGF II, L.P. | Shares | $673,730.26 |
| Motivate Ventures QP Fund I, LP | Shares | $596,122.85 |

---

[1]    Harland Group LLC is 100% owned by Giles.

| Defendant | Type of Interest | Amount of Transfer or Obligation |
|---|---|---|
| Acrew Capital MGP, LLC Acrew Capital Fund, L.P. | Shares | $556,985.41 |
| Liquid 2 Ventures Fund II, L.P. | Shares | $480,045.45 |
| Correlation Ventures II, L.P. | Shares | $480,045.45 |
| Adapt VC LLC | Shares | $480,045.45 |
| AAVCF3 LP | Shares | $480,045.45 |
| Basecamp Fund 201 via Alumni Ventures Group Embedded Trust | Shares | $480,045.45 |
| The Gardner 2008 Living Trust | Shares | $480,045.45 |
| Cathexis Subsidiaries GP, LLC, Cathexis Ventures LP | Shares | $480,045.45 |
| Launchpad Capital Fund I LP | Shares | $480,045.45 |
| Craig Shindledecker | Shares | $434,860.42 |
| Operator Partners, LLC | Shares | $432,028.77 |
| Acrew Capital MGP, LLC, Acrew Capital Fund (A), L.P. | Shares | $380,189.36 |
| Kerr Investment Holdings Pty Ltd a/t/f The Kerr Family Trust | Shares | $359,619.46 |
| Motivate Ventures Motivate Ventures Fund I, LP | Shares | $355,695.60 |
| Homebrew Ventures III, LP | Shares | $328,471.31 |
| Adam Boryenace | Shares | $303,390.99 |
| Motivate Ventures Motivate Ventures QP Fund I, LP | Shares | $300,660.47 |
| Kerr Investment Holdings Pty Ltd a/t/f The Kerr Family Trust | Shares | $269,492.10 |
| The 2016 Karkal Family Trust | Shares | $269,492.10 |
| Stuart Sopp | Shares | $269,492.10 |
| VentureSouq Capital SPC o/b/o VSQ SP 59 (YCS20) | Shares | $240,022.73 |
| Jonathan Weiner | Shares | $240,022.73 |
| James Nichols | Shares | $237,959.67 |
| Peter T. Lawler Living Trust | Shares | $237,959.67 |
| Carol H. Duggan Revocable Living Trust | Shares | $237,959.67 |
| KV5 Pty Ltd a/t/f KV5 Trust | Shares | $190,367.73 |
| Michael Ferrari | Shares | $190,367.73 |
| Motivate Ventures Motivate Ventures Fund I, LP | Shares | $179,405.21 |
| Stanton Camp | Shares | $141,582.46 |
| Mike McGee | Shares | $131,469.43 |
| BCIP Venture Associates II, L.P. | Shares | $129,467.05 |
| Aaron Frank | Shares | $120,021.48 |

| Defendant | Type of Interest | Amount of Transfer or Obligation |
|---|---|---|
| Benjamin Londergan | Shares | $120,021.48 |
| Jonathan Christodoro | Shares | $120,021.48 |
| Z Perret Trust | Shares | $120,021.48 |
| Akhil Paul | Shares | $120,021.48 |
| Fairchild Fund III, LLC | Shares | $120,021.48 |
| BCIP Venture Associates II, L.P. | Shares | $85,576.49 |
| BCV 2019-MD Primary, L.P. | Shares | $48,218.94 |
| Kamran Ansari | Shares | $48,016.68 |
| Acrew Capital MGP, LLC Acrew Capital Fund (A), L.P. | Shares | $47,915.55 |
| BCV 2019-MD Primary, L.P. | Shares | $31,876.28 |
| BCIP Venture Associates II-B, L.P. | Shares | $8,474.72 |
| BCIP Venture Associates II-B, L.P. | Shares | $5,602.62 |
| **Total Transferred to Defendants for Shares** | | **$202,149,276.05** |
| | | |
| Monique Saugstad | Options | $268,950.74 |
| Christopher Young | Options | $258,986.06 |
| Derek Clark | Options | $239,075.83 |
| Adam Boryenace | Options | $121,697.97 |
| Craig Shindledecker | Options | $121,697.97 |
| Joshua Allen Slate | Options | $94,616.65 |
| Justin Lovero | Options | $84,253.82 |
| Joshua Slate | Options | $60,848.98 |
| Mike McGee | Options | $60,848.98 |
| Stanton Camp | Options | $60,848.98 |
| Tana Lawler | Options | $60,848.98 |
| Tim Millar | Options | $60,848.98 |
| Dena Wever | Options | $35,107.26 |
| John Dwyer | Options | $20,782.58 |
| Brandon Mann | Options | $16,843.57 |
| David Meents | Options | $15,578.62 |
| Lindsey Boerner | Options | $7,265.59 |
| Brent Johnson | Options | $6,234.77 |
| David Streckert | Options | $6,234.77 |
| Kiara Baudoin | Options | $4,156.52 |
| **Total Transferred to Defendants for Options** | | **$1,605,727.62** |
| | | |
| TI Platform NLI Venture Limited II | SAFE | $9,067,021.82 |
| Torch Capital II, LP | SAFE | $6,457,980.65 |
| Treasury Fund I, LP | SAFE | $3,690,265.99 |
| PruVen Capital Partners Fund I, LP | SAFE | $2,767,694.43 |

| Defendant | Type of Interest | Amount of Transfer or Obligation |
|---|---|---|
| Transpose Platform Fintech Fund II, L.P. | SAFE | $2,003,816.59 |
| Fin VC Regatta I, LP | SAFE | $1,845,122.88 |
| TI Platform Fund II, LP | SAFE | $1,845,122.88 |
| Thomas G. Miglis Revocable Trust | SAFE | $922,551.33 |
| SWS Holding Company, LLC | SAFE | $873,968.32 |
| Alumni Ventures Group - Embedded Financial Trust A | SAFE | $645,798.06 |
| Philippe Jabre | SAFE | $461,275.66 |
| Bain Capital Venture Fund 2019, L.P. | SAFE | $401,649.22 |
| Silverstone Venture Investments Limited | SAFE | $369,024.58 |
| EM Fund I, a series of Chris Golda Investments, LP | SAFE | $258,772.29 |
| TriplePoint Private Venture Credit Inc. | SAFE | $230,637.83 |
| Fund 1, a Series of Not Boring Capital, LP | SAFE | $184,502.17 |
| Warren Lowell Putnam & Brynn Jinnett Putnam, Tenants in Common | SAFE | $184,502.17 |
| TriplePoint Ventures 5 LLC | SAFE | $161,444.46 |
| Embedfi June 2021, a Series of Party Round LLC | SAFE | $131,004.23 |
| Correlation Ventures II, LP | SAFE | $83,028.00 |
| TriplePoint Venture Lending Fund, LLC | SAFE | $69,173.15 |
| Joe Percoco | SAFE | $46,115.43 |
| Clayton Gardner | SAFE | $46,115.43 |
| Kick the Hive LLC | SAFE | $46,115.43 |
| BCIP Venture Associates II, L.P. | SAFE | $41,463.44 |
| Stephen Harper | SAFE | $36,892.34 |
| Samuel Jones | SAFE | $36,892.34 |
| Jonathan Duarte | SAFE | $36,892.34 |
| Christian Nordby | SAFE | $27,669.26 |
| Christopher Harper | SAFE | $18,446.17 |
| BCV 2019-MD Primary, L.P. | SAFE | $15,432.49 |
| BCIP Venture Associates II-B, L.P. | SAFE | $2,710.29 |
| **Total Transferred to Defendants for SAFEs** | | **$33,009,101.67** |
| | | |
| Michael Giles | Retention Payment | $55,000,000.00 |
| Laurence Beal | Retention Payment | $2,000,000.00 |
| Monique Saugstad | Retention Payment | $2,000,000.00 |
| Joshua Allen Slate | Retention Payment | $700,000.00 |
| Paul Trone | Retention Payment | $700,000.00 |
| Brandon Mann | Retention Payment | $500,000.00 |
| Justin Lovero | Retention Payment | $300,000.00 |
| Matthew Lyon | Retention Payment | $300,000.00 |

| Defendant | Type of Interest | Amount of Transfer or Obligation |
|---|---|---|
| Adam Boryenace | Retention Payment | $250,000.00 |
| Craig Shindledecker | Retention Payment | $250,000.00 |
| Christopher Young | Retention Payment | $200,000.00 |
| Dena Wever | Retention Payment | $175,000.00 |
| Lindsey Boerner | Retention Payment | $175,000.00 |
| Brent Johnson | Retention Payment | $150,000.00 |
| John Dwyer | Retention Payment | $150,000.00 |
| Tana Lawler | Retention Payment | $150,000.00 |
| David Meents | Retention Payment | $100,000.00 |
| David Streckert | Retention Payment | $100,000.00 |
| Mike McGee | Retention Payment | $100,000.00 |
| Stanton Camp | Retention Payment | $100,000.00 |
| Tim Millar | Retention Payment | $100,000.00 |
| Kiara Baudoin | Retention Payment | $50,000.00 |
| **Total Retention Payments and Payment Obligations to Defendants** | | **$63,550,000** |

Case 23-50380-JTD

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-_____(JTD) |
| MICHAEL GILES, *et al.*,[2] | |
| Defendants. | |

## EXHIBIT "B"

Filed on behalf of: The Plaintiffs

**Howard W. Robertson**
Landis Rath & Cobb LLP

919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE 19899
P 302.467.4426  F 302.467.4450
Email : robertson@lrclaw.com

### EXHIBIT "B"

This is a true copy of a photograph, marked with the letter "B", mentioned and referred to in the Affidavit of Service of David Robert Holland sworn on the ____ of  June 2023.

DEPONENT: ..........................................

BEFORE ME: ..........................................

**Photograph taken at the time of service for KV5 Pty Ltd (KV5 Trust) for
1302/39 Coventry St Southbank VIC 3006**



Case 23-50380-JTD

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-_____ (JTD) |
| MICHAEL GILES, *et al.*,[2] | |
| Defendants. | |

## EXHIBIT "C"

Filed on behalf of: The Plaintiffs

**Howard W. Robertson**
Landis Rath & Cobb LLP

919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE 19899
P 302.467.4426  F 302.467.4450
Email : robertson@lrclaw.com

## EXHIBIT "C"

This is a true copy of a photograph, marked with the letter "C", mentioned and referred to in the Affidavit of Service of David Robert Holland sworn on the �container of June 2023.

DEPONENT: ............................................

BEFORE ME: ............................................

**Photograph taken at the time of service for Kerr Investment Holdings Pty Ltd (The Kerr Family Trust) for 9/636 St Kilda Rd, Melbourne VIC 3006**

