**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors,[1] | (Jointly Administered) |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| -against- | |
| ROCKET INTERNET CAPITAL PARTNERS II SCS, ROCKET INTERNET CAPITAL PARTNERS (EURO) II SCS, GFC GLOBAL FOUNDERS CAPITAL GMBH, GFC GLOBAL FOUNDERS CAPITAL GMBH & CO. BETEILIGUNGS KG NR. 1, WILLIAM HOCKEY LIVING TRUST, and 9YARDS CAPITAL INVESTMENTS II LP, | Adv. Pro. No. 23-50379 (JTD) |
| Defendants. | |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC. | |
| Plaintiffs, | Adv. Pro. No. 23-50380 (JTD) |
| -against- | |
| MICHAEL GILES, et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS THE COMPLAINTS**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**SAUL EWING LLP**
Lucian B. Murley (DE Bar No. 4892)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6898
luke.murley@saul.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
cspeckhart@cooley.com

-and-

Michael Klein (admitted *pro hac vice*)
Aric Wu (admitted *pro hac vice*)
Caroline Pignatelli (admitted *pro hac vice*)
Erica J. Richards (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
mklein@cooley.com
ahwu@cooley.com
cpignatelli@cooley.com
erichards@cooley.com

Dated: August 15, 2023

*Attorneys for the Defendants Listed on Annex A*

# <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

TABLE OF AUTHORITIES ................................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................................... ix

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 8

    I.      Plaintiffs Alameda, WRS, And WRSS .................................................................. 8

    II.     Non-Party FTX Trading Ltd. (FTX.com) ............................................................. 9

    III.    The Rapid Growth Of The FTX Group .................................................................. 9

    IV.   WRS Acquires Embed To Expand The FTX.US Exchange Platform To
          Encompass Trading Of Traditional Securities ..................................................... 11

          A.     On June 10, 2022, WRS And Embed Enter Into A Merger Agreement ....... 11

          B.     On September 30, 2022, The Merger Transaction Closes ........................... 13

    V.     The Abrupt Collapse Of The FTX Group In November 2022 ................................. 13

    VI.    The U.S. Government Charges The FTX Insiders With Fraud ................................. 14

    VII.   The FTX Debtors Initiate A Slew Of Adversary Proceedings ................................. 14

    VIII.  The Three Adversary Proceedings Relating To The Embed Acquisition .................. 15

LEGAL STANDARDS ...................................................................................................... 16

ARGUMENT ..................................................................................................................... 19

    I.      The Complaint Should Be Dismissed In Its Entirety Because The Named
          Plaintiffs Have No Enforceable Interest In The Funds They Seek To Recover ....... 19

    II.     The Complaint Should Be Dismissed In Its Entirety Because All Of Plaintiffs'
          Claims Against Defendants Are Barred By Bankruptcy Code Section 550(b) ........ 22

          A.     Plaintiffs' Own Allegations Confirm That Defendants Are Subsequent
                  Transferees, Not Initial Transferees Subject to Section 550(a)(1) ............... 23

          B.     Plaintiffs' Own Allegations Confirm That Defendants Are Good Faith
                  Subsequent Transferees Within The Scope Of Section 550(b) .................... 24

# TABLE OF CONTENTS
## (Continued)

**Page**

    C.    The Court Should Not Allow Plaintiffs To Evade Section 550(b) Through Artful Pleading ............................................................................... 26

III.    Counts I and III of the Complaint Should Also Be Dismissed Because Plaintiffs' Allegations Of Actual Fraud Do Not Relate To The Embed Acquisition ................. 30

IV.    Counts II and IV Of The Complaint Should Be Dismissed For Failure To Adequately Allege Constructive Fraud ...................................................................... 35

V.    Bankruptcy Code Section 546(e) Bars Counts II, III, And IV Of The Complaint .... 39

    A.    The Equity Purchase Transfers That Plaintiffs Seek To Avoid Were Made In Connection With A "Securities Contract," As Defined In Section 741(7) ................................................................................................. 40

    B.    The Equity Purchase Transfers That Plaintiffs Seek To Avoid Were "Settlement Payments," As Defined In Section 741(8) ................................. 41

    C.    The Equity Purchase Transfers That Plaintiffs Seek To Avoid Were Made By Or For The Benefit Of A "Financial Institution" ............................ 42

VI.    Plaintiffs' Claims To Avoid Post-Closing Retention Payments In Counts I-IV Of The Complaint Should Be Dismissed Because The Obligation To Make Any Such Payments Lies With Embed, A Non-Debtor, And Plaintiffs Do Not Adequately Allege Facts Showing That Such Obligations Are Actually Or Constructively Fraudulent ............................................................................................ 43

VII.    Plaintiffs' Claim In Count V Of The Complaint To Avoid The Retention Payment Made To Mr. Giles As A Preference Should Be Dismissed Because It Was Not Made On Account Of An Antecedent Debt ................................................. 45

VIII.    Counts VI and VII Of The Complaint Should Be Dismissed For Failure To Adequately Allege A Primary Violation In Counts I-V ........................................... 47

CONCLUSION ...................................................................................................................... 48

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Allegheny Univ. Health Sci. v. Phila. Health Care Trust (In re Allegheny Health,*
  *Educ. & Rsch. Found.)*, 253 B.R. 157 (Bankr. W.D. Pa. 2000) ...............................................47

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................................17

*Asher Candy Co. v. MAFCO Holdings, Inc. (In re Marvel Ent. Grp., Inc.)*,
  273 B.R. 58 (D. Del. 2002)................................................................................................44

*Baraka v. McGreevey*,
  481 F.3d 187 (3d Cir. 2007)...............................................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................................17

*Bond v. Nat. Fin. Servs & JP Turner & Co., LLC (In re U.S. Mortg. Corp.)*,
  491 B.R. 642 (Bankr. D.N.J. 2013) ...................................................................................39

*Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l Corp.)*,
  590 F.3d 252 (3d Cir. 2009)..........................................................................................41, 42

*Burtch v. Huston (In re USDigital, Inc.)*,
  443 B.R. 22 (Bankr. D. Del. 2011) ................................................................................37, 45

*Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*,
  500 B.R. 384 (Bankr. D. Del. 2013) ...................................................................................26

*Burtch v. Opus, L.L.C. (In re Opus E., L.L.C.)*,
  480 B.R. 561 (Bankr. D. Del. 2012) ...............................................................................18, 45

*Byers v. Intuit, Inc.*,
  2009 WL 948651 (E.D. Pa. Mar. 18, 2009)........................................................................17

*Carickhoff v. Cantor (In re Live Well Fin., Inc.)*,
  2023 WL 4025816 (Bankr. D. Del. June 14, 2023)..............................................................38

*Charys Liquidating Trust v. Hades Advisors, LLC (In re Charys Holding Co.,*
  *Inc.)*, 2010 WL 2788152 (Bankr. D. Del. July 14, 2010) ......................................................45

*Clean Air Council v. U.S. Steel Corp.*,
  4 F.4th 204 (3d Cir. 2021) .................................................................................................26

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Cooper v. Ashley Commc'ns (In re Morris Commc'ns NC, Inc.),*
    914 F.2d 458 (4th Cir. 1990) ...................................................36

*Crawford v. Zambrano (In re Zambrano Corp.),*
    478 B.R. 670 (Bankr. W.D. Pa. 2012) ....................................33

*Erie Marine Enter., Inc. v. NationsBank, N.A. (In re Erie Marine Enter., Inc.),*
    216 B.R. 529 (Bankr. W.D. Pa. 1998) .....................................26

*ETS Payphones, Inc. v. AT & T Universal Card (In re PSA, Inc.),*
    335 B.R. 580 (Bankr. D. Del. 2005) ........................................27

*Forman v. Kelly Cap., LLC (In re Nat'l Serv. Indus., Inc.),*
    2015 WL 3827003 (Bankr. D. Del. June 19, 2015) ................33

*Friedman v. Wellspring Cap. Mgmt., LLC (In Re Sportco Holdings, Inc.),*
    2021 WL 4823513 (Bankr. D. Del. Oct. 14, 2021) ...........33, 34

*Gavin Solmonese, LLC v. Corp. Servs. Co. (In re Daily Bread Winddown, LLC),*
    2022 Bankr. LEXIS 3078 (Bankr. D. Del. Nov. 1, 2022) .................37, 47

*Gavin Solmonese, LLC v. Shyamsundar (In re Amcad Holdings, LLC),*
    579 B.R. 33 (Bankr. D. Del. 2017) ..........................................35

*Giuliano v. Ferdinand (In re Liquid Holdings Grp., Inc.),*
    2018 WL 2759301 (Bankr. D. Del. June 6, 2018) ...................18

*Giuliano v. Shorenstein Co. LLC (In re Sunset Aviation, Inc.),*
    468 B.R. 641 (Bankr. D. Del. 2011) ........................................47

*Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.),*
    2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) ................39

*In re H.H. Distribs., L.P.,*
    400 B.R. 44 (Bankr. E.D. Pa. 2009) ........................................20

*Halperin v. Moreno (In re Green Field Energy Servs., Inc.),*
    2018 WL 6191949 (Bankr. D. Del. Nov. 28, 2018) ...............19

*Harden v. Harrison (In re Harrison),*
    627 B.R. 832 (Bankr. E.D. N.C. 2021)....................................21

*Hechinger Invest. Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Del., Inc.),* 489 F.3d 568 (3d Cir. 2007)..........................................8, 46

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Holliday v. Credit Suisse Sec. (USA) LLC*,
    2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021) ........................................................43

*Insys Liquidation Tr. v. Quinn Emanuel Urquhart & Sullivan, LLP (In re Insys Therapeutics, Inc.)*, 2021 WL 5016127 (Bankr. D. Del. Oct. 28, 2021) ..............................38

*Internal Rev. Serv. v. Nordic Village, Inc. (In re Nordic Village, Inc.)*,
    915 F.2d 1049 (6th Cir.1990) ...........................................................................27

*Jalbert v. Souza (In re F-Squared Inv. Mgmt., LLC)*,
    2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019) ..............................................38

*James Cable, LLC v. Millennium Digital Media Sys., LLC (In re Broadstripe, LLC)*, 435 B.R. 245 (Bankr. D. Del. 2010) ...........................................................17

*Kaler v. Remily (In re Remily)*,
    314 B.R. 790 (Bankr. D. N.D. 2004) ................................................................44

*Kapila v. U.S. of Am. (In re Taylor)*,
    386 B.R. 361 (Bankr. S.D. Fla. 2008) ...............................................................35

*In re KB Toys Inc.*,
    736 F.3d 247 (3d. Cir. 2013)............................................................................47

*Kelly v. Opportunity Fin., LLC (In re Petters Co., Inc.)*,
    562 B.R. 391 (Bankr. D. Minn. 2016) ...............................................................26

*Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*,
    336 B.R. 87 (Bankr. D. Del. 2005) ...................................................................36

*Kirschner v. Merill Lynch (In re Tribune Co. Fraudulent Conv. Litig.)*,
    946 F.3d 66 (2d Cir. 2019)..........................................................................39, 41

*Kitchen v. Boyd (In re Newpower)*,
    233 F.3d 922 (6th Cir 2000) ...........................................................................20

*Liquidation Trust v. Uphold HQ Inc. (In re Cred Inc.)*,
    650 B.R. 803 (D. Del. 2023)..........................................................16, 17, 34, 37

*Love v. B.R.B. Enter., Ltd. (In re Calvillo)*,
    263 B.R. 214 (W.D. Tex. 2000).......................................................................36

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*,
    181 F.3d 505 (3d Cir. 1999)........................................................................41, 42

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736 (3d Cir. 2013) .................................................................47

*Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139 (3d Cir.1996) ...............................................36

*Miller v. Energy Star Records (In re DA Liquidating Corp.)*, 622 B.R. 172 (Bankr. D. Del. 2020) ................................................45, 46

*Miller v. SWZ Fin. II, LLC (In re United Tax Grp., LLC)*, 2018 WL 1135496 (Bankr. D. Del. Feb. 28, 2018) ...................18, 32, 33

*MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426 (D. N.J. 2012) .........................................................33

*Nat'l Distillers & Chem. Corp. v. Dep't of Energy*, 1980 WL 1057 (D. Del. Oct. 23, 1980) ...............................................17

*In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187 (S.D.N.Y. 2020) ..............................................43

*Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007) ..............................................33

*Off. Comm. of Unsecured Creditors of Champion Enters. Inc. v. Credit Suisse (In re Champion Enters., Inc.)*, 2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010) ....................17

*Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527 (Bankr. D. Del. 2009) ...............................................18, 32

*Off Comm. of Unsecured Creditors v. Aust (In re Network Access Sols., Corp.)*, 330 B.R. 67 (Bankr. D. Del. 2005) ...............................................36

*OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696 (Bankr. D. Del. 2005) .........................................18

*PAH Litig. Trust v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, 2016 WL 3611831 (Bankr. D. Del. June 20, 2016)................41, 42

*Parkell v. Lyons*, 2019 WL 1435885 (D. Del. Mar. 31, 2019) ...........................................17

# TABLE OF AUTHORITIES
## (Continued)

<u>Page(s)</u>

*Piazza v. Pac. Mar. Indus. Corp. (In re George G. Sharp, Inc.)*,
  2022 WL 1714178 (Bankr. S.D.N.Y. May 25, 2022)..............................46

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Secs. LLC)*,
  12 F.4th 171 (2d Cir. 2021) .......................................................27

*Purpura v. JP Morgan Chase*,
  2018 WL 1837952 (D.N.J. Apr. 18, 2018) ..................................18

*Rollaguard Sec., LLC v. TD Bank, N.A. (In re Rollaguard Sec., LLC)*,
  591 B.R. 895 (Bankr. S.D. Fla. 2018) ................................31, 34

*Schaffer ex rel. Schaffer v. Weast*,
  546 U.S. 49 (2005)......................................................................27

*Sharp International Corp. v. State Street Bank & Trust Co. (In re Sharp
  International Corp.)*, 302 B.R. 760 (E.D.N.Y. 2003).................31, 32, 34

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
  337 B.R. 791 (Bankr. S.D.N.Y. 2005).........................................34

*SIPC v. Madoff*,
  476 B.R. 715 (S.D.N.Y. 2012)....................................................39

*Snyder v. Biros (In re U Lock, Inc.)*,
  2023 WL 4678609 (Bankr. W.D. Pa. July 21, 2023)....................21

*Symonies v. Sobol (In re Sobol)*,
  545 B.R. 477 (Bankr. M.D. Pa. 2016) ........................................18

*Talley v. Christiana Care Health Sys.*,
  2018 WL 4938566 (D. Del. Oct. 11, 2018) .................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)....................................................................17

*Transp., Inc. v. Kahn (In re Hemingway Transp.)*,
  954 F.2d 1 (1st Cir. 1992)...........................................................21

*In re Tribune Co. Fraudulent Conv. Litig.*,
  2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019)..............................42

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*
  429 B.R. 73 (Bankr S.D.N.Y. 2010)...........................................34

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Trustee of the NP Creditor Litig. Trust (In re NewPage Corp.)*, 555 B.R. 444 (D.
Del. 2016) ....................................................................................................................45

*VFB, LLC v. Campbell Soup Co.*,
482 F.3d 624 (3d Cir. 2007).........................................................................................37

*Wasserman v. Bressman (In re Bressman)*,
327 F.3d 229 (3d Cir. 2003).............................................................................27, 28, 30

*Zazzali v. Hirschler Fleischer, P.C.*,
482 B.R. 495 (D. Del. 2012).........................................................................................38

**Statutes**

11 U.S.C.
§ 101 ..................................................................................................... *passim*
§ 105 ............................................................................................................29
§ 502 ...............................................................................................8, 21, 47
§ 544 .............................................................................................19, 39, 40, 47
§ 546 ..................................................................................................... *passim*
§ 547 ..................................................................................................... *passim*
§ 548 ..................................................................................................... *passim*
§ 550 ..................................................................................................... *passim*
§ 741 ..................................................................................................... *passim*

**Rules**

Fed. R. Civ. P.
8(a) ..............................................................................................................17
9(b) ..............................................................................................................18
12(b)(6) .........................................................................................................16

**Other Authorities**

7 Collier on Bankruptcy ¶ 1108.13 (16th ed.) .......................................................36

2 J. Strong, McCormick on Evidence § 342 (5th ed. 1999).........................................27

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Alameda** | Alameda Research Ltd. |
| **Complaint or Compl.** | The *Giles* Complaint filed in Adv. Proc. No. 23-50380 |
| **Debtors** | FTX Trading Ltd. and each of its affiliated debtors and debtors in possession in the Main Case |
| **D.I.** | Docket number of filings in the Main Case and adversary proceedings |
| **Embed** | Embed Financial Technologies Inc. |
| **Embed Clearing** | Embed Clearing LLC |
| **Embed Equity Interests** | Equity interests in Embed comprising shares, options, warrants and SAFEs |
| **Equity Purchase Transfers** | Payments made to acquire Defendants' Embed Equity Interests |
| **FTX.com** | The trade name for the business conducted by FTX Trading Ltd. |
| **FTX Group** | The collection of Debtor and non-Debtor entities described in footnote 4 of the Complaint |
| **FTX Insiders** | Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, and Zixiao "Gary" Wang |
| **FTX.US** | The trade name of WRSS, which operated the cryptocurrency exchange founded by Messrs. Bankman-Fried, Singh and Wang to provide cryptocurrency trading services to U.S. customers |
| ***Giles* Complaint** | Complaint filed in Adv. Proc. No. 23-50380 |
| **Incentive Agreements** | Retention Inventive Award Agreements entered into with certain Defendants in connection with the Merger Agreement |
| **Main Case** | The jointly administered chapter 11 cases pending before the United States Bankruptcy Court for the District of Delaware under lead Case No. 22-11068 |
| **Merger Agreement** | The Agreement and Plan of Merger by and Among West Realm Shires, Inc., Ingrained Merger Sub, Inc., Embed Financial Technologies Inc., and Shareholder Representative Services LLC dated June 10, 2022 |
| **Plaintiffs** | Alameda, WRS, and WRSS |
| ***Rocket* Complaint** | Complaint filed in Adv. Proc. No. 23-50379 |
| **SAFE** | Simple agreement for future equity |
| **WRS** | West Realm Shires, Inc. |
| **WRSS** | West Realm Shires Services, Inc. |

## INTRODUCTION

Until its "stunning collapse" in November 2022, FTX was the golden child of the crypto scene and widely praised as one of the most stable companies in a volatile and loosely regulated market.  As part of their rapid expansion efforts supported by prominent investors, the FTX Insiders turned their sights to acquiring Embed, a software company that provided the proprietary technology infrastructure used by its wholly-owned subsidiary Embed Clearing, which was in turn a licensed broker-dealer, custodian, and clearing firm.  Plaintiffs characterize the acquisition as a rushed, impulsive, and ill-advised lark.  But the contemporaneous facts, including the prior experience of a WRS subsidiary as an Embed customer, the FTX Insiders' desire to build out FTX's business-to-business division, and the size of the transaction relative to the large-scale operations of FTX's many entities, reflect that the acquisition was an ordinary corporate transaction pursued for a legitimate business purpose.

Although Embed was still a relatively young growth-phase company, its promise was undeniable and had attracted over $40 million in investments from some of the most reputable venture capital firms in the United States.  Among its singular achievements in the industry, Embed built its technology platform from the ground up and obtained regulatory approvals from a litany of regulatory bodies and clearinghouses with unprecedented speed,[2] and became a member of both The Nasdaq Stock Market LLC and the Investors' Exchange LLC ("**IEX**").  Moreover, whereas many broker-dealers must rely on third parties to act as the clearing firm and custodian, Embed Clearing was authorized to serve as a clearing firm and custodian for equities, options, mutual funds, fractional equities, and over-the-counter equities.

---

[2] These regulatory bodies and clearinghouses included: the U.S. Securities and Exchange Commission, the Financial Industry Regulatory Authority, Inc. ("**FINRA**"), the Depository Trust Company ("**DTC**"), the National Securities Clearing Corporation ("**NSCC**"), and The Options Clearing Corporation.

A WRS subsidiary was an early Embed client and, based on that first-hand experience with Embed's capabilities, WRS decided to make an offer to acquire Embed in the hope of bringing the value generated by Embed's services in-house. The acquisition was a small, but important component of WRS's larger strategy to expand its business and secure the position of the exchange it operated under the name FTX.US as an industry leader by providing business customers with access to an integrated service platform for transactions involving a wide range of products, including spot crypto, equities, crypto derivatives, and options.

WRS first approached Embed about a potential transaction in March 2022. The parties entered into an initial memorandum of terms the next month, and, following a diligence process led by WRS's outside counsel, Latham & Watkins LLP, the Merger Agreement was signed on June 10, 2022. Plaintiffs make much of the agreed $220 million purchase price for a pre-revenue company, denigrating it as "inflated." That term is used from the viewpoint of bankrupt estates faced with billions of dollars in claims and a challenging economic environment in which to liquidate their assets, and is contradicted by Embed's continued solvency following the FTX bankruptcy. Plaintiffs' contention that WRS overpaid for Embed falls apart completely when viewed in context at the time of the transaction, which is when Embed's value must be evaluated for purposes of Plaintiffs' claims. At the time the Merger Agreement was executed, the $220 million purchase price was a rounding error compared to the FTX Group's reported aggregate market value of approximately $40 billion, and even to FTX.US's standalone $8 billion valuation. It is hardly surprising that WRS was comfortable agreeing to a relatively small acquisition following six weeks of diligence, particularly since Embed had only two years of history and other potential buyers waiting in the wings, as well customers it had signed and potential customers in the pipeline and $32 million in cash on hand, an amount sufficient to fund Embed's operations

indefinitely following the merger transaction without the need for additional capital from other FTX companies.

Moreover, as is true for *any* acquisition of a company, the purchase price needed to be satisfactory to Embed's existing shareholders.  The Complaint[3] derides the relevancy of this point, but most of Embed's investors had been with it since its inception in May 2020, so their views on value were informed by more than two years of experience with Embed's founder, Defendant Michael Giles, and his team, and were based on a variety of factors that included, among other things: the experience, skill, and dedication of the management team; the competitiveness of the industry and market demand for Embed's services; and the function, innovation, and scalability of its products.  Based on their familiarity with Embed and their knowledge of these factors, Embed's investors had ascribed a post-money valuation cap of $135 million to the company at the time of its last capital raise announced in October 2021.  The purchase price agreed to by WRS was consistent with that valuation plus the investors' expected return on investment.

As a clearing and custodial broker-dealer, Embed Clearing was required to obtain the consent of numerous regulatory bodies in connection with the merger.  Mr. Giles was instrumental in that process, which can often take six months to a year but was completed by the Embed team at a breakneck pace of only three months due to the extraordinary efforts by Mr. Giles and the Embed team.  By September 30, 2022, all the necessary regulatory approvals were finally received.  WRS's acquisition of Embed closed on that date without incident and Embed continued to operate successfully and without any financial support from the other FTX companies until the commencement of FTX's bankruptcy cases.

---

[3] The *Rocket* Complaint and *Giles* Complaint name different defendants, but are otherwise substantially identical.

In November 2022, media reports of financial weakness created a frenzy among FTX customers, who collectively sought to withdraw billions of dollars from their accounts. Unable to fulfill the withdrawal requests, FTX filed for bankruptcy just nine days later, and allegations that certain members of FTX's leadership team had "misappropriated" (*i.e.*, stolen) customer funds from the international cryptocurrency exchange operated by FTX Trading Ltd. (which did business as FTX.com) began to spread. It was, by all accounts, a "stunning collapse."

In an attempt to recoup as much value as possible from the chaos of the FTX collapse, the Debtors have filed a flurry of adversary proceedings. Each of those complaints, including the one filed against Defendants in this proceeding, contains the same general allegations regarding fraudulent activities by members of the FTX leadership team with respect to FTX.com and that entity's customers, and broadly paints the entire FTX enterprise with the same patina of fraud. But even if the allegations that individual insiders engaged in certain fraudulent or criminal practices prove to be true, that does not mean that *all* business dealings by entities in the FTX Group were also fraudulent. Indeed, the allegations in the Complaint itself (and repeated *ad nauseam* in other filings by the Debtors) show the opposite. This adversary proceeding to avoid the Embed acquisition—an arm's length transaction with a legitimate business purpose—is a prime example of the Debtors' overreach. At its heart, the Complaint is premised on certain insiders' alleged misconduct, but fails to allege any plausible connection between that conduct and the Embed acquisition. This failure creates a variety of fatal infirmities in every Count of the Complaint and, as a consequence, the Complaint should be dismissed in its entirety for multiple independent reasons.

Outrageously, Plaintiffs assert over and over that the payments to Defendants were stolen from FTX.com, but then pretend that FTX.com is not the true party with standing to recover those

payments.  Mirroring the very insider conduct they allege caused FTX's collapse, the Plaintiffs have omitted FTX.com as a plaintiff and disregard the initial transfer of funds from FTX.com to Alameda when it suits them.  Far from an accident, this decision appears to be an intentional attempt to circumvent the Bankruptcy Code section 550(b) bar of avoidance claims against good faith subsequent transferees.  Despite Plaintiffs' creative tactics, however, the applicability of section 550(b) to each Defendant is clear from the face of the Complaint and dooms all of Plaintiffs' claims.  The Complaint should be dismissed for the following reasons:

*First*, the named Plaintiffs have no enforceable interest in the funds they seek to recover. The Complaint unambiguously alleges that all of the money used to acquire Embed was part of the roughly $8 billion in funds misappropriated from FTX.com customers by the FTX Insiders through Alameda for use as a secret slush fund.  Based on Plaintiffs' own allegations, Alameda had no entitlement to those funds, but served as a conduit to hide their source, which allowed the FTX Insiders to use them for everything from private homes and jets to business investments made through and by other FTX entities.  Although the Complaint alleges that the payments to Defendants for the Embed acquisition share this common source, FTX.com is not a named plaintiff in the Complaint (although it is in other adversary proceedings commenced by the Debtors). Because the Complaint alleges that the funds transferred from Plaintiffs to Defendants were actually property of FTX.com customers that Plaintiffs had no entitlement to hold or use, Plaintiffs were mere conduits for those  misappropriated funds and had no independent enforceable interests in the property they seek to recover.  Accordingly, their Complaint should be dismissed.

*Second*, Plaintiffs' claims are barred by Bankruptcy Code section 550(b) because Defendants are subsequent transferees of the funds they received in connection with the Embed acquisition and took those transfers for value and without knowledge of the avoidability of the

initial transfer from FTX.com to Alameda. Based on Plaintiffs' own allegations, the funds Plaintiffs seek to recover were initially transferred from FTX.com to an Alameda bank account, and then to WRSS and WRS bank accounts, before finally being transferred to Defendants via the paying and escrow agent Western Alliance Bank as part of the Embed acquisition. Bankruptcy Code section 550(b) protects subsequent transferees from liability for all avoidance claims if they receive the transfer for value and in good faith without knowledge of the avoidability of the initial transfer. Plaintiffs admit that each Defendant gave value in the form of equity interests in Embed or employment with Embed. Plaintiffs also allege that the FTX Insiders "surreptitiously" orchestrated the initial transfers between FTX.com and Alameda in order to keep the transfers secret even from other FTX employees. Defendants could not have had knowledge of the initial transfer, or that it was avoidable. Because it is apparent from the face of the Complaint that Defendants accepted their subsequent transfers for value and without knowledge that they were benefitting from fraudulent activity, all of Plaintiffs' claims against Defendants should be dismissed as barred by section 550(b).

*Third*, Plaintiffs' claims for intentional fraudulent transfer should also be dismissed because Plaintiffs' fraud allegations have no connection to the Embed acquisition. In order to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor, Plaintiffs must show that the alleged fraudulent intent is related to the transfers sought to be avoided. Here, none of the fraud allegations in the Complaint relate to the transfers made to Defendants in connection with the Embed acquisition. Instead, the fraud allegations concern the FTX Insiders' fraudulent misappropriation of funds from FTX.com customers and the imaginary loan of those funds by the FTX Insiders to WRS in exchange for SAFEs from WRS. None of those fraudulent transfers were "to or for the benefit of" Defendants. The transfers to Defendants were made by WRS in exchange

for Embed.  The Complaint alleges that the acquisition of Embed was for a legitimate business purpose—"to provide FTX.US customers with the ability to trade stocks, in addition to cryptocurrency, on the FTX.US exchange platform"—and does not allege any facts that show WRS had an actual intent to defraud creditors in making those specific transfers.

*Fourth*, Plaintiffs' claims for constructive fraud should also be dismissed because the Complaint fails to plead facts showing that WRS's arm's length acquisition of Embed and the continued employment of key Embed employees resulted in the receipt of less than reasonably equivalent value.  Although the determination of reasonably equivalent value must be made at the time of the transaction, Plaintiffs impermissibly rely on irrelevant allegations concerning events that occurred not only after the closing of the Embed transaction, but also after the bankruptcy filings of Plaintiffs and other FTX Group entities to establish the value of Embed.

*Fifth*, even if Plaintiffs were to argue, and the Court were to assume *arguendo*, that Defendants are initial transferees of WRS, Plaintiffs' section 548(a)(1)(B) claim for constructive fraudulent transfer and actual and constructive fraudulent transfer claims under Delaware state law would still be barred by at least two safe harbors under Bankruptcy Code section 546(e).  The transfers from WRS to Defendants are both (i) "transfer[s] made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7);" and (ii) "settlement payment[s], as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution."

*Sixth*, Plaintiffs' claims with respect to post-closing retention payments to certain Embed employees should also be dismissed because no such payments have been made and any future obligation to make such payments lies with Embed, a non-Debtor.

*Seventh*, Plaintiffs' preference claim with respect to the retention payment made to Mr. Giles should also be dismissed because the retention payment was not made on account of an antecedent debt.  The obligation to make the retention payment to Mr. Giles arose, and was satisfied, on September 30, 2022, when the Embed acquisition closed.  Where, as here, "there is no delay between when the debt arises and payment of the obligation," the transfer is, by definition, not on account of an antecedent debt and "outside the scope of § 547(b)."  *Hechinger Invest. Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d 568, 574 (3d Cir. 2007).

*Eighth*, Plaintiffs' claims to recover transferred funds under section 550(a)(1) and disallow claims pursuant to section 502(d) should also be dismissed because, for all the reasons summarized above, Plaintiffs have failed to adequately allege facts showing Defendants have received any transfers that are recoverable or avoidable.

For these and all the other reasons herein, the Complaints in both Adv. Pro. No. 23-50379 and Adv. Pro. No. 23-50380 should be dismissed with prejudice.[4]

## **FACTUAL BACKGROUND**

### I.    **Plaintiffs Alameda, WRS, And WRSS**

Samuel Bankman-Fried and Zixiao "Gary" Wang co-founded Plaintiff Alameda Research Ltd., a cryptocurrency trading firm.  ¶¶ 3, 14, 17;[5] Main Case D.I. 1242-1 at 3.  Caroline Ellison was Alameda's co-CEO from August 2021 to September 2022, when she became Alameda's sole CEO and director.  ¶ 15.  Messrs. Bankman-Fried, Wang, and Nishad Singh founded Plaintiff WRS.  ¶¶ 14, 16-17.  Mr. Bankman-Fried was the CEO and sole director of WRS.  ¶ 14.  Plaintiff

---

[4] To the extent applicable, Defendants join in and incorporate by reference the arguments made in the motions to dismiss filed by the other defendants named in the Complaints.

[5] Freestanding cites to "¶ _" refer to paragraphs of the *Giles* Complaint.

WRSS, a WRS subsidiary that did business as FTX.US, was a cryptocurrency exchange for U.S. customers.  ¶¶ 3, 11.

## II.    Non-Party FTX Trading Ltd. (FTX.com)

Messrs. Bankman-Fried and Wang founded non-party FTX Trading Ltd. d/b/a FTX.com, an international cryptocurrency exchange.  Main Case D.I. 1242 at 4.

## III.    The Rapid Growth Of The FTX Group

Plaintiffs Alameda, WRS, and WRSS were part of what Plaintiffs have dubbed the "FTX Group."  ¶ 5.  The so-called FTX Group is "comprised of four silos," which Plaintiffs describe as "(a) a group composed of Plaintiffs and Debtors WRS, WRSS, and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda, Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries."  ¶ 5 n.4.  Non-party FTX Trading Ltd. is in a different silo than the Plaintiffs.  *Id.*

Fueled by investor enthusiasm for digital currencies and rapid user proliferation, the "FTX Group" experienced meteoric growth.  *See generally* Main Case D.I. 24 ¶ 35.  By July 2021, FTX Group entities had raised $900 million in equity funding at an $18 billion valuation, with funding from "prominent investors" including venture capital firms Softbank Group and Sequoia Capital, hedge-fund Third Point, private equity firm Thoma Bravo, and hedge-fund billionaires Israel Englander, Alan Howard, and Paul Tudor Jones.[6]  In January 2022, FTX Group announced it had closed a $400 million capital raise at a $32 billion valuation, with funding from leading venture

---

[6] Alexander Osipovich, *Crypto Exchange FTX Valued at $18 Billion in Funding Round,* Wall St. J. (July 20, 2021), https://tinyurl.com/2hcc7bkr.  Pdf or hard copies of this and other publicly available material cited herein are available upon request to Defendants' counsel.

capital and private equity firms, including Temasek, Paradigm, SoftBank Vision Fund 2, Lightspeed Venture Partners, Steadview Capital, Tiger Global, and Insight Partners.[7]

FTX Group entities also established numerous high-profile business relationships. In 2021 alone, for example, FTX Group entities (i) completed a $135 million, 19-year deal to buy the naming rights to the home of the Miami Heat basketball team; (ii) completed a deal in which football quarterback Tom Brady became an FTX "ambassador" and both he and his then-wife, supermodel Gisele Bündchen, took equity stakes in certain FTX Group entities; and (iii) completed a deal with Major League Baseball to become the "Official Cryptocurrency Exchange brand of MLB," with FTX branding displayed on all umpire uniforms within the league.[8]

In February 2022, Congress invited Mr. Bankman-Fried to testify in support of enhanced crypto market regulation.[9] Mr. Bankman-Fried was viewed as an industry leader who "worked to enhance standards, disclosure, oversight, and customer protection in the crypto industry." Main Case D.I. 1242-1 at 1.

Mr. Bankman-Fried stated publicly that FTX was "prepared to spend billions of dollars to buy stakes in companies as it looks to grow the suite of products it offers customers."[10] By November 2022, FTX Group had acquired more than 150 entities,[11] "operated in 250 jurisdictions,

---

[7] *See FTX Trading Ltd. Closes $400M Series C Round*, PR Newswire (Jan. 31, 2022), https://tinyurl.com/mpte89y6.

[8] Alexander Osipovich, *Crypto Exchange FTX Valued at $18 Billion in Funding Round,* Wall St. J. (July 20, 2021), https://tinyurl.com/2hcc7bkr; Zack Seward, *FTX Strikes Sponsorship Deal with MLB, Umpires to Wear Crypto Exchange's Logo*, CoinDesk (June 23, 2021), https://tinyurl.com/bdfca6t5.

[9] David Yaffe-Bellany, *A Crypto Emperor's Vision: No Pants, His Rules*, N.Y. Times (May 14, 2022), https://tinyurl.com/9zy5pn7c.

[10] Allyson Versprille & Yuegi Yang, *Crypto Giant FTX Ready with Billions of Dollars for Acquisitions*, Bloomberg (May 27, 2022), https://tinyurl.com/bdda75js.

[11] *See* Becky Yerak, *FTX Seeks to Claw Back $240 Million From Embed Acquisition*, Wall St. J. (May 18, 2023), https://tinyurl.com/36tj3dzb.

controlled tens of billions of dollars of assets across its various companies, engaged in as many as 26 million transactions per day, and had millions of users."  Main Case D.I. 1242-1 at 10.

## IV.     WRS Acquires Embed To Expand The FTX.US Exchange Platform To Encompass Trading Of Traditional Securities

In March 2022, the FTX Insiders turned their sights to Embed, a company founded by Defendant Michael Giles, in order to provide U.S. customers with the ability to not only trade cryptocurrency, but also conventional securities such as stock, on the FTX.US exchange platform operated by WRS.  ¶¶ 3-4, 28, 37.[12]

### A.       On June 10, 2022, WRS And Embed Enter Into A Merger Agreement

On June 10, 2022, WRS and Embed executed an "Agreement and Plan of Merger" under which WRS would acquire Embed and its subsidiary Embed Clearing LLC, a FINRA, DTC, NSCC, Nasdaq, and IEX member clearing firm.  ¶ 38; Ex.[13] 1 (Merger Agreement) §§ 2.1-2.2.

The Merger Agreement contemplated a reverse triangular merger transaction in which a WRS subsidiary would merge into Embed, which would in turn become a subsidiary of WRS on the closing date of September 30, 2022.  ¶ 5; Ex. 1 §§ 2.1(a), 2.3.  The Merger Agreement provided for payment of $220,000,000 in merger consideration to holders of Embed Equity Interests (subject to various adjustments).  Ex. 1 §§ 3.1(c), 3.6.  WRS entered into both an exchange agreement and escrow agreement with Western Alliance Bank, which acted as WRS's depository and distributor of the merger consideration and escrow agent for the merger transaction.  *Id.* §§ 3.2(a), 3.2(f); Ex. 4 (Merger Agreement, Annex J, Form of Escrow Agreement) ¶¶ 2-4.

---

[12] *See also FTX US Acquires Clearing Firm Embed to Enhance FTX Stocks*, PR Newswire (June 21, 2022), https://tinyurl.com/2mjffwmu.

[13] Freestanding cites to "Ex. _" refer to exhibits of the Declaration of Lucian B. Murley in Support of Defendants' Motion to Dismiss the Complaints, dated August 15, 2023.

The Merger Agreement also provided that certain employees would receive retention payments as an incentive to remain with Embed until the acquisition closed or afterward. *Id.* § 7.3.  For Mr. Giles, WRS promised a retention payment of $55,000,000 at closing (September 30, 2022), provided that he stayed with Embed through closing.  *Id.*; ¶ 5; Ex. 3  (Merger Agreement, Annex L-1, Form of Retention Incentive Award Agreement and Giles Retention Incentive Award Agreement) ¶ 2.  For other key Embed employees, WRS promised that, following the closing of the merger transaction, it would cause non-Debtor "[Embed] (or, if applicable, another member of the FTX Group) to pay or cause to be paid . . . the Retention Incentive Payment," Ex. 2 (Merger Agreement, Annex L-2, Form of Retention Incentive Award Agreement) ¶ 1, provided the employees remained with Embed for at least two years following closing, with the payments being made in five installments starting on September 30, 2023.  ¶ 47.

In a June 21, 2022 press release, FTX US's President Brett Harrison praised Embed's technology and infrastructure and explained the rationale for acquiring Embed:

> "As I mentioned when we launched FTX Stocks, our new equities and ETF trading platform, our goal at FTX is to provide a comprehensive trading application that spans all asset classes.  For equities and options trading this necessarily includes services such as clearing and custody, and our partnership with Embed showed us that they have built excellent technology and infrastructure to provide these services.  We're looking forward to working together to integrate both our teams and our technology as we continue to build FTX Stocks."  The acquisition signals the Company's intention to expand the financial services it offers to US customers, and will enable it to route, execute, clear, and custody all customer equities and options accounts and trades through use of Embed's infrastructure and licensure.  In addition, Embed and FTX US share a common goal to provide whitelabel brokerage services to other businesses, applications, and customers.[14]

---

[14] *FTX US Acquires Clearing Firm Embed to Enhance FTX Stocks*, PR Newswire (June 21, 2022), https://tinyurl.com/2mjffwmu.

B.    **On September 30, 2022, The Merger Transaction Closes**

On September 30, 2022, the merger transaction closed.  ¶ 38.  Western Alliance Bank paid holders of Embed Equity Interests their respective shares of the merger consideration, Embed became a WRS subsidiary, and Mr. Giles was provided his retention payment.  ¶¶ 5, 38, 45, 47; Ex. 1; Ex. 4 ¶ 4.  Although Mr. Giles only needed to remain employed through September 30, 2022, to receive his retention payment, ¶ 45; Ex. 1 § 7.3; Ex. 3 ¶ 2, he continued his employment with Embed until Embed terminated him on May 16, 2023, two days before the filing of these adversary proceedings.  Most of the other Defendants who were employees of Embed were also terminated at this time.

V.    **The Abrupt Collapse Of The FTX Group In November 2022**

In November 2022, the FTX Group experienced a "stunning collapse."  Main Case D.I. 1242-1 at 1.  Media reports of financial weakness at Alameda[15] created a frenzy among FTX exchange customers, who sought to withdraw over $5 billion from their accounts, resulting in a halt of trading.[16]  The inability of the FTX exchanges to fulfill customer withdrawal requests "shocked crypto investors and badly tarnished the reputation of Mr. Bankman-Fried, who had embraced regulation of digital currencies and branded himself as a crypto entrepreneur driven by ethics and philanthropy."[17]

On November 11, 2022, numerous FTX Group entities filed for bankruptcy, Main Case D.I. 1, "upend[ing] crypto markets" and "sen[ding] shock waves through [the] industry."[18]

---

[15] *See, e.g.*, Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Nov. 2, 2022), https://tinyurl.com/398275au.

[16] Vicky Huang et al., *FTX Tapped into Customer Accounts to Fund Risky Bets, Setting Up Its Downfall,* Wall St. J. (Nov. 11, 2022), https://tinyurl.com/y72nxjd9.

[17] *Id.*; *See also* Main Case D.I. 1232 at 1.

[18] David Yaffe-Bellany, *Embattled Crypto Exchange FTX Files for Bankruptcy*, N.Y. Times (Nov. 11, 2022), https://tinyurl.com/2v2ykk5e.

Although the various Debtors' chapter 11 cases are being jointly administered, the cases are *not* substantively consolidated.  Main Case D.I. 3 ¶ 12.

## VI.    The U.S. Government Charges The FTX Insiders With Fraud

Messrs. Bankman-Fried, Wang, and Singh and Ms. Ellison have been charged with various crimes, including that they used Alameda to misappropriate funds of FTX.com customer funds.[19] ¶¶ 29-30, 67.  Mr. Wang and Ms. Ellison have pled guilty to various counts of conspiracy to commit fraud, and Mr. Singh has pled guilty to various counts of fraud.  ¶ 29.  Mr. Bankman-Fried has not pled guilty to any charges and faces a criminal trial.  *Id.*  None of the criminal indictments or pleas reference the Embed transaction.

## VII.    The FTX Debtors Initiate A Slew Of Adversary Proceedings

In an attempt to recoup money for the estates, the Debtors have undertaken efforts to sell assets of FTX Group entities.  For example, the Debtors sold LedgerX, a derivatives exchange acquired for $298 million in 2021, for $50 million.  *See generally* Main Case D.I. 1433, Ex. A § 1.1.

To date, at least nine adversary proceedings have been commenced seeking amounts ranging from $3 million to $300 million for alleged fraudulent transfers and preference claims.[20] The adversary proceedings attack previous payments to entities and individuals such as former employees, venture capital firms, private equity firms, and other crypto entities, among others, as preferences.

---

[19] *See* Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Mar. 28, 2023), D.I. 115; Waiver of Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), D.I. 7; Waiver of Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 28, 2022), D.I. 91; Waiver of Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), D.I. 9 ¶ 67.

[20] *See* Case No. 23-50084; Case No. 23-50411; Case No. 23-50419; Case No. 23-50437; Case No. 23-50444; Case No. 23-50448; Case No. 23-50379; Case No. 23-50380; Case No. 23-50381.

FTX Trading Ltd., a non-party here, is the named plaintiff in a number of the adversary proceedings where the FTX Insiders are alleged to have misappropriated funds of FTX.com customer funds. For instance, in Case No. 22-11068, FTX Trading Ltd. seeks to unwind certain transactions on the ground that the FTX Insiders "defrauded FTX.com's customers, creditors and shareholders" by, among other things, funneling "approximately $71.6 million" into the challenged transactions with funds coming "directly . . . from . . . FTX [Trading Ltd.]." Case No. 23-50444 D.I. 1 ¶¶ 35-36, 54. Similarly, in Case No. 23-50145, FTX Trading Ltd. alleges that several of the transfers made by FTX Trading Ltd. to another FTX subsidiary, FTX DM, should be avoided as fraudulent because FTX Trading Ltd. did not receive reasonably equivalent value in exchange for the funds transferred from FTX Trading Ltd. Case No. 23-50145 D.I. 1 ¶ 26.

## VIII.    The Three Adversary Proceedings Relating To The Embed Acquisition

On May 17, 2023, Plaintiffs commenced three adversary proceedings relating to the Embed acquisition. Two are against Embed's former holders of Embed Equity Interests, Adv. Pro. Nos. 23-50379 and 23-50380. One of those two is also filed against former employees of Embed. 23-50380. The third is against the FTX Insiders. Adv. Pro. No. 23-50381. Aside from naming different defendants, the Complaints in each case are substantively identical.

Plaintiffs seek to recover money allegedly misappropriated from FTX.com customers. ¶¶ 52-55. Plaintiffs allege that, through a series of transactions, the FTX Insiders took approximately $8 billion in funds belonging to FTX.com customers and moved them to an Alameda bank account, a portion of which then flowed to a WRSS bank account and then to a WRS bank account, before finally being paid to Defendants in exchange for Embed. ¶¶ 33, 52. Plaintiffs seek to avoid all transfers and obligations to Defendants in connection with the Embed transaction, ¶¶ 70, 74, 80, 85; *Giles* Compl. Ex. A; *Rocket* Compl. Ex. A, on the grounds that they were actual fraudulent transfers, ¶¶ 69-72, 78-82 (Counts I and III of the Complaint), or constructively fraudulent

transfers, ¶¶ 73-77; 83-89 (Counts II and IV).  Plaintiffs also seek recovery of the retention

payment made to Mr. Giles as a preferential transfer, ¶¶ 90-100 (Count V), the return of all

payments to Defendants that are avoided under Counts I through V, ¶¶ 101-03 (Count VI), and the

disallowance of all claims held by Defendants against any Debtor pending their return of any

avoided transfers ¶¶ 104-06 (Count VII).[21]

Despite alleging that the funds transferred to Defendants originated with FTX.com and

were transferred to and through various other FTX Group entities that had no entitlement to them

before they were ultimately transferred to Defendants, ¶¶ 52-55, FTX.com is not named as a

plaintiff, and Plaintiffs allege that "Defendants are the initial transferees or the entities for whose

benefit such transfers were made." ¶ 103.

## LEGAL STANDARDS

When presented with a Rule 12(b)(6) motion to dismiss, a court is guided by two "working

principles" in evaluating the sufficiency of the factual allegations in a complaint.  *Liquidation*

*Trust v. Uphold HQ Inc. (In re Cred Inc.)*, 650 B.R. 803, 812-13 (D. Del. 2023) (citations omitted).

"First, the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Id.* at 813 (citations omitted).

Although well-pleaded facts should be accepted as true, a court need not accept "'unsupported

conclusions and unwarranted inferences,' or 'a legal conclusion couched as a factual allegation,'"

*Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted), or "allegations that

are contradicted by other allegations in the [complaint]." *Talley v. Christiana Care Health Sys.*,

---

[21] Because Count V in the *Giles* Complaint is directed solely against Mr. Giles, who is not a named defendant in the *Rocket* action, *Rocket* Complaint Counts V and VI are the counterparts to *Giles* Complaint Counts VI and VII.

2018 WL 4938566, at *5 n.4 (D. Del. Oct. 11, 2018).   Moreover, the court may consider "'documents incorporated into the complaint by reference and matters of which a court may take judicial notice[,]'" *Off. Comm. of Unsecured Creditors of Champion Enters. Inc. v. Credit Suisse, (In re Champion Enters., Inc.)*, 2010 WL 3522132, at *4 n.7 (Bankr. D. Del. Sept. 1, 2010) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)), and need not accept as true allegations in the complaint contradicted by such documents.   *See James Cable, LLC v. Millennium Digital Media Sys., LLC (In re Broadstripe, LLC)*, 435 B.R. 245, 254 n.31 (Bankr. D. Del. 2010); *Byers v. Intuit, Inc.*, 2009 WL 948651, at *2 (E.D. Pa. Mar. 18, 2009); *Nat'l Distillers & Chem. Corp. v. Dep't of Energy*, 1980 WL 1057, at *1 (D. Del. Oct. 23, 1980).

"Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . [A] complaint must do more than allege the plaintiff's entitlement to relief.   A complaint has to 'show' such an entitlement with its facts." *In re Cred Inc.*, 650 B.R. at 813 (citations omitted).   For claims that are not based on alleged fraud, the court must consider whether the complaint satisfies the pleading requirements of Fed. R. Civ. P. 8(a)—*i.e.*, whether the facts alleged in a complaint are sufficient to show that a plaintiff has a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).   Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*   "A plausible claim does more than merely allege entitlement to relief; it must also demonstrate the basis for that 'entitlement with its facts.'" *Parkell v. Lyons*, 2019 WL 1435885, at *1 (D. Del. Mar. 31, 2019).   A plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).   Rather, a plaintiff bears the burden of "plead[ing] factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

For claims based on alleged fraud, the court must consider whether the complaint satisfies "Rule 9(b)'s more rigorous pleading requirement," *Purpura v. JP Morgan Chase*, 2018 WL 1837952, at *9 (D.N.J. Apr. 18, 2018); *see also Giuliano v. Ferdinand (In re Liquid Holdings Grp., Inc.)*, 2018 WL 2759301, at *6 (Bankr. D. Del. June 6, 2018), under which a plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Miller v. SWZ Fin. II, LLC (In re United Tax Grp., LLC)*, 2018 WL 1135496, at **2, 8-9, n.55 (Bankr. D. Del. Feb. 28, 2018) (finding allegations related to fraudulent conveyance claims insufficient to satisfy Rule 9(b)); *Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 544 (Bankr. D. Del. 2009) ("Federal Rule of Civil Procedure 9(b) requires those asserting fraudulent transfer claims in bankruptcy proceedings to plead them with specificity."); *OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 699 (Bankr. D. Del. 2005) (granting motion to dismiss because "[o]ther than merely identifying the allegedly fraudulent transfers . . . the Complaint fails to allege with [Rule 9(b)] specificity any facts in support of the fraudulent transfer claim."). "[B]oilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Burch v. Opus, L.L.C. (In re Opus E., L.L.C.)*, 480 B.R. 561, 573 (Bankr. D. Del. 2012) (citation omitted); *see also Symonies v. Sobol (In re Sobol)*, 545 B.R. 477, 500 (Bankr. M.D. Pa. 2016) (dismissing complaint because plaintiff's claim was only supported by "a conclusory statement with no supporting factual allegations").

## ARGUMENT

I.  **The Complaint Should Be Dismissed In Its Entirety Because The Named Plaintiffs Have No Enforceable Interest In The Funds They Seek To Recover**

As a predicate to avoiding any transfer for actual or constructive fraud or a preferential transfer, a trustee or debtor-in-possession (*i.e.*, the party bringing the suit) must first establish that the debtor (*i.e.*, the individual or entity whose estate is at issue) had an enforceable, and not merely transient, interest in the transferred property.  *See* 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of *an interest of the debtor* in property . . .") (emphasis added); 11 U.S.C. § 544 ("The trustee shall have . . .  the rights and powers of, or may avoid any transfer of *property of the debtor* . . .") (emphasis added); *Halperin v. Moreno (In re Green Field Energy Servs., Inc.)*, 2018 WL 6191949, at *37 (Bankr. D. Del. Nov. 28, 2018) ("[T]he Court must first decide the threshold question whether the Trustee has demonstrated a transfer of an interest in Debtor's property in a manner that may be avoidable.").

Here, the Complaint makes passing references to "*Plaintiffs'* present or future creditors," ¶¶ 81, 93 (emphasis added), but is devoid of any factual allegations showing that Plaintiffs or their present or future creditors have an enforceable interest in the funds transferred to Defendants in connection with the Embed acquisition.  Instead, the Complaint unambiguously alleges that all the money WRS used to fund the Embed acquisition was misappropriated from FTX.com:

> [A]ll of the funding from the Embed acquisition came from Alameda, which, at the FTX Insiders' direction, had surreptitiously and unlawfully diverted and transferred assets *belonging to FTX.com*.

¶ 27 (emphasis added); *see also id.* ("by causing Alameda to take money *belonging to FTX.com* and spend it on the FTX Insiders' pet projects, the FTX insiders *defrauded FTX.com's creditors, including customers and investors*.") (emphasis added); ¶ 31 ("In reality, however, the FTX insiders routinely, and secretly, used Alameda to loot 'several billion dollars' from FTX.com using

the 'special privileges,' thereby *defrauding FTX.com's creditors, including customers and investors*.") (emphasis added); ¶ 53 ("All of the money came from Alameda, which by this time had been used by the FTX insiders to misappropriate billions of dollars from FTX.com.").

Because the Complaint alleges that the money used to fund the Embed acquisition was misappropriated from FTX.com customers without their knowledge and without requisite authority—*i.e.*, the funds were stolen—those customers could not have intended to transfer title to or possession of the funds to the Plaintiffs. ¶¶ 27, 31, 53, 81. Thus, unlike a Ponzi scheme where investors voluntarily transfer funds to a bad actor under false pretenses, title to customer funds held at FTX.com never passed to the Plaintiffs. Courts have distinguished these two scenarios and held that, where a victim's funds were stolen by a debtor before its bankruptcy filing, the debtor's estate holds no interest in them. *See, e.g., Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 929-31 (6th Cir 2000) (citing the principle, "long established at common law, that a thief has no title in the property that he steals" and, therefore, "[t]here is no basis for a constructive trust as to the stolen property in the hands of the thief because of his lack of a property interest") (citations omitted). Because the funds misappropriated from FTX.com's customers are not property of the Plaintiff's estates, only FTX.com—*a non-party to this proceeding*—and *its* customers and creditors have a legitimate interest in the money used to fund the Embed acquisition.

Plaintiffs cannot claim to have an enforceable interest in the misappropriated funds of FTX.com customers by virtue of their affiliation with what they have dubbed the "FTX Group." As the Debtors made clear in their motion to authorize the joint administration of the FTX Debtors' Chapter 11 estates, "joint administration of these Chapter 11 Cases will not adversely affect the Debtors' respective creditors because this Motion requests only administrative, and not substantive, consolidation of the Debtors' estates." Main Case D.I. 3 ¶ 12; *see In re H.H. Distribs.,*

*L.P.,* 400 B.R. 44, 53 (Bankr. E.D. Pa. 2009) ("Substantive consolidation merges the assets and liabilities of the debtors into a unitary debtor estate with all the cumulative assets and liabilities[.] The result is that all claim holders must look to the consolidated entity for their distribution."); *id.* at 53 n. 15 ("Substantive consolidation differs from procedural consolidation, more commonly known as joint administration, in that the latter does not effect the substantive rights of creditors or their respective debtor estates but rather is a tool of administrative convenience and cost efficiency"); *see also Transp., Inc. v. Kahn (In re Hemingway Transp.)*, 954 F.2d 1, 11-12 (1st Cir. 1992).

Absent substantive consolidation, the joint administration of the Debtors' Chapter 11 estates is not sufficient to confer standing on Alameda, WRS, or WRSS to pursue claims on behalf of FTX.com or FTX.com's creditors. Nor does it circumvent the requirement that, as Plaintiffs in this case, Alameda, WRS, and WRSS must adequately allege a specific and traceable interest in the transferred property at issue. *See Snyder v. Biros (In re U Lock, Inc.)*, 2023 WL 4678609, at *9 (Bankr. W.D. Pa. July 21, 2023) (granting motion to dismiss with prejudice because the petitioner "stated no claim for relief because . . . the Trust [had not] received a 'transfer of an interest of the debtor' in the Property."); *Harden v. Harrison (In re Harrison)*, 627 B.R. 832, 839 (Bankr. E.D. N.C. 2021) (dismissing adversary proceeding because the complaint failed to allege facts showing that the plaintiff had an interest in the property transferred to the defendants).

Because they have no interests in the funds they seek to recover, Plaintiffs cannot obtain avoidance of transfers on the grounds of actual or constructive fraud (Counts I-IV), recover the retention payment to Mr. Giles as a preferential transfer (Counts V), obtain the return of the transferred funds under 11 U.S.C. § 550 (Count VI), or seek the disallowance of claims under 11 U.S.C. § 502 (Count VII). The Complaint should therefore be dismissed in its entirety.

21

II.     **The Complaint Should Be Dismissed In Its Entirety Because All Of Plaintiffs' Claims Against Defendants Are Barred By Bankruptcy Code Section 550(b)**

As discussed above, Plaintiffs' own allegations demonstrate that the only Debtor with a property interest in the funds paid to Defendants, and the only Debtor with standing to pursue the claims to avoid and recover those payments, is FTX.com.  Debtors' decision to exclude FTX.com as a named plaintiff here would be puzzling, were it not for the legal hurdle that Plaintiffs seek to avoid.  By properly analyzing the transfers to Defendants by beginning with the initial transfer of those funds from FTX.com to Alameda, it is apparent that Defendants are each subsequent transferees of FTX.com within the scope of Bankruptcy Code section 550(b), rather than initial transferees of one or more of the Plaintiffs subject to section 550(a)(1).  This shift in where the initial transfer is deemed to occur is fatal to all of the claims asserted in the Complaint.  Plaintiffs admit, as they must, that each Defendant gave value in the form of their equity interests in Embed or continued employment with Embed.  In addition, Plaintiffs allege that the FTX Insiders kept the initial transfers between FTX.com and Alameda a secret even from other FTX employees, meaning that Defendants could not have had knowledge of the initial transfers much less that they were avoidable.

In an apparent effort to circumvent the protections of section 550(b), Plaintiffs have omitted FTX.com as a party to this action and pretend that Alameda, WRSS, or WRS (it is unclear which) is the initial transferor.  But while a plaintiff need not avoid every transfer in a chain of transfers in order to seek to recover those transfers from the ultimate transferee, it cannot arbitrarily decide to ignore the initial transfer of a debtor's interest in property to pursue meritless claims against good faith transferees.

Notwithstanding Plaintiffs' sleight-of-hand in omitting the initial transfer from their claims—a tactic that is uncomfortably reminiscent of the FTX Insiders' own treatment of

FTX.com's property—it is clear from the face of the Complaint that Defendants are good faith subsequent transferees under section 550(b).  Accordingly, all of Plaintiffs' claims are a barred by Bankruptcy Code section 550(b) and the Complaint should be dismissed in its entirety.

### A.    Plaintiffs' Own Allegations Confirm That Defendants Are Subsequent Transferees, Not Initial Transferees Subject to Section 550(a)(1)

Because FTX Trading Ltd. (d/b/a FTX.com) is the only Debtor with a property interest in the funds transferred to Defendants, any analysis of the claims to avoid those transfers must necessarily begin with the transfer from FTX.com.  Based on Plaintiffs' own allegations, Defendants are subsequent transferees rather than initial transferees.  Indeed, Plaintiffs' conclusory assertion that "Defendants are the initial transferees or the entities for whose benefit such transfers were made," ¶ 103, is belied by their repeated allegations in the Complaint that the funds at issue were "surreptitiously" transferred from FTX.com to an Alameda bank account, in the first instance, and then to WRSS and WRS bank accounts, before finally being transferred to Defendants as part of the Embed acquisition.  ¶¶ 27, 31, 53, 81.

Section 550(a)(1) provides that a trustee may recover property transferred in an avoided transaction from "the initial transferee of such transfer or the entity for whose benefit such transfer was made."  11 U.S.C. § 550(a)(1).  Here, however, the payments to Defendants were multiple steps removed from the initial transfers from FTX.com.  The initial (and only avoidable) transfers in the chain were clearly not made by FTX.com "to" Defendants.  Nor, based on Plaintiffs' allegations, were those transfers made by FTX.com "for the benefit of" Defendants.  The Complaint clearly alleges that neither FTX.com nor Defendants were even aware of the transfers, and that the FTX Insiders orchestrated the initial transfer of funds from FTX.com to Alameda in secret for the FTX Insiders' *own* benefit.  ¶ 30 ("[T]he FTX Insiders frequently caused Alameda to misappropriate funds from the FTX exchanges for their own benefit, including to make

acquisitions like Embed.") (emphasis added); ¶ 49 ("[T]the FTX Insiders created false and misleading records suggesting that the funding for the Embed acquisition by WRS had come personally from Bankman-Fried, Singh, and Wang, even though the funds used to acquire Embed had been transferred from an Alameda bank account to a WRSS bank account and ultimately to a WRS bank account. The FTX Insiders did this to justify transferring to themselves WRS shares, which they expected to appreciate in value as a result of the Embed acquisition."); ¶ 68 ("The transfers were part of a scheme to enrich and otherwise benefit the FTX Insiders").

Because the initial avoidable transfer was not made by FTX.com to Defendants or for their benefit, Defendants are all subsequent transferees, not initial transferees subject to section 550(a)(1).

### B.    Plaintiffs' Own Allegations Confirm That Defendants Are Good Faith Subsequent Transferees Within The Scope Of Section 550(b)

Plaintiffs' claims to recover transfers from Defendants as subsequent transferees are governed by section 550(b), which protects good faith subsequent transferees from liability for ***all*** avoidance claims, including claims to avoid actual fraudulent transfers under section 548(a)(1)(B) and preference claims.  11 U.S.C. § 550(b).  In recognition that a subsequent transferee is much more likely to be an innocent party than a direct transferee of a bad actor-turned-debtor, the statutory language of section 550(b) is markedly different from that in section 548(c).

Under section 548(c), a good faith initial transferee can retain a transferred interest only to the extent of value given, but is otherwise still liable for and subject to an avoidable transfer claim: "a transferee or obligee . . . that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. § 548(c).

By contrast, section 550(b) provides a complete bar to the trustee's ability to recover from a good faith transferee and is not limited to the extent of value given: "[T]he trustee may not recover under section (a)(2) of this section [permitting recovery of avoided transfers from subsequent transferees] from—(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1).

Here, the Complaint clearly alleges that Defendants gave value in exchange for the Embed consideration they received and were not aware of the secret initial transfers between FTX.com and Alameda, much less that those transfers were avoidable. Specifically, Plaintiffs admit that, in exchange for the payments they received, each Defendant gave value in the form of their equity interests in Embed and/or their labor. ¶ 38. In addition, the Complaint alleges that the FTX Insiders "surreptitiously" orchestrated the initial transfers between FTX.com and Alameda, and that the FTX Insiders intentionally kept these transfers secret. ¶ 31 ("In reality, however, the FTX Insiders routinely, and secretly, used Alameda to loot 'several billion dollars' from FTX.com using the 'special privileges,' thereby defrauding FTX.com's creditors, including customers and investors."); ¶ 49-55; *see also* Main Case D.I. 24 ¶ 68 (Report by Mr. John J. Ray III, Chief Executive Officer of the Debtors, stating "many of the employees of the FTX Group, including some of its senior executives, were not aware of the shortfalls or potential commingling of digital assets. Indeed, I believe some of the people most hurt by these events are current and former employees and executives, whose personal investments and reputations have suffered.").

Accepting as true Plaintiffs' own allegations that no one outside of the FTX Insiders knew about the initial transfers between FTX.com and Alameda, Defendants could not have had

knowledge of the avoidability of those transfers.[22]  Nor would reasonable diligence performed by Defendants in connection with the Embed transaction—which did not involve the FTX.com silo at all—have revealed those transfers.

Because Defendants' good faith and value given is apparent from the face of the Complaint, all of Plaintiffs' claims against Defendants should be dismissed as barred by section 550(b).  *See Clean Air Council v. U.S. Steel Corp.*, 4 F.4th 204, 211 (3d Cir. 2021) (affirming dismissal of complaint because "[w]e may dismiss a complaint when an unanswered affirmative defense appears on its face") (internal quotation and citation omitted); *Kelly v. Opportunity Fin., LLC (In re Petters Co., Inc.)*, 562 B.R. 391, 401 (Bankr. D. Minn. 2016) ("[A] plaintiff cannot recover from a subsequent transferee if the subsequent transferee received the property for value and in good faith.  The value and good faith exception is an affirmative defense, but if the defense is clear from the face of the complaint then it is a bar to recovery.").

## C.    The Court Should Not Allow Plaintiffs To Evade Section 550(b) Through Artful Pleading

Even if Plaintiffs were to seek leave to amend in order to remove allegations demonstrating that Defendants are good faith subsequent transferees pursuant to section 550(b), the Complaint would still be subject to dismissal because Plaintiffs do not, and cannot, plead facts showing that the section 550(b) bar should not apply.

Whereas the transferee bears the burden of proof for a good faith defense under section 548(c), the Third Circuit has stated that "[i]t is not at all clear to us that 'the language of the [section 550(b)] places the burden of showing value, good faith, and lack of knowledge, on the transferee

---

[22] A transferee's good faith is based on "what the transferee [objectively] 'knew or should have known.'"  *Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*, 500 B.R. 384, 401 n. 113 (Bankr. D. Del. 2013) (citation omitted); *see also Erie Marine Enter., Inc. v. NationsBank, N.A. (In re Erie Marine Enter., Inc.)*, 216 B.R. 529, 537 (Bankr. W.D. Pa. 1998) (dismissing claim because "the [transferee] was a subsequent transferee that took for value, in good faith, and without knowledge of the voidability of the transfer").

as a defense,'" *Wasserman v. Bressman* (*In re Bressman)*, 327 F.3d 229, 236 n.2 (3d Cir. 2003)

(quoting *Internal Rev. Serv. v. Nordic Village, Inc. (In re Nordic Village, Inc.)*, 915 F.2d 1049,

1055 (6th Cir.1990)),[23] and cited with approval the following passage from the dissenting opinion

in *In re Nordic Village*:

> Although the Code makes clear that initial transferees are generally presumed to be
> on notice of the voidability of a transfer and have few if any defenses to the trustee,
> (see 11 U.S.C. §§ 549, 550(a)(1); Bankruptcy Rule 6001), the Code also makes
> clear that subsequent transferees are not under such a severe disability. 11 U.S.C. §
> 550(b). Such a dichotomy is rationally related to the fact that initial transferees will
> generally have knowledge and therefore act in bad faith since they deal directly
> with the bankrupt. In contrast, subsequent transferees are much more likely to be
> innocent third parties. They have little ability to protect themselves by making
> cursory checks on their transferor. Absent an express rule placing the burden of
> proof on subsequent transferees, I believe the burden should rest on the party
> seeking to recover the property, at least as to the issues of the subsequent
> transferee's good faith and knowledge.

*In re Nordic Village*, 915 F.2d at 1063-64 (dissenting opinion).

Some courts have downplayed or disregarded the different language in section 550(b) and

reasoned that the transferee, regardless of its place in a chain of transfers, will be in the best

position to plead and prove facts showing its good faith. *See, e.g.*, *Picard v. Citibank, N.A. (In re*

*Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 199 (2d Cir. 2021). But while "[t]he ordinary

rule, based on considerations of fairness, does not place the burden upon a litigant of establishing

facts peculiarly within the knowledge of his adversary, . . . this 'rule is far from being universal,

and has many qualifications upon its application.'" *Schaffer ex rel. Schaffer v. Weast*, 546 U.S.

49, 57-60 (2005) (citations omitted); *id.* at 56 (citing 2 J. Strong, McCormick on Evidence § 342,

---

[23] *But see ETS Payphones, Inc. v. AT & T Universal Card (In re PSA, Inc.)*, 335 B.R. 580, 586 (Bankr. D. Del. 2005)
(relying on *Nordic Village*, without any reference to or acknowledgment of the Third Circuit's observations in
*Bressman*, and stating that the transferee defendant "would have the burden to show that it 1) took for value, 2) in
good faith, and 3) without knowledge of the validity of the transfer.").

p. 433 (5th ed. 1999) ("Very often one must plead and prove matters as to which his adversary has superior access to the proof")).

Notwithstanding the majority view that section 550(b) is an affirmative defense, the Third Circuit has expressly reserved the issue because "we agree . . . that the Code treats initial transferees in a different manner than subsequent transferees and that a substantial argument can be made in favor of placing the burden of proof on the trustee with respect to subsequent transferees." *In re Bressman*, 327 F.3d at 236 n.2.

There are multiple factors weighing in favor of requiring that a trustee plead and prove that a subsequent transferee acted in bad faith or had knowledge of a debtor's fraud. *First*, a subsequent transferee that had no involvement with the initial transfer is presumptively more likely to have taken in good faith and without knowledge of the circumstances of the initial transfer, so why should they still bear the same burden as the initial transferee to demonstrate that fact and be forced to prove what is already presumptively true? *Second*, while transferees may indeed already have information tending to show their good faith, the additional burden on a trustee or debtor to conduct a reasonable inquiry into those facts as part over its overall ethical duty to investigate claims before bringing them (as well as its fiduciary duty to identify and maximize the value of estate assets with the assistance of retained professionals) is likely to be *de minimis* in most cases. *Third*, if the good faith burden rests on the subsequent transferee, section 550(b) is likely to promote the abuse of innocent creditors, contravening its protective intent. Establishing an affirmative defense often requires a defendant to incur substantial litigation costs associated with discovery and motion practice. Thus, faced with immense pressure to bring money into their insolvent estates, plaintiffs are incentivized to bring meritless claims and extract settlement value from subsequent transferees that plaintiffs know perfectly well took in good faith but who will, in most instances, make the

rational decision to just pay the estate to make the claims go away rather than incur the time, expense, and distraction of defending them.

In light of the text and intent of section 550(b), Plaintiffs bear the burden to plead and prove that their claims against Defendants are not barred.  But even if the Court determines that section 550(b) does not require it, section 105(a) of the Bankruptcy Code gives the court flexibility to place the burden on the plaintiff under appropriate circumstances.  11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

This case raises issues of public policy that present just such circumstances.  Like *Lehman*, *Enron*, *SemCrude*, and a host of other bankruptcy cases prompted by fraudulent activities within large corporate enterprises, the FTX bankruptcy is vast in scope.[24]  Based on the lessons from those cases, Plaintiffs' adversary proceedings against the Defendants here likely represent a small fraction of the litigation that will be pending before this Court for years to come.  But FTX is also distinguishable from those other cases in certain important respects.  FTX did not operate in a highly regulated industry; instead, regulation of the cryptocurrency industry, known for its extreme volatility and highly speculative products, is nascent.[25]  It was these very qualities that attracted so many FTX customers and investors, who willingly embraced the risk in the hope that they would strike it rich in a modern-day gold rush.  Their enthusiasm provided access to cash that the FTX

---

[24] *See generally In re Lehman Brothers Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y.); *In re Enron Corp.,* No. 01-16034 (Bankr. S.D.N.Y.); *In re SemCrude LP,* No. 08-11525 (Bankr. D. Del.).

[25] *See* SEC, *Exercise Caution with Crypto Asset Securities: Investor Alert* (March 23, 2023), https://tinyurl.com/yumu5zf3; *see also*  Eric Lipton, *As Scrutiny of Cryptocurrency Grows, the Industry Turns to K Street,* N.Y. Times (May 9, 2021) (updated Nov. 1, 2021), https://tinyurl.com/5n8ytzws (Janet Yellen, Treasury Secretary stated crypto currency ". . . is a highly speculative asset, and I think people should beware, it can be extremely volatile.").

Group used to acquire other legitimate businesses like Embed through ordinary, run-of-the-mill M&A transactions.

Thus, unlike many other corporate schemes that have come to light, FTX's customers arguably had vastly different expectations and knowingly accepted more risk in dealing with the Debtors than the Debtors' other creditors.  For that reason, it would be particularly inequitable to require ordinary creditors and counterparties of FTX such as the Defendants, who merely engaged in an arm's length business transaction, to bear the burden and expense to prove affirmatively what the Complaint already admits—that the FTX Insiders' fraudulent activities were a well-kept secret.

The Court can prevent the adversary proceedings in these cases from needlessly clogging the Court's docket and delaying finality for the Debtors' creditors, and minimize the potential for abusive (if well-intentioned) litigation tactics, by presuming that subsequent transferees of transfers from FTX.com took in good faith and requiring that Plaintiffs bear the burden of pleading and proving a subsequent transferee's lack of good faith.  Such a presumption would be consistent with the prepetition conduct and reasonable expectations of the Debtors' stakeholders, and with the facts as pled in the Complaint.  And requiring that Plaintiffs plead and prove a subsequent transferee's lack of good faith would be consistent with the Third Circuit's observation that "the Code treats initial transferees in a different manner than subsequent transferees and that a substantial argument can be made in favor of placing the burden of proof on the trustee with respect to subsequent transferees." *In re Bressman*, 327 F.3d at 236 n.2.

## III.    Counts I and III of the Complaint Should Also Be Dismissed Because Plaintiffs' Allegations Of Actual Fraud Do Not Relate To The Embed Acquisition

Counts I and III should also be dismissed because the Complaint is devoid of facts showing that the Embed acquisition was undertaken with "actual intent to hinder, delay, or defraud" any of Plaintiffs' creditors.  11 U.S.C. § 548(a)(1)(A).  Instead, the allegations in the Complaint are

inconsistent with such fraudulent intent.  Plaintiffs admit that acquiring Embed served a legitimate business purpose, *i.e.*, to "expand FTX.US's operations into conventional securities markets," which would in turn result in "enriching" WRS shareholders.  ¶ 28.

The fraud allegations that are in the Complaint are misdirected and relate to transactions distinct from the Embed acquisition.

> In prosecuting a fraudulent transfer claim based on actual intent, it is typically not sufficient to show that the debtor intended to defraud someone and the debtor also made a transfer.  Just because a debtor is involved in a fraudulent scheme does not mean that every transfer made by that debtor is made with fraudulent intent.  In order to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor, the plaintiff must show that the alleged fraudulent intent is *related to the transfers* sought to be avoided.

*Rollaguard Sec., LLC v. TD Bank, N.A. (In re Rollaguard Sec., LLC)*, 591 B.R. 895, 918 (Bankr. S.D. Fla. 2018) (emphasis added).

Here, none of the fraud allegations in the Complaint relate to the transfers made in connection with the Embed acquisition even though these are the transfers Plaintiffs seek to avoid. ¶¶ 70, 80; *Giles* Compl. Ex. A; *Rocket* Compl. Ex. A.  Instead, Plaintiffs' fraud allegations concern the FTX Insiders' fraudulent misappropriation of FTX.com customer funds.  ¶¶ 27, 31, 53, 81. That is insufficient.

*Sharp International Corp. v. State Street Bank & Trust Co. (In re Sharp International Corp.)* is instructive. There, Sharp's bankruptcy trustee brought suit against State Street, one of Sharp's former lenders, to recover, among other things, a $12 million payment made to State Street from the $25 million in proceeds from a sale of subordinated notes to Noteholders.  302 B.R. 760, 767-69 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005).  Notwithstanding the bankruptcy trustee's factual allegations showing that Sharp used "inflated financial statements to induce the Noteholders to advance sums far in excess of what they would have been willing to provide had they known Sharp's true financial picture," the district court dismissed Sharp's claim that the $12

million payment was avoidable as an intentional fraudulent conveyance because "the fraud detailed in Sharp's complaint concerns the manner in which the debt to the Noteholders arose, not the subsequent conveyance of those funds to State Street, which was a legitimate creditor of Sharp." *Id.* at 784.

Similarly, the fraud alleged in the Complaint concerns the FTX Insiders' misappropriation of FTX.com customer funds through Alameda, ¶¶ 27, 31, 53, 81, not the subsequent transfers of those funds to acquire Embed.  Indeed, the Complaint alleges that WRS's acquisition of Embed, which operated a FINRA licensed broker-dealer, custodian and clearing firm, was for a legitimate business purpose: "to provide FTX.US customers with the ability to trade stocks, in addition to cryptocurrency, on the FTX.US exchange platform." ¶ 4.

Because the Complaint underscores that the transfers of funds for the Embed acquisition were for a legitimate purpose, it is not surprising that it also fails to plead facts showing the presence of "badges of fraud" indicative of fraudulent intent, much less a "confluence of several" badges. *In re Fedders*, 405 B.R. at 545-47 (dismissing avoidance claims under Bankruptcy Code section 548(a)(1)(A) and state law Unform Fraudulent Transfer Act); *see also In re United Tax Grp.*, 2018 WL 1135496, at *10 (explaining that "Plaintiffs must plead sufficient facts to support badges of fraud" and holding that proposed claims for actual fraudulent conveyance were insufficiently pled).

**Insolvency**.  Plaintiffs fail to allege facts supporting their conclusory assertion that they were insolvent at the time of, or rendered insolvent by, the Embed acquisition.  ¶ 68; *see In re United Tax Grp.*, 2018 WL 1135496, at *10 (rejecting "conclusory statement of insolvency").  Even accepting *arguendo* Plaintiffs' conclusory assertion, this factor is of little weight as every transaction involving the Plaintiffs during the same period would also bear this badge.

*Relationship Between Debtor and Transferee*.  Plaintiffs do not allege that they have the type of close, insider relationship with Defendants that courts have found to be a badge of fraud. *See, e.g.*, *In re United Tax Grp.*, 2018 WL 1135496, at *10 ("insider relationship between the Debtor and SWZ, the recipient of all of the transfers"); *Forman v. Kelly Cap., LLC (In re Nat'l Serv. Indus., Inc.*), 2015 WL 3827003, at *5 (Bankr. D. Del. June 19, 2015) (close relationship where transfers were made to "officers and members of the Debtor's board"); *Crawford v. Zambrano (In re Zambrano Corp.*), 478 B.R. 670, 692 (Bankr. W.D. Pa. 2012) (close relationship where debtor and transferee were both controlled by members of the same family).  Instead, Plaintiffs allege an arm's length relationship between Plaintiffs and Defendants.  *See generally* ¶¶ 28, 37-38.  *See Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*, 361 B.R. 369, 396 (Bankr. S.D.N.Y. 2007) (dismissing claim for actual fraudulent conveyance where "there were no familial or personal relationships between the parties" and instead "an arm's length relationship").

*Consideration for Conveyance*.  Plaintiffs concede that, as a result of the Embed transaction, WRS acquired Embed, which operated a FINRA licensed broker-dealer, custodian and clearing firm, and the continued employment of key Embed employees, ¶¶ 3, 5, 47.  As WRS received consideration for the transfer, Plaintiffs cannot establish this badge of fraud.  *Friedman v. Wellspring Cap. Mgmt., LLC (In Re Sportco Holdings, Inc.*), 2021 WL 4823513, at *16 (Bankr. D. Del. Oct. 14, 2021) (dismissing counts of actual fraud where debtor received consideration for the transfer); *compare MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426, 437 (D. N.J. 2012) (denying motion to dismiss where debtor received "no consideration" for transfer).

***Portion of Estate Transferred***.    Plaintiffs allege only that Defendants were paid $243,665,744.76[26] in connection with the Embed acquisition.    Plaintiffs do not allege what this amount represents in relation to the total value of the Debtors' estates, much less that the funds transferred represented "substantially all" of the Debtors' assets.    *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)* 429 B.R. 73, 92-93 (Bankr S.D.N.Y. 2010) (denying motion to dismiss where "substantially all" assets were transferred for no consideration).

***Reservation of Benefits***.    Plaintiffs do not allege, nor could they, that Defendants retained any control over or derived any further benefit from the property transferred.

***Secrecy***.    Plaintiffs do not allege that the Embed transaction was concealed.    Nor could they.    FTX publicly touted the acquisition of Embed, including in a June 21, 2022 press release.[27] To the extent Plaintiffs' contention that "material facts relating to the transfers were concealed" refers to WRS's transfer of funds to Defendants, ¶ 68, it is unsupported by any factual allegations. To the extent Plaintiffs' contention refers to the FTX Insiders' fraudulent misappropriation of FTX.com customer funds, it is misdirected and irrelevant.    *See In re Sharp Int'l Corp.*, 302 B.R. at 784; *In re Rollaguard*, 591 B.R. at 918.

In sum, the Complaint does not come close to pleading a confluence of several badges of fraud, underscoring that Counts I and III of the Complaint should be dismissed.    *In re Cred Inc* 650 B.R. at 834-35 (dismissing actual fraudulent transfer claims because badges of fraud were supported by "conclusory statements" only); *see also In re Sportco Holdings*, Inc. 2021 WL 4823513, at *16 (dismissing actual fraudulent transfer claims because allegations "[did] not constitute sufficient badges of fraud to survive a motion to dismiss"); *Silverman v. Actrade Cap.,*

---

[26] *Giles* Compl. ¶¶ 5, 38 ($236,764,105.34); Rocket Compl. ¶¶ 5, 38 ($6,901,639.42).

[27] *FTX US Acquires Clearing Firm Embed to Enhance FTX Stocks*, PR Newswire (June 21, 2022), https://tinyurl.com/2mjffwmu.

*Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (dismissing claims for intentional fraudulent conveyance because "[t]he Complaint contains few if any 'badges of fraud' in its various allegations").

## IV.   Counts II and IV Of The Complaint Should Be Dismissed For Failure To Adequately Allege Constructive Fraud

Counts II and IV of the Complaint should also be dismissed for failure to adequately allege constructive fraud in connection with the Embed acquisition.  To adequately plead a claim for constructive fraud under either the Bankruptcy Code or the Delaware Uniform Fraudulent Transfer Act, Plaintiffs must plead facts showing that there was a transfer for less than reasonable equivalent value *at the time of the transfer* "and not beyond that point.  Subsequent increase or decrease in the value of the consideration does not affect [the] evaluation." *Kapila v. U.S. of Am. (In re Taylor)*, 386 B.R. 361, 370 (Bankr. S.D. Fla. 2008), *aff'd sub nom. United States v. Kapila*, 402 B.R. 56 (S.D. Fla. 2008).

Here, Plaintiffs impermissibly rely on allegations concerning events that occurred not only after the closing of the Embed transaction, but also after the bankruptcy filings of Plaintiffs and other FTX Group entities:  "On January 12, 2023, as part of the Chapter 11 Cases, the Court authorized certain procedures proposed by the Debtors with respect to running a sale process for Embed[.] . . . [T]he Debtors received twelve non-binding Initial Indications of Interest . . . with an average value of approximately $35 million. . . . The bidders had figured out what the FTX Group and FTX Insiders did not bother to assess prior to the Embed acquisition, namely, that Embed's vaunted software platform was essentially worthless."  ¶¶ 57, 62.

These allegations regarding bids made after the bankruptcy filings of Plaintiffs and other FTX Group entities are irrelevant as to whether Plaintiffs received "reasonable equivalent value" on September 30, 2022, the date the Embed acquisition closed.  *See Gavin Solmonese, LLC v.*

*Shyamsundar (In re Amcad Holdings, LLC)*, 579 B.R. 33, 41 (Bankr. D. Del. 2017) ("'a court must consider whether, 'based on the circumstances that existed at the time' of the transfer, it was 'legitimate and reasonable' to expect some value accruing to the debtor'"); *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 94 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006) ("the determination of reasonably equivalent value must be made at the time of the transaction"); *Off Comm. of Unsecured Creditors v. Aust (In re Network Access Sols., Corp.)*, 330 B.R. 67, 76 (Bankr. D. Del. 2005) (same).[28]  They also defy common sense.  It is self-evident that a company in obvious financial distress lacks leverage to obtain top dollar for its assets.  The liquidation of a debtor's assets through a bankruptcy case does not negate that indisputable fact—it merely helps to mitigate further value destruction by implementing an orderly process in lieu of a "fire sale" on the courthouse steps.  *See* 7 Collier on Bankruptcy ¶ 1108.13 (16th ed.).

The only allegations in the Complaint that even arguably relate to Embed's value at or prior to closing do not come close to meeting Plaintiffs' pleading burden:

- Plaintiffs make no attempt to reconcile their vague allegation that, in May 2022, an unnamed Embed employee was "concerned" with unspecified software bugs that FTX US's President noticed, ¶ 41, with the "excellent [Embed] technology and infrastructure" that FTX US's President praised in late June 2022,[29] or otherwise provide any context for why these unspecified software bugs meant that WRS received less than reasonably equivalent value when the Embed transaction closed on September 30, 2022.

---

[28] *See also Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 151-52 (3d Cir.1996) (rejecting rule that "only successful investments can confer value on a debtor," admonishing courts from "viewing [] events with the benefit of hindsight to conclude that any transfer that did not bring in the actual, economic equivalent of what was given up," and holding that courts should "determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return"); *Cooper v. Ashley Commc'ns (In re Morris Commc'ns NC, Inc.)*, 914 F.2d 458, 472 (4th Cir. 1990) (disregarding testimony supporting lack of reasonably equivalent value after the transfer of property); *Love v. B.R.B. Enter., Ltd. (In re Calvillo)*, 263 B.R. 214, 219 (W.D. Tex. 2000) (rejecting expert testimony on reasonably equivalent value based on hindsight).

[29] *See FTX US Acquires Clearing Firm Embed to Enhance FTX Stocks*, PR Newswire (June 21, 2022), https://tinyurl.com/2mjffwmu.

- Plaintiffs refer to snippets of an Embed employee's exchanges in June 2022 purportedly expressing concern about the Embed platform's ability to onboard new user accounts for FTX Stocks, ¶ 42, but do not allege that the employee's concern materialized or that Embed's platform otherwise jeopardized or impaired the commercial success of FTX Stocks.

- Plaintiffs contend that the purchase price for Embed, a growth-stage startup company, was "astronomical," when it had a "mere $25,000 in net revenue" and a "miniscule customer base," ¶ 44, but revenues are largely irrelevant when valuing startups that have only begun to generate sales.  Indeed, at or around the time of the Embed acquisition, crypto and fintech startups routinely raised hundreds of millions of venture capital based on valuations in the billions.[30]

Plaintiffs have failed to plead facts showing that WRS's arm's length acquisition of Embed, which operated a FINRA licensed broker-dealer, custodian and clearing firm, as well as the continued employment of key Embed employees, resulted in the receipt of less than reasonably equivalent value.  This alone provides independent grounds for the dismissal of Counts II and IV of the Complaint.  *In re Cred Inc.*, 650 B.R. at 835-37 (dismissing constructive fraud claims for failure to plead facts showing receipt of less than reasonably equivalent value); *Gavin Solmonese, LLC v. Corp. Servs. Co. (In re Daily Bread Winddown, LLC)*, 2022 Bankr. LEXIS 3078, at *8 (Bankr. D. Del. Nov. 1, 2022) (dismissing constructive fraud claim because the complaint "contains no factual information from which one could conclude that the Debtors did not 'get what they gave'") (citing *VFB, LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)); *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 39-40 (Bankr. D. Del. 2011) (dismissing

---

[30] For example: (i) Fireblocks was valued at $8 billion and raised $550 million in funding in August 2022 (Joanna Ossinger, *Crypto Startup Backed By Google Fund Hits $8 Billion Valuation*, Bloomberg (January 27, 2022), https://tinyurl.com/33vm23wa); (ii) Binance raised more than $200 million in a seed round in April 2022 at a pre-money valuation of $4.5 billion  (Chris Metinko, *Crypto Exchange Binance.US Raises $200M-Plus 'Seed' Round at $4.5B*, Crunchbase (April 6, 2022), https://tinyurl.com/yzdxuxa8); (iii) KuCoin announced in April 2022 a $150 million pre-Series B funding round, bringing its valuation to $10 billion (*KuCoin Raises $150 Million at $10 Billion Valuation to Pioneer Exploration in Web 3.0*, Business Wire (May 10, 2022), https://tinyurl.com/yu2rhbdh); (iv) Brex raised $300 million in January 2022 at a valuation of $12.3 billion  (Mary Ann Azevedo, *Fintech Brex Confirms $12.3B Valuation, Snaps Up Meta Exec to Serve as its Head of Product*, Techcrunch (January 11, 2022), https://tinyurl.com/5h4pwsdc); and (v) Klarna raised $800 million in July 2022 at a valuation of $6.7 billion  (Paul Sawers, *Klarna Confirms $800M Raise as Valuation Drops 85% to $6.7B*, Techcrunch (July 11, 2022), https://tinyurl.com/3d3mm8wk).

constructive fraud claims based on "conclusory" allegations and "threadbare assertions"); *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520-21 (D. Del. 2012) (dismissing constructive fraud claims for failure to adequately plead facts supporting the claims).

Counts II and IV of the Complaint should also be dismissed for the independent reason that Plaintiffs have failed to plead facts showing that the Debtor transferor (here, WRS) was insolvent at the time of, or rendered insolvent by, the Embed acquisition. "Insolvency is determined at the time of conveyance." *Jalbert v. Souza (In re F-Squared Inv. Mgmt., LLC)*, 2019 WL 4261168, at *11 (Bankr. D. Del. Sept. 6, 2019). Here, the challenged transfers occurred on September 30, 2022, when the Embed acquisition closed. The Complaint is devoid of any allegation that WRS, the only Plaintiff that was a party to the Merger Agreement, was insolvent at the time of, or rendered insolvent by, the September 30, 2022 closing. Instead, Plaintiffs make the irrelevant allegation that WRSS was insolvent as of November 8-9, 2022, ¶ 64, and the conclusory assertion that Alameda "could not repay what it owed" in "early September 2022" ¶ 65. That is patently insufficient. *See In re F-Squared Inv. Mgmt., LLC*, 2019 WL 4261168, at *11 (finding insufficient "conclusory statement" and a mere "recitation of the word 'insolvency'" without "any specific allegations" supporting alleged insolvency); *Carickhoff v. Cantor (In re Live Well Fin., Inc.)*, 2023 WL 4025816, at *8 (Bankr. D. Del. June 14, 2023) (dismissing constructive fraud claim for failure to adequately plead facts regarding the debtor transferor's financial condition at the time of the challenged transfer); *Insys Liquidation Tr. v. Quinn Emanuel Urquhart & Sullivan, LLP (In re Insys Therapeutics, Inc.)*, 2021 WL 5016127, at *5 (Bankr. D. Del. Oct. 28, 2021) (same).[31]

---

[31] Plaintiffs otherwise rely on a random assortment of irrelevant allegations regarding the alleged misconduct of the FTX Insiders with respect to FTX.com customer funds. *See, e.g.*, ¶¶ 66-67.

**V.    Bankruptcy Code Section 546(e) Bars Counts II, III, And IV Of The Complaint**

Even if Plaintiffs were to argue, and the Court were to assume *arguendo*, that Defendants

are initial transferees of transfers from WRS, Counts II, III and IV of the Complaint, which seek

to avoid transfers made to acquire Defendants' Embed Equity Interests, ¶¶ 73-89; *Giles* Compl.

Ex. A; *Rocket* Compl. Ex. A, would still be still barred by Bankruptcy Code section 546(e), which

provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the
> trustee may not avoid a transfer that is a margin payment, as defined in section 101,
> 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of
> this title, made by or to (or for the benefit of) a commodity broker, forward contract
> merchant, stockbroker, financial institution, financial participant, or securities
> clearing agency, or that is a transfer made by or to (or for the benefit of) a
> commodity broker, forward contract merchant, stockbroker, financial institution,
> financial participant, or securities clearing agency, in connection with a securities
> contract, as defined in section 741(7), commodity contract, as defined in section
> 761(4), or forward contract, that is made before the commencement of the case,
> except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Congress enacted section 546(e) to promote "certainty" and "finality" by protecting certain

transactions from being unwound years later for the benefit of a bankruptcy estate.  *Golden v.*

*Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*, 2023 WL 2552399, at *9, n.59 (Bankr. D.

Del. Mar. 16, 2023) (analyzing *Kirschner v. Merrill Lynch (In re Tribune Co. Fraudulent Conv.*

*Litig.)*, 946 F.3d 66, 92 (2d Cir. 2019)).  Although section 546(e) does not bar actual fraudulent

transfer claims under section 548(a)(1)(A), it bars section 548(a)(1)(B) claims for constructive

fraudulent transfer and both actual and constructive fraudulent transfer claims under state law

brought pursuant to section 544(b).  *See SIPC v. Madoff*, 476 B.R. 715, 722 (S.D.N.Y. 2012)

(Section 546(e) safe harbor prevents avoidance of transfers under sections 548(a)(1)(A),

548(a)(1)(B) and 544(b), including state law claims for actual and constructive fraudulent

transfer), *aff'd sub nom In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014); *Bond*

*v. Nat. Fin. Servs & JP Turner & Co., LLC (In re U.S. Mortg. Corp.)*, 491 B.R. 642, 675-76 (Bankr. D.N.J. 2013) (Section 546(e) safe harbor bars all state law claims brought under section 544(b), including state law claims for actual and constructive fraudulent transfer).

Here, the Equity Purchase Transfers that Plaintiffs seek to avoid in Counts II, III, and IV fall squarely within at least two of the section 546(e) safe harbors.  As explained below, they were both (i) "transfer[s] made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7);" and (ii) "settlement payment[s], as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution." 11 U.S.C. § 546(e).

### A.    The Equity Purchase Transfers That Plaintiffs Seek To Avoid Were Made In Connection With A "Securities Contract," As Defined In Section 741(7)

The Equity Purchase Transfers were indisputably made "in connection with a securities contract," 11 U.S.C. § 546(e), which Bankruptcy Code section 741(7) defines to include, among other things, (i) "a contract for the purchase [or] sale . . . of a security," 11 U.S.C. § 741(7)(A)(i), (ii) "any repurchase . . . transaction on any such security," *id.*, and (iii) "any other agreement or transaction that is similar to [such] an agreement."  *Id.* at (7)(A)(vii).

As alleged in the Complaint, the Equity Purchase Transfers were made pursuant to the Merger Agreement.  ¶¶ 38; *Giles* Compl. Ex. A; *Rocket* Compl. Ex. A.  The Merger Agreement was a "securities contract" because it was a contract for the purchase, sale, or repurchase of securities—here, Defendants' Embed shares, options, warrants, and SAFEs.[32]  *See, e.g.*, Ex. 1 § 3.2.

---

[32] The Bankruptcy Code defines a "security" to include, among other things, stocks, notes, bonds, warrants or rights to subscribe to or purchase or sell a security, and any other claim or interest commonly known as a security.  11 U.S.C. § 101(49).

The Equity Purchase Transfers were thus made in connection with a securities contract for purposes of Section 546(e). *See PAH Litig. Trust v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, 2016 WL 3611831, at *11 (Bankr. D. Del. June 20, 2016) (explaining that "section 546(e) should be interpreted liberally" and finding that payments were made in connection with securities contract notwithstanding that Defendants' shares were "converted into certificates redeemable for cash prior to the merger's closing"); *In re Tribune*, 946 F.3d at 81 ("all of the payments at issue, including those connected to the redemption of shares, were 'in connection with a securities contract'").

## B.    The Equity Purchase Transfers That Plaintiffs Seek To Avoid Were "Settlement Payments," As Defined In Section 741(8)

The Equity Purchase Transfers were also indisputably "settlement payment[s]," 11 U.S.C. § 546(e), which Bankruptcy Code section 741(8) defines as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  "In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018).  Thus, as the Third Circuit explained in holding that a payment for shares during a leveraged buyout was a "settlement payment" for purposes of section 546(e), "the term 'settlement payment' is a broad one that includes almost all securities transactions." *Id.*; *see also Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 257-59 (3d Cir. 2009) (rejecting trustee argument that the term "settlement payment" is limited to payments for publicly-traded securities).

As alleged in the Complaint, the Equity Purchase Transfers were payments made for Defendants' securities in Embed.   ¶¶ 38; *Giles* Compl. Ex. A; *Rocket* Compl. Ex. A.   They are therefore "settlement payments" as defined in section 741(8).   *See In re Resorts*, 181 F.3d at 515-16; *In re Plassein*, 590 F.3d at 257-59; *Physiotherapy Holdings*, 2016 WL 3611831, at *11 (explaining that "section 546(e) should be interpreted liberally" and finding that payments made as part of reverse-triangular merger were "settlement payments").

### C.  The Equity Purchase Transfers That Plaintiffs Seek To Avoid Were Made By Or For The Benefit Of A "Financial Institution"

Finally, the Equity Purchase Transfers were "made by or to (or for the benefit of) a . . . financial institution."  11 U.S.C. § 546(e).  As explained below, WRS was a "financial institution" for purposes of section 546(e).

The Bankruptcy Code defines a "financial institution" to include "a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank . . . and, when any such . . . entity is acting as agent or custodian for a customer . . . in connection with a securities contract . . . *such customer*."  11 U.S.C. § 101(22)(A) (emphasis added).

Here, WRS was a customer of a Western Alliance Bank, a state-chartered bank and a member of the Federal Reserve System supervised by the Federal Reserve Board,[33] in connection with a securities contract (*i.e.*, the Merger Agreement).  Indeed, the Merger Agreement specifically designated Western Alliance Bank acted as WRS's exchange and escrow agent for the Equity Purchase Transfers.  *See* Ex. 1 § 3.2; Ex. 4 ¶ 4.

WRS was therefore a "financial institution" for purposes of section 546(e).  *See In re Tribune Co. Fraudulent Conv. Litig.*, 2019 WL 1771786, at *9-11 (S.D.N.Y. Apr. 23, 2019)

---

[33] *See* Western Alliance Bank Institution Details, FDIC (last updated Aug. 4, 2023), https://tinyurl.com/ytz2ua2c.

(holding that Tribune was CTC's customer and thus a "financial institution" for purposes of section 546(e) because "Tribune engaged the CTC's services as depositary" and "CTC was entrusted with billions of dollars of Tribune cash and was tasked with making payments on Tribune's behalf to Shareholders upon the tender of their stock certificates to CTC"), *aff'd*, 10 F.4th 147 (2d Cir. 2021); *see also Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 WL 4150523, at **6-7 (S.D.N.Y. Sept. 13, 2021) (affirming dismissal of fraudulent conveyance claims as safe-harbored and holding that customer of a bank acting as depository and distributor of proceeds was "financial institution" for purposes of section 546(e)); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 202 (S.D.N.Y. 2020) (dismissing fraudulent conveyance claims as safe-harbored and holding that customer of a bank acting as distributor of merger consideration was a "financial institution" for purposes of section 546(e)).

\* \* \*

In sum, even assuming *arguendo* that Defendants are initial transferees of transfers from WRS, Counts II, III, and IV of the Complaint are still barred by Bankruptcy Code section 546(e) because the Equity Purchase Transfers Plaintiffs seek to avoid were (i) "transfer[s] made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7);" and/or (ii) "settlement payment[s], as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution." 11 U.S.C. § 546(e).

## VI. Plaintiffs' Claims To Avoid Post-Closing Retention Payments In Counts I-IV Of The Complaint Should Be Dismissed Because The Obligation To Make Any Such Payments Lies With Embed, A Non-Debtor, And Plaintiffs Do Not Adequately Allege Facts Showing That Such Obligations Are Actually Or Constructively Fraudulent

The Complaint is impossibly vague with respect to the allegations pled and relief sought in connection with the retention payments to Defendants other than Mr. Giles. It is unclear whether Plaintiffs are alleging that any Defendant other than Mr. Giles has received a retention payment

that is subject to avoidance, or whether they seek only to avoid obligations to make retention payments to Defendants in the future.  Either way, Plaintiffs' claims to avoid these transfers fail and should be dismissed.

As acknowledged in the Complaint, the Incentive Agreements governing the post-closing retention payments with Embed employees other than Mr. Giles "provide that the bonuses are to be paid in five installments beginning on September 30, 2023," and required those employees to "remain at Embed for two years after [the September 2022] closing in order to receive their full bonuses," ¶ 47 & n.5; Ex. 2 ¶ 1.  Since the date by which the first installment has not yet passed, and Plaintiffs cannot recover retention payments that have not yet been made.  *See, e.g., Asher Candy Co. v. MAFCO Holdings, Inc. (In re Marvel Ent. Grp., Inc.)*, 273 B.R. 58, 63, 83-85 (D. Del. 2002) (finding defendant had no liability under section 548 "because no 'transfers' occurred during the relevant periods within the meaning of the [Bankruptcy] Code"); *Kaler v. Remily (In re Remily)*, 314 B.R. 790, 798 (Bankr. D. N.D. 2004) ("there was no transfer, and the trustee's claim under section 548(a)(1) fails").

To the extent Plaintiffs seek to avoid obligations to make retention payments in the future, the Incentive Agreements make clear that the obligation to make the post-closing retention payments lies with Embed, a non-Debtor, and that the exercise of that obligation does not require a transfer of Plaintiff' property: "[WRS] will cause [Embed] (or, if applicable, another member of the FTX Group) to pay or cause to be paid to Employee the Retention Incentive Payment."  Ex. 2 ¶ 1.

As a result, the obligation to make post-closing retention payments under the Incentive Agreements are not avoidable obligations of any Debtor, much less any of the Plaintiffs.  Even if such obligations were subject to avoidance, the Complaint contains no allegations whatsoever to

support Plaintiffs' claims that those future obligations are either actual or constructive fraudulent transfers. In the absence of any factual allegations to support their conclusory statements that the obligations are avoidable, Plaintiffs' claims must be dismissed. *See In re Opus East, L.L.C.*, 480 B.R. at 573 (even under the "more relaxed standard" generally applied to a bankruptcy trustee, as a third party outsider to the debtor's transactions, "Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible.").

VII.    **Plaintiffs' Claim In Count V Of The Complaint To Avoid The Retention Payment Made To Mr. Giles As A Preference Should Be Dismissed Because It Was Not Made On Account Of An Antecedent Debt**

Count V of the Complaint, which seeks to avoid the retention bonus paid to Mr. Giles at closing as a preference, ¶¶ 90-100, should also be dismissed because the retention bonus was not paid on account of an antecedent debt. *See Miller v. Energy Star Records (In re DA Liquidating Corp.)*, 622 B.R. 172, 176-77 (Bankr. D. Del. 2020) ("To survive a motion to dismiss, Trustee must sufficiently plead all elements of a preference, including an antecedent debt.")

For a transfer to be avoidable as a preference under section 547 of the Bankruptcy Code, the transfer must be "for or on account of an antecedent debt *owed* by the debtor *before* such transfer was made." 11 U.S.C. § 547(b)(2) (emphasis added). "A transfer is *deemed* 'on account of an antecedent debt' if the debtor incurs the liability prior to the alleged preferential transfer." *Trustee of the NP Creditor Litig. Trust (In re NewPage Corp.)*, 555 B.R. 444, 450 (D. Del. 2016); *see also In re USDigital, Inc.*, 443 B.R. at 36; *Charys Liquidating Trust v. Hades Advisors, LLC (In re Charys Holding Co., Inc.)*, 2010 WL 2788152, at *5 (Bankr. D. Del. July 14, 2010). "A debt 'is deemed to have been incurred on the date upon which the debtor first becomes legally bound to pay.'" *In re NewPage Corp.*, 555 B.R. at 450. A payment obligation typically arises when the services are performed or the goods are transferred; if the parties to an agreement to perform services or transfer goods intend that future conditions be satisfied before an obligation

45

to pay for services rendered is triggered, the payment obligation (*i.e.*, the debt) arises only after those contingencies have also occurred.  *See Piazza v. Pac. Mar. Indus. Corp. (In re George G. Sharp, Inc.)*, 2022 WL 1714178, at *10 (Bankr. S.D.N.Y. May 25, 2022) ("[A] contingent contractual obligation does not give rise to an 'antecedent debt' until the payment obligations are actually triggered.").

Here, the Incentive Agreement with Mr. Giles makes clear that payment of Mr. Giles' retention bonus was contingent upon the closing of the merger transaction and Mr. Giles' continued employment with Embed through closing: "Employee's eligibility to receive the Retention Incentive Payment pursuant to Section 1 is conditioned upon Employee's continuous employment with [Embed] through the Closing." Ex. 3 ¶ 2; *see also id*. at Recitals ¶ C ("Effective Date" of the "Agreement" will be "September 30, 2022"); ¶ 1 ("The Retention Incentive Payment will vest and become payable *as of the Effective Date*.) (emphasis added).   In the Complaint, Plaintiffs admit that the retention bonus was paid to Mr. Giles contemporaneously with the closing. ¶ 5 ("Defendant Giles was paid his $55,000,000 retention bonus in full on the September 30, 2022 closing date of the transaction."); ¶ 47 ("Giles was the only one who was paid his full retention bonus on the September 30, 2022 closing date.").

The obligation to pay Mr. Giles' retention bonus both arose, and was satisfied, on September 30, 2022, when the merger transaction closed.  Where, as here, "there is no delay between when the debt arises and payment of the obligation," the transfer is, by definition, not on account of an antecedent debt and "outside the scope of § 547(b)." *In re Hechinger Inv. Co.*, 489 F.3d at 574.  Accordingly, Count V of the Complaint should be dismissed. *See In re DA Liquidating Corp.*, 622 B.R. at 176-77 (dismissing preference claim for failure to plead antecedent debt).

**VIII.   Counts VI and VII Of The Complaint Should Be Dismissed For Failure To Adequately Allege A Primary Violation In Counts I-V**

Count VI of the Complaint, which seeks to recover transferred funds under Bankruptcy Code section 550(a)(1), ¶¶ 101-03, should be dismissed because, as discussed above, Defendants are not initial transferees and Plaintiffs have failed in any event to adequately allege facts showing that these transfers are avoidable under sections 544, 547, and 548.  *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 750 (3d Cir. 2013) (explaining that section 550(a)(1) only allows recovery of "property whose transfer has been avoided"); *Allegheny Univ. Health Sci. v. Phila. Health Care Trust (In re Allegheny Health, Educ. & Rsch. Found.)*, 253 B.R. 157, 173 (Bankr. W.D. Pa. 2000) (explaining that section 550(a)(1) only allows recovery "if, and to the extent that, said transfer is successfully avoided"); *In re Daily Bread Winddown, LLC*, 2022 Bankr. LEXIS 3078, at *11 (explaining that section 550 is "not a separate basis for liability" and that to survive a motion to dismiss a claim under section 550 the plaintiff "needs . . . to state a plausible claim to avoid under section 547 or 548").

Similarly, Count VII of the Complaint, which seeks to disallow claims pursuant to Bankruptcy Code section 502(d), should be dismissed because, as discussed above, Defendants are not initial transferees and Plaintiffs have failed in any event to adequately allege facts showing Defendants have received transfers that are recoverable or avoidable.  *See In re KB Toys Inc.*, 736 F.3d 247, 249 (3d. Cir. 2013) ("Under § 502(d), a bankruptcy claim can be disallowed if the claimant receives property that is avoidable or recoverable by the bankruptcy estate"); *Giuliano v. Shorenstein Co. LLC (In re Sunset Aviation, Inc.)*, 468 B.R. 641, 651–52 (Bankr. D. Del. 2011) ("Section 502(d) provides that 'the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section[s] . . . 547, 548, 549 of this title.'").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss with prejudice the Complaints in both Adv. Pro. No. 23-50379 and Adv. Pro. No. 23-50380.

Dated: August 15, 2023
      Wilmington, Delaware

**SAUL EWING LLP**

*/s/Lucian B. Murley*
Lucian B. Murley (DE Bar No. 4892)
1201 North Market Street, Suite 2300,
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6898
luke.murley@saul.com

-and-

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
cspeckhart@cooley.com

-and-

Michael Klein (admitted *pro hac vice*)
Aric Wu (admitted *pro hac vice*)
Caroline Pignatelli (admitted *pro hac vice*)
Erica J. Richards (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
mklein@cooley.com
ahwu@cooley.com
cpignatelli@cooley.com
erichards@cooley.com

*Counsel to the Defendants Listed on Annex A*

**ANNEX A**

9Yards Capital Investments II LP
Aaron Frank
AAVCF3 LP
Adapt VC LLC
Akhil Paul
Benjamin Londergan
Brandon Mann
Brent Johnson
Carol H. Duggan Revocable Living Trust
Cathexis Subsidiaries GP, LLC
Cathexis Ventures, LP
Christian Nordby
Christopher Harper
Christopher Young
Clayton Gardner
David Meents
Dena Wever
Derek Clark
EM Fund I, a series of Chris Golda Investments, LP
Embedfi June 2021, a series of Party Round LLC
Fairchild Fund III, LLC
Fund I, a series of 20VC, LP
Fund I, a series of Not Boring Capital, LP
Harland Group LLC
James Nichols
Joe Percoco
John Dwyer
Jonathan Duarte
Jonathan Weiner
Joshua Allen Slate
Justin Lovero
Kerr Investment Holdings Pty Ltd a/t/f The Kerr Family Trust
Kiara Baudoin
Kick the Hive LLC
KV5 Pty Ltd ATF KV5 Trust
Matthew Lyon
Michael Ferrari
Michael Giles
Monique Saugstad
Motivate Ventures Fund I, LP
Motivate Ventures QP Fund I, LP
Operator Partners, LLC
Peter T. Lawler Living Trust

Philippe Jabre
PruVen Capital Partners Fund I, LP
S20, a series of Chris Golda Investments, LP
Silverstone Venture Investments Limited
Soma Capital Fund, III, LP
Soma Capital Fund III Partners LLC
Stephen Harper
Stuart Sopp
SWS Holding Company, LLC
The Gardner 2008 Living Trust
Thomas G. Miglis Revocable Trust
TriplePoint Private Venture Credit Inc.
TriplePoint Venture Lending Fund, LLC
TriplePoint Ventures 5 LLC
VentureSouq Capital SPC o/b/o VSQ SP 59 (YCS20)
William Hockey Living Trust
Yaselleraph Finance Pty Ltd ATF Yaselleraph Finance Trust
Z Perret Trust