## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC.,<br><br>Plaintiffs,<br><br>- against -<br><br>MICHAEL GILES, *et al.*,<br><br>Defendants. | Adv. Pro. No. 23-50380 (JTD) |

## EMBED SHAREHOLDER DEFENDANTS' MEMORANDUM
## OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Date:  August 15, 2023

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

/s/  Elizabeth Wang
Daniel A. Mason (Del. Bar No. 5206)
Elizabeth Wang (Del. Bar No. 6620)
500 Delaware Avenue, Suite 200, P.O. Box 32
Wilmington, DE 19899-0032
Telephone: (302) 655-4410
Fax:        (302) 397-2710
Email:      dmason@paulweiss.com
            ewang@paulweiss.com

William A. Clareman (*pro hac vice* forthcoming)
Gregory F. Laufer (*pro hac vice* forthcoming)
Kenneth S. Ziman (*pro hac vice* forthcoming)

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

i

1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Fax:        (212) 492-0248
Email:      wclareman@paulweiss.com
            glaufer@paulweiss.com
            kziman@paulweiss.com

Randall S. Luskey (*pro hac vice* forthcoming)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Fax:        (202) 204-7391
Email:      rluskey@paulweiss.com

*Attorneys for Embed Shareholder Defendants The 2016 Karkal Family Trust; Acrew Capital Fund (A), L.P.; Acrew Capital Fund, L.P.; Acrew Capital MGP, LLC; Bain Capital Venture Fund 2019 LP; BCIP Venture Associates II, L.P.; BCIP Venture Associates II-B, L.P.; BCV 2019-MD Primary, L.P.; Buckley Ventures GP, LLC; Buckley Ventures, LP; Correlation Ventures II, LP; Fin VC Regatta I, LP; Homebrew Ventures III, LP; Jonathan Christodoro; Kamran Ansari; Launchpad Capital Fund I LP; LGF II, L.P.; Liquid 2 Ventures Fund II, L.P.; Propel Venture Partners, LLC; Propel Venture Partners US Fund I LP; Putnam (Warren Lowell Putnam & Brynn Jinnett Putnam, Tenants in Common); Samuel Jones; Torch Capital II, LP; Transpose Platform o/b/o TI Platform Fund II; TI Platform NLI Venture Limited II; Transpose Platform Fintech Fund II, L.P.; TI Platform Fund II, LP; Treasury Fund I, LP; Y Combinator ES20, LLC; and YCC20, L.P.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iv

SUMMARY OF ARGUMENT ............................................................................................1

STATEMENT OF FACTS ...................................................................................................5

I.      The Parties and Relevant Non-Parties ....................................................................5

II.     Alameda's Misappropriation of Funds from FTX.com Customers .........................6

III.    WRS's Acquisition of Embed ..................................................................................6

IV.     The Collapse of the FTX Group ..............................................................................8

V.      This Action................................................................................................................8

LEGAL STANDARD..........................................................................................................10

ARGUMENT .......................................................................................................................11

I.      PLAINTIFFS' ACTUAL FRAUDULENT TRANSFER CLAIMS (COUNTS
        ONE AND THREE) FAIL TO STATE A CLAIM FOR RELIEF AGAINST THE
        EMBED SHAREHOLDER DEFENDANTS ...................................................................11

II.     THE SAFE HARBOR UNDER SECTION 546(e) OF THE BANKRUPTCY
        CODE BARS PLAINTIFFS' CONSTRUCTIVE FRAUD CLAIMS (COUNTS
        TWO AND FOUR) UNDER THE BANKRUPTCY CODE AND ALL STATE
        LAW AVOIDANCE CLAIMS....................................................................................16

        A.      The Transfers to the Embed Shareholder Defendants Were Settlement
                Payments in Connection with a Securities Contract ...............................................17

        B.      The Transfers to the Embed Shareholder Defendants Were Made by and to
                "Financial Institutions".........................................................................................19

        C.      Section 546(e) Also Requires Dismissal of All of Plaintiffs' State Law
                Fraudulent Transfer Claims ...................................................................................22

III.    PLAINTIFFS' CLAIMS UNDER SECTION 550(a)(1) CLAM (COUNT SIX)
        AND SECTION 502(d) (COUNT SEVEN) SHOULD BE DISMISSED, AS
        PLAINTIFFS HAVE NOT ALLEGED AN AVOIDABLE TRANSFER ......................24

IV.     THE EMBED SHAREHOLDER DEFENDANTS JOIN IN AND ADOPT THE
        ARGUMENTS SET FORTH BY THE OTHER DEFENDANTS ..................................26

CONCLUSION.....................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpizar-Fallas* v. *Favero*,
908 F.3d 910 (3d Cir. 2018)................................................................................10

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)...........................................................................................10

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)...........................................................................................10

*In re Bernard L. Madoff Inv. Sec. LLC*,
773 F.3d 411 (2d Cir. 2014)...........................................................................18, 23

*In re BMT-NW Acquisition, LLC*,
582 B.R. 846 (Bankr. D. Del. 2018) .....................................................................25

*In re Borden Chems. & Plastics Operating Ltd.*,
336 B.R. 214 (Bankr. D. Del. 2006) .....................................................................16

*In re Bos. Generating LLC*,
617 B.R. 442 (Bankr. S.D.N.Y. 2020), *aff'd sub nom. Holliday* v. *Credit
Suisse Sec. (USA) LLC*, No. 20 CIV. 5404 (GBD), 2021 WL 4150523
(S.D.N.Y. Sept. 13, 2021).....................................................................................23

*In re Conex Holdings, LLC*,
518 B.R. 792 (Bankr. D. Del. 2014) ......................................................................7

*In re Copeland*,
291 B.R. 740 (Bankr. E.D. Tenn. 2003) ...............................................................14

*In re Cred Inc.*,
650 B.R. 803 (Bankr. D. Del. 2023) ................................................................10, 11

*In re DHP Holdings II Corp.*,
435 B.R. 264 (Bankr. D. Del. 2010) .....................................................................25

*In re Elrod Holdings Corp.*,
421 B.R. 700 (Bankr. D. Del. 2010) .....................................................................14

*In re Fairfield Sentry Ltd.*,
No. 10-13164 (SMB), 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020),
*aff'd*, 630 F. Supp. 3d 463 (S.D.N.Y. 2022) .........................................................21

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) .................................................................11, 12, 15, 16

*Fowler* v. *UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009)..................................................................................5, 10

*In re Hamilton Taft & Co.*,
    176 B.R. 895 (Bankr. N.D. Cal. 1995), *aff'd*, 196 B.R. 532 (N.D. Cal. 1995),
    *aff'd*, 114 F.3d 991 (9th Cir. 1997).........................................................................23

*In re Hechinger Inv. Co. of Del.*,
    274 B.R. 71 (D. Del. 2002)......................................................................................23

*Holliday* v. *Credit Suisse Sec. (USA) LLC*,
    No. 20 CIV. 5404 (GBD), 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021).............................21

*In re KB Toys Inc.*,
    736 F.3d 247 (3d Cir. 2013)....................................................................................24

*Kelley* v. *Safe Harbor Managed Acct. 101, Ltd.*,
    31 F.4th 1058 (8th Cir. 2022) .................................................................................19

*In re Live Well Fin., Inc.*,
    2023 WL 4065433 (Bankr. D. Del. June 16, 2023)....................................................13

*Merit Mgmt. Grp., LP* v. *FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018).............................................................................................22

*Mervyn's, LLC* v. *Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
    426 B.R. 488 (Bankr. D. Del. 2010) ...........................................................................7

*In re Nat'l Forge Co.*,
    344 B.R. 340 (W.D. Pa. 2006).................................................................................23

*In re Nine West LBO Sec. Litig.*,
    482 F. Supp. 3d 187 (S.D.N.Y. 2020).............................................................4, 19, 21

*In re Our Alchemy, LLC*,
    2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) ..................................................11

*In re PennySaver USA Publ'g, LLC*,
    587 B.R. 445 (Bankr. D. Del. 2018) .........................................................................25

*In re PennySaver USA Publ'g, LLC*,
    602 B.R. 256 (Bankr. D. Del. 2019) .........................................................................11

*In re Plassein Int'l Corp.*,
    590 F.3d 252 (3d Cir. 2009)..............................................................................17, 18

*In re Quorum Health Corp.*,
  No. 20-10766 (BLS), 2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) ...........................18

*In re Resorts Int'l, Inc.*,
  181 F.3d 505 (3d Cir. 1999).................................................................................................18

*In re Samson Res. Corp.*,
  625 B.R. 291 (Bankr. D. Del. 2020) .....................................................................................17

*In re Tribune Co. Fraudulent Conv. Litig.*,
  10 F.4th 147 (2d Cir. 2021) ..................................................................................................12

*In re Tribune Co. Fraudulent Conv. Litig.*,
  No. 11-md-2296, 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017)..................................................14

*In re Tribune Co. Fraudulent Conv. Litig.*,
  946 F.3d 66 (2d Cir. 2019).........................................................................................4, 19, 20

*In re Tribune*,
  464 B.R. 126 (Bankr. D. Del. 2011) .....................................................................................15

*U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns Inc.*,
  892 F. Supp. 2d 805 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014)........................22

*In re Ultimate Acquisition Partners, LP*,
  No. 11-10245 MFW, 2012 WL 1556098 (Bankr. D. Del. May 1, 2012) ...............................25

*In re USDigital, Inc.*,
  443 B.R. 22 (Bankr. D. Del. 2011) .......................................................................................24

*In re Zohar III, Corp.*,
  631 B.R. 133 (Bankr. D. Del. 2021) .....................................................................................11

**Statutes and Rules**

6 *Del. C.* § 1304 ........................................................................................................... *passim*

11 U.S.C. § 101(22)(A)...........................................................................................................24

11 U.S.C. § 502(d) ........................................................................................................9, 24, 25

11 U.S.C. § 544(b) ...........................................................................................................9, 24

11 U.S.C. § 546(e) ......................................................................................................... *passim*

11 U.S.C. § 548 .............................................................................................................. *passim*

11 U.S.C. § 550(a) ...........................................................................................................9, 24

Fed. R. Bankr. P. 7009 ...................................................................................................1, 10

Fed. R. Bankr. P. 7019 ...........................................................................................................7

Fed. R. Bankr. P. 7012 ...........................................................................................................1

Fed. R. Civ. P. 9(b) ........................................................................................................1, 10, 11

Fed. R. Civ. P. 12(b)(6) .................................................................................................1, 10

Fed. R. Evid. 201 ....................................................................................................................7

The Embed Shareholder Defendants[2] respectfully submit this memorandum of law in support of their motion to dismiss Counts One through Four and Six through Seven of the complaint filed by plaintiffs Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services, Inc. ("WRSS") (collectively, "Plaintiffs") (the "Complaint" or "Compl.," D.I. 1), pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rules 7012 and 7009 of the Federal Rules of Bankruptcy Procedure.[3]  Pursuant to Federal Rule of Bankruptcy Procedure 7012, the Embed Shareholder Defendants do not consent to entry of final orders or judgments by the Bankruptcy Court in this adversary proceeding.

## SUMMARY OF ARGUMENT

Plaintiffs, three Debtors in the FTX bankruptcy, are seeking avoidance of payments made to the Embed Shareholder Defendants—30 former Embed Financial Technologies Inc. ("Embed") shareholders—and other defendants in connection with WRS's September 2022 acquisition of Embed, a stock clearing firm and FINRA licensed broker-dealer. Plaintiffs allege that the payments were fraudulent transfers under Section 548 of the Bankruptcy Code and Section 1304 of Title 6 of the Delaware Code and should be clawed back.  The

---

[2]  The "Embed Shareholder Defendants" are:  The 2016 Karkal Family Trust; Acrew Capital Fund (A), L.P.; Acrew Capital Fund, L.P.; Acrew Capital MGP, LLC; Bain Capital Venture Fund 2019 LP; BCIP Venture Associates II, L.P.; BCIP Venture Associates II-B, L.P.; BCV 2019-MD Primary, L.P.; Buckley Ventures GP, LLC; Buckley Ventures, LP; Correlation Ventures II, LP; Fin VC Regatta I, LP; Homebrew Ventures III, LP; Jonathan Christodoro; Kamran Ansari; Launchpad Capital Fund I LP; LGF II, L.P.; Liquid 2 Ventures Fund II, L.P.; Propel Venture Partners, LLC; Propel Venture Partners US Fund I LP; Putnam (Warren Lowell Putnam & Brynn Jinnett Putnam, Tenants in Common); Samuel Jones; Torch Capital II, LP; Transpose Platform o/b/o TI Platform Fund II; TI Platform NLI Venture Limited II; Transpose Platform Fintech Fund II, L.P.; TI Platform Fund II, LP; Treasury Fund I, LP; Y Combinator ES20, LLC; and YCC20, L.P.

[3]  Count Five, a preference claim, is asserted only against Defendant Michael Giles, and not against the Embed Shareholder Defendants.  As such, it is not addressed in this motion.

evidence squarely contradicts Plaintiffs' claims—a point the Embed Shareholder Defendants will establish if this matter proceeds.  But Plaintiffs' Complaint should go no further than this motion, because it is beset by at least two fatal, and irremediable, flaws warranting its dismissal at the pleading stage:

*First*, to the extent Plaintiffs are attempting to allege "actual" fraud—that is, that WRS, WRSS, and Alameda actually intended to hinder, defraud, and delay their creditors by consummating the Embed acquisition—Plaintiffs have failed to allege sufficient, much less particularized (as Rule 9(b) requires) "badges of fraud" necessary to raise a plausible inference of fraud.  In fact, Plaintiffs have totally disregarded the "badge of fraud" courts routinely address first in such an analysis:  a relationship between the debtor (as transferor) and the transferees (here, the Embed Shareholder Defendant and the other defendants).  Nor could Plaintiffs credibly allege any such badge of fraud because there was no such relationship here.  To the contrary, by Plaintiffs' own account, WRS's acquisition of Embed was an arm's-length transaction between sophisticated businesses.  None of the Plaintiffs or their "insiders" who Plaintiffs allege drove the transaction had any financial interest in Embed, and they therefore did not stand to gain by allegedly paying more for Embed than it was worth, as Plaintiffs summarily and implausibly allege they did.  In fact, Plaintiffs allege that the "insiders" expected the value of their shares *in WRS* to increase as a result of WRS's Embed acquisition, which they claim was intended to enable Plaintiffs to broaden their service offerings by providing clearing and custody services for equity trades.  As such, by Plaintiffs' own tacit admission, the acquisition would have *benefitted* WRS's and WRSS's creditors by strengthening WRS and WRSS rather than result in a transfer intended to prevent payment to those creditors.

Plaintiffs' other attempt at alleging fraud is equally inadequate.  They claim that WRS was "snookered" into paying what it did for Embed because it did not know what certain Embed employees purportedly knew:  that there were "bugs" in the company's platform that would make the company less valuable.  But that allegation flatly contradicts Plaintiffs' theory that WRS, WRSS, and Alameda "insiders" ***intentionally*** overpaid for Embed to defraud their creditors because there is no allegation that those insiders themselves had any knowledge of the purported "bugs" in Embed's platform.  Courts are not required to, and in fact should not, blindly accept such facially incoherent allegations.

Other commonly recognized "badges of fraud" are also absent from the Complaint.  For example, rather than concealing the acquisition or conducting it in secret, WRS publicly announced it in a news release in June 2022, shortly after it agreed to the deal.  Also, Plaintiffs do not and cannot plausibly allege that their "insiders" retained any control over or derived any benefit from the funds they used to acquire Embed after the acquisition closed, or that the $220 million WRS paid to acquire Embed represented a substantial portion of WRS's assets.  And, while Plaintiffs allege in conclusory fashion that the transfers made in connection with the acquisition occurred "shortly before or shortly after Plaintiffs incurred substantial debts," they do not specify with any factual allegations what those "substantial debts" were or what reasons, if any, there were for the supposed timing of any alleged debt incurrences.

In short, the Complaint lacks any particularized factual allegations showing that Plaintiffs or their "insiders" agreed to the acquisition with an actual intent to hinder, defraud, or delay creditors, and, in fact, the allegations that Plaintiffs do make contradict such a claim.  Plaintiffs' actual fraudulent transfer claims, therefore, fail to state a claim for relief.

***Second***, Plaintiffs' constructive fraud claim under the Bankruptcy Code and all of their state law avoidance claims fail because the "safe harbor" for settlements of securities trades provided under Section 546(e) of the Bankruptcy Code bars those claims. Congress enacted Section 546(e) to provide stability and finality to securities transactions. It bars *all* avoidance actions, including those under state law, for transfers that involve settlement payments made by, to, or for the benefit of a financial institution in connection with a securities contract, with the specific exception of avoidance claims brought under Section 548(a)(1)(A).

The transfers of funds made in connection with WRS's acquisition of Embed fit all of those requirements. They were settlement payments made in connection with a securities contract because WRS made them to acquire Embed shares pursuant to the parties' merger agreement. And they were payments made by or to a financial institution because the parties agreed that the payment would be made to, and then disbursed by, Western Alliance Bank, which is a commercial bank that acted as the parties' agent in connection with the transaction. This is the exact same fact pattern that courts have recently ruled is sufficient to trigger the Section 546(e) safe harbor.[4]

Accordingly, none of Plaintiffs' claims against the Embed Shareholder Defendants state a claim for relief and they should all be dismissed with prejudice.

---

[4] *See, e.g.*, *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 80 (2d Cir. 2019); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 191 (S.D.N.Y. 2020).

## STATEMENT OF FACTS[5]

### I.    The Parties and Relevant Non-Parties

Plaintiffs in this action—Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services, Inc. ("WRSS")—are three members of a group of companies the Complaint refers to as the "FTX Group."  (Compl. ¶ 5 n.4.)

Prior to the filing of the chapter 11 cases, Alameda was a cryptocurrency trading firm owned by Samuel Bankman-Fried (90%) and Zixiao "Gary" Wang (10%).  (*Id.* ¶¶ 3, 9.)

WRS is a Delaware holding company owned principally by Bankman-Fried (52.99%), Wang (16.93%), and Nishad Singh (7.83%).  (*Id.* ¶¶ 3, 10.)

WRSS is a wholly owned subsidiary of WRS.  It did business as FTX US, the cryptocurrency exchange Bankman-Fried, Wang, and Singh founded to offer cryptocurrency trading services to U.S. customers.  (*Id.* ¶¶ 3, 11.)

Non-party FTX Trading Ltd.—a separate entity in the FTX Group and also a Debtor in this bankruptcy—did business as FTX.com, which was the principal international cryptocurrency exchange FTX Group operated.  (*See id.* ¶ 27.)

The Complaint refers to Bankman-Fried, Wang, Singh, and former Alameda CEO Caroline Ellison as the "FTX Insiders."  (*Id.* ¶ 5.)

Non-party Embed Financial Technologies Inc. ("Embed") is a software company that WRS acquired in September 2022.  (*Id.* ¶¶ 3, 5.)  Embed developed trading software for broker-dealers and registered investment advisors, including Embed's wholly-owned subsidiary Embed Clearing LLC, which was FINRA licensed broker-dealer.  (Ex. 2.)[6]

---

[5]   The well-pleaded allegations in the Complaint are assumed true solely for purposes of this Motion.  *Fowler* v. *UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[6] "Ex. __" refers to exhibits to the Declaration of Elizabeth Wang, dated August 15, 2023.

The Embed Shareholder Defendants are 30 former shareholders of Embed who received payments in exchange for their shares in connection with WRS's acquisition of the company.  (*See id.* ¶¶ 5, 13, 38; *supra* note 2.)  The Embed Shareholder Defendants all invested in Embed well before the discussions regarding the WRS acquisition of Embed began.

Other defendants include Michael Giles, the founder and CEO of Embed until February 2023, and other former Embed employees and shareholders.  (Compl. ¶¶ 3, 12–13.)

## II.    Alameda's Misappropriation of Funds from FTX.com Customers

Plaintiffs allege that Alameda engaged in a massive misappropriation of funds from FTX.com customers separate and apart from the acquisition of Embed that Plaintiffs are challenging in this action.  In particular, Plaintiffs allege that, in 2019, Wang made "certain changes to [the FTX.com] code to give Alameda 'special privileges on the FTX platform,' including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government issued) currencies and cryptocurrencies."  (*Id.* ¶ 30 (alternation in original).)

The Complaint alleges that the FTX Insiders, using these purported "special privileges," "frequently caused Alameda to misappropriate funds from the FTX exchanges for their own benefit," and "loot[ed]" several billion dollars from FTX.com.  (*Id.* ¶ 30.)

## III.    WRS's Acquisition of Embed

According to the Complaint, on or about March 15, 2022, WRS began talks to acquire Embed, with the goal of providing customers on the FTX US exchange with the ability to trade stocks in addition to cryptocurrency.  (*Id.* ¶ 4.)  A WRS subsidiary had been Embed's first major client.  (*Id.* ¶ 44.)  WRS pursued the acquisition with the belief that Embed's technology would "help expand FTX US's operations into conventional securities markets."  (*Id.* ¶ 28.)  WRS planned to call the new product offering "FTX Stocks."  (*Id.* ¶ 4.)

On April 15, 2022, WRS and Embed signed a term sheet providing that WRS would acquire Embed for $220 million. (*Id.* ¶ 38.) Approximately two months later, on June 10, 2022, WRS and Embed signed a definitive Agreement and Plan of Merger ("Merger Agreement"), confirming that WRS would pay $220 million in merger consideration to Embed stockholders. (*Id.*; Ex. 1 [Merger Agreement] § 3.1(c).)[7]

WRS announced its acquisition of Embed in a news release on June 21, 2022, entitled "FTX US Acquires Clearing Firm Embed to Enhance FTX Stocks." (Ex. 2.)[8] Brett Harrison, the President of FTX US, lauded the acquisition in the release. Noting that FTX US had previously partnered with Embed, during which time Embed had showed FTX US that it had built "excellent technology and infrastructure to provide [clearing and custody] services," Harrison added:

> The acquisition signals [FTX US's] intention to expand the financial services it offers to US customers, and will enable it to route, execute, clear, and custody all customer equities and options accounts and trades through use of Embed's infrastructure and licensure. In addition, Embed and FTX US share a common goal to provide whitelabel brokerage services to other businesses, applications, and customers.

*Id.*

---

[7]   The Complaint explicitly refers to and cites the Merger Agreement, and it is integral to Plaintiffs' claims. (Compl. ¶¶ 38, 45, 94.) The Court may therefore consider the Merger Agreement on this Motion. *See In re Conex Holdings, LLC*, 518 B.R. 792, 804 & n.66 (Bankr. D. Del. 2014) (finding that court can consider operating agreement mentioned in motion to dismiss because it is "integral to the Complaint and explicitly relied on by the Trustee," and therefore the "Trustee is presumably on notice" of the agreement).

[8]   Under the "public record exception," this court may take judicial notice of public records, including news releases, to "acknowledge that the facts contained in the records existed in the public realm at that time." *Mervyn's, LLC* v. *Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 496 (Bankr. D. Del. 2010); *see also* Fed. R. Evid. 201; Fed. R. Bankr. P. 7019 (incorporating Federal Rules of Evidence). This Court has previously taken judicial notice of press releases in the context of a motion to dismiss an adversary proceeding regarding fraudulent transfer. *See id.* ("The Court is taking judicial notice of the press releases because they are public documents.").

The Complaint alleges that, in May and June 2022, certain Embed employees exchanged emails about "bugs" in the Embed platform that would make it difficult to handle new accounts, but it does not allege that anyone at WRS—or any of the Embed Shareholder Defendants—were aware of these emails or the "bugs" they described.  (Compl. ¶¶ 41–43.)  In fact, the Complaint alleges that WRS "got snookered" into paying what it paid for Embed.  (*Id.* ¶ 43.)

## IV.     The Collapse of the FTX Group

In November 2022, the Debtors in this proceeding filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code "on an emergency basis."  (*Id.* ¶¶ 2, 25.)   The emergency filing followed an avalanche of redemption requests by FTX.com customers following revelations of the lavish spending by the FTX Insiders and Alameda's misappropriation of funds from FTX.com customers.   (Ex. 3 ("[U]sers frantically—and unsuccessfully—sought to get their money out of the exchange as FTX.com paused most withdrawals.").)

Subsequently, prosecutors brought criminal fraud charges against the FTX Insiders in connection with their operation of various companies in the FTX Group.  (Compl. ¶¶ 29, 67.)  Wang, Singh, and Ellison have pleaded guilty to certain charges, while Bankman-Fried has not.  (*Id.* ¶ 29.)

## V.      This Action

Plaintiffs—Alameda, WRS, and WRSS, but not FTX.com—filed this adversary proceeding on May 17, 2023.  (D.I. 1.)  In the Complaint, Plaintiffs allege that the funds WRS used to acquire Embed were among the funds that Alameda misappropriated from FTX.com customers, although there is no allegation that the Embed Shareholder Defendants or anyone else at Embed knew that or had reason to know anything of the sort.  (Compl. ¶ 27.)  In fact, the

8

Complaint alleges that the FTX Insiders took pains to mask where the funds for the acquisition came from.  (*Id.* ¶¶ 49–52.)  It alleges that Alameda signed promissory notes for $200 million in loans to Bankman-Fried, Singh, and Wang, and that Bankman-Fried, Singh, and Wang transferred that amount to WRS (*id.* ¶¶ 50–51), while the actual flow of funds purportedly went from a bank account controlled by Alameda at Signature Bank to a bank account controlled by WRSS at Signature Bank, and then to a bank account controlled by WRS at Signature Bank.  (*Id.* ¶¶ 52–53.)

Plaintiffs do not identify what they contend Embed's valuation was at the time that the Embed Shareholder Defendants made their investments in Embed, and allege no facts to show the acquisition was not an arm's-length transaction or that the $220 million that WRS agreed to pay for Embed did not reflect fair market value of the company at the time of the transaction.  Instead, they allege only that, several months after the collapse of the FTX Group, the emergency bankruptcy filing, and an in-Court sale process, the only final bid for Embed's assets was for $250,000.  (*Id.* ¶ 60.)

The Complaint asserts six claims against the Embed Shareholder Defendants under federal and state law in connection with WRS's acquisition of Embed, all based on the same allegations:  (i) actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) (Count One); (ii) constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) (Count Two); (iii) actual fraudulent transfer under 6 Del. Code § 1304(a)(1) and 11 U.S.C. § 544(b) (Count Three); (iv) constructive fraudulent transfer under 6 Del. Code § 1304(a)(2) and 11 U.S.C. § 544(b) (Count Four); (v) property recovery under 11 U.S.C. § 550(a)(1) (Count Six); and (vi) disallowance of claims under 11 U.S.C. § 502(d) (Count Seven).

**LEGAL STANDARD**

When reviewing a motion to dismiss under Rule 12(b)(6), courts must evaluate whether a complaint contains sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the complaint alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). Although courts must accept factual allegations as true, that principle is "inapplicable to legal conclusions." *Id.* "In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211.

Actual fraudulent transfer claims must also satisfy the heightened pleading requirements of Rule 9(b), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7009, which requires a complaint to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009; *In re Cred Inc.*, 650 B.R. 803, 834 (Bankr. D. Del. 2023) ("Actual fraudulent transfer claims . . . must meet the elevated pleading standards of Federal Rule of Civil Procedure 9(b)." (internal quotation marks omitted)). "This has been interpreted to require that plaintiffs 'state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged' and 'plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Alpizar-Fallas* v. *Favero*, 908 F.3d 910, 919 (3d Cir. 2018) (quoting *Frederico* v. *Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).

## ARGUMENT

### I.    PLAINTIFFS' ACTUAL FRAUDULENT TRANSFER CLAIMS (COUNTS ONE AND THREE) FAIL TO STATE A CLAIM FOR RELIEF AGAINST THE EMBED SHAREHOLDER DEFENDANTS

Plaintiffs' actual fraudulent transfer claims (Counts One and Three) fail to state a claim for relief against the Embed Shareholder Defendants because the purported fraudulent scheme that Plaintiffs allege in regard to the acquisition of Embed is wholly implausible, and Plaintiffs have not adequately alleged, and cannot plausibly allege, sufficient "badges of fraud" to state such a claim under governing law.

In order to plead a claim for avoidance of an actual fraudulent transfer under both Section 548(a)(1)(A) of the Bankruptcy Code and Section 1304 of Title 6 of the Delaware Code, Plaintiffs must allege facts establishing that the challenged transfer was made with "actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A); *see also In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 267–68 (Bankr. D. Del. 2019) (analyzing actual fraudulent claims under the Bankruptcy Code and under Delaware law together, and noting that "[t]he elements for avoidance of a fraudulent conveyance under Delaware law are essentially identical to those of section 548(a)(1)(B)" (quoting *In re Opus E., LLC*, 528 B.R. 30, 82–83 (Bankr. D. Del. 2015))).

In addition, Plaintiffs' actual fraudulent transfer claims must satisfy the heightened pleading standards of Rule 9(b).  *See In re Cred Inc.*, 650 B.R. at 834.  Rule 9(b) requires a plaintiff to "plead with particularity the 'circumstances' of the alleged fraud."  *In re Our Alchemy, LLC*, 2019 WL 4447545, at *5 (Bankr. D. Del. Sept. 16, 2019) (quoting *Seville Indus. Mach. Corp.* v. *Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).

Fraudulent transfer claims under Section 548(a)(1)(A) are typically pleaded through allegations that a challenged transfer bore "badges of fraud" that evince fraudulent intent.  *See In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009); *In re Zohar III,*

*Corp.*, 631 B.R. 133, 174 (Bankr. D. Del. 2021) (applying "badges of fraud" to state law fraudulent transfer claims pursuant to Section of 544(b)).  The "badges of fraud" that courts often refer to include:  "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction." *Id.*  Pleading a single badge of fraud is insufficient to state viable claim for relief; rather, a "confluence of several in one transaction" is generally required.  *Id.*

Courts routinely dismiss actual fraudulent transfer claims where, as here, a plaintiff makes inadequate badges of fraud allegations.  *See, e.g.*, *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 162 (2d Cir. 2021) (finding the "district court correctly held that the Trustee failed to plead 'badges of fraud' sufficient to raise a strong inference of actual fraudulent intent"); *Fedders*, 405 B.R. at 545 (dismissing actual fraud claim where plaintiff only pleaded insolvency).

Plaintiffs' allegations fall far short of these requirements.  In a nutshell, Plaintiffs allege that Bankman-Fried and other FTX insiders orchestrated a scheme to misappropriate funds from customer accounts at FTX.com; transfer those funds through various accounts held by Alameda, WRS, and WRSS; and ultimately use the funds to acquire Embed, which Plaintiffs allege those insiders knew was not worth what WRS agreed to pay for it.  (Compl. ¶¶ 27, 43, 49–55.)

This purported "scheme" makes no sense and is implausible on its face.  Plaintiffs offer no remotely plausible explanation as to why FTX Insiders would misappropriate funds from FTX.com customers, only to give the funds away by causing WRS to vastly overpay to

acquire an unaffiliated stock-clearing firm. Critically, Plaintiffs do not allege that Bankman-Fried or any of the other FTX Insiders had any financial interest whatsoever in Embed before the acquisition; to the contrary, the Complaint acknowledges that the acquisition was an arm's-length transaction between sophisticated and wholly unrelated parties. (*See id.* ¶¶ 37–38.)

In fact, Plaintiffs concede that the FTX Insiders pursued the Embed acquisition "because they believed it would help expand FTX US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders." (*Id.* ¶ 28.) But that motivation is wholly incompatible with an intent to defraud Plaintiffs' creditors. The FTX Insiders owned more than 77% of WRS. (*Id.* ¶ 10.) Thus, they would be impoverishing—not enriching—themselves by vastly overpaying for a purportedly flawed securities trading platform, as Plaintiffs claim they did. They could have intended to enrich themselves as equity holders of WRS, WRSS, and Alameda through the acquisition of Embed only if they thought the acquisition would *benefit* those companies, not render them insolvent. Underscoring that point, Plaintiffs themselves allege that the FTX Insiders expected the value of WRS shares "to appreciate in value as a result of the Embed acquisition." (*Id.* ¶ 49.)

Thus, the FTX Insiders' financial interests were not opposed to but, rather, were aligned with the interests of the creditors of WRS, WRSS, and Alameda, and they could not have been intending to defraud the creditors by making an acquisition that would benefit the companies and themselves as shareholders.

Moreover, Plaintiffs' own allegation that WRS "got snookered" into purportedly overpaying to acquire Embed, (*id.* ¶ 43), is also incompatible with a claim of actual fraudulent intent. Under settled law, it is "the intent of the transferor, not the transferee, that must be established" to support such a claim. *In re Live Well Fin., Inc.*, 2023 WL 4065433, at *3 (Bankr.

D. Del. June 16, 2023).  Here, WRS could not have made the acquisition with an actual intent to hinder, defraud, or delay its creditors if the alleged overpayment for the company was *un*intentional and the result of being "snookered" by Embed.  "Fraudulent intent requires an actual intent to mislead, which is more than mere negligence.  A 'dumb but honest' [debtor] does not satisfy the test."  *In re Copeland*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003) (quoting *Palmacci* v. *Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)).

Not surprisingly, then, Plaintiffs' attempts to allege particularized facts sufficient to show "badges of fraud" fail.

The central "badge of fraud" underlying many, if not most, viable claims of actual fraud is that the debtor had some financial interest in the transferee, which explains why the debtor would be willing to make a transfer to the transferee without receiving reasonably equivalent value.  *See In re Elrod Holdings Corp.*, 421 B.R. 700, 712 (Bankr. D. Del. 2010) ("Cases imputing a transferee's intent to a transferor have typically involved sole shareholders of the transferor, with complete control of the transferor, transferring assets to themselves as transferee.").  But here, that critical element is entirely missing from the Complaint.  In fact, the ***sole*** paragraph of the Complaint that focuses on purported "badges of fraud" (Compl. ¶ 68) does not even mention that element.  Nor could it plausibly do so because, as the Complaint does not dispute, the Embed acquisition was an arm's-length transaction by sophisticated businesspeople. It was therefore "significantly different from the family relationships—a husband conveying property to his wife, for example, or a mother conveying property to her son—one typically sees in fraudulent conveyance cases."  *In re Tribune Co. Fraudulent Conv. Litig.*, No. 11-md-2296, 2017 WL 82391, at *14 (S.D.N.Y. Jan. 6, 2017) (quoting *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 576 (S.D.N.Y. 2015)).

14

Other critical "badges of fraud" are also missing from the Complaint.  For example, Plaintiffs do not and cannot allege that the FTX Insiders retained any control over or derived any benefit from the funds WRS used to acquire Embed.  Nor do they allege that the $220 million WRS paid to acquire Embed represented a substantial portion of WRS's assets.  Instead, all Plaintiffs do is allege in only the most conclusory fashion that the transfers made in connection with the acquisition occurred "shortly before or shortly after Plaintiffs incurred substantial debts" (Compl. ¶ 68(vi)), but they do not allege what those "substantial debts" were nor do Plaintiffs attempt to explain what the significance of that timing is for actual fraudulent transfer purposes.  Plaintiffs also allege that "[n]umerous material facts relating to the transfers were concealed," (*id.* ¶ 68(ii)), but nowhere specify what those supposed facts are, and in any event they have totally disregarded the fact that WRS *itself* disclosed the transaction in a news release distributed on June 21, 2022.  (Ex. 2.)  That disclosure further negates any suggestion of fraudulent intent.  *See*, *e.g.*, *In re Tribune*, 464 B.R. 126, 162 (Bankr. D. Del. 2011) (finding that transactions at issue were "not secretive or concealed," since the "record showed that the relevant financial information in the period leading up to the [transactions] was regularly disclosed"); *Fedders*, 405 B.R. at 545–46 (finding concealment badge was not established where debtor's "dealings with [defendant banks] were anything but concealed," since the debtor's borrowing from the banks were "disclosed in a public filing with the SEC").

While Plaintiffs allege that they "were insolvent when, or became insolvent shortly after, the transfers [in connection with the Embed acquisition] were made" (Compl. ¶ 68(v)), that allegation disregards the fact that, as the Complaint itself admits, the FTX Group was a thriving company at the time of the transaction, and collapsed months later—virtually overnight—not as a result of the Embed acquisition, but because of the disclosure of the

wholesale misappropriation of funds from FTX.com by FTX Insiders and improper intercompany transfers that facilitated that misappropriation of funds, as evidenced by the guilty pleas by FTX Insiders that the Complaint itself describes.  (*Id.* ¶¶ 29–30; *see* D.I. 4, Declaration of John J. Ray in Support of Chapter 11 Petitions and First Day Pleadings, Case No. 22-11068, D.I. 24,  ¶¶ 5, 63, 65.)

In short, not only do Plaintiffs fail to allege the "confluence" of badges of fraud required to adequately allege actual fraudulent intent, *Fedders*, 405 B.R. at 545, but their own allegations squarely contradict any pretense of fraudulent intent.  Plaintiffs' claims of actual fraudulent transfers (Counts One and Three) should therefore be dismissed for failure to state a claim for relief.

## II.    THE SAFE HARBOR UNDER SECTION 546(e) OF THE BANKRUPTCY CODE BARS PLAINTIFFS' CONSTRUCTIVE FRAUD CLAIMS (COUNTS TWO AND FOUR) UNDER THE BANKRUPTCY CODE AND ALL STATE LAW AVOIDANCE CLAIMS (COUNT III)

Plaintiffs' avoidance claims, other than their claim under Section 548(a)(1)(A), also fail because they are barred by the "safe harbor" provision in Section 546(e) of the Bankruptcy Code.

Section 546(e) provides a complete defense to avoidance claims other than those under Section 548(a)(1)(A).  *See* 11 U.S.C. § 546(e); *In re Borden Chems. & Plastics Operating Ltd.*, 336 B.R. 214, 217 (Bankr. D. Del. 2006) ("Section 546(e) of the Code provides . . . a complete defense to avoidance claims brought by a Trustee." (quoting *Williams* v. *Morgan Stanley Cap. Grp. Inc. (In re Olympic Nat. Gas Co.)*, 294 F.3d 737, 740 (5th Cir. 2002))). Section 546(e) provides, in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution . . . ,

> or that is a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

"Section 546(e) shields certain securities transactions from the trustee's avoidance powers for the purpose of promoting stability and finality in the securities markets." *In re Samson Res. Corp.*, 625 B.R. 291, 294 (Bankr. D. Del. 2020). "Congress's intent to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries . . . reflected a larger purpose memorialized in the . . . broad statutory language defining the transactions covered. That larger purpose was to promote finality . . . and certainty for investors." *Id.* (internal quotation marks omitted).

The allegedly fraudulent transfers here fit each of the elements required for the Section 546(e) safe harbor to apply. The transfers were settlement payments *and* transfers made in connection with a securities contract. And they were transfers made by *and* to "financial institutions" as defined under the Bankruptcy Code.

### A.   The Transfers to the Embed Shareholder Defendants Were Settlement Payments in Connection with a Securities Contract

A qualifying transfer under Section 546(e) includes a "settlement payment" and "a transfer made . . . in connection with a securities contract." 11 U.S.C. § 546(e).

The Bankruptcy Code defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." *Id.* § 741(8). The Third Circuit has repeatedly held that the "'extremely broad' statutory definition of 'settlement payment'" encompasses "the transfer of cash or securities made to complete a securities transaction," and that "[a] payment for shares . . . is obviously a

common securities transaction, and . . . therefore . . . is also a settlement payment for the purposes of section 546(e)." *In re Resorts Int'l, Inc.*, 181 F.3d 505, 515–16 (3d Cir. 1999); *see also In re Plassein Int'l Corp.*, 590 F.3d 252, 259 (3d Cir. 2009) (reaffirming *Resorts*).[9]

Under this binding authority, the payments made to the Embed Shareholder Defendants in connection with WRS's acquisition of Embed were clearly "settlement payments," because they were payments for the Embed Shareholder Defendants' shares, options, and SAFEs. (*See* Compl. ¶ 38, Ex. 1 [Merger Agreement] §§ 3.1, 3.2.)

In addition, the transfers at issue are qualifying transfers as "transfer[s] made . . . in connection with a securities contract." 11 U.S.C. § 546(e). Under the Bankruptcy Code, a "securities contract" includes "a contract for the purchase, sale, or loan of a security" and "any other agreement . . . that is similar to" such a contract. *Id.* § 741(7)(A). "Thus, the term 'securities contract' expansively includes contracts for the purchase or sale of securities, as well as any agreements that are *similar* or *related to* contracts for the purchase or sale of securities." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418 (2d Cir. 2014). Under Section 546(e), "[t]his concept is broadened even farther because § 546(e) also protects a transfer that is 'in connection' with a securities contract." *Id.*

Here, the payments to the Embed Shareholder Defendants were qualifying transfers because they were made pursuant to the Merger Agreement, which is on its face a contract for the purchase and sale of securities (Ex. 1 §§ 3.1, 3.2), and therefore a "securities contract" for purposes of Section 546(e). *See, e.g.*, *In re Quorum Health Corp.*, No. 20-10766 (BLS), 2023 WL 2552399, at *5–6 (Bankr. D. Del. Mar. 16, 2023) (finding that a contract for the

---

[9]   The Third Circuit has also rejected any extratextual requirement that the shares at issue be publicly traded. *See Plassein*, 590 F.3d at 258–59 (confirming that a "settlement payment" may be "a transaction outside of the publicly traded securities settlement system").

purchase of stock and other equity interests was a "securities contract" for purposes of Section 546(e)).

Accordingly, there can be no legitimate dispute that the transfers to the Embed Shareholder Defendants were qualifying transfers as both settlement payments and transfers in connection with a securities contract.

### B. The Transfers to the Embed Shareholder Defendants Were Made by and to "Financial Institutions"

Under the Bankruptcy Code, a "financial institution" includes:

> a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, ***when any such*** Federal reserve bank, receiver, liquidating agent, conservator or ***entity is acting as agent or custodian for a customer*** (whether or not a "customer", as defined in section 741) ***in connection with a securities contract*** (as defined in section 741) ***such customer*** . . . .

11 U.S.C. § 101(22)(A) (emphasis added). Therefore, when a financial institution acts as an agent or a custodian for a customer in connection with a securities contract, that customer is also a "financial institution" under the Bankruptcy Code. *See In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 80 (2d Cir. 2019) (finding that a customer was a financial institution by virtue of a bank acting as its agent in connection with a securities contract); *Kelley* v. *Safe Harbor Managed Acct. 101, Ltd.*, 31 F.4th 1058, 1065 (8th Cir. 2022) (affirming the district court's reliance on *Tribune* to find that the customer of a financial institution was itself a financial institution for purposes of Section 546(e)); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 191 (S.D.N.Y. 2020) ("[W]hen a bank serves as a paying agent to help a company effectuate payments to its shareholders in connection with a securities contract, all payments made in connection with that securities contract are safe harbored from a bankruptcy trustee's avoidance powers with respect to certain fraudulent conveyance claim.").

Here, WRS and Defendants retained Western Alliance Bank, a commercial bank, to act as their agent in connection with the acquisition. WRS paid the merger consideration to Western Alliance Bank, which then distributed the funds to Embed's shareholders at closing. (Ex. 1 § 3.2(a).) Courts have held that these circumstances are sufficient to trigger Section 546(e) by virtue of the "customer" prong of Section 101(22)(A).

For example, in *Tribune*, as here, the parties "manifested [their] intent to grant authority to [the agent] by depositing the aggregate purchase price for the shares with [the agent] and entrusting [the agent] to pay the tendering shareholders. [The agent], in turn, manifested its assent by accepting the funds and effectuating the transaction." *Tribune*, 946 F.3d at 80. Based on these facts, the Second Circuit, following the plain text of the statute, found that the plaintiff itself was a "financial institution" under the Bankruptcy Code by virtue of a bank acting as its agent in connection with a securities contract, which caused Section 546(e) to apply to the challenged transfers. *See id.*

In another virtually identical arrangement, the Southern District of New York recently rejected an argument that a paying agent in an LBO transaction was "a non-agent contractor," as "the merger agreement that governed the transaction specified that such payments were to be made by a 'paying agent' and 'pursuant to a paying agent agreement in customary form.'" *Nine West*, 482 F. Supp. 3d at 192. As a result, the court found that the paying agent arrangement required the application of Section 546(e). *Id.* at 202. Similar language appears in the Merger Agreement. (Ex. 1 § 3.2(a).)

Here, as in *Tribune* and *Nine West*, "[the agent] was entrusted with [millions] of dollars of [WRS] cash and was tasked with making payments on [WRS's] behalf to Shareholders upon the tender of their stock certificates to [the agent]. ***This is a paradigmatic principal-agent***

*relationship*." *Nine West*, 482 F. Supp. 3d at 202 (emphasis added) (quoting *In re Tribune Co.*
*Fraudulent Conv. Litig.*, No. 11MD2296 (DLC), 2019 WL 1771786, at *11 (S.D.N.Y. Apr. 23,
2019), *aff'd*, 10 F.4th 147 (2d Cir. 2021) ("Tribune entered into an agreement with [the agent]
whereby [the agent] was hired to be a steward of Tribune's money and its shareholders' stock.  It
was clearly acting on behalf of Tribune, which is enough to satisfy § 546(e)."), *cert. denied sub*
*nom. Kirschner* v. *FitzSimons*, 142 S. Ct. 1128 (2022).

Other courts have come to the same conclusion on similar facts.    *See, e.g.*,
*Holliday* v. *Credit Suisse Sec. (USA) LLC*, No. 20 CIV. 5404 (GBD), 2021 WL 4150523, at *7
(S.D.N.Y. Sept. 13, 2021) ("BostonGen manifested its assent to [the bank's] agency by
authorizing the bank to receive funds from the lenders and entrusting it to make the necessary
distribution in connection with the Tender Offer.  [The bank] manifested its acceptance of the
agency relationship by receiving and distributing the funds in connection with the Tender Offer
as BostonGen instructed.  Finally, BostonGen maintained control over key aspects of the
undertaking.  Thus, an agency relationship existed between BostonGen and [the bank].")
(citations omitted); *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2020 WL 7345988, at *7
(Bankr. S.D.N.Y. Dec. 14, 2020) (holding that the fact that redemption payments made by
certain funds "were paid by [the bank] establishes the necessary agency" between the bank and
the funds.  "It is implausible to infer that [the bank] made the redemption payments to specific
redeemers in specific amounts absent the Funds' directions to do so.  Moreover, [the bank]
accepted those directions by executing the redemption payments."), *aff'd*, 630 F. Supp. 3d 463
(S.D.N.Y. 2022).

Finally, while the Supreme Court refrained from ruling on the "customer" issue in *Merit* as it was not raised by the parties, Justice Breyer noted that, had it been raised, the resolution of the issue would be quite simple:

> [W]hy are we hearing this case? . . . [W]hen I look up the definition of financial institution, it says that not only is it Credit Suisse and not only is it Citizens Bank, but ***it is also the customers of each of those financial institutions*** in an instance where the bank is acting as agent or custodian for a customer.
>
> Now, it seems to me that Citizens Bank is acting [as] agent or custodian of a customer, namely VVD, and it seems to me that Credit Suisse is acting as—as an agent or custodian for VVD.

Transcript of Oral Argument at 15-16, *Merit Mgmt. Grp., LP* v. *FTI Consulting, Inc.*, 138 S. Ct. 883 (2018) (emphasis added).

Accordingly, both WRS and the Defendants are "financial institutions" for purposes of Section 546(e), because they are customers of Western Alliance Bank, a commercial bank that acted as their agent in connection with the Merger Agreement, which was a securities contract.

**C.    Section 546(e) Also Requires Dismissal of All of Plaintiffs' State Law Fraudulent Transfer Claims**

Because Section 546(e) applies to the transfers to the Embed Shareholder Defendants, all of Plaintiffs' avoidance claims based on state-law fraudulent transfer theories are also barred, regardless of whether such claims are based on alleged intentional or constructive fraud.

By its plain terms, Section 546(e) "operates notwithstanding all of Section 544." *U.S. Bank Nat'l Ass'n* v. *Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 817 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014). Accordingly, courts have consistently held that Section 546(e) bars *all* state law claims for fraudulent transfer, regardless of whether such claims are for

actual or constructive fraudulent transfer.  *See, e.g.*, *id.* ("If Congress wished to exclude state law 'actual intent' fraudulent transfer claims from the operation of Section 546(e), it could have expressly done so.  The fact that Congress did expressly exclude Section 548(a)(1)(A) implies that it did not want to exclude state 'actual intent' fraudulent transfer claims."); *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 98 (D. Del. 2002) ("[I]t is clear that Congress has *not* exempted section 544 transfers from section 546(e)."); *In re Bos. Generating LLC*, 617 B.R. 442, 479 (Bankr. S.D.N.Y. 2020) ("[T]he plain language of section 546(e) . . . provides an exception only for intentional fraudulent transfer claims brought under the Bankruptcy Code and no more."), *aff'd sub nom. Holliday* v. *Credit Suisse Sec. (USA) LLC*, No. 20 CIV. 5404 (GBD), 2021 WL 4150523, at *9 (S.D.N.Y. Sept. 13, 2021) ("By its plain language, a trustee may not exercise the vested state law intentional and constructive fraudulent conveyance claims to avoid a transfer within the scope of Section 546(e)."); *In re Nat'l Forge Co.*, 344 B.R. 340, 370 (W.D. Pa. 2006) ("[I]f Congress had intended to exempt from § 546(e)'s protection allegations of actual fraud under state law fraudulent transfer theories, it could have easily done so."); *In re Hamilton Taft & Co.*, 176 B.R. 895, 901 (Bankr. N.D. Cal. 1995) ("Section 546(e) does bar actions brought under section 544 (using state fraudulent conveyance statutes) to recover transfers made . . . with actual intent to hinder, delay, or defraud creditors."), *aff'd*, 196 B.R. 532 (N.D. Cal. 1995), *aff'd*, 114 F.3d 991 (9th Cir. 1997); *SIPC* v. *Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 722 (S.D.N.Y. 2012) (noting that "§ 546(e) bars the Trustee from pursuing the claims here made under § 548(a)(1)(B) and § 544," including actual fraudulent transfer claims under state law), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014).

*       *       *

As the transfers to the Embed Shareholder Defendants fit the requirements of the Section 546(e) safe harbor, and as Section 546(e) operates as a complete defense to all avoidance claims other than those brought under Section 548(a)(1)(A), Plaintiffs' claims brought under Section 548(a)(1)(B) (Count Two) and Section 544(b) and the Delaware statutes (Counts Three and Four) are barred and should be dismissed.

### III. PLAINTIFFS' CLAIMS UNDER SECTION 550(a)(1) CLAM (COUNT SIX) AND SECTION 502(d) (COUNT SEVEN) SHOULD BE DISMISSED, AS PLAINTIFFS HAVE NOT ALLEGED AN AVOIDABLE TRANSFER

Finally, because all of the Plaintiffs' avoidance claims should be dismissed for the reasons explained above, Plaintiffs' claims under Sections 550(a)(1) (Count Six) and Section 502(d) of the Bankruptcy Code (Count Seven) should also be dismissed.

Section 550(a) of the Bankruptcy Code applies only "to the extent that a transfer is avoided." 11 U.S.C. § 550(a). Accordingly, a claim under Section 550(a) must be dismissed if the underlying avoidance claim is dismissed. *See In re USDigital, Inc.*, 443 B.R. 22, 40 (Bankr. D. Del. 2011) ("The claims under section 550 . . . fail because the transfers at issue are unavoidable.").

Section 502(d) of the Bankruptcy Code provides for the disallowance of any claim asserted by an entity that has received an avoidable transfer unless and until the transferee repays the avoided transfer. *See* 11 U.S.C. § 502(d). "Under § 502(d), a bankruptcy claim can be disallowed if a claimant receives property that is avoidable or recoverable by the bankruptcy estate." *In re KB Toys Inc.*, 736 F.3d 247, 249 (3d Cir. 2013) (citing 11 U.S.C. § 502(d)). This claim plainly fails against the Embed Shareholder Defendants, as (i) the Embed Shareholder Defendants have not asserted any claims against the Plaintiffs and (ii) as discussed above, Plaintiffs have not alleged an avoidable transfer.

Moreover, a plaintiff may not bring a claim under Section 502(d) until it has obtained a judicial determination of the alleged transferee's liability.  *See, e.g.*, *In re Ultimate Acquisition Partners, LP*, No. 11-10245 MFW, 2012 WL 1556098, at *3 (Bankr. D. Del. May 1, 2012) ("The Trustee has not obtained any judicial determination of [the alleged transferee's] liability, and therefore, has no basis for a section 502(d) claim."); *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 468 (Bankr. D. Del. 2018) (dismissing a claim under Section 502(d), as the plaintiff "has failed to obtain a judicial determination on either the preference or the fraudulent transfer claims"); *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 867 (Bankr. D. Del. 2018) ("The Trustee has not obtained a judicial determination on the preference complaint—a prerequisite to a claim under Section 502(d). Therefore, The Trustee fails to adequately plead a claim under Section 502(d)."); *In re DHP Holdings II Corp.*, 435 B.R. 264, 272–73 (Bankr. D. Del. 2010) ("[S]ection 502(d) is triggered only after a judgment has been entered requiring the turnover of property to the estate.  Here, the Debtors have not obtained an order requiring the turnover of the outstanding balance, and therefore section 502(d) is not available.") (citation omitted).

Accordingly, Count Six, for property recovery pursuant to Section 550(a)(1) of the Bankruptcy Code, and Count Seven, for disallowance of claims pursuant to Section 502(d) of the Bankruptcy Code, should be dismissed.

IV. **THE EMBED SHAREHOLDER DEFENDANTS JOIN IN AND ADOPT THE ARGUMENTS SET FORTH BY THE OTHER DEFENDANTS**

As further grounds for this Motion, the Embed Shareholder Defendants join in and adopt the arguments the other defendants in this action set forth in their motions to dismiss the Complaint.

## **CONCLUSION**

For the reasons discussed above, Counts One through Four and Six through Seven asserted against the Embed Shareholder Defendants should be dismissed with prejudice.

Dated: August 15, 2023
Wilmington, Delaware

Respectfully submitted,

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

/s/  Elizabeth Wang
Daniel A. Mason (Del. Bar No. 5206)
Elizabeth Wang (Del. Bar No. 6620)
500 Delaware Avenue, Suite 200, P.O. Box 32
Wilmington, DE 19899-0032
Telephone: (302) 655-4410
Fax:        (302) 397-2710
Email:     dmason@paulweiss.com
             ewang@paulweiss.com

William A. Clareman (*pro hac vice* forthcoming)
Gregory F. Laufer (*pro hac vice* forthcoming)
Kenneth S. Ziman (*pro hac vice* forthcoming)
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Fax:        (212) 492-0248
Email:     wclareman@paulweiss.com
             glaufer@paulweiss.com
             kziman@paulweiss.com

Randall S. Luskey (*pro hac vice* forthcoming)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Fax:         (202) 204-7391
Email:      rluskey@paulweiss.com

*Attorneys for Embed Shareholder Defendants The 2016 Karkal Family Trust; Acrew Capital Fund (A), L.P.; Acrew Capital Fund, L.P.; Acrew Capital MGP, LLC; Bain Capital Venture Fund 2019 LP; BCIP Venture Associates II, L.P.; BCIP Venture Associates II-B, L.P.; BCV 2019-MD Primary, L.P.; Buckley Ventures GP, LLC; Buckley Ventures, LP; Correlation Ventures II, LP; Fin VC Regatta I, LP; Homebrew Ventures III, LP; Jonathan Christodoro; Kamran Ansari; Launchpad Capital Fund I LP; LGF II, L.P.; Liquid 2 Ventures Fund II, L.P.; Propel Venture Partners, LLC; Propel Venture Partners US Fund I LP; Putnam (Warren Lowell Putnam & Brynn Jinnett Putnam, Tenants in Common); Samuel Jones; Torch Capital II, LP; Transpose Platform o/b/o TI Platform Fund II; TI Platform NLI Venture Limited II; Transpose Platform Fintech Fund II, L.P.; TI Platform Fund II, LP; Treasury Fund I, LP; Y Combinator ES20, LLC; and YCC20, L.P.*