**<u>EXHIBIT 1</u>**

**AGREEMENT AND PLAN OF MERGER**

**dated as of**

**June 10, 2022**

**by and among**

**WEST REALM SHIRES, INC.,**

**INGRAINED MERGER SUB, INC.,**

**EMBED FINANCIAL TECHNOLOGIES INC.,**

**and SHAREHOLDER REPRESENTATIVE SERVICES LLC as Holder Representative**

_____

THIS DOCUMENT SHALL BE KEPT CONFIDENTIAL PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BY THE RECIPIENT HEREOF OR, IF APPLICABLE, ITS AFFILIATE, WITH RESPECT TO THE SUBJECT MATTER HEREOF.

## TABLE OF CONTENTS

Page

ARTICLE I. CERTAIN DEFINITIONS..................................................................2

    1.1    Definitions...........................................................................2
    1.2    Construction.........................................................................2
    1.3    Knowledge...........................................................................3

ARTICLE II. THE MERGER; CLOSING................................................................3

    2.1    The Merger..........................................................................3
    2.2    Effects of the Merger..............................................................4
    2.3    Closing; Effective Time...........................................................4
    2.4    Certificate of Incorporation and Bylaws of the Surviving Corporation.....4
    2.5    Directors and Officers of the Surviving Corporation .............................4

ARTICLE III. EFFECTS OF THE MERGER ON THE CAPITAL STOCK AND
EQUITY AWARDS.............................................................................................5

    3.1    Conversion of Company Shares and Options. ..........................................5
    3.2    Payment and Exchange of Certificates and Options; Payment of Company
            SAFEs, Company Warrants and Closing Debt. .....................................7
    3.3    Estimated Price Components; Estimated Closing Merger Consideration..8
    3.4    Adjustment Amount................................................................9
    3.5    Reserved. ..........................................................................12
    3.6    Holder Representative Fund.....................................................12
    3.7    Exchange Agent ....................................................................13
    3.8    Lost Certificate ....................................................................13
    3.9    Dissenting Shares ..................................................................13
    3.10   Withholding .......................................................................14

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE
COMPANY ......................................................................................................14

    4.1    Corporate Organization of the Company...............................................14
    4.2    Subsidiaries.........................................................................14
    4.3    Due Authorization ................................................................15
    4.4    No Conflict.........................................................................15
    4.5    Governmental Consents...........................................................15
    4.6    Capitalization of the Company...................................................16
    4.7    Financial Statements..............................................................16
    4.8    Litigation and Proceedings ......................................................17
    4.9    Legal Compliance.................................................................17
    4.10   Company Benefit Plans...........................................................17
    4.11   Taxes ...............................................................................19
    4.12   Brokers' Fees ......................................................................21
    4.13   Insurance...........................................................................21
    4.14   Licenses, Permits and Authorizations .........................................21

| | | |
|---|---|---:|
| 4.15 | Real Property | 23 |
| 4.16 | Intellectual Property | 23 |
| 4.17 | Data Privacy | 26 |
| 4.18 | Affiliate Matters | 27 |
| 4.19 | Absence of Certain Business Practices | 27 |
| 4.20 | Contracts | 27 |
| 4.21 | Employees | 29 |
| 4.22 | No Additional Representations or Warranties; Non-Reliance | 30 |

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUB ... 31

| | | |
|---|---|---:|
| 5.1 | Corporate Organization | 31 |
| 5.2 | Due Authorization | 31 |
| 5.3 | No Conflict | 31 |
| 5.4 | Brokers' Fees | 32 |
| 5.5 | Availability of Funds | 32 |
| 5.6 | No Additional Representations or Warranties; Non-Reliance | 32 |

ARTICLE VI. COVENANTS OF THE COMPANY ... 32

| | | |
|---|---|---:|
| 6.1 | Conduct of Business | 32 |
| 6.2 | Inspection | 35 |
| 6.3 | Termination of Certain Agreements; Third-Party Consents | 35 |
| 6.4 | 280G Vote | 35 |
| 6.5 | No Solicitation of Transactions | 36 |

ARTICLE VII. COVENANTS OF BUYER ... 36

| | | |
|---|---|---:|
| 7.1 | Indemnification and Insurance | 36 |
| 7.2 | Retention of Books and Records | 37 |
| 7.3 | Post-Closing Incentive Plan | 37 |
| 7.4 | Employee Matters | 38 |

ARTICLE VIII. JOINT COVENANTS ... 39

| | | |
|---|---|---:|
| 8.1 | Support of Transaction | 39 |
| 8.2 | HSR Act and Foreign Antitrust Approvals | 39 |
| 8.3 | FINRA and SEC Approvals | 41 |
| 8.4 | Stockholder Approval | 41 |
| 8.5 | Further Assurances | 42 |
| 8.6 | Tax Matters | 42 |

ARTICLE IX. CONDITIONS TO OBLIGATIONS ... 45

| | | |
|---|---|---:|
| 9.1 | Conditions to the Obligations of Buyer, Merger Sub and the Company | 45 |
| 9.2 | Conditions to the Obligations of Buyer and Merger Sub | 45 |
| 9.3 | Conditions to the Obligations of the Company | 46 |
| 9.4 | Company Deliverables | 46 |
| 9.5 | Buyer Deliverables | 47 |

    9.6     Waiver of Conditions; Frustration of Conditions.................................... 47

ARTICLE X. TERMINATION/EFFECTIVENESS................................................... 48

    10.1    Termination................................................................................ 48
    10.2    Effect of Termination................................................................. 49

ARTICLE XI. HOLDER REPRESENTATIVE ....................................................... 49

    11.1    Designation and Replacement of Holder Representative........................ 49
    11.2    Authority and Rights of the Holder Representative; Limitations on
           Liability ...................................................................................... 49

ARTICLE XII. INDEMNIFICATION...................................................................... 50

    12.1    Survival of Representations, Warranties and Covenants ...................... 50
    12.2    Indemnification ............................................................................ 51
    12.3    Indemnification Claims Procedures ................................................ 51
    12.4    Limitations on Indemnification Liability................................................ 53
    12.5    Indemnification Sole and Exclusive Remedy ...................................... 54
    12.6    Special Rule for Fraud ................................................................... 54
    12.7    Contribution ............................................................................... 54

ARTICLE XIII. MISCELLANEOUS ....................................................................... 55

    13.1    Waiver ........................................................................................ 55
    13.2    Notices ....................................................................................... 55
    13.3    Assignment ................................................................................. 56
    13.4    Rights of Third Parties.................................................................. 56
    13.5    Expenses .................................................................................... 56
    13.6    Governing Law............................................................................. 57
    13.7    Captions; Counterparts................................................................. 57
    13.8    Schedules and Annexes ................................................................ 57
    13.9    Entire Agreement......................................................................... 57
    13.10   Amendments ............................................................................... 57
    13.11   Publicity...................................................................................... 58
    13.12   Severability ................................................................................. 58
    13.13   Jurisdiction; Waiver of Jury Trial.................................................... 58
    13.14   Enforcement................................................................................ 59
    13.15   Non-Recourse.............................................................................. 59
    13.16   Waiver of Conflicts Regarding Representations; Attorney-Client Privilege
           .................................................................................................. 59

ANNEXES

Annex A – Defined Terms

Annex B – Form of Certificate of Merger

Annex C – Form of Certificate of Incorporation

Annex D – Form of Letter of Transmittal

Annex E – Form of Support Agreement

Annex F – Form of SAFE Liquidation Agreement

Annex G – Form of SAFE Cancellation Agreement

Annex H – Option Termination Notice

Annex I – Illustrative Estimated Closing Statement and Distribution Schedule

Annex J – Form of Escrow Agreement

Annex K – Form of Warrant Redemption Agreement

Annex L – Forms of Retention Incentive Award Agreement

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement"), dated as of June 10, 2022, is entered into by and among West Realm Shires, Inc., a Delaware corporation ("Buyer"), Ingrained Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Buyer ("Merger Sub"), Embed Financial Technologies Inc., a Delaware corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, solely in its capacity as representative, agent and attorney-in-fact of the Pre-Closing Holders (the initial "Holder Representative").

## RECITALS

WHEREAS, the respective boards of directors of Buyer, Merger Sub and the Company have approved and declared advisable the Merger (defined below) upon the terms and subject to the conditions of this Agreement and in accordance with the DGCL (defined below);

WHEREAS, the respective boards of directors of Buyer, Merger Sub and the Company have determined that the Merger is in furtherance of and consistent with their respective business strategies and is fair to, and in the best interest of, their respective stockholders;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as an inducement to Buyer's willingness to enter into this Agreement, certain Pre-Closing Holders set forth on Schedule A (representing stockholders of the Company who currently hold at least (a) a majority of the issued and outstanding shares of the Company Stock, (b) a majority of the issued and outstanding shares of Common Stock (including Common Stock issued or issuable upon conversion of the Preferred Stock) held directly or indirectly by Persons other than the Founder and his Affiliates, and (c) a majority of the issued and outstanding shares of the Company's preferred stock, par value $0.00001 per share) are executing Support Agreements, substantially in the form attached hereto as Annex E (each such agreement, a "Support Agreement"), pursuant to which, among other things, each such Pre-Closing Holder (i) agrees to approve this Agreement and the Merger, (ii) irrevocably appoints the Holder Representative as its proxy to vote its Company Shares in favor of the transactions contemplated by this Agreement and the Merger, (iii) agrees to deliver any required stockholder consent approving this Agreement and the Merger, and (iv) subject to, conditioned upon and effective as of the Closing, releases the Releasing Parties (as defined in the Support Agreement);

WHEREAS, concurrently with the execution and delivery of this Agreement, and as an inducement to Buyer's willingness to enter into this Agreement, each holder of an outstanding Company Warrant is executing a Warrant Cancellation and Redemption Agreement, substantially in the form attached hereto as Annex K (each such agreement, a "Warrant Redemption Agreement"), pursuant to which, among other things, each such Pre-Closing Holder (a) irrevocably agrees to sell to the Company at the Effective Time (as defined below) each Company Warrant held by such Pre-Closing Holder for the "Warrant Redemption Price" as set forth in such Warrant Redemption Agreement and (b) irrevocably agrees that such Company Warrants shall be cancelled as of the Effective Time following such redemption;

WHEREAS, concurrently with the execution and delivery of this Agreement, and

as an inducement to Buyer's willingness to enter into this Agreement, the holders of a majority-in-interest of the outstanding Company SAFEs have executed that certain SAFE Agreement Amendment and Liquidation Agreement, in the form attached hereto as <u>Annex F</u> (the "<u>SAFE Liquidation Agreement</u>"), pursuant to which, among other things, each such Company SAFE Holder (a) irrevocably agrees to amend all outstanding Company SAFEs to provide that such Company SAFEs shall only be entitled to receive at the Effective Time (as defined below) with respect to each Company SAFE held by any Company SAFE Holder an amount in cash equal to the greater of (i) the "Cash-Out Amount" for such Company SAFE and (ii) the "Conversion Amount" for such Company SAFE (the "<u>SAFE Cancellation Amount</u>"), subject to, contingent upon, and following receipt of a SAFE Cancellation Agreement, and (b) irrevocably agrees that all Company SAFEs shall be cancelled as of the Effective Time and represent only the right to receive their respective SAFE Cancellation Amount; and

WHEREAS, for certain limited purposes, and subject to the terms set forth herein, the Holder Representative shall serve as a representative of the Pre-Closing Holders (defined below).

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and intending to be legally bound hereby, Buyer, Merger Sub and the Company agree as follows:

## ARTICLE I.
## CERTAIN DEFINITIONS

1.1    <u>Definitions</u>.  As used herein, capitalized terms have the meanings ascribed thereto in <u>Annex A</u>, which shall be deemed to be incorporated into this Agreement (and all other Schedules and Annexes hereto) as if set forth herein.

1.2    <u>Construction</u>.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article", "Section", "Schedule" or "Annex" refer to the specified Article or Section of, or Schedule or Annex to, this Agreement; (v) the word "including" shall mean "including, without limitation," and (vi) the word "or" shall be disjunctive but not exclusive.

(b)    Unless the context of this Agreement otherwise requires, references to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

(c)    Unless the context of this Agreement otherwise requires, references to statutes shall include all subsequent amendments and other modifications thereto, and all rules and regulations promulgated thereunder.

(d)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified and any such period shall exclude the date

specified as the beginning of the period and shall conclude at 6:00 pm (Eastern Time) on the final day of such period.

(e)     The phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if".

(f)     The phrases "provided to Buyer" or "made available to Buyer" or words of similar import, mean providing the referenced materials to Buyer or any of its representatives in any format or otherwise making the referenced materials available to Buyer or its representatives, including in the online data room hosted on Google Drive and maintained by the Company in connection with the transactions contemplated hereby.

(g)     All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(h)     All amounts payable pursuant to this Agreement shall be paid in U.S. dollars, and all references to "$" or "dollars" shall mean the lawful currency of the United States of America.

(i)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto to express their mutual intent and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement, nor shall any rule of strict construction be applied against any party.

1.3     <u>Knowledge</u>.  As used herein, the phrase "to the knowledge" of any Person shall mean the actual knowledge (after reasonable due inquiry of their direct reports who would reasonably be expected to have knowledge of the applicable matter) of, in the case of the Company, Michael H. Giles, Laurence Beal, Breanna Phillips and Monique Saugstad, and in the case of all other Persons, such Person's executive officers.

**ARTICLE II.**
**THE MERGER; CLOSING**

2.1     <u>The Merger</u>.

(a)     Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the applicable provisions of the Delaware General Corporation Law (the "<u>DGCL</u>"), Buyer, Merger Sub and the Company (Merger Sub and the Company sometimes being referred to herein as the "<u>Constituent Corporations</u>") shall cause Merger Sub to be merged with and into the Company effective as of the Effective Time, with the Company being the surviving corporation (the "<u>Merger</u>").  The Merger shall be consummated at the Effective Time in accordance with this Agreement and evidenced by a certificate of merger relating to the Merger in the form set forth as <u>Annex B</u> (the "<u>Certificate of Merger</u>").

(b)     Upon consummation of the Merger, the separate corporate existence of Merger Sub shall cease and the Company, as the surviving corporation of the Merger (hereinafter referred

3

to for the periods at and after the Effective Time as the "<u>Surviving Corporation</u>"), shall continue its corporate existence under the DGCL as a wholly owned subsidiary of Buyer.

2.2    <u>Effects of the Merger</u>.  At and after the Effective Time, the effect of the Merger shall be as provided in this Agreement and the applicable provisions of the DGCL.  Without limiting the foregoing, the Surviving Corporation shall thereupon and thereafter possess all of the rights, property, privileges, powers and franchises, of a public as well as a private nature, of the Constituent Corporations, and shall become subject to all the debts, liabilities, restrictions, disabilities and duties of each of the Constituent Corporations.

2.3    <u>Closing; Effective Time</u>.  Subject to the terms and conditions of this Agreement, the closing of the Merger (the "<u>Closing</u>") shall take place remotely via the electronic exchange of documents and signatures on the date that is five (5) Business Days after the date on which all conditions set forth in <u>Section 9.1</u> shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or such other time and place as Buyer and the Company may mutually agree. The date on which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>".  Subject to the satisfaction or waiver of all of the conditions set forth in <u>Article IX</u>, and provided this Agreement has not theretofore been terminated pursuant to its terms, Buyer, Merger Sub and the Company shall cause the Certificate of Merger to be executed, acknowledged and filed with, and accepted by, the Secretary of State of the State of Delaware as provided in Section 251 of the DGCL.  The Merger shall become effective at the time when the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later time as may be agreed by Buyer and the Company in writing and specified in the Certificate of Merger (the "<u>Effective Time</u>").

2.4    <u>Certificate of Incorporation and Bylaws of the Surviving Corporation</u>.

    (a)    At the Effective Time, the certificate of incorporation of the Company shall be amended as of the Effective Time to read in its entirety in the form of the certificate of incorporation attached hereto as <u>Annex C</u>, and, as so amended, shall become the certificate of incorporation of the Surviving Corporation until thereafter amended in accordance with the applicable provisions of the DGCL and such certificate of incorporation; <u>provided</u> that any such amendment shall be subject to the provisions of <u>Section 7.1</u>.

    (b)    The parties hereto shall take all actions necessary so that the bylaws of the Company in effect immediately prior to the Effective Time shall, from and after the Effective Time, be amended in their entirety in the form of the bylaws of Merger Sub as in effect immediately prior to the Effective Time (except that (i) in any event such amended bylaws must comply with <u>Section 7.1</u> and (ii) all references to the name of Merger Sub shall be changed to refer to the name of the Company), until thereafter amended in accordance with the applicable provisions of the DGCL, the certificate of incorporation of the Surviving Corporation and such bylaws; <u>provided</u> that any such amendment shall be subject to the provisions of <u>Section 7.1</u>.

2.5    <u>Directors and Officers of the Surviving Corporation</u>.

    (a)    The directors of Merger Sub immediately prior to the Effective Time shall be the directors of the Surviving Corporation immediately after the Effective Time, each to hold office

156819932.11

in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

(b)     The officers of the Company immediately prior to the Effective Time shall be the officers of the Surviving Corporation immediately after the Effective Time, each to hold office in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors are duly appointed or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

## ARTICLE III.
## EFFECTS OF THE MERGER ON THE CAPITAL STOCK AND EQUITY AWARDS

3.1    Conversion of Company Shares and Options.

(a)     At the Effective Time, by virtue of the Merger and without any further action on the part of any stockholder of the Company, Buyer or Merger Sub (other than compliance with Section 3.2 by the applicable holder):

(i)     each share of Company Stock held by Buyer, Merger Sub or the Company in treasury or otherwise, shall be cancelled and retired and shall cease to exist, and no consideration shall be delivered or receivable in exchange therefor (such shares, "Cancelled Shares");

(ii)     each share of Company Stock that is issued and outstanding immediately prior to the Effective Time (a "Company Share") (other than (x) Cancelled Shares and (y) shares of Company Stock held by Persons who object to the Merger and comply with the provisions of the DGCL concerning the rights of holders of such Company Stock to dissent from the Merger and require appraisal of their shares of Company Stock (the "Dissenting Stockholders" and such shares of Company Stock, the "Dissenting Shares"), which Cancelled Shares and Dissenting Shares shall not constitute "Company Shares" hereunder) shall thereupon be cancelled and converted into and become the right to receive the applicable portion of the Merger Consideration, as determined pursuant to Section 3.1(d);

(iii)     each Option that is vested, unexercised and outstanding immediately prior to the Effective Time, including any such Option that vests in connection with the consummation of the transactions contemplated by this Agreement (such Options collectively being referred to herein as the "Vested Options"), shall thereupon be cancelled and converted into and become the right to receive the applicable portion of the Merger Consideration, as determined pursuant to Section 3.1(d);

(iv)     each Option to the extent that it is not a Vested Option shall terminate and be forfeited for no consideration; and

(v)     each restricted stock award for Common Stock that is not vested, as of immediately prior to the Effective Time, shall terminate and be forfeited for no consideration.

156819932.11

(b)      At the Effective Time, by virtue of the Merger and without any action on the part of Buyer or Merger Sub, each share of common stock, par value $0.0001 per share, of Merger Sub shall be converted into one share of common stock, par value $0.0001 per share, of the Surviving Corporation.

(c)      (i)      The "Estimated Closing Merger Consideration" shall consist of (A) $220,000,000, plus (B) the Estimated Net Working Capital Adjustment Amount, less (C) Estimated Closing Date Debt, plus (D) Estimated Closing Date Cash, less (E) the Holder Representative Fund, less (F) the Adjustment Escrow Amount, less (G) Estimated Company Transaction Expenses, plus (H) the Estimated Closing Date Company Cash Burn, with such amount determined prior to the adjustments set forth in the AMC Provisions.

(ii)      The "Merger Consideration" shall consist of (A) the Estimated Closing Merger Consideration, plus (B) the aggregate Additional Merger Consideration.

(d)      The Merger Consideration shall be allocated among the Pre-Closing Holders as set forth below in this Section 3.1(d), and shall be payable in accordance with, and subject to the terms and conditions of, this Agreement, including Section 3.2 and the AMC Provisions.

(i)      Each Pre-Closing Holder of Company Shares shall be entitled to receive in respect of each Company Share held by such holder immediately prior to the Effective Time, (i) the Cash Per Fully-Diluted Company Share, plus (ii) the applicable portion of the Additional Merger Consideration attributable to such Company Shares in accordance with the AMC Provisions.

(ii)      Each Pre-Closing Holder of Vested Options shall be entitled to receive in respect of each Vested Option held by such holder immediately prior to the Effective Time a portion of the Merger Consideration in cash equal to (i) the product of (x) the excess (if any) of (A) the Cash Per Fully-Diluted Company Share over (B) the per-share exercise price of such Vested Option, multiplied by (y) the aggregate number of shares of Company Stock issuable upon exercise in full of all Vested Options held by such holder immediately prior to the Effective Time, plus (ii) the applicable portion of the Additional Merger Consideration with respect to such Vested Options in accordance with the AMC Provisions, in each case, less applicable Tax withholdings.

(iii)      The "Cash Per Fully-Diluted Company Share" shall mean (i) the sum of (A) the Estimated Closing Merger Consideration, plus (B) the Aggregate Vested Option Exercise Price, divided by (ii) the Aggregate Fully-Diluted Company Shares.

(e)      From and after the Effective Time, (i) holders of Certificates shall cease to have any rights as stockholders of the Company and (ii) the consideration paid pursuant to this Article III upon the surrender of Certificates in accordance with the terms hereof shall be deemed to have been paid in full satisfaction of all rights pertaining to the Company Share, subject to the continuing rights of the Pre-Closing Holders under this Agreement.  At the Effective Time, the

transfer books of the Company shall be closed and no transfer of Company Shares shall be made thereafter. If, between the date of this Agreement and the Effective Time, the shares of Company Stock are changed into a different number or class of shares by means of any stock split, division or subdivision of shares, stock dividend, reverse stock split, consolidation of shares, reclassification or other similar transaction, then the Cash Per Fully-Diluted Company Share shall be appropriately adjusted by the Company to reflect such actions.

3.2     Payment and Exchange of Certificates and Options; Payment of Company SAFEs, Company Warrants and Closing Debt.

(a)     Immediately prior to the Effective Time, Buyer shall (i) enter into a customary exchange agent agreement (the "Exchange Agent Agreement") with Western Alliance Bank (the "Exchange Agent") and (ii) pay to the Exchange Agent, by wire transfer of immediately available funds, an amount (the "Funding Amount") equal to (A) the Estimated Closing Merger Consideration, minus (B) the product of (1) the number of Dissenting Shares and (2) the Cash Per Fully-Diluted Company Share; provided that (x) Buyer will promptly thereafter pay to the Exchange Agent any amounts by which the Funding Amount increases due to any Dissenting Shares becoming Company Shares in accordance with Section 3.9 and (y) notwithstanding the foregoing, Buyer shall pay directly to the Surviving Corporation (instead of the Exchange Agent) the portion of Funding Amount attributable to the Estimated Closing Merger Consideration payable with respect to Vested Options, and the Surviving Corporation shall, subject to Section 3.2(c), pay such amounts through its payroll or other appropriate system (with respect to Pre-Closing Holders of Vested Options who are not employees of the Company as of the Effective Time) to the applicable Pre-Closing Holders. The fees and expenses of the Exchange Agent shall be paid by Buyer.

(b)     After the Effective Time, each Pre-Closing Holder of Company Shares represented by an outstanding certificate or certificates for such Company Shares (collectively, the "Certificates"), upon surrender of such Certificates to the Exchange Agent and a duly completed and executed letter of transmittal in the form attached hereto as Annex D ("Letter of Transmittal") (which shall include, among other things, an executed consent to the appointment of the Holder Representatives as contemplated by Article XI) to the Exchange Agent and such other documentation as may be reasonably requested by the Exchange Agent or Buyer, and shall be entitled to receive from the Exchange Agent in exchange therefor such portion of the Merger Consideration into which such holder's Company Shares shall have been converted as a result of the Merger; provided, however, that the Additional Merger Consideration shall be paid pursuant to the AMC Provisions. Notwithstanding the foregoing, in the event that any Pre-Closing Holder delivers a duly completed and executed Letter of Transmittal and, if applicable, the Certificate(s) representing such Company Shares to Buyer at the Closing, Buyer shall pay the amount which such holder is entitled in consideration therefor directly to such holder at the Closing by wire transfer of immediately available funds and the Funding Amount payable to the Exchange Agent shall be reduced by such amount. Pending such surrender and exchange of a Pre-Closing Holder's Certificate(s), a holder's Certificate(s) shall be deemed for all purposes to evidence such holder's right to receive the portion of the Merger Consideration into which such Company Shares shall have been converted as a result of the Merger.

(c)     As promptly as practicable following the date first written above, the Company

shall deliver to each Pre-Closing Holder of Vested Options a Notice of Termination and Cash-Out of Options in substantially the form attached hereto as <u>Annex H</u> (each, an "<u>Option Termination Notice</u>" and collectively, the "<u>Option Termination Notices</u>").  After the Effective Time, but on the first payroll date following the later of (i) the Effective Time and (ii) the date on which the applicable Pre-Closing Holder of Vested Options delivers the executed Option Termination Notice, each Pre-Closing Holder of Vested Options shall be entitled to receive from the Surviving Corporation through its payroll or other appropriate system (with respect to Pre-Closing Holders of Vested Options who are not employees of the Company as of the Effective Time) in exchange therefor such portion of the Merger Consideration into which such holder's Vested Options shall have been converted as a result of the Merger; <u>provided</u>, <u>however</u>, that the Additional Merger Consideration shall be paid pursuant to the AMC Provisions.  Notwithstanding the forgoing or anything to the contrary in the AMC Provisions, except to the extent it would not cause an impermissible payment under Section 409A of the Code and the Department of Treasury Regulations and guidance thereunder (including because of Treasury Regulations § 1.409A-3(g)), the Pre-Closing Holders of Vested Options shall not be entitled to receive any payment with respect to their Vested Options, and no payment shall be made to such Pre-Closing Holders of Vested Options with respect to their Vested Options, in connection with the transactions contemplated hereby, including under the AMC Provisions, later than the fifth (5th) anniversary of the Closing Date. In the event that any such payment would otherwise have been owed to any such Pre-Closing Holder of Vested Options, such payment instead will be distributed to the Pre-Closing Holders pro rata (not taking into account their Vested Options) in accordance with the number of Company Shares held by such Pre-Closing Holders of Company Shares immediately prior to the Effective Time.

(d)     At the Effective Time, each holder of a Company Warrant, pursuant to the applicable Warrant Redemption Agreement, and upon surrender of such Company Warrants to the Company, shall be entitled to receive the "Warrant Redemption Price" set forth in such Warrant Redemption Agreement and Buyer shall pay, or cause to be paid, the aggregate "Warrant Redemption Prices" payable pursuant to the Warrant Redemption Agreements to the holders of Company Warrants.

(e)     At or following the Effective Time, each Company SAFE Holder, upon delivery of a SAFE Cancellation Agreement in substantially the form attached hereto as <u>Annex G</u> (each, a "<u>SAFE Cancellation Agreement</u>" and collectively, the "<u>SAFE Cancellation Agreements</u>") to the Company and Buyer, shall be entitled to receive the "SAFE Cancellation Amount" with respect such Company SAFE and Buyer shall pay, or cause to be paid, the aggregate "SAFE Cancellation Amounts" payable pursuant to the Company SAFEs to the Company SAFE Holders.

(f)     At the Effective Time, (i) Buyer shall pay the Adjustment Escrow Amount to Western Alliance Bank, in its capacity as escrow agent of the parties hereto (the "<u>Escrow Agent</u>"), to be held in escrow in accordance with the terms of the Escrow Agreement, and (ii) Buyer shall pay, or shall cause to be paid, to the intended beneficiaries thereof (as identified in writing by the Company to Buyer prior to the Closing and, in the case of fees and expenses, by invoices, and in the case of Closing Date Debt, as provided in Payoff Letters with respect thereto) (A) the Closing Date Debt that will be repaid at Closing and (B) the Estimated Company Transaction Expenses.

3.3     <u>Estimated Price Components; Estimated Closing Merger Consideration</u>.

(a)     Not less than five (5) Business Days prior to the Closing Date and in no event more than ten (10) Business Days prior to the Closing Date, the Company shall deliver to Buyer a written statement (the "Estimated Closing Statement") setting forth (i) its good faith estimate of (A) the Closing Date Net Working Capital (such estimate, "Estimated Closing Date Net Working Capital"), (B) Closing Date Debt (such estimate, "Estimated Closing Date Debt"), (C) Closing Date Cash (such estimate, "Estimated Closing Date Cash"), (D) the Closing Date Company Transaction Expenses (such estimate, "Estimated Company Transaction Expenses"), and (E) Closing Date Company Cash Burn (such estimate, the "Estimated Closing Date Company Cash Burn", and together with Estimated Closing Date Net Working Capital, Estimated Closing Date Debt, Estimated Closing Date Cash, and Estimated Company Transaction Expenses, the "Estimated Price Components"), (ii) the Company's calculation of the Estimated Net Working Capital Adjustment Amount and (iii) based on such estimates, a calculation of the Estimated Closing Merger Consideration. An illustrative example Estimated Closing Statement calculated as of the March 31, 2022 on the basis of assumptions set forth therein is attached hereto as Annex I.

(b)     Following delivery by the Company of the Estimated Closing Statement and before the Closing, the Company shall make its senior executive officers and relevant accounting and financial personnel reasonably available for inquiries from and discussions with representatives of Buyer relating to the Estimated Closing Statement and the Company shall consider in good faith any comments made by such representatives of Buyer and reflect any appropriate changes in the Estimated Closing Statement, as determined by the Company in its reasonable discretion.

(c)     The Estimated Closing Statement shall be prepared in good faith in accordance with the Accounting Principles, this Agreement (including all applicable definitions contained herein), the Organizational Documents of the Company, the Equity Plan and applicable award agreements relating to the Options and any other Contract containing terms and conditions applicable to any payments to be made at Closing in connection with this Agreement, the Transaction Agreements and the transactions contemplated hereby and thereby. Buyer shall be entitled to rely on the Estimated Closing Statement as the true, correct and complete and definitive allocation of all amounts payable or deliverable by Buyer pursuant to this Agreement at the Closing and thereafter (including each Pre-Closing Holder's allocation of the Merger Consideration at Closing), and in no event shall Buyer or any of its Affiliates (including, after the Closing, the Company and its Subsidiaries) have any liability to any Pre-Closing Holder, any of their respective Affiliates or any other Person in respect of payments made at Closing in accordance with the terms of this Agreement as set forth on the Estimated Closing Statement.

3.4     Adjustment Amount.

(a)     As soon as reasonably practicable following the Closing Date, and in any event within ninety (90) calendar days thereof, Buyer shall prepare and deliver to the Holder Representative (i) an unaudited consolidated balance sheet of the Company and its Subsidiaries (the "Closing Balance Sheet"), and (ii) a statement setting forth (A) a calculation of Net Working Capital as of the Calculation Time ("Closing Date Net Working Capital"); provided, that the Calculation Time for purposes of determining the amount of current Tax assets and current Tax liabilities taken into account in Net Working Capital shall be the end of the day on the Closing Date, (B) a calculation of the aggregate amount of all Debt of the Company as of the Calculation

Time ("Closing Date Debt"), (C) a calculation of Cash as of the Calculation Time ("Closing Date Cash"), (D) a calculation of the amount of Company Transaction Expenses as of the Calculation Time ("Closing Date Company Transaction Expenses"), (E) a calculation of Company Cash Burn as of the Calculation Time (the "Closing Date Company Cash Burn" and, together with Closing Date Net Working Capital, Closing Date Debt, Closing Date Cash, and Closing Date Company Transaction Expenses, the "Price Components"), and (F) based on the calculations in subclauses (A) through (E), a calculation of the Adjustment Amount (if any) reflecting the adjustments pursuant to this Section 3.4; provided, each of the Price Components shall be calculated in accordance with the Accounting Principles and, as applicable, the definitions of the Price Components. Without the prior written consent of the Holder Representative, Buyer shall not have the right (except to reflect the final resolution of any disputes in accordance with Section 3.4(c)) to modify the Closing Balance Sheet or Buyer's or the Surviving Corporation's proposed calculation of the Price Components after Buyer delivers such Closing Balance Sheet and calculations pursuant to this Section 3.4(a).

(b)    Following the Closing, Buyer shall provide the Holder Representative and its representatives access to the records, properties, personnel and (subject to the execution of customary work paper access letters if requested) auditors or accountants of Buyer and its Subsidiaries (including the Surviving Corporation and its Subsidiaries) relating to the preparation of the Closing Balance Sheet and the Price Components and shall cause the personnel of Buyer and its Subsidiaries to cooperate with the Holder Representative in connection with its review of the Closing Balance Sheet and the Price Components.

(c)    If the Holder Representative shall disagree with such calculation of any of the Price Components or the Adjustment Amount, it shall notify Buyer of such disagreement in writing, setting forth in reasonable detail the particulars of such disagreement, within thirty (30) days after its receipt of the Closing Balance Sheet. In the event that the Holder Representative does not provide a notice of disagreement within such thirty (30)-day period, the Holder Representative and Buyer shall be deemed to have agreed to the Closing Balance Sheet and the calculations of the Price Components and the Adjustment Amount delivered by Buyer, which shall be final, binding and conclusive for all purposes hereunder. In the event any notice of disagreement is timely provided, Buyer and the Holder Representative shall use reasonable best efforts for a period of twenty (20) days (or such longer period as they may mutually agree) to resolve any disagreements with respect to the calculations of the Price Components and the Adjustment Amount. If, at the end of such period, they are unable to resolve such disagreements, then any such remaining disagreements shall be resolved by an independent accounting or financial consulting firm of recognized national standing as may be mutually selected by Buyer and the Holder Representative (such firm, subject to the following proviso, the "Auditor"); provided, that if the Holder Representative and Buyer cannot agree on the Auditor, either party may request that the American Arbitration Association (the "AAA") choose the Auditor, in which case the AAA's choice of the Auditor will be binding and the expenses of the AAA will be shared fifty percent (50%) by Buyer and fifty percent (50%) by the Holder Representative. Each of Buyer and the Holder Representative (i) shall promptly provide their respective assertions regarding the Price Components and the Adjustment Amount and, to the extent relevant thereto, the Closing Balance Sheet in writing to the Auditor and to each other, and (ii) shall have the opportunity to provide to the Auditor and to the other a written response to the other's written assertions promptly after receipt thereof. The Auditor shall be instructed to render its determination with respect to such

10

disagreements as soon as reasonably possible (which the parties hereto agree should not be later than sixty (60) days following the day on which the disagreement is referred to the Auditor). The Auditor shall base its determination solely on (A) the written submissions of the parties and shall not conduct an independent investigation and (B) the extent (if any) to which the Price Components and the Adjustment Amount require adjustment (only with respect to the remaining disagreements submitted to the Auditor) in order to be determined in accordance with Section 3.4 (including the definitions of the Price Components); provided that the Auditor, in resolving such disputed items, shall not assign to any disputed item a value greater than the greatest value for such disputed item assigned by Buyer or the Holder Representative, or less than the smallest value for such disputed item assigned by Buyer or the Holder Representative. The determination of the Auditor shall be final, conclusive and binding on the parties. The date on which the Price Components and the Adjustment Amount are finally determined in accordance with this Section 3.4(c) is hereinafter referred to as the "Determination Date." All fees and expenses of the Auditor relating to the work, if any, to be performed by the Auditor hereunder shall be borne pro rata as between Buyer, on the one hand, and the Holder Representative as a Holder Representative Expense, on the other hand, in proportion to the allocation of the dollar value of the amounts in dispute as between Buyer and the Holder Representative (set forth in the written submissions to the Auditor) made by the Auditor such that the party prevailing on the greater dollar value of such disputes pays the lesser proportion of the fees and expenses. For example, if the Holder Representative challenges items underlying the calculations of the Price Components in the net amount of $1,000,000, and the Auditor determines that Buyer has a valid claim for $400,000 of the $1,000,000, Buyer shall bear sixty percent (60%) of the fees and expenses of the Auditor and the Holder Representative shall bear the remaining forty percent (40%) of the fees and expenses of the Auditor as a Holder Representative Expense.

(d)     The "Adjustment Amount," which may be positive or negative, shall mean (i) Closing Date Net Working Capital, minus Estimated Closing Date Net Working Capital, plus (ii) Estimated Closing Date Debt, minus Closing Date Debt, plus (iii) Closing Date Cash, minus Estimated Closing Date Cash, plus (iv) Estimated Company Transaction Expenses, minus Closing Date Company Transaction Expenses, plus (v) Closing Date Company Cash Burn, minus Estimated Closing Date Company Cash Burn (in each case, with respect to the Price Components, as finally determined in accordance with Section 3.4(c)). The Adjustment Amount shall be paid in accordance with Section 3.4(e).

(e)     (i)     If the Adjustment Amount, as finally determined pursuant to this Section 3.4, is a negative number, the Holder Representative and Buyer shall each, within five (5) Business Days after the Determination Date, direct the Escrow Agent to (A) pay to Buyer from the Adjustment Escrow Funds an aggregate amount equal to the absolute value of the Adjustment Amount, but not to exceed the amount of the Adjustment Escrow Funds, and (B) pay, or cause the Exchange Agent to pay, each Pre-Closing Holder its Pro Rata Share of any remaining Adjustment Escrow Funds after giving effect to the payments pursuant to subclause (A) of this Section 3.4(e); provided that the portion of any remaining Adjustment Escrow Funds payable to Pre-Closing Holders with respect to any Vested Options held by such holders immediately prior to the Closing shall be paid to the Surviving Corporation and the Surviving Corporation shall cause to be paid to each such Pre-Closing Holder through its payroll or other appropriate system (with respect to Pre-Closing Holders of Vested Options who are not employees of the Company as of the Effective Time) the portion of such Additional Merger Consideration attributable to such holder's Vested

Options, less any applicable tax withholdings. Buyer, the Company and the Holder Representative each acknowledges and agrees that neither Buyer nor the Company shall be entitled to receive any funds in excess of the balance of the Adjustment Escrow Funds in connection with any Adjustment Amount, and that the Adjustment Escrow Funds are the sole source of recourse available to any party to this Agreement for any amounts required to be paid with respect to a negative Adjustment Amount.

(ii)    If the Adjustment Amount, as finally determined pursuant to this Section 3.4, is a positive number, Buyer shall, within five (5) Business Days after the Determination Date, (A) pay, or cause the Exchange Agent to pay, to each Pre-Closing Holder an amount in cash equal to such holder's Pro Rata Share of the lesser of (x) the Adjustment Amount and (y) Adjustment Escrow Amount (such lesser amount, the "Adjustment Surplus"), and (B) with the Holder Representative, direct the Escrow Agent to release to the Exchange Agent for payment to each Pre-Closing Holder such Pre-Closing Holder's Pro Rata Share of the Adjustment Escrow Funds; provided that, in each case, the portion of any remaining Adjustment Escrow Funds and any amounts under clause (A) above payable to Pre-Closing Holders, in each case, with respect to any Vested Options held by such holders immediately prior to the Closing shall be paid to the Surviving Corporation and the Surviving Corporation shall cause to be paid to each such Pre-Closing Holder through its payroll or other appropriate system (with respect to Pre-Closing Holders of Vested Options who are not employees of the Company as of the Effective Time) the portion of such Additional Merger Consideration attributable to such holder's Vested Options, less any applicable tax withholdings. Buyer, the Company and the Holder Representative each acknowledges and agrees that the Pre-Closing Holders shall not be entitled to receive in the aggregate any funds in excess of the Adjustment Escrow Amount in connection with any Adjustment Amount.

(iii)    If the Adjustment Amount is equal to zero (0), then the Holder Representative and Buyer shall each, within five (5) Business Days after the Determination Date, direct the Escrow Agent to release to the Exchange Agent for payment to each Pre-Closing Holder such Pre-Closing Holder's Pro Rata Share of the Adjustment Escrow Funds; provided that the portion of any remaining Adjustment Escrow Funds and any Adjustment Surplus payable to Pre-Closing Holders with respect to any Vested Options held by such holders immediately prior to the Closing shall be paid to the Surviving Corporation and the Surviving Corporation shall cause to be paid to each such Pre-Closing Holder through its payroll or other appropriate system (with respect to Pre-Closing Holders of Vested Options who are not employees of the Company as of the Effective Time) the portion of such Additional Merger Consideration attributable to such holder's Vested Options, less any applicable tax withholdings.

(iv)    Any amounts which become payable pursuant to this Section 3.4(e) will constitute an adjustment to the Merger Consideration for all applicable Tax purposes to the extent permitted by applicable Law.

3.5    Reserved.

3.6    Holder Representative Fund. Upon the Closing, the Buyer will wire US$250,000 (the "Holder Representative Fund") to the Holder Representative, which will be used for any expenses incurred by the Holder Representative. The Pre-Closing Holders will not receive any interest or

12

earnings on the Holder Representative Fund and irrevocably transfer and assign to the Holder Representative any ownership right that they may otherwise have had in any such interest or earnings. The Holder Representative will hold these funds separate from its corporate funds and will not voluntarily make these funds available to its creditors in the event of bankruptcy. As soon as practicable following the completion of the Holder Representative's responsibilities, the Holder Representative will deliver any remaining balance of the Holder Representative Fund to the Exchange Agent for further distribution to the Pre-Closing Holders. For tax purposes, the Holder Representative Fund will be treated as having been received and voluntarily set aside by the Pre-Closing Holders at the time of Closing.

3.7    Exchange Agent.  Promptly following the date which is one (1) year after the Effective Time, Buyer shall instruct the Exchange Agent to deliver to the Surviving Corporation all cash, Certificates and other documents in its possession relating to the transactions contemplated hereby, and the Exchange Agent's duties shall terminate upon completion of such delivery.  Thereafter, each Pre-Closing Holder of a Certificate (other than Certificates representing Dissenting Shares) may surrender such Certificate (together with a duly completed and executed Letter of Transmittal) to Buyer and (subject to applicable abandoned property, escheat and similar Laws) receive in consideration therefor, and Buyer shall promptly pay, or cause to be promptly paid, the portion of the Merger Consideration deliverable in respect thereof as determined in accordance with this Article III without any interest thereon.

3.8    Lost Certificate.  In the event any Certificate has been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed, the Exchange Agent shall issue in exchange for such lost, stolen or destroyed Certificate the Merger Consideration deliverable in respect thereof as determined in accordance with this Article III without requirement to post any bond or other security.

3.9    Dissenting Shares.  Notwithstanding the foregoing provisions of this Article III, the Dissenting Shares shall not be converted into a right to receive any portion of the Merger Consideration and the holders thereof shall be entitled to such rights as are granted by Section 262 of the DGCL.  Each holder of Dissenting Shares who becomes entitled to payment for such shares pursuant to Section 262 of the DGCL shall receive payment therefor from the Surviving Corporation in accordance with the DGCL; provided, however, that (i) if any such holder of Dissenting Shares shall have failed to establish such holder's entitlement to appraisal rights as provided in Section 262 of the DGCL, or (ii) if any such holder of Dissenting Shares shall have effectively withdrawn such holder's demand for appraisal of such shares or lost such holder's right to appraisal and payment for such holder's shares under Section 262 of the DGCL, such holder shall forfeit the right to appraisal of such shares and each such share shall not constitute a Dissenting Share and shall be treated as if it had been a Company Share immediately prior to the Effective Time and converted, as of the Effective Time, into a right to receive from the Surviving Corporation the portion of the Merger Consideration deliverable in respect thereof as determined in accordance with this Article III, without any interest thereon (and such holder shall be treated as a Pre-Closing Holder).  The Company will give Buyer reasonable notice of all written notices received by the Company pursuant to Section 262 of the DGCL.  Without the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed), the Company shall not voluntarily make any payment with respect to, or settle or offer to settle, any such demand for payment.  From and after the Effective Time, no stockholder who has properly exercised and

13

perfected appraisal rights pursuant to Section 262 of the DGCL shall be entitled to vote his or her shares of Company Stock for any purpose or receive payment of dividends or other distributions with respect to his or her shares of Company Stock (except dividends and distributions payable to stockholders of record at a date which is prior to the Effective Time).

3.10    Withholding.  Buyer, the Company, the Surviving Corporation, the Exchange Agent and the Escrow Agent shall be entitled to deduct and withhold from all amounts otherwise payable to any Person in connection with the Transactions contemplated by this Agreement such amounts that Buyer, the Company, the Surviving Corporation, the Exchange Agent and the Escrow Agent, respectively, are required to deduct and withhold with respect to any such payments under the Code or any provision of state, local, provincial or foreign Tax Law.  To the extent that amounts are so withheld, such withheld amounts shall be paid over to the appropriate Governmental Authority and treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.  Buyer, the Company, the Surviving Corporation, the Exchange Agent and the Escrow Agent, as the case may be, shall cooperate in good faith with any reasonable request from the applicable payee to minimize the amount of any such withholding to the extent permitted by applicable Law.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the schedules to this Agreement previously exchanged among the parties (the "Schedules"), the Company represents and warrants to Buyer and Merger Sub as of the date of this Agreement and as of the Closing Date as follows:

4.1    Corporate Organization of the Company.  The Company has been duly incorporated and is validly existing as a corporation in good standing under the Laws of the State of Delaware and has the corporate power and authority to own or lease its properties and to conduct its business as it is now being conducted.  The Company is duly licensed or qualified to do business and (where applicable) is in good standing as a foreign corporation in each jurisdiction in which the ownership of its property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, as applicable, except where the failure to be so licensed or qualified or in good standing would not reasonably be expected to have a Material Adverse Effect on the Company.

4.2    Subsidiaries.  The Subsidiaries of the Company and their jurisdiction of incorporation or organization are set forth on Schedule 4.2.  Such Subsidiaries have been duly formed or organized and are validly existing under the laws of their respective jurisdictions of incorporation or organization and have the power and authority to own or lease their respective properties and to conduct their respective businesses as now being conducted, except where the failure to be so formed, organized or existing, or to have such power and authority, would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.  Each Subsidiary of the Company is duly licensed or qualified to do business and (where applicable) in good standing as a legal entity in each jurisdiction in which the ownership of its property or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified or in good standing would not reasonably be expected to have a Material Adverse Effect on the Company.

14

4.3     Due Authorization. The Company has all requisite corporate power and authority to execute and deliver this Agreement and (subject to receipt of the Merger Consent and the consents, approvals, authorizations and other requirements described in Section 4.5) to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby have been duly and validly authorized and approved by the board of directors of the Company, and no other corporate proceeding on the part of the Company is necessary to authorize this Agreement (other than the Merger Consent).  This Agreement has been duly and validly executed and delivered by the Company and (assuming this Agreement constitutes a legal, valid and binding obligation of Buyer and Merger Sub) constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (collectively, the "Remedies Exception").

4.4     No Conflict.  Subject to the receipt of the Merger Consent and the consents, approvals, authorizations and other requirements set forth in Section 4.5 and except as may result from any facts or circumstances relating solely to Buyer or any of its Affiliates, the execution and delivery of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby do not and will not, as of the Closing, (a) violate any provision of, or result in the breach of, any applicable Law to which the Company or any of its Subsidiaries is subject or by which any property or asset of the Company or any of its Subsidiaries is bound, (b) conflict with the certificate of incorporation, bylaws or other organizational documents of the Company or any of its Subsidiaries, (c) violate any provision of or result in a breach of, or require a consent under, any Contract, other than the Contracts listed on Schedule 4.4, or terminate or result in the termination of any such Contract, or result in the creation of any Lien (other than a Permitted Lien) under any such Contract upon any of the properties or assets of the Company or any of its Subsidiaries, or constitute an event which, after notice or lapse of time or both, would result in any such violation, breach, termination or creation of a Lien, or (d) result in a violation or revocation of any required license, permit or approval from any Governmental Authority, except to the extent that the occurrence of any of the foregoing items set forth in clause (c) or (d) would not reasonably be expected to (i) be material to the Company and its Subsidiaries, taken as a whole, or (ii) have a material adverse effect on the ability of the Company to enter into and perform its obligations under this Agreement.

4.5     Governmental Consents.  Assuming the truth and completeness of the representations and warranties of Buyer and Merger Sub contained in this Agreement and except as may result from any facts or circumstances relating solely to Buyer or any of its Affiliates, no consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority is required on the part of the Company with respect to the Company's execution or delivery of this Agreement or the consummation by the Company of the transactions contemplated hereby, except for (a) applicable requirements of the HSR Act or any similar foreign Law, (b) the approvals set forth in Section 8.3, (c) any consents, approvals, authorizations, designations, declarations or filings, the absence of which would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole, (d) compliance with any applicable securities Laws, (e) as otherwise disclosed on Schedule 4.5 and (f) the filing of the Certificate of Merger in accordance with the DGCL.

4.6    Capitalization of the Company.

(a)    The authorized capital stock of the Company consists of (i) 11,250,000 shares of Company Stock, of which 5,550,000 shares are issued and outstanding as of the date of this Agreement, and (ii) 4,640,594 shares of preferred stock, par value $0.0001 per share, of the Company of which (A) 2,420,000 are designated Series Seed-1 Preferred Stock, 2,373,324 of which are issued and outstanding as of the date of this Agreement, (B) 517,653 are designated Series Seed-2 Preferred Stock, all of which are issued and outstanding as of the date of this Agreement, (C) 452,941 are designated Series Seed-3 Preferred Stock, all of which are issued and outstanding as of the date of this Agreement, and (D) 1,250,000 are designated Series Seed-4 Preferred Stock, 1,165,844 of which are issued and outstanding as of the date of this Agreement. All of the issued and outstanding shares of Company Stock have been duly authorized and validly issued and are fully paid and nonassessable and have not been issued in violation of any preemptive or similar rights.

(b)    Schedule 4.6(b) sets forth, as of the date of this Agreement, a complete list of (i) the Options, including the name of each holder of an Option, the number of shares of Company Stock issuable upon exercise of each such Option, whether each such Option is an incentive stock option or a non-qualified stock option, the vesting schedule and status of each such Option, and the exercise price per share of each such Option; (ii) the Company Warrants, including the name of each holder of a warrant, the number of shares of Company Stock issuable upon exercise of each such warrant, and the exercise price per share of each such warrant; and (iii) the Company SAFEs, including the name of each Company SAFE Holder and the Purchase Amount (as defined therein) for each Company SAFE. No Option has an exercise price that is less than the fair market value of the underlying equity as of the date such Option was granted, as determined in compliance with the relevant IRS guidance in effect on the date of grant. The treatment of the Options described in Section 3.2 is permitted by the terms of the Equity Plan and the applicable award agreements thereunder. No awards other than Options have been granted under the Equity Plan.

(c)    Except for the Options, the Company Warrants, and the Company SAFEs, there are no outstanding options, warrants, rights or other securities convertible into or exchangeable or exercisable for shares of Company Stock, or any other commitments or agreements providing for the issuance of additional shares, the sale of treasury shares, or for the repurchase or redemption of shares of Company Stock, and there are no agreements of any kind which may obligate the Company to issue, purchase, register for sale, redeem or otherwise acquire any of its capital stock. Except for this Agreement and as set forth on Schedule 4.6(c), there is no voting trust, proxy or other agreement or understanding with respect to the voting of the shares of Company Stock.

4.7    Financial Statements. Attached as Schedule 4.7 are (a) the audited consolidated balance sheets and statements of income, cash flow and stockholders' equity of the Company and its Subsidiaries as of and for the twelve-month period ended December 31, 2021 (together with the auditor's reports thereon, the "Audited Financial Statements") and (b) an unaudited consolidated balance sheet and statements of income and cash flow of the Company and its Subsidiaries as of and for the three (3)-month period ended March 31, 2022 (the "Interim Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). The Financial Statements present fairly, in all material respects, the consolidated financial position and results of operations of the Company and its Subsidiaries as of the dates and for the periods indicated in such

16

Financial Statements in conformity with GAAP (except in the case of the Interim Financial Statements for the absence of footnotes and other presentation items and for normal year-end adjustments). As of the date of this Agreement, there is no liability, debt or obligation of the Company or any of its Subsidiaries of a type required to be reflected or reserved for on a balance sheet prepared in accordance with GAAP, except for liabilities and obligations (i) reflected or reserved for on the Financial Statements or disclosed in the notes thereto, (ii) that have arisen since the date of the most recent balance sheet included in the Financial Statements in the ordinary course of the operation of business of the Company and its Subsidiaries, (iii) incurred in connection with the transactions contemplated by this Agreement, (iv) disclosed in the Schedules or (v) which would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

4.8    <u>Litigation and Proceedings</u>.  As of the date of this Agreement, there are no pending or, to the knowledge of the Company, threatened in writing, lawsuits, actions, suits, claims or other proceedings at law or in equity or, to the knowledge of the Company, investigations, in each case, before or by any Governmental Authority against the Company or any of its Subsidiaries that, in each case, if resolved adversely to the Company or any of its Subsidiaries, would (after taking into account applicable insurance) reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

4.9    <u>Legal Compliance</u>. The Company and its Subsidiaries are, as of the date of this Agreement, in compliance with all applicable Laws, except where the failure to be in compliance with such Laws would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole. As of the date of this Agreement, neither the Company nor any of its Subsidiaries has received any written notice from any Governmental Authority of a material violation of any applicable Law at any time during the past two years that would reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

4.10    <u>Company Benefit Plans</u>.

(a)    <u>Schedule 4.10(a)</u> sets forth a complete list of each material Company Benefit Plan and separately identifies each Company Benefit Plan that is a PEO Benefit Plan. Except as set forth on <u>Schedule 4.10(a)</u>, no Company Benefit Plan provides compensation or benefits to any current or former Service Provider who performs (or has performed) services for the Company or any of its Subsidiaries outside of the United States or is governed by Law outside of the United States. No Company Benefit Plan is (i) an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) or (ii) intended to be qualified under Section 401(a) of ERISA.

(b)    With respect to each Company Benefit Plan, the Company has delivered or made available to Buyer or its representatives current and correct copies of, to the extent applicable (and, with respect to each Company Benefit Plan that is a PEO Benefit Plan, to the extent in the Company's possession after reasonable request to the PEO), (i) the plan document (or, in the case of an unwritten Company Benefit Plan, a summary of the material terms and conditions thereof) and any trust agreement or other funding arrangement relating thereto, (ii) the most recent summary plan description and all summaries of material modifications thereto, (iii) the most recent annual report on Form 5500 and all attachments thereto filed with the IRS, and (iv) the most recent determination, opinion letter, or advisory letter, if any, issued by the IRS, and (v) any material,

17

non-routine correspondence with any Governmental Authority since December 31, 2018.

(c)    (i) Each Company Benefit Plan has been funded, administered, operated, and maintained in all material respects in accordance with its terms and all applicable Laws, including, to the extent applicable, ERISA and the Code; and (ii) all contributions required to be made with respect to any Company Benefit Plan on or before the date of this Agreement have been made. The Company and each of its Subsidiaries has satisfied in all material respects all of its obligations with respect to all PEOs.

(d)    To the Knowledge of the Company, each Company Benefit Plan that is a "group health plan" as defined in Section 733(a)(1) of ERISA has complied in all material respects with the Affordable Care Act.  No event has occurred, and no condition or circumstance exists, that could subject the Company or any of its Subsidiaries to any liabilities, penalties, or Tax under Sections 4980D or 4980H of the Code or any other provision of the Affordable Care Act.

(e)    No Company Benefit Plan is, and none of the Company, and of its Subsidiaries or any ERISA Affiliate has any liability with respect to, a pension plan that is subject to Title IV of ERISA or Section 412 of the Code, and neither the Company, any of its Subsidiaries nor any ERISA Affiliate has sponsored or contributed to or been required to contribute to a multiemployer pension plan (as defined in Section 3(37) of ERISA) or other pension plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code at any time within the previous six (6) years.

(f)    No Company Benefit Plan provides (or could require the Company, Buyer or any of their respective Affiliates to provide) (i) post-employment health, medical, life insurance, or other welfare benefits other than (A) coverage through the end of the month of retirement or other termination of employment or service, (B) disability benefits attributable to disabilities occurring at or prior to retirement or other termination of employment or service, (C) conversion rights at the sole expense of the converting individual, and (D) coverage mandated by Section 4980B of the Code or other applicable Law (the cost of which is borne solely by the applicable employee) or (ii) welfare benefits to any individual who is not a current or former employee of the Company (or a dependent thereof).

(g)    With respect to each Company Benefit Plans, (i) no actions, suits or claims (other than routine claims for benefits in the ordinary course, appeals of such claims and domestic relations order proceedings) are pending or, to the knowledge of the Company, threatened, and (ii) to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to give rise to any such actions, suits or claims.

(h)    Except as set forth on Schedule 4.10(h), the execution of this Agreement and performance of the transactions contemplated hereby (whether alone or together with any other event or circumstance on or following the Closing, including termination of employment) will not (i) entitle any current or former Service Provider to severance pay, or any payment of other compensation or benefits from the Company or any of its Subsidiaries, or otherwise, (ii) result in any payment, acceleration of payment, funding, vesting or increase in the amount of compensation or benefits with respect to any current or former Service Provider or (iii) result in any modification, amendment or otherwise affect the rights of the Company or any of its Subsidiaries or Buyer or its

Affiliates (including, without limitation, the right to modify or terminate) under any Company Benefit Plan.

(i)    No Company Benefit Plan or other Contract to which the Company or any of its Subsidiaries is a party or otherwise bound has resulted or could result, alone or together with any other payments or benefits (whether occurring prior to, on or following the Closing, including in connection with termination of employment), in the payment of any "excess parachute payment" within the meaning of Section 280G of the Code as a result of or otherwise related to the consummation of the Transaction.

(j)    Each Company Benefit Plan and other Contract to which the Company or any of its Subsidiaries is a party or otherwise bound that is subject to Section 409A has been maintained in documentary and operational compliance with Section 409A of the Code and the applicable guidance issued thereunder in all material respects.    Neither the Company nor any of its Subsidiaries has any indemnity, gross-up or similar obligation for any Taxes imposed under Section 4999 or 409A of the Code.

4.11    <u>Taxes</u>.

(a)    All material Tax Returns required by Law to be filed by or with respect to the Company or any of its Subsidiaries have been timely filed (taking into account any extensions thereof), and all such Tax Returns are true and complete in all material respects. No claim has been made, or threatened in writing, by a Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries does not file a Tax Return that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction in respect of Taxes that would be covered by or the subject of such Tax Return.

(b)    The Company and its Subsidiaries have timely paid all material Taxes which are due and payable by the Company and its Subsidiaries (whether or not such Taxes have been shown as due on any Tax Return). The unpaid Taxes of the Company and its Subsidiaries did not, as of the date of the Interim Financial Statements, exceed the reserve for Tax liability (excluding any reserve for deferred Taxes) set forth on the face of the Interim Financial Statements. Since the date of the Interim Financial Statements, the Company and its Subsidiaries have not incurred any liability for Taxes outside the ordinary course of business or otherwise inconsistent with past custom and practice.

(c)    All material Taxes required by applicable Law to be withheld by the Company and its Subsidiaries have been withheld and timely paid over to the appropriate Governmental Authority.

(d)    No deficiency for any material Taxes has been asserted or assessed by any Governmental Authority against the Company or any of its Subsidiaries (or, to the knowledge of the Company, has been threatened or proposed in writing), except for deficiencies which have been satisfied by payment, settled or withdrawn.    No Action by any Governmental Authority is pending or threatened in writing against the Company or any of its Subsidiaries with respect to any material Taxes due from the Company or any of its Subsidiaries. No issues relating to Taxes of the Company or its Subsidiaries were raised by the relevant Governmental Authority in any

completed audit or examination that would reasonably be expected to result in any additional liability for any material Taxes in a later taxable period. There are not currently in force any waivers or agreements binding upon the Company or any of its Subsidiaries for any statute of limitations or the extension of time for the assessment of any Tax, nor has any request been made in writing for any such waivers or agreements.

(e)     There are no Tax indemnification or Tax sharing agreements under which the Company or any of its Subsidiaries would reasonably be expected to be liable after the Closing Date for any Tax liability of any Person that is neither the Company nor one of its Subsidiaries, other than customary agreements with unrelated customers, vendors, lessors, lenders and the like or other agreements entered into in the ordinary course of business and that do not relate primarily to Taxes. Neither the Company nor any of its Subsidiaries has been a member of an affiliated, combined, consolidated, unitary or other similar group for any federal, state, local or foreign Tax purposes, other than such a group the parent of which is the Company. Neither the Company nor any of its Subsidiaries have any liability for the Taxes of any other Person (other than among the Company and its Subsidiaries) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by Contract (other than customary commercial Contracts with unrelated customers, vendors, lessors, lenders and the like entered into in the ordinary course of business and that do not relate primarily to Taxes) or otherwise.

(f)     Neither the Company nor any of its Subsidiaries has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for tax-free treatment under Section 355 of the Code (or under so much of Section 356 of the Code as relates to Section 355 of the Code) in the two (2) years prior to the date of this Agreement.

(g)     Neither the Company nor any of its Subsidiaries has entered into a "listed transaction" that has given rise to a disclosure obligation under Section 6011 of the Code and Treasury Regulations Section 1.6011-4 and that has not been disclosed in the relevant Tax Return of the Company or the relevant Subsidiary.

(h)     There are no Liens for Taxes upon any property or asset of the Company or its Subsidiaries (other than statutory Liens for current Taxes not yet due and payable).

(i)     Neither the Company nor any of its Subsidiaries has elected at any time to be treated as an S corporation within the meaning of Section 1361(a)(1) of the Code (or any corresponding provision of state, local or foreign Tax Law).

(j)     Each of the Company and its Subsidiaries is, and always has been, resident for Income Tax purposes only in the United States. Neither the Company nor any of its Subsidiaries has engaged in a trade or business, had a branch or permanent establishment (within the meaning of an applicable Tax treaty), or otherwise become subject to Tax jurisdiction in a country (or political subdivision thereof or therein) other than the United States.

(k)     Neither the Company nor any of its Subsidiaries is a partner for Tax purposes with respect to any joint venture, partnership, or other arrangement or Contract that is treated as a partnership for Tax purpose.

(l)      Neither the Company nor any of its Subsidiaries will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing Date as a result of any (i) installment sale, open transaction or other transaction on or prior to the Closing Date, (ii) accounting method change or agreement with any Governmental Authority, (iii) use of the cash method of accounting or an improper method of accounting for any period or portion thereof ending prior to the Closing Date, (iv) prepaid amount or deferred revenue received or accrued on or prior to the Closing or (v) intercompany transaction or excess loss account described in Section 1502 of the Code (or any corresponding provision of state, local or foreign Tax Law).

4.12      Brokers' Fees.  No broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other similar commission, for which Buyer, the Company or any of its Subsidiaries would be liable in connection with the transactions contemplated by this Agreement based upon arrangements made by the Company, any of its Subsidiaries or any of their Affiliates.

4.13      Insurance. Schedule 4.13 contains a list of all material policies of property, fire and casualty, product liability, workers' compensation, and other forms of insurance held by, or for the benefit of, the Company or any of its Subsidiaries as of the date of this Agreement.  True and complete copies of such insurance policies (or, to the extent such policies are not available, policy binders) have been made available to Buyer or its representatives. As of the date of this Agreement, neither the Company nor any of its Subsidiaries has received any written notice from any insurer under any such insurance policies, canceling or materially adversely amending any such policy or denying renewal of coverage thereunder, and all premiums on such insurance policies due and payable as of the date of this Agreement have been paid.

4.14      Licenses, Permits and Authorizations.

(a)      The Company and its Subsidiaries hold, and are, as of the date of this Agreement, in compliance with, all of the material licenses, approvals, consents, registrations and permits necessary under applicable Laws to permit the Company and its Subsidiaries to own, operate, use and maintain their assets in the manner in which they are now operated, used and maintained and to conduct the business of the Company and its Subsidiaries as currently conducted, except where the absence of, or the failure to be in compliance with, any such license, approval, consent, registration or permit would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole. As of the date of this Agreement, there are no pending or, to the knowledge of the Company, threatened in writing, claims, actions, suits or other proceedings in law or in equity or, to the knowledge of the Company, investigations, in each case before or by any Governmental Authority that would reasonably be expected to result in the revocation or termination of any such license, approval, consent, registration or permit that is material to the conduct of the business of the Company and its Subsidiaries as currently conducted, except for any such revocation or termination that would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

(b)      Except for the Company Broker-Dealer, none of the Company or its Subsidiaries are required to be registered as a broker or a dealer in any jurisdiction, and the Company Broker-Dealer is, and at all times required by applicable Law has been, duly registered, licensed or

qualified as a broker-dealer under the Exchange Act and in each jurisdiction where the conduct of its business requires such registration, licensing or qualification. The Company Broker-Dealer is a member in good standing of FINRA and is in compliance in all material respects with the Exchange Act and applicable rules and regulations of FINRA. Each Registered Representative of the Company and its subsidiaries is duly registered or licensed to act in such capacity.

(c)     The Company has made available to Buyer true, correct and complete copies of Company Broker-Dealer's Uniform Application for Broker-Dealer Registration on Form BD, reflecting all amendments thereto to the date of this Agreement ("Form BD"). The Company Broker-Dealer has timely filed all required amendments to Form BD and Financial and Operational Combined Uniform Single ("FOCUS") reports, and each amendment to Form BD and FOCUS report of the Company Broker-Dealer, as of the date of filing with the SEC and FINRA, did not contain any untrue statement of a fact or omit to state a fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not materially misleading.

(d)     No exemptive orders, "no-action" letters or similar exemptions or regulatory relief have been obtained, nor are any requests pending therefor, by or with respect to the Company or its Subsidiaries or any officer, director, partner or employee of any of them in connection with the business of the Company or its Subsidiaries.

(e)     Except as disclosed on the Company Broker-Dealer's Form BD or the Forms U-4 of its respective Registered Representatives and "associated persons" (as defined in the Exchange Act), none of the Company Broker-Dealer or, to the knowledge of the Company, any of its Registered Representatives or "associated persons" has been the subject of any legal proceeding before any Governmental Authority that would be required to be disclosed on Form BD and is not so disclosed, and, to the knowledge of the Company, no such legal proceeding is pending or threatened with respect to the Company Broker-Dealer with respect to any of its Registered Representatives or "associated persons" (as defined in the Exchange Act).

(f)     None of the Company Broker-Dealer nor any "associated person" (as defined in the Exchange Act) thereof (i) is or has been ineligible to serve as a broker-dealer or an associated person of a broker-dealer under Section 15(b) of the Exchange Act, (ii) is subject to a "statutory disqualification" as defined in Section 3(a)(39) of the Exchange Act or (iii) is subject to disqualification under Rule 506(d) of Regulation D under the Securities Act. To the knowledge of the Company, there is no legal proceeding pending or threatened that is reasonably likely to result in any such person being deemed ineligible as described in clause (i), subject to a "statutory disqualification" as described in clause (ii) or subject to disqualification as described in clause (iii).

(g)     The Company Broker-Dealer has implemented written policies and procedures as required by applicable Law (including, but not limited to, FINRA Rules 3110, 3120 and 3130), including (i) written supervisory procedures and a supervisory control system, (ii) written anti-money laundering policies and procedures that incorporate, among other things, a written customer identification program, (iii) written policies and procedures designed to protect non-public personal information about clients and other third parties, (iv) written policies and procedures designed to detect, prevent and mitigate identity theft and (v) written recordkeeping policies and procedures; true, correct and complete copies of such policies and procedures have been delivered

to Buyer and, except as otherwise noted in any such reports or filings, the Company Broker-Dealer has been in compliance with such policies and procedures in all material respects.

(h)     The Company Broker-Dealer maintains and, at all times has maintained, its net capital (i) in excess of the amount that it is or was, as applicable, required to maintain under Rule 15c3-1 under the Exchange Act (or such higher amount that has been agreed to with any Governmental Authority) and (ii) in an amount sufficient to ensure that it is not, and has not been, required to file notice under Rule 17a-11 under the Exchange Act, including as a result of being informed by FINRA or the SEC that it is or has been in violation of Rule 15c3-l of the Exchange Act.

(i)     The Company Broker-Dealer is a member of The Depository Trust Company and the National Securities Clearing Corporation and is in compliance, and the during the term of its respective memberships has been in compliance, in all material respects with the "Membership Approval Conditions" in its membership agreements with both organizations (the "Clearing Membership Approval Conditions"), including the requirements thereunder to maintain a debt facility and to maintain certain minimum levels of net capital or net income.

4.15     Real Property. The Company does not own any real property.  Schedule 4.15 lists, as of the date of this Agreement, all Leased Real Property. Except as would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole, (a) the Company or one of its Subsidiaries has a valid and enforceable leasehold estate in, and enjoys peaceful and undisturbed possession of, all Leased Real Property, subject to the Remedies Exception and any Permitted Liens and (b) as of the date of this Agreement, neither the Company nor any of its Subsidiaries has received any written notice from any lessor of such Leased Real Property of, nor does the Company or any of its Subsidiaries have knowledge of the existence of, any default, event or circumstance that, with or without notice, lapse of time, or both, would constitute a default under any of the leases governing the Leased Real Property.

4.16     Intellectual Property.

(a)     Schedule 4.16(a) lists all Owned Intellectual Property and Intellectual Property Rights exclusively licensed to the Company or one of its Subsidiaries that has been issued by, registered with, or the subject of an application filed with, as applicable, the United States Patent and Trademark Office, the United States Copyright Office, private domain name registrar, or any similar office or agency anywhere in the world ("Registered Company Intellectual Property.") All Registered Company Intellectual Property is currently in material compliance with all formal legal requirements (including, as applicable, payment of filing, examination and maintenance fees, inventor declarations, proofs of working or use, timely post-registration filing of affidavits of use and incontestability, and renewal applications), and the Company and its Subsidiaries have taken all actions necessary, to obtain, perfect and maintain such Registered Company Intellectual Property in full force and effect.  All issued Registered Company Intellectual Property is valid, subsisting and enforceable, and, to the knowledge of the Company, applications for Registered Company Intellectual Property are valid, subsisting and enforceable. No Registered Company Intellectual Property has ever been found invalid, unpatentable or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding, except for claims rejected or refused in connection with the prosecution of any Registered Company Intellectual Property.   No

23

Registered Company Intellectual Property has been or is now involved in any interference, reissue, re-examination, inter-partes review, post-grant review, or opposition proceeding. No Registered Company Intellectual Property at any time has been cancelled, abandoned, allowed to lapse or not renewed, except where the Company or one of its Subsidiaries has, in its reasonable business judgment, decided to cancel, abandon, allow to lapse or not renew such Registered Company Intellectual Property. The Company or one of its Subsidiaries is the exclusive owner of all right, title and interest in and to all Owned Intellectual Property, free and clear of all liens or other encumbrances (except for Permitted Liens), and has valid and continuing legal right (pursuant to valid and enforceable written agreements) to use, sell, license and otherwise exploit, as the case may be, all other Company Intellectual Property as the same is used, sold, licensed and otherwise exploited by the Company or one of its Subsidiaries in their respective businesses as currently conducted and as currently proposed to be conducted.

(b)     The operation of the business of the Company and its Subsidiaries, as currently conducted and as currently proposed to be conducted, the products or services marketed or sold (or proposed to be marketed or sold) by the Company or its Subsidiaries, and the Owned Intellectual Property are not infringing upon, misappropriating or otherwise violating (and did not in the past infringe, misappropriate or violate) any Intellectual Property Rights of any Person; provided, however, that the foregoing representation and warranty is made to the knowledge of the Company with respect to patents only.

(c)     As of the date of this Agreement, the Company and its Subsidiaries have not, as of the date of this Agreement, received from any Person in the six (6) years prior to the date of this Agreement any written notice, charge, complaint, claim or other written assertion of any infringement or violation by, or misappropriation of, any Intellectual Property Rights of any Person. There are no settlements, covenants not to sue, consents, judgments, or orders or similar obligations that: (i) restrict the rights of the Company or any of its Subsidiaries to use any Intellectual Property Rights in any manner, (ii) restrict the business of the Company or any of its Subsidiaries in order to accommodate any third party's Intellectual Property Rights, or (iii) permit third parties to use the Owned Intellectual Property.

(d)     To the knowledge of the Company, as of the date of this Agreement, no third party has infringed, misappropriated or otherwise violated and no third party is currently infringing upon, misappropriating or otherwise violating any of the Owned Intellectual Property. Within the six (6) years prior to the date of this Agreement, neither the Company nor any of its Subsidiaries has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert any Action against any Person involving or relating to any Owned Intellectual Property.

(e)     Other than with respect to commercially available software products under standard end-user object code license agreements, there are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Owned Intellectual Property.

(f)     The Company or one its Subsidiaries has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic

devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Company's and its Subsidiaries' respective businesses.

(g)     Each employee, consultant or third party who is or was involved in the creation or development of any portion of, or would otherwise have rights in or to, any Owned Intellectual Property has executed a valid and enforceable written agreement with the Company or one of its Subsidiaries that assigns to the Company or the applicable Subsidiary all rights, title and interest in and to any such Owned Intellectual Property and all rights therein and irrevocably waives moral rights in such Owned Intellectual Property, and all Owned Intellectual Property in such third party's contribution is owned exclusively by the Company or one of its Subsidiaries. To the knowledge of the Company, it will not be necessary to use any inventions of any of its employees or consultants (or Persons it currently intends to hire) made prior to their employment by the Company or any of its Subsidiaries, including prior employees or consultants, or academic or medical institutions with which any of them may be affiliated now or may have been affiliated in the past. To the knowledge of the Company, no employee of the Company or any of its Subsidiaries is: (i) bound by or otherwise subject to any contract restricting him or her from performing his or her duties, or (ii) in breach of any contract with any former employer or other person concerning Intellectual Property Rights or confidentiality due to his or her activities as an employee of the Company or any of its Subsidiaries.

(h)     The Company and its Subsidiaries have not embedded, used or distributed any Open Source Software in connection with any Company Products in any manner that would materially restrict the ability of the Company and its Subsidiaries to protect its proprietary interests in any such product or service or in any manner that requires, or purports to require (i) any Owned Intellectual Property (other than the Open Source Software itself) be disclosed or distributed in source code form or be licensed for the purpose of making derivative works; (ii) any material restriction on the consideration to be charged for the distribution of any Owned Intellectual Property; (iii) the creation of any material obligation for the Company or any of its Subsidiaries with respect to Owned Intellectual Property, or the grant to any third party of any rights or immunities under Owned Intellectual Property; or (iv) any other material limitation, restriction or condition on the right of the Company or any of its Subsidiaries with respect to its use or distribution of any Owned Intellectual Property.

(i)     No government funding, facilities of a university, college, other educational institution or research center was used in the development of any Owned Intellectual Property that would affect the Company's or any of its Subsidiaries' rights in the Owned Intellectual Property. To the knowledge of the Company, no Person who was involved in, or who contributed to, the creation or development of any Owned Intellectual Property, has performed services for the government, university, college, or other educational institution or research center in a manner that would materially adversely affect the Company's or any of its Subsidiaries' rights in the Owned Intellectual Property.

(j)     Except as set forth in Schedule 4.16(j), no source code for any Company Products has been delivered, licensed, or made available to any escrow agent or other person who is not, as of the date of this Agreement, an employee of the Company or any of its Subsidiaries or a contractor of the Company or any of its Subsidiaries providing services thereto, and the Company and its Subsidiaries have no duty or obligation (whether present, contingent, or otherwise) to

deliver, license, or make available such source code to any escrow agent or other person. No event has occurred, and no circumstance or condition exists, that will, or could reasonably be expected to, require the delivery, license, or disclosure of any source code for any Company or Subsidiary product or service or Owned Intellectual Property to any other person who is not, as of the date of this Agreement, an employee of the Company or any of its Subsidiaries.

(k)     All Company Products: (i) comply in all material respects with all applicable Laws and industry standards; and (ii) materially conform to all applicable contractual commitments, express and implied warranties (to the extent not subject to legally effective express exclusions thereof), representations and claims in advertising, and marketing materials, and applicable specifications, user manuals, training materials, and other published documentation. None of the Company Products contain any bug, defect, or error that materially adversely affects, or could reasonably be expected to materially adversely affect, the functionality, or performance of such Company Products.

(l)     To the knowledge of the Company, the Company Products do not contain any "virus", "worm", "time bomb", "key-lock", "back door", "drop dead device", "Trojan horse", "spyware", or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have any of the following functions: (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or (ii) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent (collectively, "Malicious Code"). The Company implements industry standard measures designed to prevent the introduction of Malicious Code into Company Products.

(m)     The computers, Software, servers, workstations, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by the Company and its Subsidiaries (collectively, the "IT Assets") (i) operate and perform in all material respects as required by the Company and have not materially malfunctioned or failed within the past three (3) years, (ii) are adequate and sufficient for the operations of the Company; and (iii) do not contain any Malicious Code. The Company has in place commercially reasonable measures, consistent with current industry standards, to protect the security of the IT Assets (and all information and transactions stored or contained therein or transmitted thereby) against unauthorized use or access and against the introduction of Malicious Code, and the Company has not experienced any material unauthorized use or disclosure of, or access to, the IT Assets or any information or data of the Company. The Company has implemented commercially reasonable data backup, data storage, system redundancy and disaster recovery procedures, as well as a commercially reasonable business continuity plan.

4.17   Data Privacy. In connection with its collection, storage, use or disclosure of any information that constitutes "personal information," "personal data", "personally identifiable information" or substantially similar term as defined in applicable laws (collectively "Personal Information") by or on behalf of the Company or any of its Subsidiaries, the Company and its Subsidiaries are and have been in compliance with (a) all applicable laws (including, without limitation, laws relating to privacy, data security, data transfer, consumer protection, social security number protection, and breach disclosure and notification) in all relevant jurisdictions ("Privacy Laws"), (b) privacy policies applicable to the Company or its Subsidiaries and public

26

written statements regarding the Company's or any of its Subsidiary's privacy or data security practices, (c) contracts with third-parties governing Personal Information, privacy and data issues into which the Company or any of its Subsidiaries have entered or by which it is otherwise bound; and (d) the requirements of any contract codes of conduct or industry standards, by which the Company or any of its Subsidiaries are bound (collectively, "<u>Privacy Obligations</u>"). The Company and its Subsidiaries maintain and have maintained reasonable physical, technical, and administrative security measures and policies to protect all Personal Information owned, stored, used, maintained, or controlled by or on behalf of the Company or any of its Subsidiaries from and against unlawful, accidental or unauthorized access, destruction, loss, use, modification or disclosure. The Company and its Subsidiaries have a privacy policy which complies with Privacy Laws prior to the collection of any Personal Information. There has been no reportable occurrence under the Privacy Obligations of unlawful, accidental, or unauthorized destruction, loss, use, modification or disclosure of or access to Personal Information owned, stored, used, maintained or controlled by or on behalf of the Company or any of its Subsidiaries. Neither the Company nor any of its Subsidiaries have been required under any Privacy Obligation to notify government authorities, affected individuals or other parties of any unauthorized access to or disclosure of the Company's or any of its Subsidiaries' confidential information or trade secrets. Neither the Company nor any of its Subsidiaries have received any written notice that it is or has been in breach of any Privacy Obligations. No action, audit, assessment, suit, legal proceeding, investigation, administrative enforcement proceeding or arbitration proceeding before any court, administrative body or other governmental authority (whether or a criminal, civil or administrative nature) has been filed or commenced against the Company or any of its Subsidiaries nor threatened against the Company or any of its Subsidiaries, alleging any failure to comply with any Privacy Laws, and neither the Company nor any of its Subsidiaries have knowingly incurred any material liabilities under any Privacy Laws.

4.18    <u>Affiliate Matters.</u> Except for (a) the Company Benefit Plans, (b) Contracts relating to labor and employment matters set forth on <u>Schedule 4.10,</u> (c) Contracts solely between or among the Company and any of its Subsidiaries, and (d) as set forth on <u>Schedule 4.18,</u> neither the Company nor any of its Subsidiaries is party to any material Contract with any (i) officer or director of the Company or any of its Subsidiaries or (ii) Affiliate of the Company.

4.19    <u>Absence of Certain Business Practices.</u> As of the date of this Agreement, (a) the Company and its Subsidiaries are, to the knowledge of the Company, in compliance with all applicable Specified Business Conduct Laws, except where the failure to have such rights would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole, (b) neither the Company nor any of its Subsidiaries has (i) received written notice of or made a voluntary, mandatory or directed disclosure to any Governmental Authority relating to any actual violation of any Specified Business Conduct Law or (ii) been a party to or the subject of any pending or, to the knowledge of the Company, threatened Action or, to the knowledge of the Company, investigation by or before any Governmental Authority related to any actual violation of any Specified Business Conduct Law, except, in each case, to the extent any such disclosure, Action or investigation would not reasonably be expected to have a Material Adverse Effect on the Company.

4.20    <u>Contracts.</u>

(a)    Except as set forth on <u>Schedule 4.20</u>, neither the Company nor any of its Subsidiaries is a party to or bound by any written or oral:

(i)    any Contract for the employment or consultancy of any officer, individual employee or other Person on a full time, part-time or consulting basis or providing for the payment of any cash or other compensation or benefits upon the sale of all or a material portion of its assets or a change of control (other than at-will employment agreements with its employees which do not commit the Company or any Subsidiary thereof to severance, termination or other similar payments and which are terminable without prior notice);

(ii)    Contract relating to indebtedness of the Company or any Company Subsidiaries or to the mortgaging or pledging of, or otherwise placing a Lien on (other than a Permitted Lien), any of its assets or any of its securities;

(iii)    Contract containing covenants that in any way purport to restrict the right or freedom of the Company or any Subsidiary thereof to (A) engage in any business activity, (B) engage in any line of business or compete with any Person, (C) conduct any activity in any geographic area, or (D) solicit any Person to enter into a business or employment relationship, or enter into such a relationship with any Person;

(iv)    Contract under which it has advanced or loaned any other Person any amounts in excess of $50,000;

(v)    Contract under which it is lessee of or holds or operates any real property or tangible personal property with a value in excess of $50,000, owned by any other Person;

(vi)    Contract requiring the Company or any Subsidiary thereof to indemnify or hold harmless any Person whereby the Company or any Subsidiary thereof is responsible for indemnification obligations in excess of $250,000;

(vii)    any Contract between any Pre-Closing Holders or their respective Affiliates, on the one hand, and the Company, any Subsidiary thereof or their respective Affiliates, on the other hand;

(viii)    Contract that provides any customer with pricing, discounts or benefits that change based on the pricing, discounts or benefits offered to other customers of the Company, including any Contract which contains a "most favored nation" provision;

(ix)    Contract involving the settlement of any Action or threatened Action (A) which will (x) involve payments after the date of the Reference Balance Sheet of consideration in excess of $250,000 or (y) impose monitoring or reporting obligations to any other Person outside the ordinary course of business or (B) with respect to which conditions precedent to the settlement have not been satisfied;

(x)    Contract relating to the acquisition or sale of a business (or any material portion thereof), whether or not consummated; or

(xi)    Contract with any Governmental Authority.

(b)    All of the Contracts set forth or required to be set forth on Schedule 4.20 (each, a "Material Contract") are valid, binding and enforceable against the Company and each Subsidiary thereof (to the extent party thereto) and enforceable by the Company and each Subsidiary thereof (to the extent party thereto) against the other parties thereto, in accordance with their respective terms. The Company and each of its Subsidiaries have performed all material obligations required to be performed by them under such Contracts and neither the Company nor any such Subsidiary has received any notice that it is in default under or in breach of any such Contract. To the Company's knowledge, (i) no event has occurred which with the passage of time or the giving of notice or both would result in a default, breach or event of noncompliance by the Company or any Subsidiary thereof under any such Contract; (ii) no other party to any such Contract is in breach thereof or default thereunder and none of the Company nor any of its Subsidiaries has received any notice of termination, cancellation, breach or default under any such Contract; and (iii) there are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Company or any of its Subsidiaries under any of the Material Contracts with any Person and no such Person has made written demand for such renegotiation. The Company and each of its Subsidiaries (to the extent party thereto) shall have the benefit of each Material Contract and shall be entitled to enforce each such Contract immediately following the Closing.

(c)    A true, correct and complete copy of each written Material Contract and an accurate written description setting forth the terms and conditions of each oral Material Contract have been delivered to Buyer.

4.21    Employees.

(a)    The Company has made available to Buyer a list that is complete and accurate as of the date of this Agreement of the name of each current Service Provider of the Company and its Subsidiaries, together with each such Service Provider's position or function, classification (whether as an employee, independent contractor, or otherwise), classification as exempt or non-exempt under applicable wage and hour Laws (if an employee), principal work location (city and state), hourly rate or annual base salary or fees, and target annual incentive or bonus arrangement with respect to such Person. Except as disclosed on Schedule 4.21(a), all Service Providers employed or engaged by the Company or its Subsidiaries work and reside in the United States.

(b)    Except as set forth on Schedule 4.21(b), as of the date of this Agreement, to the Company's knowledge, no executive or key employee of the Company or any of its Subsidiaries is a party to any confidentiality, non-competition, proprietary rights or other similar agreement between such employee and any other Person besides the Company or its Subsidiaries that interferes with the right of any such employee to be employed by the Company because of the nature of the business conducted by the Company or to the use of trade secrets, confidential or proprietary information of others.

(c)    (i) There are no collective bargaining or similar agreements or Contracts with any labor union or other labor organization to which the Company or any of its Subsidiaries is a party or otherwise bound by or subject to, and no employees of the Company or any of its Subsidiaries are represented by any such union or other labor organization with respect to their

156819932.11

employment by the Company or its Subsidiary, as applicable; (ii) no labor organization or group of employees has filed any representation petition or made any written demand for recognition during the past three (3) years; (iii) no union organizing or decertification activities are underway or threatened, and no such activities have occurred during the past three (3) years; (iv) there are no and during the past three (3) years there have not been any pending or threatened strikes, work stoppages, slowdowns, lockouts, or other material labor disputes; (v) there are no unfair labor practice charges or complaints pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries and no such charges or complaints have been filed against the Company or any of its Subsidiaries during the past three (3) years; and (vi) there is not pending, nor, to the knowledge of the Company, threatened, any material grievance proceeding, arbitration or administrative or judicial proceeding against or affecting the Company or any of its Subsidiaries or with respect to any Service Provider, nor is the Company or any of its Subsidiaries bound by any consent decree with any Governmental Authority, in each case arising out of the employment of labor.

(d)    Neither the Company nor any of its Subsidiaries is delinquent in any material respect in the payment of any wages, salaries, bonuses, commissions, expenses, wage premiums, or any other compensation that has become due and payable to its current and former employees, independent contractors, or other Service Providers pursuant to any Applicable Law, Contract, or employment plan or policy.

(e)    Each of the Company and its Subsidiaries is in compliance in all material respects with all applicable Law relating to employment or labor, including those related to hiring, background checks, equal opportunity, notice, health and safety, employment eligibility verification, immigration, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action and the payment of social security and other similar Taxes. To the Knowledge of the Company, each of the Company and its Subsidiaries, as applicable, has properly classified all current Service Providers as either employees or independent contractors and as exempt or non-exempt for all purposes and has made all appropriate filings in connection with services provided by, and compensation paid to, such Service Providers.

(f)    Neither the Company nor any of its Subsidiaries has any outstanding liability under the WARN Act with respect to plant closings or mass layoffs or similar reductions in force implemented during the past three (3) years.

4.22    No Additional Representations or Warranties; Non-Reliance.

(a)    Except as provided in this Article IV, neither the Company nor any of its Affiliates, nor any of their respective managers, directors, officers, employees, stockholders, partners, members, agents or representatives has made, or is making, any representation or warranty whatsoever, express or implied, at law or in equity, to Buyer or Merger Sub or their respective Affiliates, directors, officers, employees, stockholders, partners, members or representatives, and no such party shall be liable in respect of the accuracy or completeness of any information provided to Buyer or Merger Sub or their respective Affiliates, directors, officers, employees, stockholders, partners, members or representatives.

(b)    In making its decision to enter into this Agreement and to complete the transactions contemplated hereby, the Company has made its own investigation and relied solely upon the express representations and warranties of the Buyer and Merger Sub provided in <u>Article V</u>. In furtherance of the foregoing, the Company hereby expressly disclaims and negates reliance on any other projections, estimates, forecasts, or statements.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUB

Except as set forth in the Schedules, Buyer and Merger Sub represent and warrant to the Company as of the date of this Agreement and as of the Closing Date as follows:

5.1    <u>Corporate Organization</u>.  Each of Buyer and Merger Sub has been duly incorporated and is validly existing as a corporation in good standing under the Laws of the State of Delaware and has the corporate power and authority to own or lease its properties and to conduct its business as it is now being conducted.  Each of Buyer and Merger Sub is duly licensed or qualified and (where applicable) is in good standing as a foreign corporation in each jurisdiction in which the ownership of its property or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified or in good standing would not reasonably be expected to have a material adverse effect on Buyer or Merger Sub.  Buyer owns, beneficially and of record, all of the outstanding shares of capital stock of Merger Sub, free and clear of all Liens.

5.2    <u>Due Authorization</u>.  Each of Buyer and Merger Sub has all requisite corporate power and authority to execute and deliver this Agreement and to perform all obligations to be performed by it hereunder.  The execution and delivery of this Agreement by Buyer and Merger Sub and the consummation by them of the transactions contemplated hereby have been duly and validly authorized and approved by the board of directors of each of Buyer and Merger Sub, and no other corporate proceeding on the part of Buyer or Merger Sub is necessary to authorize this Agreement (other than the adoption of this Agreement by Buyer in its capacity as the sole stockholder of Merger Sub, which adoption will occur immediately following the execution of this Agreement by Merger Sub).  This Agreement has been duly and validly executed and delivered by each of Buyer and Merger Sub and (assuming this Agreement constitutes a legal, valid and binding obligation of the Company and the Holder Representative) constitutes a legal, valid and binding obligation of each of Buyer and Merger Sub, enforceable against Buyer and Merger Sub in accordance with its terms, subject to the Remedies Exception.

5.3    <u>No Conflict</u>.  The execution and delivery of this Agreement by Buyer and Merger Sub and the consummation by them of the transactions contemplated hereby do not and will not, as of the Closing, (a) conflict with, violate any provision of, or result in the breach of any applicable Law to which Buyer or Merger Sub is subject or by which any property or asset of Buyer or Merger Sub is bound, (b) conflict with the certificate of incorporation, bylaws or other organizational documents of Buyer or any Subsidiary of Buyer (including Merger Sub), or (c) conflict with, violate any provision of, result in a breach of, constitute a default (or an event which, with or without notice, lapse of time or both, would become a default) under, require a consent under, give to any person any right of acceleration, termination, modification or cancellation under, result in the creation of any Lien (other than Permitted Liens) under, or terminate or result in the termination

of, any agreement, indenture or other instrument to which Buyer or any Subsidiary of Buyer (including Merger Sub) is a party or by which Buyer or any Subsidiary of Buyer (including Merger Sub) may be bound, or terminate or result in the termination of any such agreement, indenture or instrument, or result in the creation of any Lien under any such agreement, indenture or instrument upon any of the properties or assets of Buyer or any Subsidiary of Buyer (including Merger Sub) or constitute an event which, after notice or lapse of time or both, would result in any such violation, breach, termination or creation of a Lien, except to the extent that the occurrence of the foregoing items set forth in <u>clauses (a)</u> or <u>(c)</u> would not reasonably be expected to have a material adverse effect on Buyer or Merger Sub.

5.4    <u>Brokers' Fees</u>.  No broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other similar commission in connection with the transactions contemplated by this Agreement based upon arrangements made by Buyer or any of its Affiliates.

5.5    <u>Availability of Funds</u>.    At the Closing, Buyer will have sufficient cash or existing borrowing capacity under committed borrowing facilities in immediately available funds to enable Buyer to timely perform its obligations, including to: (a) pay in full all amounts payable by Buyer under <u>Article III</u> and <u>Section 7.3</u>; (b) pay in full any obligation of the Company that may become due as a result of this Agreement or any other Transaction Agreement or the consummation of the transactions contemplated hereby or thereby; and (c) pay in full all fees, costs and expenses payable by Buyer in connection with this Agreement and the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby.

5.6    <u>No Additional Representations or Warranties; Non-Reliance</u>.

      (a)    Except as provided in this <u>Article V</u>, neither Buyer, the Merger Sub nor any of their respective Affiliates, nor any of their respective managers, directors, officers, employees, stockholders, partners, members, agents or representatives has made, or is making, any representation or warranty whatsoever, express or implied, at law or in equity, to the Company or any of its Affiliates, directors, officers, employees, stockholders, partners, members or representatives, and no such party shall be liable in respect of the accuracy or completeness of any information provided to Company or its Affiliates, directors, officers, employees, stockholders, partners, members or representatives.

      (b)    In making its decision to enter into this Agreement and to complete the transactions contemplated hereby, each of Buyer and the Merger Sub have made its own investigation and relied solely upon the express representations and warranties of the Company provided in <u>Article IV</u>. In furtherance of the foregoing, each of Buyer and the Merger Sub hereby expressly disclaims and negates reliance on any other projections, estimates, forecasts, or statements.

## ARTICLE VI.
## COVENANTS OF THE COMPANY

6.1    <u>Conduct of Business</u>.  From the date of this Agreement through the Closing, except as would constitute a violation of applicable Law, as set forth on <u>Schedule 6.1</u>, as contemplated by

156819932.11

this Agreement or as consented to by Buyer in writing (such consent not to be unreasonably withheld, conditioned or delayed), the Company:

(a)     shall, and shall cause its Subsidiaries to, operate its business in the ordinary course and substantially in accordance with past practice (taking into account any material event or change in circumstance that occurs following the date of this Agreement); provided, that, for the avoidance of doubt, the Company shall not be obligated to take or cause its Subsidiaries to take, and shall not be deemed to be in breach of this Section 6.1(a) for failing to take or cause any of its Subsidiaries to take, any action that would not be permitted by Section 6.1(b);

(b)     shall not, and shall not permit any of its Subsidiaries to:

(i)     (A) change or amend the certificate of incorporation, bylaws or other organizational documents of the Company or any of its Subsidiaries, except as otherwise required by Law; or (B) authorize for issuance, issue, grant, sell, deliver, dispose of, pledge or otherwise encumber any equity securities of the Company or any of its Subsidiaries, except for issuances of shares of Company Stock upon the exercise of existing options to purchase shares of Company Stock;

(ii)     make or declare any dividend or distribution to the stockholders of the Company, except for dividends or distributions of cash or cash equivalents, in each case, made prior to the Closing Date and prior to the Calculation Time;

(iii)     sell, assign, transfer, convey, lease or otherwise dispose of any material assets or properties, except (A) in the ordinary course of business, (B) pursuant to existing Contracts or (C) for sale of obsolete assets;

(iv)     except in the ordinary course of business or as otherwise required by this Agreement, Law, an existing Company Benefit Plan or an existing Contract, (A) grant any material severance or material termination pay (other than pursuant to policies or agreements of the Company or any of its Subsidiaries in effect on the date of this Agreement) which will become due and payable after the Closing Date; (B) hire or terminate (other than terminations for cause and replacement of individuals terminated for cause) any executive officers of the Company; (C) adopt, enter into or materially amend any Company Benefit Plan (except changes to group healthcare or welfare benefits in the ordinary course of business or any other amendment required by Law) or, other than in connection with an individual's promotion or new hires of non-executive officer employees, any material individual employment, or consulting agreement in a manner that would materially increase Buyer's liabilities with respect thereto; or (D) enter into any collective bargaining agreement;

(v)     acquire by merger or consolidation with, or merge or consolidate with, or purchase all or substantially all of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof;

(vi)     make any material loans or material advances of money to any Person (other than the Company and its Subsidiaries), except for (A) loans made pursuant to Company Benefit Plans or advances to employees or officers of the Company or any of its Subsidiaries for expenses or (B) trade credit, in each case, incurred in the ordinary course of business;

(vii)     (A) except as required by applicable Law, make, change or rescind any material Tax election, adopt or change any material method of accounting for Tax purposes, file any amended material Tax Return, enter into any Tax allocation, sharing or indemnity agreement or closing agreement related to Taxes (other than customary commercial Contracts with unrelated customers, vendors, lessors, lenders and the like entered into in the ordinary course of business and that do not relate primarily to Taxes), request or consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, fail to pay any material Tax that becomes due and payable (including any estimated tax payments), incur a material Tax liability outside the ordinary course of business, surrender or forfeit any right to claim a material Tax refund or credit or other material Tax benefit, make any voluntary Tax disclosure or Tax amnesty or similar filing, file any material Tax Return in a manner inconsistent with past practice or settle or compromise any Action regarding Taxes, in each case, to the extent such action would adversely affect Buyer, the Company or any of its Subsidiaries with respect to a Post-Closing Tax Period, or (B) except as required or permitted by GAAP, make any material change to any financial accounting principles, methods or practices;

(viii)     enter into any Contract that would be a Material Contract if it had been entered into on the date of this Agreement, or amend, modify or terminate any Material Contract;

(ix)     make, commit to make or authorize any capital expenditure in excess of $250,000;

(x)     incur any Debt or assume, guarantee or endorse the obligations or enter into any "keepwell" or other agreements to maintain the fiscal condition of any Person, in each case, other than Debt that will be discharged at Closing;

(xi)     issue, sell, pledge, dispose of, encumber or transfer any equity securities, securities convertible, exchangeable or exercisable into equity securities, or warrants, options or other rights to acquire equity securities, of the Company or any Subsidiary thereof, including any Company Warrants or Company SAFEs;

(xii)     reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock (or other equity securities);

(xiii)     waive, release, assign, settle or compromise any material rights or claims, or any material litigation or arbitration;

(xiv)     disclose any trade secrets (including source code for the Company Software) or other proprietary and confidential information to any Person that is not subject to any confidentiality or non-disclosure agreement;

(xv)     make any change in accounting policies, practices, principles, methods or procedures, other than as required by GAAP or by a Governmental Authority;

(xvi)     write up, write down or write off the book value of any assets, individually or in the aggregate, for the Company and the Company Subsidiaries taken as a whole, in excess of $250,000 except for depreciation and amortization in accordance with GAAP consistently applied; or

156819932.11

(xvii)   enter into any agreement, or otherwise become obligated, to do any action prohibited under this Section 6.1(b).

(c)    The Company shall cause the Company Broker-Dealer to maintain Regulatory Capital in an amount that is in excess of the Minimum Net Capital Requirement or such higher amount as agreed to in writing with any Governmental Authority.

(d)    Nothing contained in this Agreement shall give Buyer, directly or indirectly, any right to control or direct the operations of the Company and its Subsidiaries prior to the Closing. Prior to the Closing, each of the Company and Buyer shall exercise, consistent with the other terms and conditions of this Agreement, complete control and supervision over their respective businesses.

6.2    Inspection.  Subject to confidentiality obligations and similar restrictions that may be applicable to information furnished to the Company or any of its Subsidiaries by third parties that may be in the Company's or any of its Subsidiaries' possession from time to time, and except for any information that is subject to attorney-client privilege or other privilege from disclosure, the Company shall, and shall cause its Subsidiaries to, afford to Buyer and its accountants, counsel and other representatives reasonable access, during normal business hours, in such manner as to not interfere with the normal operation of the Company and its Subsidiaries, to their respective properties, books, contracts, commitments, Tax Returns, records and appropriate officers and employees of the Company and its Subsidiaries, and shall furnish such representatives with financial and operating data and other information concerning the affairs of the Company and its Subsidiaries, in each case, as such representatives may reasonably request for the sole purpose of preparing for the operation of the business of the Company and its Subsidiaries following the Closing; provided, that such inspection shall be conducted in accordance with all applicable competition Laws, shall only be upon reasonable advance notice and shall be at Buyer's sole cost and expense.

6.3    Termination of Certain Agreements; Third-Party Consents.  Prior to the Effective Time, the Company shall have taken all actions necessary to terminate, and shall cause to be terminated, each Contract listed on Schedule 6.3 to the extent such Contract will not terminate in accordance with its terms in connection with the transactions contemplated by this Agreement. Prior to the Effective Time, the Company shall use commercially reasonable efforts to obtain the written consent of the applicable parties to the Contracts that are listed on Schedule 4.4 of the Schedules and designated with an asterisk (*).

6.4    280G Vote.  If any Person who is a "disqualified individual" (within the meaning of Section 280G of the Code and the Department of Treasury regulations promulgated thereunder) with respect to the Company or one of its Subsidiaries may receive any payment(s) or benefit(s) that could constitute "parachute payments" under Section 280G of the Code in connection with the transactions contemplated by this Agreement, then: (a) the Company shall obtain and deliver to Buyer a Parachute Payment Waiver (as defined below) from each such "disqualified individual" no later than three (3) Business Days immediately prior to the Closing Date; and (b) as soon as practicable following the delivery of the Parachute Payment Waivers (if any) to Buyer (but in no event later than the Business Day immediately prior to the Closing Date), the Company shall prepare and distribute to its shareholders a disclosure statement describing all potential parachute

35

payments and benefits that may be received by such disqualified individual(s) and shall submit such payments and benefits to its shareholders for approval, in each case, in accordance with the requirements of Section 280G(b)(5)(B) of the Code and the Department of Treasury regulations promulgated thereunder, such that, if approved by the requisite percentage of the Company's shareholders, such payments and benefits shall not be deemed to be "parachute payments" under Section 280G of the Code (the foregoing actions, a "280G Vote"). Prior to the Closing, if a 280G Vote is solicited, the Company shall deliver to Buyer evidence reasonably satisfactory to Buyer, (i) that a 280G Vote was solicited in conformance with Section 280G of the Code, and the requisite shareholder approval was obtained with respect to any payments or benefits that were subject to the 280G Vote (the "Section 280G Approval") or (ii) that the Section 280G Approval was not obtained and as a consequence, pursuant to the Parachute Payment Waivers obtained by the Company, such "parachute payments" shall not be made or provided. The determination of which payments and benefits may be deemed to constitute parachute payments, the form of the Parachute Payment Waiver, the disclosure statement, any other materials to be submitted to the Company's shareholders in connection with the 280G Vote and the calculations related to the foregoing (the "Section 280G Soliciting Materials") shall be subject to advance review and approval by Buyer (which shall not be unreasonably withheld, conditioned or delayed). For purposes of this Agreement, the term "Parachute Payment Waiver" means, with respect to any Person who is a "disqualified individual," a written agreement pursuant to which the Person agrees to waive any and all right or entitlement to such Person's "parachute payments" to the extent the aggregate value thereof exceeds three times such Person's "base amount" less $1.00, as determined in accordance with Section 280G of the Code, unless the Section 280G Approval is obtained.

6.5     No Solicitation of Transactions. None of the Company or any Subsidiary thereof shall, directly or indirectly, take (and the Company shall not authorize or permit any of their respective directors, officers, employees, consultants, advisors, and agents and other representatives to take) any action to (a) encourage (including by way of furnishing non-public information), solicit, initiate or facilitate any Acquisition Proposal, (b) enter into any agreement with respect to any Acquisition Proposal or enter into any agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate the Merger or any other transaction contemplated by this Agreement or (c) participate in any way in discussions or negotiations with, or furnish any information to, any person in connection with, or take any other action to facilitate any inquiries or the making of any proposal that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal. Upon execution of this Agreement, the Company shall cease immediately and cause to be terminated any and all existing discussions or negotiations with any parties conducted heretofore with respect to an Acquisition Proposal and promptly request that all confidential information with respect thereto furnished on behalf of the Company be returned.

**ARTICLE VII.**
**COVENANTS OF BUYER**

7.1     Indemnification and Insurance.

(a)     Buyer shall cause the Surviving Corporation and each of its Subsidiaries for a period of not less than six (6) years from the Effective Time (i) to maintain provisions in its certificate of incorporation, bylaws or other organizational documents concerning the indemnification and exoneration (including provisions relating to expense advancement) of the

Surviving Corporation's and its Subsidiaries' former and current directors, managers and officers ("Indemnified Persons") that are no less favorable to those Persons than the provisions of the certificate of incorporation, bylaws or other organizational documents of the Company or such Subsidiary, as applicable, in each case, as of the date of this Agreement, and (ii) not to amend, repeal or otherwise modify such provisions in any respect that would adversely affect the rights of those Persons thereunder, in each case, except as required by Law.

(b)     The Company shall use reasonable best efforts prior to the Closing to arrange for, purchase (effective immediately following the Effective Time and at the sole expense of Pre-Closing Holders (and treated as a Company Transaction Expense) and maintain in effect (for a period of at least six (6) years following the Effective Time, (i) a prepaid, non-cancelable directors' and officers' liability insurance tail policy, which tail policy shall be effective for a period from the Effective Time through and including the sixth (6th) anniversary of the Closing Date with respect to claims arising from facts or events that occurred on or before the Closing, which tail policy shall provide for customary coverage; (ii) a prepaid, non-cancellable "run-off" coverage under the Company's "cyber" insurance; and (iii) a prepaid, non-cancelable "run-off" coverage as provided by the Company's (or its Subsidiaries') fiduciary and employee benefit policies, in each case, covering those Persons who are covered on the date of this Agreement by such policies and with terms, conditions, retentions and limits of liability that are no less advantageous than the coverage provided under the Company's existing policies (clauses (i) through (iii), the "Tail Policies").

(c)     Notwithstanding anything contained in this Agreement to the contrary, this Section 7.1 shall survive the consummation of the Merger indefinitely and shall be binding, jointly and severally, on all successors and assigns of Buyer and the Surviving Corporation.  In the event that Buyer or the Surviving Corporation or any of their respective successors or assigns consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger, or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of Buyer or the Surviving Corporation, as the case may be, shall succeed to the obligations set forth in this Section 7.1.

7.2     Retention of Books and Records.  Buyer shall cause the Company and its Subsidiaries to retain all books, ledgers, files, reports, plans, records and any other documents pertaining to the Company and its Subsidiaries in existence at the Closing that are required to be retained under current retention policies for a period of seven (7) years from the Closing Date (or, if later with respect to Tax matters, until sixty (60) days after the expiration of the applicable statute of limitations), and to make the same available after the Closing for inspection and copying by the Holder Representative or its representatives at the Holder Representative's expense (which shall be treated as a Holder Representative Expense), during regular business hours and upon reasonable request and upon reasonable advance notice.

7.3     Post-Closing Incentive Plan.  As soon as practicable after the date hereof (but in no event later than the tenth (10th) Business Day immediately prior to the Closing Date), Buyer shall adopt a retention incentive program (the "Retention Incentive Program") effective as of the Closing, in which certain employees of the Company and its Subsidiaries will participate, subject to the allocations set forth on Schedule 7.3 and the terms and conditions set forth in a Retention Incentive

Award Agreement substantially in the form attached hereto as <u>Annex L-1</u> or <u>Annex L-2</u>, as applicable (a "<u>Retention Incentive Award Agreement</u>").  Without limiting the foregoing, the Retention Incentive Program shall authorize the issuance of awards that, in the aggregate, equal $75,000,000, of which $55,000,000 will be payable to the Founder at Closing, in each case, less applicable Tax withholdings.  Prior to the Effective Time, Buyer shall provide each employee selected to participate in the Retention Incentive Program with a Retention Incentive Award Agreement, which reflects the employee's award under the Retention Incentive Program.

7.4    <u>Employee Matters</u>.

(a)    Buyer shall enter into offer letters with existing employees of the Company, to be effective as of the Closing, and shall consult with the Chief Executive Officer of the Company in connection with such process.

(b)    As of the Closing Date, and for a period of at least twelve (12) months thereafter, Buyer and its Subsidiaries and Affiliates shall provide each individual who was employed by the Company as of the Closing (each, a "<u>Company Employee</u>"), to the extent he or she remains employed by Buyer or any of its Subsidiaries or Affiliates, with (i) an annual base salary or an hourly wage rate, as applicable, that is not less than that provided to such Company Employee by the Company immediately prior to the Closing, (ii) target cash incentive compensation opportunities (including bonuses and commissions, but excluding equity or equity-based compensation) that are not less favorable than those provided to such Company Employee by the Companies immediately prior to the Closing, and (iii) employee benefits (excluding equity or equity-based compensation) that are substantially comparable in the aggregate to the employee benefits (excluding equity or equity-based compensation) provided to such Company Employee by the Company immediately prior to the Closing.

(c)    Buyer and its Subsidiaries and Affiliates will treat, and will cause each benefit plan, program, practice, policy and arrangement maintained by Buyer or any of its Subsidiaries or Affiliates following the Closing and in which any Company Employee (or the spouse, domestic partner or any dependent of any Company Employee) participates or is eligible to participate (each, a "<u>Buyer Plan</u>") to treat, for all purposes (including determining eligibility to participate, vesting, benefit accrual and level of benefits), all service with the Company and its Subsidiaries and Affiliates (or predecessor employers to the extent that the Company, any Subsidiary or Affiliate of the Company, or any Company Benefit Plan provides past service credit) as service with Buyer and its Subsidiaries and Affiliates; provided, however, that such service need not be taken into account to the extent it would result in duplication of benefits or was not taken into account for such purposes under the corresponding Company Benefit Plan.

(d)    Buyer and its Subsidiaries and Affiliates will use commercially reasonable efforts to cause each Buyer Plan that is a welfare benefit plan, within the meaning of Section 3(1) of ERISA, (i) to waive any and all eligibility  waiting periods, actively-at-work requirements, evidence of insurability requirements, pre-existing condition limitations and other exclusions and limitations with respect to the Company Employees and their spouses, domestic partners and dependents to the extent waived, satisfied or not imposed under the corresponding Company Benefit Plan, and (ii) to recognize for each Company Employee for purposes of applying annual deductible, co-payment, co-insurance and out-of-pocket maximums under such Buyer Plan any

deductible, co-payment, co-insurance and out-of-pocket expenses paid by such Company Employee and his or her spouse, domestic partner and dependents under the corresponding Company Benefit Plan during the plan year of such Company Benefit Plan in which occurs the later of the Closing Date and the date on which such Company Employee begins participating in such Buyer Plan.

(e)     Nothing in this <u>Section 7.4</u>, (i) is intended to, or will be construed to, confer upon any Company Employee or any other Person other than the Parties to this Agreement any rights or remedies hereunder, including any third-party beneficiary rights or the right to continued employment, (ii) will establish, amend or be deemed to establish or amend any Company Benefit Plan or any benefit plan, program, policy or arrangement of Buyer or any of its Subsidiaries or Affiliates, or (iii) will limit the rights of the Company, Buyer or any of their respective Subsidiaries or Affiliates to establish, amend or terminate any Company Benefit Plan or any other benefit plan, program, policy or arrangement, whether before or after Closing.

## ARTICLE VIII.
## JOINT COVENANTS

8.1     <u>Support of Transaction</u>. Without limiting any other provision of <u>Article VI</u> or <u>Article VII</u>, including <u>Section 8.2</u>, Buyer and the Company shall each, and shall each cause their respective Subsidiaries and Affiliates to: (a) use reasonable best efforts to assemble, prepare and file any information (and, as needed, to supplement such information) as may be reasonably necessary to obtain as promptly as practicable all governmental and regulatory consents required to be obtained in connection with the transactions contemplated hereby, (b) use reasonable best efforts to obtain all material consents and approvals of third parties that any of Buyer, the Company or their respective Affiliates are required to obtain in order to consummate the Merger, and (c) take such other action as may reasonably be necessary or as another party may reasonably request to satisfy the conditions of <u>Article IX</u> or otherwise to comply with this Agreement and to consummate the transactions contemplated hereby as soon as practicable (but in any event prior to the Termination Date).

8.2     <u>HSR Act and Foreign Antitrust Approvals</u>.

(a)     In furtherance of <u>Section 8.1</u>, the Company and Buyer shall, or shall cause their respective ultimate parent entity under the HSR Act to, as promptly as reasonably practicable, but in no event later than ten (10) Business Days following the execution and delivery of this Agreement, file or cause to be filed with the United States Federal Trade Commission and the United States Department of Justice the notification and report form required for the transactions contemplated by this Agreement pursuant to the HSR Act.  Subject to applicable Law relating to the exchange of information, the Company and Buyer shall, to the extent practicable, consult with the other on and consider in good faith the views of the other in connection with, submissions to any Governmental Authority in connection with the Transactions.  In exercising the foregoing rights, the Company and the Buyer shall act reasonably and as promptly as practicable.

(b)     The Company and Buyer each shall, upon request by any of the other, use reasonable best efforts to furnish the other with all reasonably necessary information concerning itself, the Company and its Subsidiaries, their respective directors, managers, members, officers

and equityholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of the Company, the Pre-Closing Holders, Buyer or any of their respective Affiliates to any third party or any Governmental Authority in connection with the Transactions; provided that such information may be provided on an outside antitrust counsel only basis.

(c)    Subject to applicable Law and as required by any Governmental Authority, reasonable best efforts of each of the Company and Buyer shall include keeping each of the others apprised of the status of matters relating to completion of the transactions contemplated hereby, including: (i) reasonably cooperating with each of the others in connection with filings under the HSR Act; (ii) promptly notifying each of the others of, and if in writing furnishing the other with copies of, any material communications from or with any Governmental Authority with respect to the transactions contemplated hereby; (iii) permitting each of the others to review in advance and considering in good faith the views of one another in connection with any proposed material communication with any Governmental Authority in connection with any proceedings under or relating to any Antitrust Law; (iv) not participating in any meeting or material discussion with any Governmental Authority in connection with any proceedings under or relating to any Antitrust Law unless it consults with each of the others in advance, and, to the extent permitted by such Governmental Authority, gives each of the other parties the opportunity to attend and participate in such meetings or discussions; and (v) consulting and cooperating with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of the Company or Buyer in connection with any proceedings under or relating to any Antitrust Law; provided, that materials required to be provided pursuant to this section may be provided on an outside antitrust counsel only basis or redacted (A) to remove references concerning the valuation of the Company, (B) as necessary to comply with contracts, (C) as necessary to comply with applicable Law, and (D) as necessary to address reasonable privilege or confidentiality concerns. If the Company or Buyer, or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Authority with respect to the transactions contemplated hereby, then such Person will use its reasonable best efforts to make, or cause to be made, as expeditiously as possible and after consultation with each of the others, an appropriate response to such request. Each of the Company and Buyer will advise each of the other promptly in respect of any understandings, undertakings or agreements (oral or written) which any of them proposes to make or enter into with any Governmental Authority in connection with the transactions contemplated hereby, and will consider in good faith the others' views regarding such understanding, undertaking or agreement prior to making any proposal or offer. Notwithstanding anything to the contrary, Buyer shall have the right, with the prior written consent of the Company (not to be unreasonably withheld, conditioned or delayed), to "pull-and-refile" pursuant to 16 C.F.R. § 803.12 any filing made under the HSR Act, or take any similar action with respect to any filing under the HSR Act.

(d)    Buyer shall, and shall cause its Affiliates, to cooperate in good faith with each applicable Governmental Authority and use its reasonable best efforts to obtain HSR Clearance and consummate the Merger prior to the Termination Date. Notwithstanding any other provision in this Agreement to the contrary, nothing in this Agreement shall require Buyer or its Affiliates to (i) initiate any Action against, defend against any Action initiated by, or respond to any so called "second request" for additional information or documentary material from, any Governmental Authority in order to obtain the HSR Clearance or (ii) agree to the sale, license, divestiture, holding

separate or other disposition of any assets, businesses, or product lines of Buyer, the Company or any of its Affiliates, or agree to be subject to any obligations requiring prior notice or prior approval of transactions not otherwise reportable pursuant to the HSR Act.

8.3     FINRA and SEC Approvals. Promptly following the date of this Agreement, but in no event later than ten (10) Business Days following the date of this Agreement, the Company shall cause to be filed by the Company Broker-Dealer with FINRA an application with respect to the transactions contemplated by this Agreement (as required by FINRA Rule 1017). The Company shall provide Buyer with a reasonable opportunity to review and comment upon such application (which comments the Company shall consider in good faith and, to the extent such comments relate to disclosure directly regarding Buyer, the Company shall incorporate into the application) prior to the filing thereof with FINRA (the "Continuing Membership Application"). Buyer will, and will cause its Affiliates to, cooperate with the Company in preparing the Continuing Membership Application, including by promptly making available additional information related to its business, assets, properties or ownership, including, without limitation, information as to financing sources and plans for maintaining the Company Broker-Dealer's net capital at or above minimum requirements, as may be requested by FINRA and by taking such other actions requested by FINRA in connection with the Continuing Membership Application. The Company and Buyer shall respond as promptly as practicable to all requests or inquiries from FINRA for additional documentation or information in connection with the Continuing Membership Application. The Company shall promptly apprise Buyer of the occurrence and substance of each communication from or to FINRA, the SEC or other Governmental Authority with respect to the Continuing Membership Application. Without the prior written consent of Buyer (in its sole discretion), the Company shall not, and shall cause the Company Broker-Dealer not to, agree to any restrictions to be imposed by FINRA as conditions to the FINRA Approval, including any requirement to maintain an amount of Regulatory Capital (a) in excess of the amount the Minimum Net Capital Requirement of the Company Broker-Dealer or (b) that would require Buyer or any of its Affiliates to make any contribution for the purpose of satisfying such requirement. Notwithstanding anything contained in this Agreement to the contrary, in no event shall Buyer or any of its Affiliates (including, after the Closing, the Company or its Subsidiaries) be required to agree to any material conditions or material restrictions not currently contained in the Company Broker-Dealer's Membership Agreement that are imposed by FINRA in connection with the Continuing Membership Application ("Material Restrictions").

8.4     Stockholder Approval. As soon as practicable after the execution and delivery of this Agreement, the Company shall take all action necessary in accordance with the DGCL and the Company's Organizational Documents, to solicit and obtain the written consent of the holders of (a) at least a majority of the shares of Company Stock; (b) at least a majority of the disinterested holders of shares of Company Stock (including shares of Common Stock issued or issuable upon conversion of the Preferred Stock); and (c) at least a majority of the shares of Preferred Stock of the Company to adopt this Agreement and approve the Merger and the transactions contemplated hereby (the "Merger Consent"). Immediately following the execution and delivery of this Agreement, Buyer, as sole stockholder of Merger Sub, shall adopt this Agreement and approve the Merger and the related transactions contemplated hereby in accordance with the DGCL and Merger Sub's Organizational Documents.

8.5    <u>Further Assurances</u>.  Each party hereto agrees that, from time to time after the Closing Date, it will execute and deliver, or cause their respective Affiliates to execute and deliver, such further instruments, and take (or cause their respective Affiliates to take) such other action, as may be reasonably necessary to carry out the purposes and intents of this Agreement.

8.6    <u>Tax Matters</u>.

(a)    The Company shall prepare and timely file or cause to be prepared and timely filed, all Tax Returns of the Company and its Subsidiaries which are due to be filed on or before the Closing Date (taking into account all applicable extensions of time for filing) (such Tax Returns, "<u>Seller Prepared Tax Returns</u>").  All such Seller Prepared Tax Returns shall be prepared in accordance with past practice (except as otherwise required by applicable Law) and shall be delivered to Buyer no later than (i) in the case of an Income Tax Return, thirty (30) days (or, in the case of an Income Tax Return with a due date within thirty (30) days after the date hereof and on or before the Closing Date, reasonably) and (ii) in the case of a non-Income Tax Return, ten (10) days (or, in the case of a non-Income Tax Return with a due date within ten (10) days after the date hereof and on or before the Closing Date, reasonably), in each case, before the due date (after giving effect to any applicable extensions of time for filing) for such Tax Returns.  The Company shall incorporate any reasonable comments (as determined by the Company in good faith) provided in writing by Buyer at least three (3) days prior to the applicable due date (after giving effect to extensions) with respect to all Seller Prepared Tax Returns.  Buyer shall prepare and timely file or shall cause to be prepared and timely filed, all Tax Returns of the Company and its Subsidiaries for taxable periods beginning on or before the Closing Date but which are required to be filed after the Closing Date (such Tax Returns, "<u>Buyer Prepared Tax Returns</u>"). Buyer Prepared Tax Returns shall be prepared in accordance with past practice (except as otherwise required by applicable Law) and shall be delivered to the Holder Representative no later than (A) in the case of an Income Tax Return, thirty (30) days (or, in the case of an Income Tax Return with a due date within thirty (30) days after the Closing Date, reasonably) and (B) in the case of a non-Income Tax Return, ten (10) days (or, in the case of a non-Income Tax Return with a due date within ten (10) days after the Closing Date, reasonably), in each case, before the due date (after giving effect to any applicable extensions of time for filing) for such Tax Returns.  Buyer shall incorporate any reasonable comments (as determined by Buyer in good faith) provided in writing by the Holder Representative at least three (3) days prior to the applicable due date (after giving effect to extensions) with respect to all Buyer Prepared Tax Returns.  To the extent permitted by applicable Law, each of the Company and Buyer (and their respective Affiliates) shall take such action as may be necessary to cause the taxable year of the Company and its Subsidiaries to end on the Closing Date, including causing the Company and its Subsidiaries, as applicable, to join Buyer's "consolidated group" (within the meaning of Treasury Regulations Section 1.1502-1(h)) effective as of the beginning of the day following the Closing Date, pursuant to Treasury Regulations Section 1.1502-76(b)(1)(ii) (or any corresponding provision of state, local or foreign Tax Laws); provided that, for avoidance of doubt, no elections shall be made under either Treasury Regulations Section 1.1502-76(b)(2)(ii) or Treasury Regulations Section 1.1502-76(b)(2)(iii).

(b)    Buyer and the Holder Representative shall cooperate fully, and shall cause their respective Affiliates to cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns, claims for Tax refunds or credits and any Action regarding Taxes of, or with respect to, the Company or any of its Subsidiaries.  Such cooperation

shall include the retention of and (upon the other party's reasonable request) the provision of records and information reasonably relevant to any such Action and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder, and the provision of such powers of attorney as may be necessary to allow for the control of any Tax Matter as described in Section 8.6(e).

(c)     The parties hereto agree for purposes of this Agreement (including for purposes of determining (i) the current Tax liabilities and current Tax assets in calculating Closing Date Net Working Capital, (ii) unpaid Income Taxes in calculating Closing Date Debt and Pre-Closing Taxes and (iii) apportioning Tax refunds), with respect to a Straddle Period, the portion of any Taxes or Tax refunds that relate to the portion of such Straddle Period ending on the Closing Date shall (A) in the case of property and similar ad valorem Taxes or Tax refunds, be deemed to be the amount of such Taxes or Tax refunds for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period and (B) in the case of any other Tax or Tax refunds not described in clause (A), be deemed equal to the amount which would be payable or receivable computed on closing of the books basis as if the relevant Tax period ended as of the close of business on the Closing Date.

(d)     Buyer, on the one hand, shall be responsible for and shall pay fifty percent (50%) of all Transfer Taxes, and the Pre-Closing Holders, severally but not jointly, on the other hand, shall each be responsible for and shall pay fifty percent (50%) of all Transfer Taxes. The party legally responsible for preparing and filing all necessary Tax Returns and other required documentation relating to such Transfer Taxes shall prepare and file such Tax Returns and other required documentation in accordance with applicable Law, and the other party shall reasonably cooperate in the filing and join in the execution of any such Tax Returns and other required documentation as may be required. In the case of any Transfer Taxes paid by one party that were the responsibility of the other party pursuant to this Section 8.6(d), such other party shall promptly reimburse the party that made the payment for the appropriate portion of such Transfer Taxes.

(e)     Buyer, the Company and its Subsidiaries, on the one hand, and the Holder Representative and its Affiliates, on the other hand, shall promptly notify each other upon receipt of written notice of any inquiries, claims, assessments, audits or similar events with respect to Taxes relating to a Pre-Closing Tax Period (any such inquiry, claim, assessment, audit or similar event, a "Tax Matter"). Any failure to so notify the other party of any Tax Matter shall not relieve such other party of any liability with respect to such Tax Matters except to the extent such party was actually and materially prejudiced as a result thereof. Buyer shall have sole control of the conduct of all Tax Matters, including any settlement or compromise thereof; provided, however, that with respect to any such Tax Matter with respect to which Buyer Indemnified Parties could reasonably be expected to claim a right of indemnification under this Agreement, Buyer shall (i) permit the Holder Representative, at the Pre-Closing Holders' expense, to reasonably participate in the proceedings related to such Tax Matter, (ii) keep the Holder Representative reasonably informed of the progress of any such Tax Matter, and (iii) not effect any settlement or compromise with respect to such Tax Matters without obtaining the Holder Representative's prior written consent thereto, which shall not be unreasonably withheld, conditioned or delayed. In the event of any conflict or overlap between the provisions of this Section 8.6(e) and Article XII, the provisions of this Section 8.6(e) shall control.

(f)    All Tax sharing agreements or similar agreements between the Company or any of its Subsidiaries, on the one hand, and any of the Pre-Closing Holders and their Affiliates, on the other hand, shall be terminated prior to the Closing Date, and, after the Closing Date, neither the Company nor any of its Subsidiaries shall be bound thereby or have any liability thereunder.

(g)    If after the Closing Date, the Company or any of its Subsidiaries receive a cash refund, or a credit in lieu of a cash refund, of any Tax (including a cash refund, or a credit in lieu of a cash refund for overpayments of estimated Taxes for the Company's taxable year ending on the Closing Date) of the Company or any of its Subsidiaries that the Company or one of its Subsidiaries actually paid prior to the Closing Date and is attributable to a Pre-Closing Tax Period, then Buyer shall promptly pay or cause to be paid to the Pre-Closing Holders the amount of such refund or credit; provided that this Section 8.6(g) shall not apply to, and the Pre-Closing Holders shall not be entitled to, any such refund or credit to the extent that (i) the right to such refund or credit arises as a result of any change in Law after the date hereof, (ii) the right to such refund or credit arises as a result of any Tax attributes of (A) the Company or any of its Subsidiaries that were generated in, or are attributable to, any Post-Closing Tax Period or (B) Buyer or any of its Affiliates (other than the Company and any of its Subsidiaries) that were generated in, or are attributable to, any taxable period (or portion thereof), (iii) the amount of such refund or credit was taken into account in determining the Closing Date Debt or as a current asset in the calculation of Closing Date Net Working Capital or (iv) such refund or credit is the subject of a then-pending Action; provided, further that this Section 8.6(g) shall apply to, and the Pre-Closing Holders shall be entitled to, any such refund or credit to the extent remaining following the resolution of such Action. The amount of any refund or credit payable to the Pre-Closing Holders pursuant to this Section 8.6(g) shall be net of any Taxes imposed with respect thereto and net of any costs and expenses associated with obtaining such refund or credit. In the event any refund, or credit in lieu of a refund, of any Tax is subsequently disallowed or determined to be an amount less than the amount taken into account to make a payment pursuant to this Section 8.6(g), by a Governmental Authority, the Founder, on behalf of the Pre-Closing Holders, shall promptly return or cause to be returned such excess to Buyer or the Company, along with any applicable interest, penalties and other additional amounts imposed by such Governmental Authority.  To the extent any such tax refund or credit relates to a Straddle Period, such tax refund or credit shall be apportioned between the Pre-Closing Holders, on the one hand, and Buyer, on the other hand, using the principles set forth in Section 8.6(c).

(h)    Except as required by applicable Law and otherwise expressly permitted by this Agreement, without the Holder Representative's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, Buyer shall not, and shall not permit the Company or any of its Subsidiaries to, (i) make or otherwise modify any Tax election with respect to the Company and its Subsidiaries that has retroactive effect to a Pre-Closing Tax Period, (ii) amend or refile any Tax Return with respect to the Company and its Subsidiaries for a Pre-Closing Tax Period, or (iii) initiate or engage in any voluntary disclosure or similar process with respect to the Company and its Subsidiaries for a Pre-Closing Tax Period with a Governmental Authority, in each case, to the extent such action would reasonably be expected to increase the amount of any Taxes for which the Pre-Closing Holders are liable under this Agreement (for the avoidance of doubt, including as a reduction to the amount of the Merger Consideration as finally determined pursuant to Section 3.4).

(i)        Any payments made to any party pursuant to <u>Article XII</u> shall constitute an adjustment of the Merger Consideration for Tax purposes and shall be treated as such by the parties on their Tax Returns to the extent permitted by Law.

## ARTICLE IX.
## CONDITIONS TO OBLIGATIONS

9.1     <u>Conditions to the Obligations of Buyer, Merger Sub and the Company</u>.  The obligations of Buyer, Merger Sub and the Company to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by all of such parties:

(a)        The HSR Clearance shall have occurred.

(b)        Either (i) the Company Broker-Dealer shall have received from FINRA the FINRA Approval to Continuing Membership Application, or (ii) (A) at least thirty (30) days shall have elapsed following submission of the Continuing Membership Application, (B) the Company shall have notified FINRA that the parties intend to consummate the transaction pursuant to FINRA Rule 1017 prior to the official receipt of FINRA approval and (C) during the period from the submission of the Continuing Membership Application to the Closing, FINRA shall not have imposed an interim restriction, a Material Restriction or otherwise advised that the parties are prohibited from consummating the transaction.

(c)        All of the Required Notices shall have been made.

(d)        There shall not be in force any injunction or order of any court or administrative agency of competent jurisdiction enjoining or prohibiting the consummation of the Merger.

(e)        The Merger Consent shall have been validly obtained under the DGCL and the Company's certificate of incorporation and bylaws.

9.2     <u>Conditions to the Obligations of Buyer and Merger Sub</u>.  The obligations of Buyer and Merger Sub to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by Buyer and Merger Sub:

(a)        The representations and warranties of the Company contained in this Agreement shall be, (i) with respect to the Fundamental Representations, true, complete and correct in all respects (other than, solely with respect to the representations and warranties of the Company in <u>Section 4.6</u> (*Capitalization of the Company*), *de minimis* inaccuracies) as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date, and (ii) with respect to all other representations and warranties (other than the Fundamental Representations), true, complete and correct in all respects (without giving effect to any materiality or Material Adverse Effect or similar qualifications contained in such representations and warranties) as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date shall remain true, complete and correct as of such date) except where the failure of such representations and warranties set forth in this <u>clause (ii)</u> to be so true, complete and correct,

individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     Since the date of the Reference Balance Sheet, there shall not have occurred a Material Adverse Effect on the Company.

(c)     Each of the covenants of the Company to be performed at or prior to the Closing shall have been performed in all material respects.

(d)     The Company shall have delivered to Buyer a certificate signed by an officer of the Company, dated as of the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 9.2(a), Section 9.2(b) and Section 9.2(c) have been fulfilled.

(e)     The Company shall have delivered or caused to be delivered to Buyer the items required by Section 9.4.

9.3     Conditions to the Obligations of the Company. The obligations of the Company to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by the Company:

(a)     The representations and warranties of Buyer and Merger Sub contained this Agreement shall be (i) with respect to the Fundamental Representations, true, complete and correct in all respects  as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date, and (ii) with respect to all other representations and warranties (other than the Fundamental Representations), true, complete and correct in all respects (without giving effect to any materiality or Material Adverse Effect or similar qualifications contained in such representations and warranties) as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date shall remain true, complete and correct as of such date) except where the failure of such representations and warranties to be so true, complete and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     Each of the covenants of Buyer and Merger Sub to be performed at or prior to the Closing shall have been performed in all material respects.

(c)     Buyer shall have delivered to the Company a certificate signed by an officer of Buyer, dated as of the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 9.3(a) and Section 9.3(b) have been fulfilled.

(d)     Buyer shall have delivered or caused to be delivered to the Company the items required by Section 9.5.

9.4     Company Deliverables. Prior to or at Closing, the Company shall deliver or cause to be delivered to Buyer the following:

(a)    a certificate of the secretary of the Company certifying as to (i) the full force and effect of the Organizational Documents of the Company, which shall be attached to such certificate as an exhibit, (ii) the full force and effect of the bylaws of the Company, which shall be attached to such certificate as an exhibit, (iii) the accuracy and full force and effect of resolutions adopted by the board of directors of the Company approving the execution and delivery of this Agreement and the performance of the Transactions and the Transaction Agreements to which it is a party, attached as one or more exhibits to such certificate, and (iv) the good standing or existence of the Company, attached as an exhibit a certificate issued by the Secretary of State of the State of Delaware as of a recent date;

(b)    a statement, together with a notice addressed to the IRS, in accordance with Treasury Regulation Sections 1.897-2(h) and 1.1445-2(c)(3) certifying that the interests in the Company are not United States real property interests within the meaning of Section 897(c) of the Code, in each case duly executed and acknowledged, in form and substance reasonably satisfactory to Buyer;

(c)    resignations, dated the Closing Date, of each member of the board of directors of the Company and, each officer of the Company, in form and substance reasonably satisfactory to Buyer, effective at the Closing;

(d)    the Escrow Agreement, dated as of the Closing Date, executed by the Holder Representative;

(e)    the Exchange Agent Agreement, dated as of the Closing Date, executed by the Holder Representative;

(f)    a Parachute Payment Waiver from each person required to delivery such waiver pursuant to Section 6.4(a); and

(g)    evidence, reasonably satisfactory to Buyer, of termination of each Contract listed on Schedule 6.3.

9.5    Buyer Deliverables.  Prior to or at Closing, Buyer shall deliver or cause to be delivered to Company the following:

(a)    the amounts to be paid at the Closing pursuant to Section 3.1, paid and delivered in accordance with such Section;

(b)    the Exchange Agent Agreement, dated as of the Closing Date, executed by Buyer; and

(c)    the Escrow Agreement, dated as of the Closing Date, executed by Buyer.

9.6    Waiver of Conditions; Frustration of Conditions.  All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Effective Time.  None of the Company, Buyer or Merger Sub may rely on the failure of any condition set forth in this Article IX to be satisfied if such failure was caused by the failure of the Company, on the one hand, or Buyer or Merger Sub, on the other hand, respectively, to (a) use reasonable best efforts to consummate the

Merger and the other transactions contemplated hereby and (b) otherwise comply with its obligations under this Agreement.

## ARTICLE X.
## TERMINATION/EFFECTIVENESS

10.1   <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)   by written consent of the Company and Buyer;

(b)   by written notice to the Company from Buyer if:

(i)   there is any material breach of any representation, warranty, covenant or agreement on the part of the Company set forth in this Agreement, such that the conditions specified in <u>Section 9.2(a)</u>, <u>Section 9.2(b)</u> or <u>Section 9.2(c)</u> would not be satisfied at the Closing (a "<u>Terminating Company Breach</u>"), except that, if such Terminating Company Breach is curable by the Company, then, for a period of up to thirty (30) days after receipt by the Company of notice from Buyer of such breach, but only as long as the Company continues to use its reasonable best efforts to cure such Terminating Company Breach (the "<u>Company Cure Period</u>"), such termination shall not be effective, and such termination shall become effective only if the Terminating Company Breach is not cured within the Company Cure Period; provided, however, that Buyer shall not be entitled to terminate this Agreement pursuant to <u>Section 10.1(b)(i)</u> in the event that Buyer is in material breach of any of its representations, warranties, covenants, or other agreements contained in this Agreement and such breach is the primary reason that any condition set forth in <u>Section 9.1</u> or <u>Section 9.3</u> would not be satisfied;

(ii)   the Closing has not occurred on or before the date that is the earlier of (A) one hundred eighty (180) days after the filing of the Continuing Membership Application and (B) March 7, 2023 (subject to <u>Section 13.14</u>, the "<u>Termination Date</u>"), unless Buyer's or Merger Sub's willful breach is the primary reason for the Closing not occurring on or before such date; or

(iii)   the consummation of any of the transactions contemplated hereby is permanently enjoined or prohibited by the terms of a final, non-appealable order of a court of competent jurisdiction; or

(c)   by written notice to Buyer from the Company if:

(i)   there is any material breach of any representation, warranty, covenant or part on the part of Buyer or Merger Sub set forth in this Agreement, such that the conditions specified in <u>Section 9.3(a)</u> or <u>Section 9.3(b)</u> would not be satisfied at the Closing (a "<u>Terminating Buyer Breach</u>"), except that, if any such Terminating Buyer Breach is curable by Buyer, then, for a period of up to thirty (30) days after receipt by Buyer of notice from the Company of such breach, but only as long as Buyer continues to exercise such reasonable best efforts to cure such Terminating Buyer Breach (the "<u>Buyer Cure Period</u>"), such termination shall not be effective, and such termination shall become effective only if the Terminating Buyer Breach is not cured within the Buyer Cure Period; <u>provided</u>, <u>however</u>, that the Company shall not be entitled to terminate this Agreement pursuant to <u>Section 10.1(c)(i)</u> in the event that the Company is in material breach of

48

any of its representations, warranties, covenants, or other agreements contained in this Agreement and such breach is the primary reason that any condition set forth in <u>Section 9.1</u> or <u>Section 9.2</u> would not be satisfied;

(ii)    the Closing has not occurred on or before the Termination Date, unless the Company's willful breach is the primary reason for the Closing not occurring on or before such date; or

(iii)    the consummation of any of the transactions contemplated hereby is permanently enjoined or prohibited by the terms of a final, non-appealable order of a court of competent jurisdiction.

10.2    <u>Effect of Termination</u>.  Except as otherwise set forth in this <u>Section 10.2</u>, in the event of the termination of this Agreement pursuant to <u>Section 10.1</u>, this Agreement shall forthwith become void and have no effect, without any liability on the part of any party hereto or its respective Affiliates, officers, directors, employees or stockholders, other than liability of the Company, Buyer or Merger Sub, as the case may be, for any willful and material breach of this Agreement or actual Fraud, in each case, occurring prior to such termination.

## ARTICLE XI.
## HOLDER REPRESENTATIVE

11.1    <u>Designation and Replacement of Holder Representative</u>.  The parties have agreed that it is desirable to designate a representative to act on behalf of Pre-Closing Holders for certain limited purposes, as specified herein.  The parties have designated Shareholder Representative Services LLC, as of the Closing for all purposes in connection with this Agreement and any related agreements as the initial Holder Representative, and approval of this Agreement by the holders of a majority of the Aggregate Fully-Diluted Company Shares shall constitute ratification and approval of such designation.  The Holder Representative may resign at any time, and the Holder Representative may be removed by the vote of Persons which collectively owned a majority of the Aggregate Fully-Diluted Company Shares immediately prior to the Effective Time (or, in the case of a termination of this Agreement, as of such termination) (the "<u>Majority Holders</u>").  In the event that a Holder Representative has resigned or been removed, a new Holder Representative shall be appointed by a vote of the Majority Holders, such appointment to become effective upon the written acceptance thereof by the new Holder Representative.  The designation of any Person as the Holder Representative is and shall be coupled with an interest, and, except as set forth in this <u>Article XI</u>, such designation is irrevocable and shall not be affected by the death, incapacity, illness, bankruptcy, dissolution or other inability to act of any of the Pre-Closing Holders.

11.2    <u>Authority and Rights of the Holder Representative; Limitations on Liability</u>.  The Holder Representative shall have such powers and authority as are necessary to carry out the functions assigned to the Holder Representative under this Agreement; <u>provided</u>, <u>however</u>, that the Holder Representative shall have no obligation to act, except as expressly provided herein.  The Holder Representative will incur no liability in connection with its services pursuant to this Agreement and any related agreements except to the extent resulting from its gross negligence or willful misconduct.  The Holder Representative shall not be liable for any action or omission pursuant to the advice of counsel.  The Pre-Closing Holders shall indemnify the Holder Representative against

49

any reasonable, documented, and out-of-pocket losses, liabilities and expenses ("Representative Losses") arising out of or in connection with this Agreement and any related agreements, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been caused by the gross negligence or willful misconduct of the Holder Representative, the Holder Representative will reimburse the Pre-Closing Holders the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct.  Representative Losses may be recovered by the Holder Representative from (a) the funds in the Holder Representative Fund and (b) any other funds that become payable to the Pre-Closing Holders under this Agreement at such time as such amounts would otherwise be distributable to the Pre-Closing Holders; provided, that while the Holder Representative may be paid from the aforementioned sources of funds, this does not relieve the Pre-Closing Holders from their obligation to promptly pay such Representative Losses as they are suffered or incurred.  In no event will the Holder Representative be required to advance its own funds on behalf of the Pre-Closing Holders or otherwise.  Notwithstanding anything in this Agreement to the contrary, any restrictions or limitations on liability or indemnification obligations of, or provisions limiting the recourse against non-parties otherwise applicable to, the Pre-Closing Holders set forth elsewhere in this Agreement are not intended to be applicable to the indemnities provided to the Holder Representative hereunder. The foregoing indemnities will survive the Closing, the resignation or removal of the Holder Representative or the termination of this Agreement.

## ARTICLE XII.
## INDEMNIFICATION

12.1    Survival of Representations, Warranties and Covenants.  None of the representations and warranties of any party contained in this Agreement shall survive the Closing; provided, however, (a) that the representations and warranties of Buyer and Merger Sub contained in this Agreement (other than the Fundamental Representations) will survive the Closing and continue in full force and effect until the first (1st) anniversary of the Closing Date, (b) the Fundamental Representations will survive the Closing and continue in full force and effect until the sixth (6th) anniversary of the Closing Date (the "Survival Expiration Date") and (c) the Tax Representations shall survive until the day that is sixty (60) days after the expiration of the applicable statute of limitations, but not later than the seventh (7th) anniversary of the Closing Date and, when used in reference to the Tax Representations, the term Survival Expiration Date shall refer to such date; provided, further, that claims based on Fraud shall survive indefinitely; and provided, further, that any covenant contained in this Agreement that, by its terms, provides for performance following the Closing shall survive until such covenant is performed or until the day that is sixty (60) days after the expiration of the applicable statute of limitations.  No claim for indemnification for breach of any representation, warranty, covenant or agreement contained in, or otherwise pursuant to, this Agreement (other than any covenant (excluding this Article XII) that provides for performance following the Closing) may be asserted pursuant to this Agreement unless (i) on or before the Survival Expiration Date, such claim is asserted by proper written notice in accordance with this Article XII, specifying, in reasonable detail, the basis of the claim, and (ii) (A) such claim is made in respect of Damages specified, in reasonable detail, prior to the Survival Expiration Date or (B) such claim arises out of a third party claim (including any claim by any Governmental Authority) asserted in writing prior to the Survival Expiration Date.  Notwithstanding the foregoing, Section 12.1 will not apply to the enforcement of Section 11.2 by the Holder Representative against the

Pre-Closing Holders, which will be enforceable by the Holder Representative in its entirety against the Pre-Closing Holders.

12.2    Indemnification.

(a)    Subject to Section 12.4, from and after the Closing, the Founder, jointly and severally with all other Pre-Closing Holders, and each other Pre-Closing Holder, severally but not jointly and in proportion to their respective Pro Rata Shares (pursuant to his, her or its Letter of Transmittal or Option Termination Notice), will, indemnify, defend and hold harmless Buyer and its Subsidiaries (including the Surviving Corporation and its Subsidiaries after the Closing) and its and their respective officers, directors, employees, shareholders, agents and representatives (collectively, the "Buyer Indemnified Parties") for any and all Damages to the extent arising from (i) any breach of any Fundamental Representation or Tax Representation, (ii) any breach by the Company of any covenant or agreement of the Company in this Agreement that, by its terms, provides for performance by the Company prior to the Closing (and only to the extent such breach occurs or results from actions of the Company taken prior to Closing), (iii) any Pre-Closing Taxes, or (iv) Fraud by the Company.

(b)    Subject to Section 12.4, from and after the Closing, Buyer shall indemnify, defend and hold harmless the Holder Representative and the Pre-Closing Holders and its and their respective officers, directors, employees, shareholders, agents and representatives (collectively, the "Seller Indemnified Parties") for any and all Damages to the extent arising from (i) any breach of any representation or warranty Buyer or Merger Sub has made in this Agreement, (ii) any breach by (A) Buyer or Merger Sub of any covenant or agreement of Buyer or Merger Sub in this Agreement or (B) the Company of any covenant or agreement of the Company in this Agreement that, by its terms, provides for performance by the Company after the Closing (and only to the extent such breach occurs after the Closing), or (iii) Fraud by Buyer.

(c)    The amount of indemnification to which an Indemnified Party shall be entitled under this Article XII shall be determined: (i) by the written agreement between the Indemnified Party and the Indemnitor; (ii) by a final judgment or decree of any court of competent jurisdiction; (iii) settlement among the parties; or (iv) by any other means to which the Indemnified Party and the Indemnitor shall agree. The judgment or decree of a court of competent jurisdiction shall be deemed final when the time for appeal, if any, shall have expired and no appeal shall have been taken or when all appeals taken shall have been finally determined.

12.3    Indemnification Claims Procedures.

(a)    If any Action is commenced or threatened that may give rise to a claim for indemnification (an "Indemnification Claim") by any Person entitled to indemnification under this Agreement (each, an "Indemnified Party"), then such Indemnified Party shall promptly (i) notify the Indemnitor and (ii) deliver to the Indemnitor a written notice (A) describing in reasonable detail the nature of the Action, (B) including the Indemnified Party's good faith estimate of the amount of Damages that may arise from such Action, and (C) describing in reasonable detail the basis for the Indemnified Party's request for indemnification under this Agreement. Failure to notify the Indemnitor in accordance with this Section 12.3(a) will not relieve the Indemnitor of any liability that it may have to the Indemnified Party, except to the extent (1) the defense of such Action is

prejudiced by the Indemnified Party's failure to give such notice or (2) the Indemnified Party fails to notify the Indemnitor of such Indemnification Claim in accordance with this <u>Section 12.3(a)</u> prior to the Survival Expiration Date.

(b)     An Indemnitor may elect at any time to assume and thereafter conduct the defense of any Action subject to any such Indemnification Claim with counsel of the Indemnitor's choice and to settle or compromise any such Action, and each Indemnified Party shall cooperate in all respects with the conduct of such defense by the Indemnitor (including the making of any related claims, counterclaim or cross complaint against any Person in connection with the Action) and the settlement of such Action by the Indemnitor; <u>provided</u>, <u>however</u>, that the Indemnitor will not approve of the entry of any judgment or enter into any settlement or compromise with respect to such Action without the Indemnified Party's prior written approval (which must not be unreasonably withheld or delayed), unless the terms of such settlement provide for a complete release of the claims that are the subject of such Action in favor of the Indemnified Party, does not have any admission of wrong doing by an Indemnified Party and does not impose any limitation on the actions of or the business of the Indemnified Party or on the Indemnified Party.  If the Indemnified Party gives an Indemnitor notice of an Indemnification Claim and the Indemnitor does not, within sixty (60) days after such notice is given, (i) give notice to the Indemnified Party of its election to assume the defense of the Action or Actions subject to such Indemnification Claim and (ii) thereafter promptly assume such defense, then the Indemnified Party may conduct the defense of such Action; <u>provided</u>, <u>however</u>, that (A) the Indemnified Party will not agree to the entry of any judgment or enter into any settlement or compromise with respect to such Action or Actions without the prior written consent of the Indemnitor (which consent shall not be unreasonably withheld, conditioned or delayed) and (B) if at any time the Indemnitor acknowledges in writing that such Action is a Damage subject to this <u>Article XII</u>, the Indemnitor may thereafter assume the defense of such Action.  To the extent the defense of any Action subject to any Indemnification Claim is assumed by the Holder Representative as the Indemnitor, at the election of the Indemnitor, the costs and expenses of such defense of, and any payment in respect of, any Action, including any settlement thereof, shall be recovered as Damages pursuant to this <u>Article XII</u>; <u>provided</u>, <u>however</u>, that no amounts (other than, at the election of the Holder Representative, costs and expenses of the Holder Representative as Indemnitor) will be recoverable by Buyer as Damages pursuant to this <u>Article XII</u> unless such Indemnified Party is actually entitled to indemnification hereunder.

(c)     If any Indemnified Party becomes aware of any circumstances that may give rise to an Indemnification Claim for any matter not involving an Action, then such Indemnified Party shall promptly (i) notify the Indemnitor and (ii) deliver to the Indemnitor a written notice (A) describing in reasonable detail the nature of the circumstances giving rise to the Indemnification Claim, (B) including the Indemnified Party's best estimate of the amount of Damages that may arise from such circumstances, and (C) describing in reasonable detail the basis for the Indemnified Party's request for indemnification under this Agreement.  Failure to notify the Indemnitor in accordance with this <u>Section 13.2(c)</u> will not relieve the Indemnitor of any liability that it may have to the Indemnified Party, except to the extent (1) the defense of such Indemnification Claim is prejudiced by the Indemnified Party's failure to give such notice or (2) the Indemnified Party fails to notify the Indemnitor of such Indemnification Claim in accordance with this <u>Section 13.2(c)</u> prior to the Survival Expiration Date.

(d)      At the reasonable request of the Indemnitor, each Indemnified Party shall grant the Indemnitor and its representatives all reasonable access to the books, records, employees and properties of such Indemnified Party to the extent reasonably related to the matters to which the applicable Indemnification Claim relates.  All such access shall be granted during normal business hours and shall be granted under the conditions which shall not unreasonably interfere with the business and operations of such Indemnified Party.

12.4    Limitations on Indemnification Liability. Notwithstanding any provision of this Agreement to the contrary, any claims an Indemnified Party makes under this Article XII will be limited as follows, to the extent applicable:

(a)      Recovery.  With respect to any claim for indemnification payable under this Article XII, and subject to the limitations in this Article XII, a Buyer Indemnified Party's Damages under this Article XII shall be paid, at Buyer's election, either jointly and severally by the Founder or, severally but not jointly by each other Pre-Closing Holder in proportion to their respective Pro Rata Shares and, except in the case of a Pre-Closing Holder's own Fraud, in each case, in an amount not to exceed the amount of proceeds actually received by such Pre-Closing Holder hereunder; provided, however, that the Founder shall be jointly and severally liable for a Buyer Indemnified Party's Damages under this Article XII, subject to the limitations set forth in Section 12.4(b) below.

(b)      Indemnification Cap. The aggregate amount of Damages for which the Buyer Indemnified Parties shall be entitled to indemnification pursuant to this Article XII will not exceed the aggregate amount of Merger Consideration, except in the case of Fraud. The aggregate amount of Damages for which the Buyer Indemnified Parties shall be entitled to indemnification pursuant to this Article XII from any Pre-Closing Holder (other than Founder) will not exceed the aggregate amount of Merger Consideration actually received by such Pre-Closing Holder, except in the case of such Pre-Closing Holder's own Fraud.

(c)      Damages Net of Insurance Proceeds and Other Third-Party Recoveries.  All Damages for which any Indemnified Party would otherwise be entitled to indemnification under this Article XII shall be reduced by the amount of insurance proceeds, indemnification payments and other third-party recoveries to which any Indemnified Party actually received or has a right to recover in respect of any Damages incurred by such Indemnified Party. In the event that any such insurance proceeds, indemnity payments or other third-party recoveries are actually received by an Indemnified Party subsequent to receipt by such Indemnified Party of any indemnification payment hereunder in respect of the claims to which such insurance proceeds, indemnity payments or other third-party recoveries relate, appropriate refunds shall be made promptly by the relevant Indemnified Parties of all or the relevant portion of such indemnification payment.

(d)      Assignment of Claims.  If any Indemnified Party receives any indemnification payment pursuant to this Article XII, at the election of the Indemnitor, such Indemnified Party shall assign to the Indemnitor all of its claims for recovery against third Persons as to such Damages, whether by insurance coverage, contribution claims, subrogation or otherwise.

(e)      Consequential, Punitive and Certain Other Damages.  No Indemnified Party shall be entitled to indemnification for any special, punitive or exemplary damages except to the extent

such damages are awarded to an unaffiliated third party in connection with an Action against the Indemnified Party.

(f)    No Duplicate Claims.    In the event a Buyer Indemnified Party or Seller Indemnified Party, as the case may be, recovers Damages in respect of an Indemnification Claim pursuant to this Article XII, no other Buyer Indemnified Party or Seller Indemnified Party, as applicable, may recover the same Damages in respect of a claim for indemnification under this Agreement.

12.5    Indemnification Sole and Exclusive Remedy. Except with respect to claims based on Fraud and claims for specific performance of covenants (including without limitation Section 8.6), following the Closing, indemnification pursuant to this Article XII shall be the sole and exclusive remedy of the parties hereto and any Persons claiming by or through any such party (including the Indemnified Parties) related to or arising from any breach of any representation, warranty, covenant or agreement contained in, or otherwise pursuant to, this Agreement and none of Buyer, Merger Sub, the Company, the Holder Representative or any Pre-Closing Holder shall have any other rights or remedies in connection with any breach of this Agreement or any other liability arising out of the negotiation, entry into or consummation of the transactions contemplated by this Agreement, whether based on contract, tort, strict liability, other Laws or otherwise.    All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth in this Article XII.    For the avoidance of doubt, any adjustments made to the Merger Consideration pursuant to Section 3.4 shall not be considered "remedies" for purposes of this Section 12.5 and shall not be limited by the terms of this Section 12.5.    Notwithstanding the foregoing, Section 12.5 will not apply to the enforcement of Section 11.2 by the Holder Representative against the Pre-Closing Holders, which will be enforceable by the Holder Representative in its entirety against the Pre-Closing Holders.

12.6    Special Rule for Fraud. Notwithstanding anything in this Article XII to the contrary, in the event of any breach of a representation, warranty, covenant, agreement or obligation by any party hereto that results from or constitutes Fraud, by or on behalf of the Company or Buyer, then such representation, warranty, covenant, agreement or obligation will survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and will continue in full force and effect for the period of the applicable statute of limitations without regard to any Survival Expiration Date and the limitations set forth in this Article XII shall not apply to any Damages that the Buyer Indemnified Parties or the Seller Indemnified Parties, respectively, may suffer, sustain or become subject to as a result of, arising out of, relating to or in connection with any such breach.

12.7    Contribution. Each Pre-Closing Holder (other than Founder) will pay to the Founder an amount equal to such Pre-Closing Holder's Pro Rata Share of any Damages that are paid by the Founder to the Buyer Indemnified Parties that are in excess of the Founder's Pro Rata Share of such Damages, but only to the extent that such Pre-Closing Holder has not already paid the Buyer Indemnified Parties its Pro Rata Share of such Damages (such Pre-Closing Holder's "Contribution Amount"). Except to the extent that such Damages resulted from Fraud committed by the Founder, the obligation of each Pre-Closing Holder (other than Founder) to pay its Contribution Amount shall be absolute and unconditional and shall not be affected by any circumstance, event or condition, including any setoff, counterclaim, defense or other right which such Pre-Closing

Holder may have against the Founder, the Buyer or any other Buyer Indemnified Party for any reason whatsoever.

## ARTICLE XIII.
## MISCELLANEOUS

13.1    <u>Waiver</u>.  Any party to this Agreement may, at any time prior to the Closing, by action taken by its board of directors, or officers thereunto duly authorized, waive any of the terms or conditions of this Agreement or (without limiting <u>Section 13.10</u>) agree to an amendment or modification to this Agreement by an agreement in writing executed in the same manner (but not necessarily by the same Persons) as this Agreement.  No waiver by any of the parties hereto of any default, misrepresentation or breach of representation, warranty, covenant or other agreement hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No waiver by any of the parties of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party sought to be charged with such waiver.

13.2    <u>Notices</u>.  All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered by FedEx or other nationally recognized overnight delivery service, or (c) when delivered by email without error message (in the case of this <u>clause (c)</u>, if transmitted prior to 6:00 p.m. (Eastern time), otherwise the next Business Day after such transmission), addressed as follows:

(a)    If to Buyer or Merger Sub or, after the Closing, the Surviving Corporation, to:

West Realm Shires Inc.
2000 Center Street, Suite 400
Berkeley, California  94704
Attention: Ryne Miller; Can Sun
Email:  ryne@ftx.us; can@ftx.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
200 Clarendon Street
Boston, Massachusetts  02116
Attention: Kristen Grannis; John Miller
Email: kristen.grannis@lw.com; john.miller@lw.com

(b)    If to the Company, prior to the Closing, to:

Embed Financial Technologies Inc.
1703 Main Street, Suite 200
Vancouver, Washington 98660
Attention: Michael H. Giles
Email: michael@embed.com

with copies (which shall not constitute notice) to:

Perkins Coie LLP
1120 NW Couch Street, Tenth Floor
Portland, Oregon 97209
Attention: Joe Bailey
Email: JoeBailey@perkinscoie.com

(c)      If to the Holder Representative, to:

Shareholder Representative Services LLC
950 17th Street, Suite 1400
Denver, CO 80202
Attention: Managing Director
Email: deals@srsacquiom.com
Telephone: (303) 648-4085

or to such other address or addresses as the parties may from time to time designate in a written notice delivered in accordance with this Section.

13.3     <u>Assignment</u>.  No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

13.4     <u>Rights of Third Parties</u>.  Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the parties hereto, any right or remedies under or by reason of this Agreement; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing (a) in the event the Closing occurs, the Indemnified Persons (and their successors, heirs and representatives) are intended third-party beneficiaries of, and may enforce, <u>Section 7.1</u>, (b) from and after the Effective Time, the Pre-Closing Holders (and their successors, heirs and representatives) shall be intended third-party beneficiaries of, and may enforce, <u>Articles II</u> and <u>III</u>, (c) the pre-Closing directors, officers, employees and representatives of the Company and its Subsidiaries (and their successors, heirs and representatives) shall be intended third party beneficiaries of, and may enforce, <u>Section 7.7(b)</u>, and (d) Prior Company Counsel and the Designated Persons shall be intended third-party beneficiaries of, and may enforce, <u>Section 13.16</u>.

13.5     <u>Expenses</u>.  Except as otherwise set forth herein, each party hereto, other than the Holder Representative (whose expenses shall be paid out of funds paid to the Holder Representative under

56

this Agreement as provided in this Agreement), shall bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby whether or not such transactions shall be consummated, including all fees of its legal counsel, financial advisers and accountants; provided, however, that the fees and expenses of the Auditor, if any, shall be paid in accordance with Section 3.4; provided, further, that, in the event that the transactions contemplated hereby are not consummated, the Company shall reimburse the Holder Representative for all costs and expenses incurred by the Holder Representative in connection with the transactions contemplated hereby.

13.6    Governing Law.  This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

13.7    Captions; Counterparts.  The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.8    Schedules and Annexes.  The Schedules and Annexes referenced herein are a part of this Agreement as if fully set forth herein.  All references herein to Schedules and Annexes shall be deemed references to such parts of this Agreement, unless the context shall otherwise require.  Any disclosure made by a party in the Schedules with reference to any section or schedule of this Agreement shall be deemed to be a disclosure with respect to all other sections or schedules to which the relevance of such disclosure is reasonably apparent.  Certain information set forth in the Schedules is included solely for informational purposes and may not be required to be disclosed pursuant to this Agreement.  The disclosure of any information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made in this Agreement, nor shall such information be deemed to establish a standard of materiality.

13.9    Entire Agreement.  This Agreement (together with the Schedules and Annexes to this Agreement) and the other Transaction Agreements constitute the entire agreement among the parties relating to the transactions contemplated hereby and supersede any other agreements, whether written or oral, that may have been made or entered into by or among any of the parties hereto or any of their respective Subsidiaries relating to the transactions contemplated hereby.  No representations, warranties, covenants, understandings or agreements, oral or otherwise, relating to the transactions contemplated by this Agreement exist among any of the parties, except as expressly set forth in this Agreement.

13.10    Amendments.  This Agreement may be amended or modified in whole or in part, only by a duly authorized agreement in writing executed in the same manner as this Agreement and which makes reference to this Agreement.  The approval of this Agreement by the stockholders of the Company shall not restrict the ability of the board of directors of the Company to terminate this Agreement in accordance with Section 10.1 or to cause the Company to enter into an amendment

to this Agreement pursuant to this <u>Section 13.10</u> to the extent permitted under Section 251(d) of the DGCL.

13.11   <u>Publicity</u>.  Buyer, Merger Sub, the Holder Representative, and the Company agree that, from the date of this Agreement, they will keep confidential, and not disclose, the existence, terms and status of this Agreement and the other Transaction Agreements, the transactions contemplated hereby and thereby and the identity of Buyer; <u>provided</u> that the Holder Representative and the Company shall have the right to communicate and discuss with, and provide to, their respective legal advisors, representatives, officers or employees, directors, consultants and agents, any information regarding the terms and status of this Agreement and the other Transaction Agreements and the transactions contemplated hereby and thereby.  Notwithstanding the foregoing, the Company and Holder Representative shall have the right to disclose information regarding this Agreement and the other Transaction Agreements to Pre-Closing Holders. After receipt of the Merger Consent, the Company and Buyer shall issue a joint press release announcing the execution of this Agreement in a form mutually agreed upon by the parties.  Notwithstanding anything herein to the contrary, the Parties shall be permitted to disclose information as required by law.

13.12   <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties.

13.13   <u>Jurisdiction; Waiver of Jury Trial</u>.

(a)   Any Action based upon, arising out of or related to this Agreement or the transactions contemplated hereby may be brought in the Delaware Chancery Court (or, if the Delaware Chancery Court shall be unavailable, any other court of the State of Delaware or, in the case of claims to which the federal courts have exclusive subject matter jurisdiction, any federal court of the United States of America sitting in the State of Delaware), and, in each case, appellate courts therefrom, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Action, waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, agrees that all claims in respect of such Action shall be heard and determined only in any such court, and agrees not to bring any Action arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any Action brought pursuant to this <u>Section 13.13(a)</u>.

(b)   Each party hereto hereby waives, to the fullest extent permitted by applicable Law, any right it may have to a trial by jury in respect of any Action arising out of this Agreement or the transactions contemplated hereby.  Each party hereto (i) certifies that no representative,

agent or attorney of any other party has represented, expressly or otherwise, that such party would not, in the event of any Action, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waiver and certifications in this <u>Section 13.13(b)</u>.

13.14   <u>Enforcement</u>.  The parties hereto agree that irreparable damage would occur, and that the parties would not have any adequate remedy at law, in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, without proof of actual damages or otherwise, in addition to any other remedy to which any party is entitled at law or in equity.  Each party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.  The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.  To the extent any party hereto brings an Action to enforce specifically the performance of the terms and provisions of this Agreement (other than an Action to enforce specifically any provision that by its terms requires performance after the Closing or expressly survives termination of this Agreement), the Termination Date shall automatically be extended to (a) the twentieth (20th) Business Day following the resolution of such Action or (b) such other time period established by the court presiding over such Action.

13.15   <u>Non-Recourse</u>.  This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to in any manner this Agreement, or the negotiation, execution or performance of this Agreement, or the transactions contemplated hereby (including any representation or warranty made in, in connection with, or as an inducement to this Agreement) may only be brought against, the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party.  Except to the extent a named party to this Agreement (and then only to the extent of the specific obligations undertaken by such named party in this Agreement and not otherwise), no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, advisor, or representative or Affiliate of any of the foregoing shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of the Company, Buyer or Merger Sub under this Agreement (whether for indemnification or otherwise) or of or for any claim based on, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, or the transactions contemplated hereby (including any representation or warranty made in, in connection with, or as an inducement to this Agreement).  Notwithstanding the foregoing, <u>Section 13.15</u> will not apply to the enforcement of <u>Section 11.2</u> by the Holder Representative against the Pre-Closing Holders, which will be enforceable by the Holder Representative in its entirety against the Pre-Closing Holders.

13.16   <u>Waiver of Conflicts Regarding Representations; Attorney-Client Privilege</u>.

      (a)   <u>Conflicts of Interest</u>.  Buyer acknowledges that Perkins Coie LLP ("<u>Prior Company Counsel</u>") have, on or prior to the Closing Date, represented one or more of the Holder Representative, one or more Pre-Closing Holders, the Company, and its Subsidiaries and other

Affiliates, and their respective officers, employees and directors (each such Person, other than the Company and its Subsidiaries, a "Designated Person") in one or more matters relating to this Agreement or any other agreements or transactions contemplated hereby (including any matter that may be related a litigation, claim or dispute arising under or related to this Agreement or such other agreements or in connection with such transactions) (each, an "Existing Representation"), and that, in the event of any post-Closing matters (i) relating to this Agreement or any other agreements or transactions contemplated hereby (including any matter that may be related to a litigation, claim or dispute arising under or related to this Agreement or such other agreements or in connection with such transactions) and (ii) in which Buyer or any of its Affiliates (including the Surviving Corporation and its Subsidiaries), on the one hand, and one or more Designated Persons, on the other hand, are or may be adverse to each other (each, a "Post-Closing Matters"), the Designated Persons reasonably anticipate that Prior Company Counsel will represent them in connection with such matters.  Accordingly, each of Buyer and the Company hereby (A) waives and shall not assert, and agrees after the Closing to cause its Affiliates to waive and to not assert, any conflict of interest arising out of or relating to the representation by one or more Prior Company Counsel of one or more Designated Persons in connection with one or more Post-Closing Matters (the "Post-Closing Representations"), and (B) agrees that, in the event that a Post-Closing Matter arises, Prior Company Counsel may represent one or more Designated Persons in such Post-Closing Matter even though the interests of such Person(s) may be directly adverse to Buyer or any of its Affiliates (including the Surviving Corporation and its Subsidiaries), and even though Prior Company Counsel may (x) have represented the Company or its Subsidiaries in a matter substantially related to such dispute or (y) be currently representing Buyer, the Surviving Corporation or any of their respective Affiliates.  Without limiting the foregoing, each of Buyer and the Company (on behalf of itself and its Affiliates) consents to the disclosure by Prior Company Counsel, in connection with one or more Post-Closing Representations, to the Designated Persons of any information learned by Prior Company Counsel in the course of one or more Existing Representations, whether or not such information is subject to the attorney-client privilege of the Company or any of its Subsidiaries or Prior Company Counsel's duty of confidentiality as to the Company or any of its Subsidiaries and whether or not such disclosure is made before or after the Closing.

(b)     Attorney-Client Privilege.  Each of Buyer and the Company (on behalf of itself and its Affiliates) waives and shall not assert, and agrees after the Closing to cause its Affiliates to waive and to not assert, any attorney-client privilege, attorney work-product protection or expectation of client confidence with respect to any communication between any Prior Company Counsel, on the one hand, and any Designated Person or the Company or any of its Subsidiaries (collectively, the "Pre-Closing Designated Persons"), on the other hand, or any advice given to any Pre-Closing Designated Person by any Prior Company Counsel, occurring during one or more Existing Representations (collectively, "Pre-Closing Privileges") in connection with any Post-Closing Representation, including in connection with a dispute between any Designated Person and one or more of Buyer, the Surviving Corporation and their respective Affiliates, it being the intention of the parties hereto that all rights to such Pre-Closing Privileges, and all rights to waiver or otherwise control such Pre-Closing Privilege, shall be retained by the Holder Representative, and shall not pass to or be claimed or used by Buyer or the Surviving Corporation, except as provided in the last sentence of this Section 13.16(b).  Furthermore, each of Buyer and the Company (on behalf of itself and its Affiliates) acknowledges and agrees that any advice given to or communication with any of the Designated Persons shall not be subject to any joint privilege

60

(whether or not the Company or one more of its Subsidiaries also received such advice or communication) and shall be owned solely by such Designated Persons.  For the avoidance of doubt, in the event that a dispute arises between one or more of Buyer, the Surviving Corporation and their respective Affiliates, on the one hand, and any of the Designated Persons, on the other hand, then the Surviving Corporation shall make available to the Holder Representative, acting on behalf of the applicable Designated Persons, all books and records of the Surviving Corporation relevant to the dispute, and the Surviving Corporation shall (and shall cause its Affiliates to) waive any Pre-Closing Privileges of the Surviving Corporation or its Affiliates applicable to such books and records.  Notwithstanding the foregoing, in the event that a dispute arises between Buyer or the Surviving Corporation or any of its Subsidiaries, on the one hand, and a third party other than a Designated Person, on the other hand, the Surviving Corporation shall (and shall cause its Affiliates to) assert the Pre-Closing Privileges on behalf of the Designated Persons to prevent disclosure of Privileged Materials to such third party; provided, however, that such privilege may be waived only with the prior written consent of the Holder Representative, acting on behalf of the applicable Designated Person.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

WEST REALM SHIRES INC.

By: _Samuel Bankman-Fried_ _____
DocuSigned by:
7EF0CBC201224C8...

Name: Samuel Bankman-Fried
Title: Chief Executive Officer

INGRAINED MERGER SUB, INC.

By: _Samuel Bankman-Fried_ _____
DocuSigned by:
7EF0CBC201224C8...

Name: Samuel Bankman-Fried
Title: Chief Executive Officer

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

EMBED FINANCIAL TECHNOLOGIES INC.

By: _____

Name: Michael Giles

Title:   Chief Executive Officer

Shareholder Representative Services LLC, solely in its capacity as the initial Holder Representative hereunder

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

EMBED FINANCIAL TECHNOLOGIES INC.

By:_____
Name: Michael Giles
Title:   Chief Executive Officer

Shareholder Representative Services LLC, solely in its capacity as the initial Holder Representative hereunder

By:_____
Name:   Sam Riffe
Title:    Managing Director