# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC.,<br><br>                    Plaintiffs,<br><br>     -against-<br><br>MICHAEL GILES, et al.,<br><br>                  Defendants. | Adv. Pro. No. 23-50380 (JTD) |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Dated August 15, 2023                                    **MORRIS JAMES LLP**

                                                            /s/ *Tara C. Pakrouh*
                                                             Eric J. Monzo (DE Bar No. 5214)
                                                              Tara C. Pakrouh (DE Bar No. 6192)
                                                              500 Delaware Avenue, Suite 1500
                                                              Wilmington, DE  19801
                                                              Telephone: (302) 888-6800
                                                              Facsimile: (302) 571-1750
                                                              E-mail: emonzo@morrisjames.com
                                                              E-mail: tpakrouh@morrisjames.com

                                                              *Counsel to Defendant Laurence Beal*

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

SUMMARY OF ARGUMENT .................................................................................................1

BACKGROUND ........................................................................................................................2

I.    MR BEAL'S SHARES IN EMBED AUTOMATICALLY VESTED UNDER HIS EMPLOYMENT CONTRACT. ................................................................2

    A.    Mr. Beal's Shares Were to Vest Periodically During the First Four Years of His Employment. ..............................................................................2

    B.    Upon a Change of Control, All of Mr. Beal's Remaining Unvested Shares in Embed Would Vest Immediately. .........................................................3

II.    THE WRS/EMBED MERGER CONSTITUTED A CHANGE OF CONTROL OF EMBED. ....................................................................................................3

    A.    WRS Purchases Embed in a Reverse Triangular Merger Involving Five Separate Entities. ...............................................................................3

    B.    The WRS/Embed Merger was a Change of Control that Automatically Vested Mr. Beal's Unvested Shares. .................................................4

    C.    Western Alliance Bank as Agent for WRS Redeems Mr. Beal's Shares in Embed. ...............................................................................................4

III.    MR. BEAL DID NOT RECEIVE A POST-CLOSING RETENTION PAYMENT. .................................................................................................................5

IV.    THE FTX GROUP FILES FOR CHAPTER 11 BANKRUPTCY. .....................................5

STANDARD OF REVIEW ........................................................................................................6

ARGUMENT ..............................................................................................................................7

I.    THE SAFE HARBOR OF SECTION 546(E) PRECLUDES CERTAIN OF PLAINTIFFS' FRAUDULENT TRANSFER CLAIMS AGAINST MR. BEAL. ................................................................................................................................7

    A.    The Purported Fraudulent Transfer at Issue Actually Occurred Between the Bank and Mr. Beal. ..............................................................................7

        1.    WRS Engaged the Bank as Its Escrow and Exchange Agent. .....................7

        2.    As WRS's Agent, the Bank was Heavily Involved in the Process of Paying Mr. Beal for His Shares. ...............................................7

        3. It is Improper for Plaintiffs to Collapse the Transfer to Mr. Beal Due to the Bank's Involvement in the Transfers ................................. 8

    B. Section 546(e) Applies When, as Here, a Settlement Payment is Made by a Financial Institution in Connection With a Securities Contract. ........................................................................................................... 9

II. PLAINTIFFS FAILED TO PLEAD ALL ELEMENTS OF ACTUAL FRAUD THUS WARRANTING DISMISSAL. ................................................................ 10

    A. Plaintiffs Fail to Allege the Particularity Requirement of an Actual Fraud Claim. .................................................................................................. 10

        1. Plaintiffs Merely Parrot the Actual Fraud Statute, Which is Insufficient. ................................................................................................ 10

        2. Plaintiffs' Financial Mismanagement Undercuts the Complaint's Plausibility ........................................................................ 11

        3. The Complaint Fails to Alternatively Plead a Confluence of Several Badges of Fraud Sufficient to Support a Finding of Actual Fraud .......................................................................................... 11

III. CONTRARY TO PLAINTIFFS' ALLEGATIONS, MR. BEAL NEVER RECEIVED A RETENTION PAYMENT. ...................................................... 12

IV. MR. BEAL JOINS IN AND ADOPTS THE ARGUMENTS SET FORTH BY THE OTHER DEFENDANTS ..................................................................... 13

CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bayou Steel B Holdings, L.L.C.*,
   642 B.R. 371 (Bankr. D. Del. 2022) ..................................................................................9

*In re Bos. Generating LLC*,
   617 B.R. 442 (Bankr. S.D.N.Y. 2020) ..............................................................................10

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) ...............................................................................................6

*In re Fedders*, *N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) ................................................................................11

*In re Hechinger Inv. Co. of Del.*,
   274 B.R. 71 (D. Del. 2002) ..............................................................................................10

*Indeck Maine Energy, L.L.C. v. ISO New England Inc.*,
   167 F. Supp. 2d 675 (D. Del. 2001) ...................................................................................7

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004) *abrogated on other grounds, Humana, Inc. v.
   Indivior, Inc.,* No. 21-2573, 2022 WL 17718342 (3d Cir. Dec. 15, 2022) ...............................6

*In re Nat'l Serv. Indus., Inc.*,
   No. 12–12057 (MFW), Adv. No. 14-50377 (MFW), 2015 WL 3827003
   (Bankr. D. Del. June 19, 2015) ........................................................................................12

*In re Nine W. LBO Sec. Litig.*,
   482 F. Supp. 3d 187 (S.D.N.Y. 2020) ..........................................................................9, 10

*In re PennySaver USA Publishing, LLC*,
   587 B.R. 445 (Bankr. D. Del. 2018) ................................................................................12

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993) .............................................................................................6

*Ruddy v. U.S. Postal Serv.*,
   455 F. App'x 279 (3d Cir. 2011) ........................................................................................6

*In re Sportco Holdings, Inc.*,
   2021 WL 4823513 (Bankr. D. Del 2021) ..........................................................................7

*In re Syntax- Brillian Corp.*,
   573 F. App'x 154 (3d Cir. 2014) ........................................................................................8

*In re The IT Group, Inc.*,
  359 B.R. 97 (Bankr. D. Del. 2006) ...................................................................................9

*In re Trib. Co. Fraudulent Conv. Litig.*,
  946 F.3d 66 (2d Cir. 2019) ..................................................................................... 9, 10

*In re Trinity Coal Corp.*,
  514 B.R. 526 (Bankr. D. Del. 2014) ...................................................................................7

*In re W.J. Bradley Mortgage Capital, LLC*,
  598 B.R. 150 (Bankr. D. Del. 2019) .................................................................................10

**Statutes**

11 U.S.C. § 105(a) ...........................................................................................................1

11 U.S.C. § 546(e) ................................................................................................. 2, 9, 10

**Other Authorities**

Fed. R. Bankr. P. 7009 ....................................................................................................10

Fed. R. Bankr. P. 7012 ......................................................................................................1

Fed. R. Civ. P. 9(b) .........................................................................................................10

16207873/10

Defendant Laurence Beal ("Defendant" or "Mr. Beal") submits this brief in support of his contemporaneously filed motion ("Motion") under section 105(a) of title 11 of the United States Code ("Bankruptcy Code"), and Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"). The Motion seeks dismissal of the May 17, 2023 *Complaint for Avoidance and Recovery of Transfers and Obligations Pursuant to 11 U.S.C. §§ 105, 544, 547, 548, and 550 and Del. Code Ann. Tit. 6, §§ 1304 and 1305, and for Disallowance of Claims Pursuant to 11 U.S.C. § 502* [Adv. 23-50380 D.I. 1] ("Complaint"),[1] as filed by Plaintiffs Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services, Inc. ("WRSS") (collectively, the "Plaintiffs").[2]

## SUMMARY OF ARGUMENT

Plaintiffs seek to hold Mr. Beal liable for the misdeeds of individuals not even party to the Complaint. Defendant Mr. Beal was the Chief Technology Officer ("CTO") of Embed Financial Technologies Inc ("Embed") pursuant to an employment agreement under which he received shares of Embed's stock that vested monthly. Six months into his employment, Plaintiff WRS started negotiating the acquisition of Embed that was eventualy styled as a reverse triangular merger. This change of control vested the remainder of Mr. Beal's unvested stock, which he was then required to transfer to WRS's agent, Western Alliance Bank (the "Bank"), in exchange for cash. The Plaintiffs now seek to avoid Mr. Beal's bargained-for consideration based on nothing more than a vaguely expressed theory that misdeeds by FTX Insiders, who were neither parties to the acquisition/merger nor listed as parties in the Complaint, may in some way be relevant to the transfer to Mr. Beal pursuant to the Merger Agreement and his employment contract.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Complaint, Memoranda, or Merger Agreement, as applicable.

[2] Mr. Beal does not consent to entry of a final order by this Court.

1

Mr. Beal incorporates and joins the arguments the other defendants in this action set forth in their motions to dismiss the Complaint [*see, e.g.,* D.I. 98; 99] (collectively, the "Memoranda") and writes separately in the instant memorandum to elaborate on issues pertaining to Mr. Beal individually.

As detailed in the Memoranda, the fraudulent transfer claims must be dismissed. The transfer to Mr. Beal is protected by the safe harbor provisions of section 546(e) of the Bankruptcy Code, which provides a complete defense to certain of the fraudulent transfer claims. On separate grounds, Plaintiffs' actual fraud claim must be dismissed because they fail to satisfy the heightened pleading standard of actual fraud, merely parrot the statute, and fail to plead the individual badges of actual fraud in any manner as to Mr. Beal that could lead to a finding of a confluence of badges of fraud.

Additionally, contary to the Plaintiffs' allegations, Mr. Beal never received the retention payments Plaintiffs seek to avoid. A simple reading of Mr. Beal's retention agreement shows that the first retention payment was not due to be paid until September 30, 2023.

## BACKGROUND

I.  **MR BEAL'S SHARES IN EMBED AUTOMATICALLY VESTED UNDER HIS EMPLOYMENT CONTRACT.**

   A.  **Mr. Beal's Shares Were to Vest Periodically During the First Four Years of His Employment.**

Mr. Beal is a former employee of the underlying target company, Embed. *Cf.* Complaint ¶ 40. Embed hired Mr. Beal in or around September 2021 pursuant to a September 3, 2021 *Employment Offer Letter* ("Employment Agreement").[3] As a condition to his employment, Mr.

---

[3] A copy of the Employment Agreement is attached to the *Declaration of Tara C. Pakrouh in Support of Defendant's Brief in Support of Defendant's Motion to Dismiss the Complaint* [D.I. 105] (the "Pakrouh Declaration") as Exhibit 2.

2

Beal was to receive "500,000 restricted shares of the Company's common stock" that were to vest monthly over forty-eight months following his start date. Employment Agreement, at p. 1.

### B. Upon a Change of Control, All of Mr. Beal's Remaining Unvested Shares in Embed Would Vest Immediately.

The Employment Agreement provides that any of Mr. Beal's unvested shares would vest immediately upon a "Change of Control", *id.*, which Embed's *2020 Equity Incentive Plan* (the "Incentive Plan")[4] defines as "'a consummation of: (a) a merger . . . or similar corporate transaction in which [Embed] merges or otherwise combines with or into any other company or other entity; or . . . (c) a sale . . . of all or substantially all of [Embed's] assets." Incentive Plan, at pp. A-1–A-2.

## II. THE WRS/EMBED MERGER CONSTITUTED A CHANGE OF CONTROL OF EMBED.

### A. WRS Purchases Embed in a Reverse Triangular Merger Involving Five Separate Entities.

Six months into Mr. Beal's employment, WRS began negotiations to acquire Embed. Complaint ¶ 4. Following the negotiations, on June 10, 2022, the Merger Agreement[5] was signed, and it closed on September 30, 2022. Complaint ¶ 45. There are no allegations that Mr. Beal had any role in the negotiation conversations with WRS.

The acquisition was structured as a reverse triangular merger, where WRS formed Merger Sub to merge into Embed, resulting in Embed becoming the "Surviving Corporation" wholly owned by WRS. Merger Agreement § 2.1. WRS agreed to provide $220 million as merger consideration, plus (i) estimated working capital, plus (ii) estimated closing date cash, less (iii) the Holder Representative Fund ($250,000 to pay the costs of the "Holder Representative"), less (iv)

---

[4] A copy of the Incentive Plan is attached to the Pakrouh Declaration as Exhibit 3.

[5] "Merger Agreement" is defined as the *Agreement and Plan of Merger,* dated June 10, 2022 (including exhibits, annexes and schedules attached thereto and contemplated thereby), a copy of which is attached to the Pakrouh Declaration as Exhibit 1.

3

the Adjustment Escrow Funds (an approximate $250,000 holdback), less (v) Embed transaction expenses, plus (vi) closing date company cash burn. *Id.* § 3.1(c)(i). Further, the Merger Agreement required Mr. Beal to remain an officer of the surviving corporation. *Id.* § 2.5(b).

> **B.    The WRS/Embed Merger was a Change of Control that Automatically Vested Mr. Beal's Unvested Shares.**

This acquisition constituted a "Change of Control" which occurred during Mr. Beal's employment and triggered the immediate vesting that Mr. Beal and Embed agreed to. Pursuant to the Merger Agreement, Mr. Beal was then provided the option to surrender his shares to the Exchange Agent (as defined below); in exchange, his shares converted into (1) a right to receive an equal amount of merger consideration (*id.* § 3.1(a)(ii)), and (2) additional consideration from the Adjustment Escrow Funds and Holder Representative Fund. *Id.* § 3.1(d)(i).

> **C.    Western Alliance Bank as Agent for WRS Redeems Mr. Beal's Shares in Embed.**

WRS engaged the Bank (or "<u>Exchange Agent</u>") to act as Exchange Agent for the deal. *Id.* at § 3.2(a). WRS agreed to deposit with the Bank the amounts necessary to pay the selling shareholders, including Mr. Beal, for their shares, withholding amounts payable to dissenting stockholders and with respect to vested options. *Id.* The Bank, on behalf of WRS, then coordinated the delivery and collection of transmittal letters, collected stock certificates, and issued the bulk of the merger consideration. *Id.* at § 3.2 (b). Mr. Beal was compensated for his securities in this manner. *See* Complaint ¶ 38, Ex. A.

The merger consideration included an estimated working capital amount, which was added to the overall sale price. The proceeds paid to the Bank were reduced by $250,000 and paid to the Bank as "Escrow Agent," pending an audit calculation of the actual working capital within ninety days of the closing. Merger Agreement at §§ 3.2(f), 3.4; Escrow Agreement, Annex J, p. 1. If there was a surplus, the Merger Agreement required WRS to direct the Escrow Agent to send the

4

adjusted escrow funds to the Exchange Agent to distribute the funds to shareholders *pro rata*. *Id.* at § 3.4(e)(ii).

## III. MR. BEAL DID NOT RECEIVE A POST-CLOSING RETENTION PAYMENT.

In connection with the merger, Mr. Beal was offered the opportunity to continue working for Embed under the *Retention Incentive Award Agreement* ("Retention Agreement").[6] *See* Retention Agreement, at Recitals; Merger Agreement, Annex L-2. In exchange, Mr. Beal would receive a retention incentive payment, payable over a twenty-four-month period:

| Post-Closing Time Period | Retention Payment Amount |
|---|---|
| On the twelve-month anniversary of closing | 50% of the payments |
| On the fifteen-month anniversary of closing | 12.5% of the payments |
| On the eighteen-month anniversary of closing | 12.5% of the payments |
| On the twenty-first-month anniversary of closing | 12.5% of the payments |
| On the twenty-fourth-month anniversary of closing | 12.5% of the payments |

Retention Agreement at § 1.

Pursuant to the Retention Agreement, Mr. Beal's first payment would be due September 30, 2023, and the final payment would be due September 30, 2024. *Id.*; Complaint ¶ 47, n.5.

## IV. THE FTX GROUP FILES FOR CHAPTER 11 BANKRUPTCY.

On November 11 and 14, 2022, the FTX Group filed voluntary Chapter 11 petitions on an emergency basis. Complaint ¶ 25. In the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* ("Ray Declaration") [D.I. 24], the Debtors' Chief Executive Officer John J. Ray testified the filing the day after the Securities Commission of the Bahamas froze non-Debtor FTX Digital Markets Ltd.'s assets. Ray Declaration, at ¶¶ 42–45.

He also testified there was pervasive corporate failures at every level, particularly with respect to cash management and financial reporting. *Id.* at ¶¶ 50–58. For example, the FTX Group had no centralized control of cash, no accurate list of bank accounts and account signatories, a lack

---

[6] A copy of the Retention Agreement is attached to the Pakrouh Declaration as Exhibit 4

of documentation for certain loan transactions, a lack of appropriate books and records and security controls regarding digital assets and the "Alameda Silo" in general, among many other admitted deficiencies. *Id.* at ¶¶ 50, 63, 65, 69. As a result, independent directors were appointed in different silos to provide the appropriate governance. *Id.* at ¶¶ 46–49.

Plaintiffs filed their Complaint against Mr. Beal and all other defendants on May 17, 2023. The Complaint seeks to claw back the negotiated funds that were paid to Mr. Beal and the other defendants at closing.[7] *See* Adv. 23-50380; D.I. 1. Despite Plaintiffs' attempt to capitalize on the wrongdoing that happened at FTX in their Complaint, including at the Plaintiff companies themselves, the Plaintiffs are scapegoating the wrong target here.

## STANDARD OF REVIEW

Mr. Beal joins in the Memoranda and separately states that in evaluating a motion to dismiss, a court can and should consider not only the allegations of the complaint, but also any documents specifically referenced in or attached to the complaint and matters of public record. *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) *abrogated on other grounds, Humana, Inc. v. Indivior, Inc.,* No. 21-2573, 2022 WL 17718342, at *1 (3d Cir. Dec. 15, 2022); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A court may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Ruddy v. U.S. Postal Serv.*, 455 F. App'x 279, 283 (3d Cir. 2011) (citation omitted). The contracts and related documents either explicitly relied on or incorporated into Plaintiff's Complaint are the (i) the Merger Agreement, (ii) Mr. Beal's Retention Agreement, and (iii) Mr. Beal's Employment Agreement, *see, e.g.*, Complaint ¶¶ 5, 6, 38, 40, 42, 43, 47, and may be properly considered by the

---

[7] Count IV of the Complaint is asserted only against Defendant Michael Giles, and not against Mr. Beal. As such, it is not addressed herein.

Court.[8] *See, e.g.*, *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (stating a court may also consider any "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case") (citation omitted); *Indeck Maine Energy, L.L.C. v. ISO New England Inc.*, 167 F. Supp. 2d 675, 678-79 (D. Del. 2001); *In re Sportco Holdings, Inc.,* 2021 WL 4823513 at *11 (Bankr. D. Del 2021).

## ARGUMENT

**I.    THE SAFE HARBOR OF SECTION 546(E) PRECLUDES CERTAIN OF PLAINTIFFS' FRAUDULENT TRANSFER CLAIMS AGAINST MR. BEAL.**

**A.    The Purported Fraudulent Transfer at Issue Actually Occurred Between the Bank and Mr. Beal.**

**1.    WRS Engaged the Bank as Its Escrow and Exchange Agent.**

In total, the merger consisted of five players: (1) WRS as buyer; (2) Merger Sub as merging entity; (3) Embed as seller; (4) Shareholder Representative Services, LLC as holder representative; and (5) the Bank as agent. As more fully described above, WRS engaged the Bank as both Exchange and Escrow Agent.

**2.    As WRS's Agent, the Bank was Heavily Involved in the Process of Paying Mr. Beal for His Shares.**

To transfer the merger consideration, WRS first had to provide the funds to the Exchange Agent before closing. Merger Agreement, at §3.2(a). Stockholders of Embed had to surrender

---

[8] Indeed, the "Entire Agreement" provision of the Merger Agreement makes clear that "[t]his Agreement . . . *and the other Transaction Agreements* constitute the entire agreement among the parties relating to the transactions *contemplated* hereby . . . ." Merger Agreement, at § 13.9 (emphasis added). The definition of "Transaction Agreement" includes "[the Merger Agreement] . . . and each other agreement, certificate, instrument and document executed and delivered in connection with the Transactions," which includes Mr. Beal's retention and employment agreements. *Id*. at Annex A "Defined Terms." Rather than restate the terms of Mr. Beal's employment and retention, the Merger Agreement incorporates them in their entirety. *See, e.g.,* Merger Argeement, at § 7.3 (retention agreement), Annex L-2 (retention agreement), Schedules 4.10(h)(2) (Employment Agreement), 4.20(a)(i)(2) (Employment Agreement). *See cf. In re Trinity Coal Corp.*, 514 B.R. 526, 531 (Bankr. D. Del. 2014) (holding under the definition of "entire agreement" in a merger agreement, other transaction documents are integral, interdependent and non-severable parts of the transaction).

7

16207873/10

their shares to the Exchange Agent, and the Exchange Agent then could pay each shareholder's share of the consideration (less certain holdbacks), as depicted below. *Id*. at § 3.2(b). Following an audit post-closing, the Exchange Agent could distribute additional funds to the shareholders if there was a surplus. *Id.* at §3.4(e).



### 3. It is Improper for Plaintiffs to Collapse the Transfer to Mr. Beal Due to the Bank's Involvement in the Transfers

As demonstrated above, the Bank played a crucial agency link in the transfer of merger consideration. In an attempt to conflate the many moving parts of the Embed acquisition, the Complaint appears to impermissibly "collapse" the transaction into one purported transfer from WRS to Mr. Beal and completely ignores the Bank's contractual involvment.[9] The Complaint, however, does not offer any rationale as to why the transaction should be so collapsed. Nonetheless, a close review of the transaction demonstrates there are many necessary and distinct links in the transfer chain. And, the Bank's agency link is an important one.

---

[9] In certain exceptional circumstances a Court may "'collapse' multiple . . . transactions for purposes of a fraudulent transfer analysis [to] consider the economic reality of the integrated whole." *In re Syntax-Brillian Corp.,* 573 F. App'x 154, 160 (3d Cir. 2014).

16207873/10

### B.    Section 546(e) Applies Ahen, as Here, a Settlement Payment is Made by a Financial Institution in Connection With a Securities Contract.

The Bankruptcy Code's securities contract safe harbor provides that, notwithstanding section 548(a)(1)(B),

> the trustee may not avoid a transfer that is . . . a settlement payment . . . made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . or that is a transfer made by or to (or for the benefit of) a. . . financial institution [or] financial participant . . . in connection with a securities contract . . . .

11 U.S.C. § 546(e).

As set forth in more detail in the Memoranda, under the Merger Agreement, Mr. Beal was required to surrender his shares to the Exchange Agent, which shares were then converted into a right to receive an equal amount of merger consideration (Merger Agreement, at § 3.2(b)).[10] Accordingly, the transfers of shares to complete the merger were "settlement payments" which were made under a securities contract—*i.e.*, the Merger Agreement.[11]

Further, as stated above, the transaction should be viewed as one between the Bank and Mr. Beal, due to the Bank's agency relationship in and control of the transfers.[12]  The Bank plainly

---

[10] *In re The IT Group, Inc.,* 359 B.R. 97, 101 (Bankr. D. Del. 2006) ("A settlement payment clearly includes a transfer of securities that completes a securities transaction.") (citations omitted).

[11] *In re Bayou Steel B Holdings, L.L.C.,* 642 B.R. 371, 389 (Bankr. D. Del. 2022) (noting section 741(7)(A)(i) provides that a "securities contract" includes "a contract for the purchase, sale, or loan of a security" and that other courts have held that such LLC interests fall within the definition's broad category capturing a "claim or interest commonly known as 'security'") (citations omitted); *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 80–81 (2d Cir. 2019) (holding that Tribune's payments for the redemption of shares from its public shareholders were "in connection with a securities contract").

[12] WRS engaged and granted the Bank authority to act as both Exchange Agent and Escrow Agent in the merger thereby becoming WRS's agent; in doing so, WRS became the Bank's customer.  *See, e.g., In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 199–202 (S.D.N.Y. 2020) (citing *In re Tribune*) (noting the recognized test for agency under section 546(e) is (1) "the principal's manifestation of intent to grant authority to the agent"; (2) "agreement by the agent"; and (3) "the principal['s] . . . mainten[ance] [of] control over key aspects of the undertaking" and holding Wells Fargo was Nine West's agent because "[Wells Fargo] was entrusted with [millions] of dollars of [Nine West] cash and was tasked with making payments on [Nine West's] behalf to Shareholders upon the tender of their stock certificates to [Wells Fargo]"); *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d at 77–80 (holding Tribune was a "customer" of Computershare, a bank, and that Computershare acted as Tribune's "agent" by serving as its paying agent to effectuate the redemption payments made to the Tribune's former shareholders).

falls within the definition of "financial institution," as a national bank. The Bank, in its capacity as Exchange Agent and on behalf of its customer, WRS, agreed to take proceeds from WRS, coordinate the sending out and collection of transmittal letters, collect the stock certificates, including the Mr. Beal's common stock certificates, and pay out the bulk of the sale proceeds on behalf of WRS. *See* Merger Agreement, at § 3.2 (a)–(f). As Escrow Agent, the Bank also agreed to hold, invest and ultimately disburse funds after an adjustment amount is determined, on behalf of WRS. Merger Agreement, Annex J; Escrow Agreement, at §§ 2–4. Since the Bank is a "financial institution" for purposes of section 546(e), WRS, by virtue of its relationship with its agent bank, is also a financial institution and all payments made in connection with the Merger Agreement, including the payments made to Mr. Beal, are safe harbored.[13] Thus, Plaintiffs' constructive fraud and state law fraudulent transfer claims fail.[14]

## II. PLAINTIFFS FAILED TO PLEAD ALL ELEMENTS OF ACTUAL FRAUD THUS WARRANTING DISMISSAL.

### A. Plaintiffs Fail to Allege the Particularity Requirement of an Actual Fraud Claim.

#### 1. Plaintiffs Merely Parrot the Actual Fraud Statute, Which is Insufficient.

Plaintiffs have failed to satisfy the particularity requirements of Rule 9(b), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7009, with respect to the actual fraudulent transfer claims asserted in Counts I and III against Beal because the Complaint "merely parrots the language of section 548(a)(1)(A) [and Delaware law] without providing any specific factual allegations"—not even an alleged excessiveness of the transfer. *See In re W.J.*

---

[13] *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d at 191–92 (holding that a party, by virtue of its relationship with its agent bank, was a financial institution under § 101(22)(A) and that all of the payments made to the public settlement payments and/or transfers made in connection with a securities contract under § 546(e) were safe harbored); *In re Trib. Co. Fraudulent Conv. Litig.,* 946 F.3d at 78 (same).

[14] *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 98 (D. Del. 2002); *In re Bos. Generating LLC*, 617 B.R. 442, 479 (Bankr. S.D.N.Y. 2020).

10

*Bradley Mortgage Capital, LLC*, 598 B.R. 150, 169 (Bankr. D. Del. 2019) (finding failure to plead actual fraud when only allegation was the receipt of allegedly excessive fees).

        **2.**        **Plaintiffs' Financial Mismanagement Undercuts the Complaint's Plausibility.**

The lack of control and documentation of the Plaintiffs' finances precludes any actual fraud claim. In the Ray Declaration, the Debtors' CEO extensively discussed of the lack of control and documentation that Plaintiffs had while the FTX Insiders were in control. *See, e.g.,* Ray Declaration at ¶¶ 50, 63, 65, 69. The lack of control and documentation evidences confusion among the Plaintiffs as to what funds they possess or paid. As of at least November 2022, none of Alameda Research LLC's (the Alameda Silo's primary operating company) consolidated financial statements had been audited and could not be relied on. *See, e.g., id.* at ¶¶ 22, 23. Nor could the debtors articulate the exact amount of cash that they held, and the companies were working off mere approximations. *Id.* at ¶ 52. While this only represents a fraction of the admitted mismanagement of funds detailed by the Ray Declaration, it is more than enough to preclude any potential claim based on actual fraud. Based on these admissions, no allegations of any transfers—either the amounts or the recipients—can be relied on and thus cannot be deemed plausible.

        **3.**        **The Complaint Fails to Alternatively Plead a Confluence of Several Badges of Fraud Sufficient to Support a Finding of Actual Fraud.**

In the absence of direct evidence of fraudulent intent, claims under section 548(a)(1)(A) are pleaded through allegations that a challenged transfer bore the so-called "badges of fraud" as enumerated in the Memoranda. The Complaint barely attempts to plead any badges of fraud, and manifestly fails to sufficiently plead a "confluence" of these factors that would suffice to state a claim as to Mr. Beal. *See, e.g., In re Fedders*, *N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).

Indeed, there is no allegation that Mr. Beal was a director or officer of any Plaintiff entity, that Plaintiffs and Mr. Beal were under common control, or that Mr. Beal otherwise controlled any Plaintiff. *Cf. In re Nat'l Serv. Indus., Inc.*, No. 12–12057 (MFW), Adv. No. 14-50377 (MFW), 2015 WL 3827003, at *5 (Bankr. D. Del. June 19, 2015) (finding close relationship existed where transfers were made to "officers and members of the Debtor's board"). There are no facts that Mr. Beal or Plaintiffs tried to conceal the transfer; rather, the transfer was disclosed publicly as noted in the Memoranda. There are no allegations of Plaintiffs reserving any benefits, control, or dominion over the transfer made to Mr. Beal after it. *In re PennySaver USA Publishing, LLC*, 587 B.R. 445, 461 (Bankr. D. Del. 2018). Mr. Beal allegedly received $12 million—merely 5%—of the over $220 million purportedly paid to the Defendants. This minuscule percentage does not even account for the Plaintiffs' remaining estate that is undisclosed in the Complaint.

The main thrust of the Complaint is not a fraudulent intent by the Plaintiffs in their payment to Mr. Beal, but is the FTX Insiders' efforts to raise the funds and the multiple transfers between Plaintiffs involved in the merger. In fact, aside from the transfers to Michael Giles, no transfer to any other Defendant is mentioned in the Complaint. The purported transfers to Mr. Beal were relegated to a mere two lines of a spreadsheet containing over 140 allegedly fraudulent transfers. *See* Complaint, Ex. A.

### III. CONTRARY TO PLAINTIFFS' ALLEGATIONS, MR. BEAL NEVER RECEIVED A RETENTION PAYMENT.

From the face of the Complaint, Mr. Beal was never paid any monies under the Retention Agreement, so this claim fails as a matter of law. According to the Retention Agreement and the Complaint, the retention award would be paid out in five installments beginning on September 30, 2023, twelve months after the closing of the Merger. Complaint at ¶ 47, n. 5; Retention Agreement, at p. 1. As such, Mr. Beal, could not have received any retention award under the Retention

Agreement. Plaintiffs' allegations to the contrary are emblematic of the unreliability and implausibility of the Complaint caused by Plaintiffs' financial mismanagement detailed above.

### IV. MR. BEAL JOINS IN AND ADOPTS THE ARGUMENTS SET FORTH BY THE OTHER DEFENDANTS

Mr. Beal hereby joins and incorporates the remaining arguments and reasoning in the Memoranda.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated August 15, 2023              **MORRIS JAMES LLP**

/s/ *Tara C. Pakrouh*
Eric J. Monzo (DE Bar No. 5214)
Tara C. Pakrouh (DE Bar No. 6192)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: tpakrouh@morrisjames.com

*Counsel to Defendant Laurence Beal*