**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINTS**

---

[1]     The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

GLOSSARY ....................................................................................... viii

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................4

LEGAL STANDARD...........................................................................7

ARGUMENT ........................................................................................8

I.  THE COMPLAINT ADEQUATELY PLEADS THAT PLAINTIFFS HAVE A PROPERTY INTEREST IN FUNDS TRANSFERRED TO DEFENDANTS IN THE EMBED ACQUISITION ........................................................8

II.  THE COMPLAINT ADEQUATELY PLEADS INTENTIONAL FRAUDULENT TRANSFERS UNDER FEDERAL AND STATE LAW .................................................10

    A.  The Complaint Directly Alleges Actual Fraudulent Intent, Rendering "Badges of Fraud" Unnecessary ........................................12

    B.  The Complaint Also Alleges "Badges of Fraud" That Support an Inference of Fraudulent Intent.................................................16

III.  WHETHER PLAINTIFFS RECEIVED "REASONABLY EQUIVALENT VALUE" IS A FACT QUESTION THAT CANNOT BE RESOLVED ON A MOTION TO DISMISS, AND DEFENDANT GILES' $1 MILLION BID SHOWS THAT PLAINTIFFS DID NOT RECEIVE SUCH VALUE ..........................18

IV.  DEFENDANTS' REFERENCES TO PURPORTED AFFIRMATIVE DEFENSES ARE NOT APPROPRIATE GROUNDS FOR DISMISSAL AT THIS STAGE.................................................20

    A.  Defendants' Arguments About the Securities Safe Harbor Under Section 546(e) Are Foreclosed by Controlling Supreme Court Precedent and Lack Factual Support in Any Event.................................................20

        1.  *Merit Management* Forecloses Defendants' Section 546(e) Argument ........................................21

        2.  *Tribune* Is Directly Contrary to *Merit Management*, But Defendants' Factual Arguments Are Unavailing Even Under *Tribune* ........................................23

-i-

    B.    Defendants' Arguments Under Section 550 Are Premature and Contradict the Complaint's Well-Pled Allegations ................................................................26

        1.    The Complaint Adequately Alleges That Defendants Are Initial Transferees ...............................................................................................26

        2.    Defendants Cannot Obtain Dismissal at the Pleading Stage Based on the Purported Affirmative Defense That They Received the Transfers in Good Faith ..............................................................................28

V.    THE COMPLAINT STATES A CLAIM FOR AVOIDANCE OF THE RETENTION PAYMENTS TO GILES AND OTHER FORMER EMPLOYEES ..........29

    A.    The $55 Million Retention Payment to Giles is an Avoidable Preference ...........29

    B.    The Obligations To Make Future Retention Payments to Former Embed Employees Are Also Avoidable ..............................................................................30

VI.    BECAUSE PLAINTIFFS HAVE ADEQUATELY PLED AVOIDANCE CLAIMS, DEFENDANTS CANNOT EVADE PLAINTIFFS' SECTION 502(d) DISALLOWANCE OR SECTION 550 RECOVERY CLAIMS.....................................32

VII.    THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND THE COMPLAINT IF IT GRANTS DEFENDANTS' MOTIONS .........................................32

CONCLUSION....................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004)...................................................................................3, 20

*Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*,
   No. 06-607, 2007 WL 1202760 (W.D. Pa. Apr. 12, 2007)....................................27

*In re Am. Home Mortg. Holding*,
   458 B.R. 161 (Bankr. D. Del. 2011) .......................................................................20

*In re Am. Tissue, Inc.*,
   No. 01-10370, Adv. No. 06-50929, 2007 WL 4178949 (Bankr. D. Del. Nov.
   20, 2007) ..................................................................................................................28

*In re Amdura Corp.*,
   75 F.3d 1447 (10th Cir. 1996) ...................................................................................9

*Ashcroft v. Iqbal*, 556 U.S. 662...................................................................................7

*In re Bernard L. Madoff Inv. Sec. LLC*,
   No. 20-cv-02586, 2022 WL 1304589 (S.D.N.Y. May 2, 2022) ............................28

*In re Bernard L. Madoff Inv. Sec. LLC*,
   12 F.4th 171 (2d Cir. 2021) *cert. denied* No. 21-1059 (Feb. 28, 2022)..............3, 28

*Black* v. *Montgomery Cnty.*,
   835 F.3d 358 (3d Cir. 2016).................................................................................7, 27

*In re BMT-NW Acquisition, LLC*,
   582 B.R. 846 (Bankr. D. Del. 2018) .......................................................................19

*Buck* v. *Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006).......................................................................................9

*In re Bullion Rsrv. of N. Am.*,
   836 F.2d 1214 (9th Cir. 1988) ...................................................................................9

*In re Centaur, LLC*,
   595 B.R. 686 (Bankr. D. Del. 2018) .......................................................................23

*In re Charys Hldg. Co.*,
   443 B.R. 628 (Bankr. D. Del. 2010) ..................................................................18, 19

*In re Com. Fin. Servs., Inc.*,
   322 B.R. 440 (Bankr. N.D. Okla. 2003) .................................................................32

*Crumpton* v. *McGarrity*,
   No. 8:11-cv-2649, 2012 WL 4466527 (M.D. Fla. Sept. 27, 2012), *aff'd sub*
   *nom. In re Northlake Foods, Inc.*, 518 F. App'x 604 (11th Cir. 2013)....................29

*In re Daily Bread Winddown, LLC*,
   No. 20-11266, Adv. No. 20-50775, 2022 Bankr. LEXIS 3078 (Bankr. D. Del.
   Nov. 1, 2022) .......................................................................................................34

*In re DBSI, Inc.*,
   447 B.R. 243 (Bankr. D. Del. 2011) .......................................................................17

*In re DBSI, Inc.*,
   468 B.R. 663 (Bankr. D. Del. 2011) .......................................................................25

*In re DBSI, Inc.*,
   No. 08-12687, 2011 WL 1810632 (Bankr. D. Del. May 5, 2011)...........................14

*In re Dearborn Bancorp, Inc.*,
   583 B.R. 395 (Bankr. E.D. Mich. 2018) .................................................................30

*Deckard* v. *Gen. Motors Corp.*,
   307 F.3d 556 (7th Cir.2002) ..................................................................................20

*Drivetrain, LLC* v. *X. Com., Inc.*,
   No. AP 22-50448, 2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023).......... *passim*

*In re DVI, Inc.*,
   No. 03-12656, Adv. No. 08-50248, 2008 WL 4239120 (Bankr. D. Del. Sept.
   16, 2008) ................................................................................................................8

*In re Energy Coop., Inc.*,
   832 F.2d 997 (7th Cir.1987) ..................................................................................29

*In re Enron Corp.*,
   328 B.R. 58 (Bankr. S.D.N.Y. 2005) ......................................................................11

*In re Enron Corp.*,
   357 B.R. 32 (Bankr. S.D.N.Y. 2006) ......................................................................30

*In re Extended Stay, Inc.*,
   No. 09-13764-JLG, 2020 Bankr. LEXIS 2128 (Bankr. S.D.N.Y. Aug. 8, 2020)....10

*In re FBI Wind Down, Inc.*,
   581 B.R. 387 (Bankr. D. Del. 2018) .....................................................................2, 9

*In re FBI Wind Down, Inc.*,
   614 B.R. 460 (Bankr. D. Del. 2020) ........................................................27

*In re Fedders N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) ........................................................11

*In re First Jersey Sec., Inc.*,
   180 F.3d 504 (3d Cir. 1999).....................................................................30

*Foman* v. *Davis*,
   371 U.S. 178 (1962)..................................................................................33

*Global Network Communs., Inc.* v. *City of New York*,
   458 F.3d 150 (2d Cir. 2006).......................................................................7

*In re Greektown Holdings, LLC*,
   621 B.R. 797 (Bankr. E.D. Mich. 2020) ..................................................25

*In re J & M Sales, Inc.*,
   No. 18-11801, Adv. No. 20-50775, 2021 Bankr. LEXIS 2268 (Bankr. D. Del.
   Aug. 20, 2021) ...................................................................................10, 17

*Kane* v. *Chester County Dep't of Children, Youth & Families*,
   10 F. Supp. 3d 671 (E.D. Pa. 2014) ...........................................................7

*Lang* v. *Morant*,
   867 A.2d 182 (Del. 2005) .........................................................................25

*In re Live Well Fin., Inc.*,
   No. 19-11317, Adv. No. 21-50990, 2023 WL 3995900 (Bankr. D. Del. June
   13, 2023) .......................................................................................... *passim*

*In re Live Well Fin., Inc.*,
   652 B.R. 699 (Bankr. D. Del. 2023) ........................................................14

*In re Manhattan Inv. Fund*,
   397 B.R. 1 (S.D.N.Y. 2007)......................................................................14

*In re Maxus Energy Corp.*,
   641 B.R. 467 (Bankr. D. Del. 2022) ........................................................16

*McCrann* v. *RIU Hotels S.A.*,
   No. 09 CIV. 9188 CM, 2010 WL 5094396 (S.D.N.Y. Dec. 6, 2010) ....................26

*In re Meadows*,
   396 B.R. 485 (B.A.P. 6th Cir. 2008).........................................................9

*Merit Mgmt. Grp., LP* v. *FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018) ................................................................................3, 21, 22

*In re Millennium Lab Holdings II, LLC*,
  No. 15-12284, Adv. No. 17-51840, 2019 WL 1005657 (Bankr. D. Del. Feb.
  28, 2019) ................................................................................................11, 14

*In re NHI, Inc.*,
  320 B.R. 563 (Bankr. D. Del. 2005) ........................................................................26

*In re NWL Holdings, Inc.*,
  No. 08-12847, Adv. No. 10-53535, 2013 WL 2436667 (Bankr. D. Del. June 4,
  2013) ..............................................................................................................32

*In re Our Alchemy, LLC*,
  642 B.R. 155 (Bankr. D. Del. 2022) ........................................................................34

*In re PennySaver USA Publ'g, LLC*,
  602 B.R. 256 (Bankr. D. Del. 2019) ........................................................................18

*In re PostRock Energy Corp.*,
  No. 16-11230, Adv. Pro. 18-01027, 2019 WL 137116 (Bankr. W.D. Okla.
  Jan. 8, 2019) ....................................................................................................30

*In re Qimonda Richmond, LLC*,
  467 B.R. 318 (Bankr. D. Del. 2012) ........................................................................19

*Robinson* v. *Beckles*,
  No. CV 10-362-SLR, 2012 WL 13206064 (D. Del. Mar. 20, 2012) ....................................33

*In re S. Peru Copper Corp. S'holder Derivative Litig.*,
  52 A.3d 761 (Del. Ch. 2011), *aff'd sub nom. Americas Mining Corp.* v.
  *Theriault*, 51 A.3d 1213 (Del. 2012) ......................................................................20

*In re S. Produce Distributors, Inc.*,
  616 B.R. 667 (Bankr. E.D.N.C. 2020), *aff'd sub nom. Adams* v. *S. Produce
  Distributors, Inc.*, No. 7:20-cv-53, 2022 WL 1055434 (E.D.N.C. Mar. 28,
  2022) ..............................................................................................................32

*In re Sentinel Mgmt. Grp., Inc.*,
  728 F.3d 660 (7th Cir. 2013) ................................................................................12

*Sharp Int'l Corp.* v. *State Street Bank & Trust Co.*,
  403 F.3d 43 (2d Cir. 2005) ..............................................................................14, 15

*In re Southmark Corp.*,
  49 F.3d 1111 (5th Cir. 1995) ..................................................................................9

*In re Student Fin. Corp.*,
    335 B.R. 539 (D. Del. 2005)....................................................................................7

*In re Syntax-Brillian Corp.*,
    No. 08-11407, 2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016)....................11, 28

*In re The Brown Schs.*,
    368 B.R. 394 (Bankr. D. Del. 2007) ......................................................................20

*In re Tribune Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019)..............................................................21, 23, 24, 25

## Statutes and Rules

11 U.S.C. § 101................................................................................21, 23, 24, 25

11 U.S.C. § 502................................................................................................32

11 U.S.C. § 544(b) ...........................................................................................31

11 U.S.C. § 546(e) .......................................................................................*passim*

11 U.S.C. § 547(b) ......................................................................................29, 30

11 U.S.C. § 548(a) ...........................................................................................31

11 U.S.C. § 550(a) ...........................................................................................27

Fed. R. Bankr. P. 7015......................................................................................32

Fed. R. Civ. P. 9(b) ..........................................................................................11

Fed. R. Civ. P. 12(b)(6).........................................................................3, 7, 8, 20

Fed. R. Civ. P. 15(a)(2)......................................................................................33

## Other Authorities

Brief for the United States as Amicus Curiae, *Deutsche Bank Trust Company*
    *Americas* v. *Robert R. McCormick Foundation*, No. 20-8 (2021).........................24

5 COLLIER ON BANKRUPTCY 550.03[05] (16th ed.) ...........................................28

# GLOSSARY

| | |
|---|---|
| **Alameda** | Plaintiff Alameda Research Ltd. |
| **Alumni Ventures Br.** | Joinder of the Alumni Ventures Defendants in the Motions to Dismiss filed in Adv. Pro. No. 23-50380, ECF No. 108 |
| **Beal Br.** | Brief in Support of Defendant Laurence Beal's Motion to Dismiss filed in Adv. Pro. No. 23-50380, ECF No. 106 |
| **Chapter 11 Cases** | The jointly administered Chapter 11 cases filed by FTX Trading Ltd. and its affiliated entities pending before the United States Bankruptcy Court for the District of Delaware under lead Case No. 22-11068 |
| **Complaint** | The complaint filed in the *Alameda Research Ltd.* v. *Michael Giles* action. Adv. Pro. No. 23-50380, ECF No. 1 |
| **Cooley Br.** | Memorandum of Law in Support of Defendants' Motion to Dismiss filed by Cooley LLP in Adv. Pro. No. 23-50380, ECF No. 98 |
| **Defendants** | Individuals and entities named as defendants in the above-captioned adversary proceeding and listed in Exhibit A to the Complaint |
| **Embed** | Embed Financial Technologies Inc. |
| **Embed Acquisition** | The transaction in which WRS acquired Embed pursuant to the Merger Agreement |
| **FTX Group** | The collection of four silos of Debtor and non-Debtor entities described in footnote 4 of the Complaint |
| **FTX Insiders** | Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, and Zixiao "Gary" Wang |
| **FTX.com** | The trade name of FTX Trading Ltd. |
| **FTX US** | The trade name of WRSS |
| **Main Case** | Chapter 11 Cases |
| **Merger Agreement** | The Agreement and Plan of Merger dated as of June 10, 2022, by and among WRSS, Ingrained Merger Sub, Inc., Embed, and Shareholder Representative Services LLC |

| | |
|---|---|
| **Paul Weiss Br.** | Embed Shareholder Defendants' Memorandum of Law in Support of Their Motion to Dismiss filed in Adv. Pro. No. 23-50380, ECF No. 99 |
| **Plaintiffs** | Alameda, WRS and WRSS |
| **WRS** | Plaintiff West Realm Shires, Inc. |
| **WRSS** | Plaintiff West Realm Shires Services, Inc. |

# INTRODUCTION[2]

It is a matter of public record that the individuals who ran the FTX Group (referred to in the Complaint as "FTX Insiders") operated a scheme to defraud creditors for their own benefit. To prop up that scheme, the FTX Insiders needed not only to maintain the appearance of a profitable business, but also to increase the scope of their fraudulent enterprise. The Embed Acquisition served both of these purposes.

Through the Embed Acquisition, the FTX Insiders hoped to get a new platform through which FTX US customers could trade stocks, thereby keeping up the illusion that the FTX Group, including FTX US, was successfully expanding, while ensnaring a new population of investor-victims and increasing the amount of money available for the FTX Insiders to misappropriate. Rushing to close the transaction and paying for it with other people's money, the FTX Insiders conducted minimal due diligence into Embed's business, products, and prospects. Coupled with intentional obfuscation about serious deficiencies in Embed's technology platform by Embed's founder, defendant Michael Giles, and others, the FTX Insiders' cavalier approach caused them to pay far more for Embed than it was worth. Within months of the acquisition, the Debtors commenced these Chapter 11 Cases, and Giles, having just pocketed more than $150 million for the company he founded, bid a paltry $1 million to buy it back—demonstrating what he thought Embed was really worth.

---

[2]    Citations to "Compl." shall refer to the complaint filed in the *Alameda Research Ltd.* v. *Michael Giles* action. Adv. Pro. No. 23-50380, ECF No. 1. This opposition addresses only the motions of Defendants named in the above-captioned Adversary Proceeding (No. 23-50380). The motions of the Defendants named in Adversary Proceeding No. 23-50379 are addressed in a separate brief filed in that proceeding. Citations to "Ex. _" refer to exhibits to the accompanying Declaration of Matthew B. McGuire, dated September 22, 2023.

In their motions to dismiss, Defendants contend that the Embed Acquisition was not a part of the FTX Insiders' fraudulent scheme because the relevant transfers came from accounts in the name of Alameda, not FTX.com.  Relying improperly on "facts" outside the Complaint, Defendants assert that this means Plaintiffs have no property interest in the transferred funds—but that is wrong.  The Complaint clearly alleges that the funds paid to Embed shareholders came from bank accounts held in the name of Alameda, WRSS, and WRS.  It is settled law that bank accounts held in the name of a debtor, and the funds contained therein, are "presumptively considered property of the debtor's estate." *In re FBI Wind Down, Inc.*, 581 B.R. 387, 400 (Bankr. D. Del. 2018).  That presumption holds even where, as here, a debtor's bank account contains commingled funds. *Id.*

Defendants next argue that Plaintiffs have not sufficiently alleged that the relevant transfers were actually or constructively fraudulent.  The Complaint, however, details the FTX Insiders' fraud—for which three (Caroline Ellison, Nishad Singh and Zixiao Wang) have already pled guilty—in which they misappropriated funds from FTX exchanges and commingled them with Alameda funds.  The Complaint further describes how the FTX Insiders used those commingled funds to, among other things, finance misguided investments like the Embed Acquisition that were designed to bolster the myth that the FTX Group was a profitable and growing enterprise.  By the time they pursued the Embed Acquisition, the FTX Insiders' fraud had rendered Plaintiffs insolvent.  Nevertheless, the FTX Insiders forged ahead with the acquisition— without meaningful due diligence—in which Defendants gladly sold for $220 million their stock in a company that had *de minimis* revenue, almost no customers (other than FTX itself), and buggy technology.  These allegations clearly support claims of actual and constructive fraud, *see In re Live Well Fin., Inc.*, No. 19-11317, Adv. No. 21-50990, 2023 WL 3995900, at *15 (Bankr. D. Del.

June 13, 2023), as does the well-pled allegation that Giles, who personally received more than $150 million from the sale, confirmed Embed's lack of value by bidding only $1 million for the company following the FTX Group's bankruptcy a few months later—an important fact that Defendants apparently hope this Court will ignore.

Defendants' remaining arguments seek to rewrite the Complaint and rely on fact-intensive purported affirmative defenses, but it is well-settled that "affirmative defense[s] may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004). For example, Defendants argue that the Complaint should be dismissed pursuant to the "securities safe harbor" contained in section 546(e) of the Bankruptcy Code. But that provision is an affirmative defense that the Supreme Court has held does not apply to the types of transfers that Plaintiffs seek to avoid here, *see Merit Mgmt. Grp., LP* v. *FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), and Defendants' factual assertions do not support application of the defense even if it properly could be raised on a motion to dismiss. In the same vein, Defendants' invocation of their self-professed good faith—a potential affirmative defense to fraudulent transfer claims under sections 548(c) and 550(b)—is an inherently fact-intensive inquiry that cannot be resolved on a motion to dismiss. *See In re Bernard L. Madoff Investment Securities LLC*, 12 F.4th 171, 196 (2d Cir. 2021) *cert. denied* No. 21-1059 (Feb. 28, 2022). In any event, the Complaint's well-pled allegations—including that certain Defendants noted the disproportionate amount of money being paid to Giles under the Merger Agreement, and encouraged him to receive that money in cash to reduce "risk"—undermine a good faith defense. Finally, Defendants urge the Court to make a premature determination, before discovery, that Embed was in fact worth what FTX Insiders caused Plaintiffs to pay for it. But the Complaint alleges more than is needed at this stage to show that Embed's vaunted technology was worth little

or nothing, its revenue was nonexistent, and its customer base was miniscule.  In private communications, Giles and other employees admitted that they hoped the transaction closed quickly, before the FTX Group started asking too many questions or Embed's platform crashed.

Plaintiffs have more than adequately alleged that the Embed Acquisition was an element of the FTX Insiders' fraudulent scheme.  Until Plaintiffs have had any opportunity to explore in discovery the facts surrounding the Embed Acquisition and, among other things, Embed's actual value, this Court should not deprive Plaintiffs of the opportunity to recover nearly a quarter of a billion dollars for the benefit of the FTX Group's creditors.

Defendants' motions are not well-founded and should be denied.

## BACKGROUND

The FTX Insiders perpetrated a massive fraud by causing Alameda to misappropriate funds from the FTX exchanges in order to enable the FTX Insiders to spend lavishly on pet projects, private houses and jets, political and "charitable" contributions, and investments, such as the Embed Acquisition.  Compl. ¶¶ 26, 29, 30.  These expenditures benefitted the FTX Insiders personally, while maintaining the façade that the FTX Group was profitable and growing, which was necessary both to perpetuate the fraudulent scheme and ensure it was not discovered.  *See id.* ¶ 26.  The Complaint alleges that the Embed Acquisition was one of many investments designed to maintain the charade.  *Id.* ¶¶ 26-28.

In furtherance of their fraudulent scheme, the FTX Insiders approached Giles regarding a potential acquisition of Embed in March 2022.  *Id.* ¶ 37.  The FTX Insiders saw Embed as a means to expand FTX US's operations into conventional securities markets, thereby enabling them to expand the scope of their fraud into a whole new arena, with a vastly larger pool of potential victims.  *See id.* ¶¶ 4, 28; Ex. A (Superseding Indictment of Samuel Bankman-Fried) ¶¶ 3, 5, 9; *see also* Ex. B (Singh Plea Tr.) at 29:7-19.  By April 15, 2022, WRS and Embed had

signed the "Memorandum of Terms," which ascribed a $220 million value to Embed and provided for $75 million in retention bonus payments to Embed employees, including a $55 million payment to defendant Giles for him to stay on for less than four months.  Compl. ¶¶ 38, 45.  The "Agreement and Plan of Merger" containing substantially the same terms was signed as of June 10, 2022.  *Id.* ¶ 38.  The Embed Acquisition closed September 30, 2022, less than six weeks before the Debtors' Chapter 11 filing.  *Id.*

In their rush to acquire Embed, the FTX Insiders sacrificed due diligence in favor of speed.  The Complaint alleges that the FTX Group performed almost no due diligence.  *Id.* ¶¶ 28, 39-43.  Giles observed that WRS was not "too worried" about due diligence.  *Id.* ¶ 40. Defendant Laurence Beal, Embed's former Chief Technology Officer, similarly observed that WRS "didn't do a ton of [due diligence]" before its subsidiary became a customer of Embed, and that he got the "sense that they are [cowboy emoji] over there."  *Id.*  Unsurprisingly, this lack of diligence on a technology startup with no real customers proved to be a big mistake.  Had WRS done proper due diligence, it would have discovered that Embed's technology was riddled with "many bugs."  *Id.* ¶ 41.  Giles expressed concern that "what will blow up the deal [with WRS] will be death by a thousand cuts issues with tech," and noted that Embed's platform was "experiencing multiple issues per day."  *Id.*  The lack of diligence also failed to uncover that the Embed platform was not capable of handling approximately 600 new user accounts, let alone the 10,000 new accounts envisioned by the "launch plan" for FTX Stocks.  *Id.* ¶ 42.

In the absence of meaningful due diligence, Giles' unsupported claims about Embed's capabilities went entirely unchecked.  As defendant Beal recognized, WRS would not have purchased Embed for $220 million "if they thought we couldn't handle 1K accounts."  *Id.*

¶ 43.    Another Embed employee observed that Embed's platform "can't really take ANY accounts," and admitted that "MG [Michael Giles] has to basically lie to get the deals he gets." *Id.*

In acquiring Embed, the FTX Insiders were also indifferent to the price paid.  The $220 million value ascribed to Embed was entirely unjustified. *Id.* ¶ 39.  Giles provided no valuation metrics to support his $220 million valuation, and WRS did not retain an investment bank or other outside advisor to perform an independent valuation. *Id.*  The sole rationale Giles provided for the $220 million valuation of Embed, which had only $37 million in assets and *$25,000 in net revenue* as of March 31, 2022, was that it supposedly would "enable [Giles] to get a deal over the line with investors." *Id.* ¶¶ 39, 44.

In addition to the inflated acquisition price, WRS also agreed to pay Giles personally a $55 million retention bonus that required only that he remain as Embed's CEO for less than four months until closing. *Id.* ¶ 45.  This bonus was awarded to Giles on top of the approximately $103 million that he stood to receive at closing as Embed's largest shareholder. *Id.*  Embed's second largest shareholder observed to Giles that he "ha[d] never seen so much of a deal this size go to a founder . . . just unusual proportions." *Id.* ¶ 46.  Recognizing the unconscionable nature of the deal he had cut for himself, Giles expressed concern about other Embed shareholders seeing the document granting him a $55 million retention payment, and expressed hope that "people don't read it in too much detail." *Id.* ¶ 47.

The truth about Embed came to light following the collapse of the FTX Insiders' fraudulent scheme and the FTX Group's subsequent Chapter 11 filings. *Id.* ¶ 25.  As part of these Chapter 11 Cases, the Court authorized bid procedures for the sale of certain of the Debtor's businesses, including Embed. *Id.* ¶ 56.  The sale process for Embed commenced less than four months after the closing of the Embed Acquisition. *Id.* ¶ 57.  The Debtors received twelve non-

binding indications of interest, but only two bidders submitted final bids after conducting due diligence on Embed and its technology. *Id.* ¶¶ 59-60. One bidder submitted a final bid of $250,000, and Giles—who just a few months earlier had personally pocketed over $150 million for his stake in the company—submitted a final bid of only $1 million. *Id.* The ten other potential bidders who declined to submit final bids learned in due diligence what Giles knew when he sold Embed to WRS for $220 million—Embed's technology had limited features and lots of bugs, and Embed would never be an enterprise-grade company without the investment of significant additional resources and several years of further development. *Id.* ¶ 61.

## LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2000) (plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007))).

For purposes of Rule 12(b)(6), "the court relies on the complaint, exhibits attached to the complaint, and matters of public record, including other judicial proceedings." *Kane* v. *Chester County Dep't of Children, Youth & Families*, 10 F. Supp. 3d 671, 680 (E.D. Pa. 2014) (citing *Sands* v. *McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)). It not permissible on a Rule 12(b)(6) motion to rely on material outside the complaint to "make a finding of fact that controvert[s] the plaintiff's own factual assertions set out in its complaint." *Global Network Communs., Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006); *see also In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005) (stating the "purpose of a motion to dismiss is to test the

sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case").   Nor

should a 12(b)(6) motion be granted based on an affirmative defense predicated on disputed facts.

*See In re DVI, Inc.*, No. 03-12656, Adv. No. 08-50248, 2008 WL 4239120, at *11 (Bankr. D. Del.

Sept. 16, 2008).

## ARGUMENT

### I.   THE COMPLAINT ADEQUATELY PLEADS THAT PLAINTIFFS HAVE A PROPERTY INTEREST IN FUNDS TRANSFERRED TO DEFENDANTS IN THE EMBED ACQUISITION.

Defendants incorrectly assert that the "Complaint unambiguously alleges that *all*

the money WRS used to fund the Embed acquisition was misappropriated from FTX.com," and

that Plaintiffs therefore lack a cognizable property interest under the Bankruptcy Code to enable

them to avoid the fraudulent transfers.  Cooley Br. at 19 (emphasis added).  Defendants' argument

ignores the well-pled allegations of the Complaint.

The Complaint alleges that "[t]he funds used to acquire Embed had been transferred

from an Alameda bank account to a WRSS bank account and ultimately to a WRS bank account."

Compl. ¶ 49; *see also id.* ¶ 54 ("Despite the fact that the funds used by WRS to acquire Embed

came from Alameda (via WRSS) . . . .").  The Complaint further alleges that, by the time the funds

for the Embed Acquisition were transferred from an Alameda bank account through conduits

WRSS and WRS, the FTX Insiders had already used Alameda to misappropriate billions of dollars

from FTX.com.  *Id.* ¶ 53; *see also id.* ¶ 27 ("All of the funding for the Embed acquisition came

from Alameda, which, at the FTX Insiders' direction, had surreptitiously and unlawfully diverted

and transferred assets belonging to FTX.com.").   Nowhere does the Complaint allege, as

Defendants contend, that "*all* the money WRS used to fund the Embed acquisition was

misappropriated from FTX.com."  Cooley Br. at 19 (emphasis added).  Instead, the Complaint

clearly alleges that the money for the Embed Acquisition came from Alameda, which by that time,

at the direction of the FTX Insiders, had commingled its own assets with misappropriated customer funds from the FTX.com exchange.[3]  Alameda then transferred funds through WRSS and WRS accounts to effectuate the transaction.  Compl. ¶ 52 ("[O]n July 26, 2022, $200 million was transferred from a bank account controlled by Alameda at Signature Bank to a bank account controlled by WRSS at Signature Bank.  That WRSS account, in turn, transferred $200 million to a bank account controlled by WRS at Signature Bank.").

Plaintiffs have an enforceable property interest in funds in their bank accounts.  It is "well-settled case law" that "any bank accounts under the legal title of the debtor, as well as any deposits in such accounts credited to the debtor, are presumptively considered property of the debtor's estate."  *In re FBI Wind Down, Inc.*, 581 B.R. at 400; *see also In re Amdura Corp.*, 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established."); *In re Meadows*, 396 B.R. 485, 490 (B.A.P. 6th Cir. 2008) (holding that funds in a debtor's checking account are property of the estate); *In re Southmark Corp.*, 49 F.3d 1111, 1117 (5th Cir. 1995) (debtor had property interest in funds in general bank account to which it held legal title).  Importantly, the presumption that funds held in a debtor's bank account are the property of the debtor "*holds even in cases where the account contains commingled funds.*"  *In re FBI Wind Down, Inc.*, 581 B.R. at 400 (emphasis added)*; In re Southmark Corp.*, 49 F.3d at 1117; *In re Bullion Rsrv. of N. Am.*, 836 F.2d 1214,

---

[3]    *See* Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com (the "Second Interim Report") at 8, Main Case ECF No. 1704 ("Simply put, as a former Alameda employee explained to the Debtors, the FTX Group made no meaningful distinction between customer funds and *Alameda funds*." (emphasis added)); *see also id.* at 9 (noting that "customer and corporate funds were commingled in" various bank accounts, including "accounts in the names of Alameda Research Ltd.").  On a motion to dismiss, the Court is permitted to consider "matters of public record, orders, [and] items appearing in the record of the case."  *See Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

1217-18 (9th Cir. 1988) (generally, where debtor funds are commingled with customers' assets, all are presumptively estate property). Thus, drawing all reasonable inferences in Plaintiffs' favor, the Complaint adequately alleges that Plaintiffs had a property interest in the fraudulently transferred funds, even if Alameda's bank account contained commingled customer funds from FTX.com as well as Alameda corporate funds.

Moreover, Defendants concede, as they must, that substantive consolidation of the FTX Debtors would render moot their argument that Plaintiffs do not have standing to pursue claims based on transfers of funds originating from FTX.com customers (which the Complaint does not allege in any event). *See* Cooley Br. at 21-22. This concession is fatal. As explained in the Debtors' draft plan of reorganization filed with the Court (Main Case, ECF No. 2100 at 50), the Debtors intend substantive consolidation, other than with respect to certain limited affiliates. At this stage, it is "enough for the Court to find that for purposes of the Motions [to Dismiss]," Plaintiffs are not "barred from invoking substantive consolidation in support of [their] assertion that [they] can aggregate the Debtors' estates in establishing [their] standing to sue." *See In re Extended Stay, Inc.*, No. 09-13764-JLG, 2020 Bankr. LEXIS 2128, at *166-167 (Bankr. S.D.N.Y. Aug. 8, 2020); *see also In re J & M Sales, Inc.*, No. 18-11801, Adv. No. 20-50775, 2021 Bankr. LEXIS 2268, at *88-89 (Bankr. D. Del. Aug. 20, 2021) (Dorsey, J.) (adopting reasoning of *Extended Stay*).

## II.    THE COMPLAINT ADEQUATELY PLEADS INTENTIONAL FRAUDULENT TRANSFERS UNDER FEDERAL AND STATE LAW.

Defendants contend that the FTX Insiders' fraudulent scheme fails to support an inference of actual fraudulent intent with respect to the Embed Acquisition. Cooley Br. at 30-31; Paul Weiss Br. at 11; Beal Br. at 10-12. That is not correct.

To state a claim for intentional fraudulent transfer, Plaintiffs need only allege that the transfers were made with the actual intent to hinder, delay, or defraud their present or future creditors. *In re Millennium Lab Holdings II, LLC*, No. 15-12284, Adv. No. 17-51840, 2019 WL 1005657, at *2 (Bankr. D. Del. Feb. 28, 2019); *In re Syntax-Brillian Corp.*, No. 08-11407, 2016 WL 1165634, at *5 (Bankr. D. Del. Feb. 8, 2016). "Fraudulent intent . . . may be pled generally," and need not be pled with particularity under Rule 9(b). *In re Millennium Lab Holdings II*, 2019 WL 1005657, at *3. Moreover, because an independent debtor-in-possession (as Plaintiffs are here) is a third-party outsider to the debtor's prior transactions, "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where [an independent debtor-in-possession] . . . is asserting the fraudulent transfer claims." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009); *see also In re Enron Corp.*, 328 B.R. 58, 73-74 (Bankr. S.D.N.Y. 2005) (finding independent debtors-in-possession subject to relaxed application of Rule 9(b)).

Defendants make much of what they claim is an absence of certain so-called "badges of fraud" in the Complaint. Cooley Br. at 32-35; Paul Weiss Br. at 11-16; Beal Br. at 11-12. Badges of fraud, however, "are essentially beside the point" where, as here, "the plaintiff makes specific factual allegations, in a non-conclusory fashion, of a [debtor]'s actual intent to defraud its creditors." *Drivetrain, LLC* v. *X. Com., Inc.*, No. AP 22-50448, 2023 WL 1804627, at *3 (Bankr. D. Del. Feb. 7, 2023). As described below, the Complaint more than adequately alleges that (i) the FTX Insiders, both generally and with respect to the Embed Acquisition, actually intended to defraud creditors and, in any event (ii) the Embed Acquisition involved sufficient "badges of fraud" from which to infer the FTX Insiders' actual intent to hinder, delay or defraud creditors.

A.    **The Complaint Directly Alleges Actual Fraudulent Intent, Rendering "Badges of Fraud" Unnecessary.**

It is well-established that transfers "driven by a desire to stay in business," or made to "create a façade that [the] Debtor was running a successful business," support an inference of actual fraud.  *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 664, 667 (7th Cir. 2013); *see also Drivetrain, LLC*, 2023 WL 1804627, at *1, *4.  Such is the case here.

The Complaint alleges that the FTX Insiders used Alameda to siphon billions of dollars from the FTX.com exchange (i) to enrich themselves, (ii) to make political and "charitable" contributions aimed at increasing the FTX Group's influence, and (iii) to finance acquisitions that would project an image of growth and expand the FTX Group's business into new markets. Compl. ¶¶ 26, 27, 32; Ex. A ¶ 9.  To keep the scheme afloat and avert suspicion, the FTX Insiders needed constant access to new capital (whether in the form of additional customer deposits or capital raises) to satisfy customer withdrawal requests, fund their pet projects, and repay loans— including billions of dollars in "short-term and open-term loans" that Alameda took from external lenders to finance its "illiquid venture investments" and "loans" to the FTX Insiders.  Compl. ¶¶ 33-35; Ex. C (Ellison Plea Tr.) at 27:19-25; Ex. B at 29:13-19; Ex. D (Wang Plea Tr.) at 24:11-19.  The Complaint alleges that, to cover their tracks, the FTX Insiders falsified financial statements, inflated revenues, and concealed their misconduct by intentionally obscuring the relationship between Alameda and FTX.  Compl. ¶¶ 34, 66, 67; Ex. B at 29:13-19; Ex. C at 28:9-16.  Then, to forestall deception and prolong the fraud, the FTX Insiders caused the FTX Group to engage in transactions such as the Embed Acquisition to create the appearance of growth and profitability and to expand the scope of the fraud.  Compl. ¶¶ 28, 49; Ex. A ¶ 9; Ex. B at 29:13-15. The true nature and purpose of these transactions was similarly disguised.  Compl. ¶ 53.  The FTX

Insiders privately acknowledged that they were keeping up a charade of the FTX Group's legitimacy and had been doing so "for a long time." *Id.* ¶ 36 (quoting Ex. A ¶ 53).

As alleged in the Complaint, the Embed Acquisition was an important aspect of the FTX Insiders' efforts to perpetuate their fraudulent scheme. In June 2022, around the time FTX signed the Merger Agreement with Embed, turmoil in the crypto market caused Alameda's external lenders to recall funds the company had used for "large illiquid venture investments" and loans to the Insiders. *Id.* ¶¶ 34, 65; Ex. C at 27-28. In response, the FTX Insiders agreed that Alameda would "borrow several billion dollars from FTX to repay those loans." Ex. C at 28:1-2; *see also* Compl. ¶ 66. Subsequently, from July to September 2022, as the FTX Group awaited regulatory approval of the Embed Acquisition, Bankman-Fried and other insiders provided misleading financial statements to lenders to conceal the relationship between FTX and Alameda and the extent of Alameda's borrowing. Compl. ¶ 34. If the FTX Insiders had not taken steps to conceal the FTX Group's true financial condition, lenders and customers would have discovered that the FTX Group could not satisfy its obligations. *See* Ex. A ¶ 9.

This Court's recent decision in *Drivetrain, LLC* v. *X. Com., Inc.* is instructive with respect to fraudulent schemes that, like the one at issue here, "differ[] from the paradigmatic fraudulent conveyance action around which" the so-called badges of fraud on which Defendants fixate "were designed." 2023 WL 1804627, at *4. In *Drivetrain*, as here, "the allegation is not that the debtor was moving its assets into friendly hands where the creditors cannot reach them," but rather "that the transaction was part of an elaborate ruse that played a critical role in the debtor's larger fraudulent scheme." *Id.* In such circumstances, "it is not surprising that the allegations of the complaint do not involve many of the typical badges of fraud . . . [b]ut that hardly means that

the allegations of the complaint do not allege the kind of transaction that is covered by the fraudulent conveyance statute."[4] *Id.*

Here, as in *Drivetrain*, the fraudulent transfer was one piece "of an elaborate head fake" by the FTX Insiders "to trick investors [and customers] into believing that the company was . . . successful enough to afford [the Embed Acquisition]" and profitable enough to expand into new markets. *Id.* at *3. The Embed Acquisition, "therefore, served no other purpose but to allow [the FTX Insiders] . . . to perpetuate fraud on [the FTX Group's] . . . investors." *Id.* (internal quotation marks omitted). These "are sufficient allegations of an actual intent to defraud" without any reference to the usual badges of fraud.[5] *Id.*

For this reason, the Defendants' reliance on the out-of-circuit decision in *Sharp International Corp.* v. *State Street Bank & Trust Co.*, 403 F.3d 43 (2d Cir. 2005), is misplaced.

---

[4]       Such direct evidence of actual fraudulent intent renders traditional badges of fraud "essentially beside the point" because the badges of fraud act merely as a "substitute for direct evidence." *Id.*; *see also In re Millennium Lab Holdings II*, 2019 WL 1005657, at *3.

[5]       The Complaint also alleges that the FTX Insiders' fraudulent scheme operated as a *de facto* Ponzi scheme, thus giving rise to a presumption of actual intent to hinder, delay or defraud creditors. *See In re DBSI, Inc.*, No. 08-12687, 2011 WL 1810632, at *4 (Bankr. D. Del. May 5, 2011) (finding that courts may apply Ponzi presumption at pleading stage to infer actual intent); *see also In re Live Well Fin., Inc.*, 652 B.R. 699, 706 (Bankr. D. Del. 2023) (inferring actual intent where "Live Well's bond trading business had turned into a de facto Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims"). As described above, the FTX Insiders misappropriated capital from customers and investors to finance acquisitions designed to make the FTX Group look like a *bona fide* business. Then, having depleted the misappropriated funds, the FTX Insiders needed still more new capital to replace that which they had stolen. To cover up this shortfall, the FTX Insiders falsified financial statements, misrepresented revenues, and concealed true intra-company relationships. Inevitably, as Ellison acknowledged, the FTX Insiders' inherently unsustainable scheme came to a screeching halt. Embed was one transaction that the FTX Insiders used to portray the image of a prosperous enterprise to customers and investors. Accordingly, the Court may presume the required actual intent based on the well-pled allegations giving rise to an inference that the Embed Acquisition formed part of the FTX Insiders' Ponzi-like scheme. *In re Manhattan Inv. Fund*, 397 B.R. 1, 11-13 (S.D.N.Y. 2007); *see also In re Live Well Fin., Inc.*, 652 B.R. at 706.

*See* Cooley Br. at 31.  Unlike the Embed Acquisition, the *Sharp* decision involved the repayment of a routine loan that plaintiffs inadequately alleged was connected to the larger fraud at issue in the bankruptcy.  *Id.* at 56 (holding that "[t]he fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not" the loan repayment).  As described above, the Embed Acquisition was part and parcel of the FTX Insiders' fraudulent scheme, and was intended to garner more customers whose money they could misappropriate.[6]

\*      \*      \*

Defendants present a false dichotomy whereby the fraudulent scheme alleged in the Complaint must be either (a) a "wholly implausible" scheme in which the FTX Group misappropriated funds only to "give the funds away" by overpaying for a "purportedly flawed securities trading platform" (Paul Weiss Br. at 12-13), or (b) a transaction in which the FTX Group acquired Embed for a "legitimate business purpose" (Paul Weiss Br. at 13; Cooley Br. at 32).  In doing so, Defendants (i) miss the larger fraudulent scheme that the Embed Acquisition was designed to advance, (ii) impermissibly demand that the Court draw unreasonable inferences *in their favor*, and (iii) misconstrue the Complaint, which alleges neither of these supposedly mutually exclusive alternatives.  Instead, the Complaint alleges that the FTX Insiders were engaged in a fraudulent scheme, that they needed to continue projecting a false image of profitability, growth, and legitimacy to sustain that scheme, and that the Embed acquisition was part of that scheme.  Compl. ¶¶ 26, 28, 34, 49; Ex. A ¶¶ 3, 5, 6, 9, 10, 12.  These allegations are sufficient to infer fraudulent intent as to transfers made in furtherance of the FTX Insiders' scheme. *Drivetrain, LLC*, 2023 WL 1804627, at *4 (finding that incurring obligations in order to project a

---

[6]     Courts have held that *Sharp* is inapposite where, as here, a "Plaintiff sufficiently ties [a] Debtor's fraudulent intent to the specific transfers at issue."  *In re Live Well Fin., Inc.*, 2023 WL 3995900, at *14.

false image of profitability to investors and other creditors was, "as a matter of ordinary English . . . one in which the debtor sought to defraud its creditors").

Moreover, the notion that there was a purportedly "legitimate business purpose" for the Embed Acquisition misses the point. That the FTX Insiders acquired Embed with the naïve expectation, buoyed by Giles' unsubstantiated bluster, that Embed was a functioning platform that would allow the FTX Group to expand its operations and receive more customer money to further their fraudulent scheme in no way negates their intent to defraud creditors. Compl. ¶ 43 ("[Michael Giles] has to basically lie to get the deals he gets[.]"). The FTX Insiders *thought* they were buying a business that would enable them to expand their fraudulent scheme and continue to defraud their creditors. That they made a bad deal because "Embed's platform and technology had limited scope and features, and that it would take several years and significant resources to build Embed into an enterprise-grade company," *id.* ¶ 61, does not negate their fraudulent intent. *See In re Maxus Energy Corp.*, 641 B.R. 467, 529 (Bankr. D. Del. 2022) (holding that "mixed intents are sufficient to find actual intent to defraud, hinder, or delay"). In any event, such an analysis is inappropriate at the motion to dismiss stage, where it is premature to evaluate disputed issues of material fact and weigh credibility.

**B.      The Complaint Also Alleges "Badges of Fraud" That Support an Inference of Fraudulent Intent.**

Even if it were necessary to consider whether the Embed Acquisition was tainted by badges of fraud, Plaintiffs' well-pled allegations point to at least two badges that this Court has sound sufficient to plead actual intent to defraud. In particular, the Complaint alleges (i) that each Plaintiff was insolvent at the time the transfers were made, and (ii) that Defendants did not give reasonably equivalent value in exchange for the transfers. *See In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 (courts look to allegations of insolvency and lack of reasonably equivalent value

as "badges of fraud"); *Drivetrain, LLC*, 2023 WL 1804627, at *3; *In re J & M Sales, Inc.*, 2021 Bankr. LEXIS 2268, at *88-89 (looking to aggregate solvency of debtors' estates on motion to dismiss). Of course, "the presence or absence of any one badge of fraud is not dispositive and courts are free to consider additional factors as well as other allegations in the complaint." *In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15; *see also Drivetrain, LLC*, 2023 WL 1804627, at *4 ("Neither the presence nor absence of any particular badge is dispositive.").

The Complaint clearly alleges that Alameda, WRS and WRSS each was insolvent when the transfers at issue were made. Ellison admitted in connection with her guilty plea "to provid[ing] materially misleading financial statements to Alameda's lenders . . . that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties" and that Alameda needed "to borrow several billion dollars from FTX" in June 2022, before the Embed Acquisition closed, because "loans were recalled by Alameda's lenders." Compl. ¶ 66; Ex. C at 28:9-16, 27:25-28:2. Singh additionally conceded that, when the Embed Acquisition transfers were made, Alameda "could not repay what it owed." Compl. ¶ 65; Ex. B at 29:2-3. A November 2022 reconciliation—an attempt to account for the FTX Insiders' rampant misuse of FTX Group funds—further underscored that WRSS had a shortfall of assets "below its liabilities of approximately $46 million," Compl. ¶ 64, while a preliminary post-petition analysis indicates that shortfall may have been as much as $128 million. *Id.*

These same allegations underscore that the FTX Group (including the Plaintiffs) as a whole failed to "properly account for their assets and liabilities" and were insolvent when the relevant transfers were made. *In re DBSI*, 447 B.R. 243, 248 (Bankr. D. Del. 2011) (improper accounting probative of insolvency); *see* Compl. ¶ 64; *see also* First Day Declaration ¶ 56-57

(expressing concern with reliability of purportedly audited financial statements, and noting the lack of availability of audited financial statements); Ex. C at 28:10-12 ("I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders."); Ex. B at 29:13-19 ("I took actions to make it appear that FTX's revenues were higher than what they were" . . . [and] provided that misleading information to auditors."). At this stage, these allegations are assumed to be true and viewed in the light most favorable to Plaintiffs. *See In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 270 (Bankr. D. Del. 2019) ("Insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss.").

As discussed below (*see infra* Section III), the allegations of the Complaint also support an inference that Plaintiffs did not receive reasonably equivalent value in exchange for the transfers at issue. After engaging in minimal diligence, the FTX Insiders agreed to pay $220 million for a fledgling company with almost no revenue, few customers, and technology Giles himself knew was "experiencing multiple issues per day." Compl. ¶¶ 41, 44. Embed's lack of value was confirmed mere months later by Giles' paltry $1 million bid for the company during the Debtors' sale process. *Id.* ¶ 59. An additional bidder similarly submitted a final bid of merely $250,000 for Embed. *Id.* ¶ 60. In any event, value is a fact question, and Defendants cannot litigate the merits of their "value" defense on a motion to dismiss. *In re Charys Hldg. Co.*, 443 B.R. 628, 638 (Bankr. D. Del. 2010) ("[R]easonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

## III.   WHETHER PLAINTIFFS RECEIVED "REASONABLY EQUIVALENT VALUE" IS A FACT QUESTION THAT CANNOT BE RESOLVED ON A MOTION TO DISMISS, AND DEFENDANT GILES' $1 MILLION BID SHOWS THAT PLAINTIFFS DID NOT RECEIVE SUCH VALUE.

Defendants argue that Plaintiffs' constructive fraudulent transfer claims under federal and state law fail because Complaint does not adequately "plead[ed] facts showing that

there was a transfer for less than reasonable equivalent value at the time of the transfer." Cooley Br. at 35. The question of reasonably equivalent value is a fact-intensive inquiry that cannot be decided on a motion to dismiss. And, as described below, Plaintiffs have pled more than they need to plead at this stage.

"[A]ll that is needed" to plead a constructive fraudulent transfer claim under federal and state law "is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent." *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 856 (Bankr. D. Del. 2018) (internal quotation marks and citation omitted). The question of whether a debtor received "'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss." *In re Qimonda Richmond, LLC*, 467 B.R. 318, 327 (Bankr. D. Del. 2012); *see also In re Charys Hldg. Co., Inc.*, 443 B.R. at 638 ("In sum, reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

Nevertheless, the Complaint adequately pleads that Plaintiffs did not receive reasonably equivalent value at the time of the transfers because:

- the Embed platform was riddled with so "many bugs" and "issues with tech" that Giles was afraid the deal with WRS would "blow up." Compl. ¶ 41;

- the Embed platform was incapable of handling "any" new accounts, let alone the 10,000 new accounts that it would need to handle at the time FTX Stocks launched, and that Giles "has to basically lie to get the deals he gets." *Id.* ¶¶ 42-43;

- Plaintiffs paid $220 million to acquire Embed, which "had total assets of approximately $37 million and a mere $25,000 in net revenue." *Id.* ¶ 44;

- Giles received a $55 million retention payment to remain with Embed for only sixteen additional weeks (amounting to $490,000 per day) until the deal closed, which caused an Embed shareholder to remark that he "ha[d] never seen so much of a deal this size go to a founder . . . just *unusual proportions*." *Id.* ¶¶ 45-46 (emphasis added); and

- only months after Plaintiffs paid $220 million for Embed, ten bidders dropped out of the bankruptcy sale process after conducting due diligence, and only two bids

-19-

were received:  one for $250,000 and Giles' own bid for $1 million—less than 1% of what he personally received from selling Embed.  *Id.* ¶¶ 60, 62.[7]

## IV.    DEFENDANTS' REFERENCES TO PURPORTED AFFIRMATIVE DEFENSES ARE NOT APPROPRIATE GROUNDS FOR DISMISSAL AT THIS STAGE.

"[A]n affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d at 277; *see also Deckard* v. *General Motors Corp.*, 307 F.3d 556, 560 (7th Cir.2002) (finding motion to dismiss "improper" because "the existence of a defense does not undercut the adequacy of the claim"); *In re The Brown Schs.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) ("the determination of the viability of [an affirmative] defense is not proper" on motion to dismiss).  Despite this guiding principle, Defendants spill significant ink attempting to rewrite the Complaint's allegations, and ask this Court to rule on a number of affirmative defenses that raise factual disputes at this early stage of the case.  These arguments cannot justify dismissal of the case.  *See In re Am. Home Mortg. Holding*, 458 B.R. 161, 172 (Bankr. D. Del. 2011) (to succeed on motion to dismiss, "[t]he affirmative defense must show with 'certainty that the plaintiff would not be entitled to relief under any statement of facts which could be proved in support of the claim'" (quoting *Cont'l Collieries* v. *Shober*, 130 F.2d 631, 635 (3d Cir. 1942)).

### A.    Defendants' Arguments About the Securities Safe Harbor Under Section 546(e) Are Foreclosed by Controlling Supreme Court Precedent and Lack Factual Support in Any Event.

Defendants urge this Court to dismiss Plaintiffs' constructive fraudulent transfer and state law fraudulent transfer claims based on the affirmative defense of the securities safe

---

[7]    Although Defendants attack as "irrelevant" bids made during the bankruptcy sale process (Cooley Br. at 35), the Delaware Court of Chancery has observed that such post-acquisition allegations provide "sucker insurance" as to value and need not be ignored by courts of equity.  *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 811 n.177 (Del. Ch. 2011), *aff'd sub nom. Americas Mining Corp.* v. *Theriault*, 51 A.3d 1213 (Del. 2012).

harbor in section 546(e) of the Bankruptcy Code.  Cooley Br. at 39; Paul Weiss Br. at 16; Beal Br. at 7-10.  That section provides, in pertinent part, that a trustee may not avoid, except under section 548(a)(1)(A), a transfer that is (i) a "settlement payment . . . made by or to (or for the benefit of) a . . . financial institution," or (ii) "made by or to (or for the benefit of) a . . . financial institution. . . in connection with a securities contract." 11 U.S.C. § 546(e).  Section 101(22) (cross referenced by section 546(e)) defines "financial institution" to include the financial institution's "customer" when the financial institution is "acting as agent or custodian for" that customer "in connection with a securities contract." 11 U.S.C. § 101(22).  Relying on out-of-circuit precedent, Defendants argue that they can hide behind this safe harbor here because the Merger Agreement happened to designate a financial institution, Western Alliance Bank, as WRS's exchange or escrow agent in connection with the acquisition, which Defendants say means that WRS should be deemed a "financial institution" under section 101(22).

This argument is unavailing for at least two reasons.  *First*, the Supreme Court's decision in *Merit Mgmt. Grp., LP*, 138 S. Ct. at 896-97, makes clear that transfers through financial institution intermediaries as part of an overarching avoidable transfer do not bring that transfer within the protections of section 546(e).  *Second*, Defendants' out-of-circuit authority, *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66 (2d Cir. 2019), is irreconcilable with *Merit Management*.  But even leaving that aside, *Tribune* does not help Defendants, because the contract on which they rely indisputably shows that Western Alliance Bank was *not* acting as an "agent" under section 101(22) for WRS or any other party.

### 1.    *Merit Management* Forecloses Defendants' Section 546(e) Argument.

In *Merit Management*, the United States Supreme Court held "that the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid." 138 S. Ct. at 893.  In so doing, the Supreme Court expressly held that transfers

through financial institutions serving as intermediaries in an overarching transfer "are simply irrelevant to the analysis under § 546(e)." *Id.* at 895.

The relevant allegations here are indistinguishable from those in *Merit Management*, which controls. In *Merit Management*, one company agreed to acquire another in a merger. The merger agreement required a "branch of Credit Suisse to finance the $55 million purchase price." *Id.* at 891. Credit Suisse wired the $55 million merger consideration to Citizens Bank, "which had agreed to serve as the third-party escrow agent for the transaction." *Id.* The selling shareholders deposited their stock certificates into escrow, the buyer received the stock certificates upon closing, and Citizens Bank disbursed the $55 million to the selling shareholders. *Id.* After the buyer filed for bankruptcy, the trustee sued Merit Management (one of the selling shareholders) under section 548(a)(1)(B) to avoid the transfer it had received from buyer as part of the acquisition. *Id.* The Supreme Court unanimously held "that the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid," and that "the Credit Suisse and Citizens Bank component parts are simply irrelevant to the analysis under §546(e)." *Id.* at 888, 895.

Here, as in *Merit Management*, Plaintiffs seek to avoid transfers to the Defendants in their capacity as Embed shareholders—not transfers to or from Western Alliance Bank as escrow agent. Under the holding of *Merit Management*, the only transfers relevant here for purposes of section 546(e) here are the transfers from Plaintiffs to Defendants. Accordingly, the fact that those transfers passed through Western Alliance Bank, a financial institution, "is simply irrelevant to the analysis under §546(e)." *Id.* at 895-96. "The focus must remain on the transfer the [Plaintiffs seek] to avoid." *Id.* at 895.

This Court has consistently followed *Merit Management*, holding that section 546(e) does not apply to transfers through financial institutions acting as intermediaries. For example, when analyzing whether the safe harbor applied to a transaction where the debtor effectuated a merger through a financial institution serving as escrow agent, this Court held that "the important transaction under review is the transfer that the Trustee seeks to avoid" excluding any "component part[s] of that transfer" from the safe harbor analysis. *In re Centaur, LLC*, 595 B.R. 686, 695, 698 (Bankr. D. Del. 2018). Similarly, in *In re Live Well Financial, Inc.*, this Court clarified that "absent an argument that a plaintiff misidentified the transfer to be avoided, conduit financial institutions (*i.e.*, the banks Movants rely on here) are 'irrelevant.'" 2023 WL 3995900, at *14.

### 2. *Tribune* Is Directly Contrary to *Merit Management*, But Defendants' Factual Arguments Are Unavailing Even Under *Tribune*.

Defendants ignore the Supreme Court's decision in *Merit Management* and, in their effort to invoke the protection of section 546(e), focus instead on the Second Circuit's decision in *Tribune*. Cooley Br. at 42-43; Paul Weiss Br. at 20; Beal Br. at 9 n.12. In *Tribune*, the Second Circuit held that Tribune Media Company was a "financial institution" under section 546(e) because it had retained Computershare Trust Company, N.A., a "financial institution," to act as "Depositary" in connection with a leveraged buyout to "pay the tendering shareholders" the merger consideration. 946 F.3d at 78, 80. According to the Second Circuit, because Tribune was a customer of Computershare (a "financial institution"), and Computershare acted as Tribune's agent in relation to the overarching transfer from Tribune to the tendering shareholders that the plaintiffs sought to avoid, Tribune itself was a "financial institution" under section 101(22). *Id.* at 80.

As a threshold matter, *Tribune* directly conflicts with the Supreme Court's holding in *Merit Management*. As the Solicitor General of the United States observed, *Tribune*'s understanding of the definition of financial institution "would render *Merit Management* a virtual nullity."[8] Indeed, the Solicitor General further pointed out that under the Second Circuit's reasoning in *Tribune*, "the *Merit Management* transaction likely fell within Section 546(e) because at least one party to the transfer was a customer of Credit Suisse or Citizens Bank, and those financial institutions were retained to effectuate certain aspects of the transaction."[9]

Faced with similar circumstances, this Court has correctly followed *Merit Management*. In *In re Live Well Financial, Inc.*, decided after *Tribune*, this Court rejected the argument that mutual releases under a stock purchase agreement could not be avoided because "the transfers were clearly made through financial institutions." 2023 WL 3995900, at *14. Finding that this argument "relie[d] on outdated cases," the Court held that "conduit financial institutions (i.e., the banks Movants rely on here) are 'irrelevant to the analysis under § 546(e).'" *Id.* (quoting *Merit Mgmt.*, 138 S. Ct. at 895). Defendants fail to explain why this Court should reach a different result here.

Other courts also have observed that the Second Circuit's decision in *Tribune* "would result in a complete workaround of *Merit Management*, which opined that the safe harbor provision does not insulate a transfer simply because a qualified intermediary acted as a mere

---

[8]    Brief for the United States as Amicus Curiae at 19, *Deutsche Bank Trust Company Americas* v. *Robert R. McCormick Foundation*, No. 20-8 (2021), available at https://www.supremecourt.gov/DocketPDF/20/20-8/171849/20210312182244408_20-8%20DeutscheBank.pdf. Although the Solicitor General urged the Court not to grant certiorari because no other Circuit had yet opined on the novel issue, she made clear that the United States viewed the *Tribune* decision as incompatible with *Merit Management* and legally incorrect. *See id.* at 19-22.

[9]    *Id.* at 20.

conduit." *In re Greektown Holdings, LLC*, 621 B.R. 797, 827 (Bankr. E.D. Mich. 2020). Such a broad interpretation of section 546(e) would insulate tendering shareholders in any merger transaction from potential avoidance actions wherever a financial institution is inserted into the middle of the transaction as a conduit, thereby dramatically expanding the safe harbor and rendering the Supreme Court's decision in *Merit Management* a nullity.

Even if *Tribune* applied here, however, it would not avail Defendants of the protections of section 546(e). Leaving aside that Defendants impermissibly seek a factual determination, on a motion to dismiss, that an agency relationship under section 101(22) existed between Western Alliance Bank and WRS, Defendants' proffered factual support actually forecloses their defense.

In *Tribune*, the court defined "agent" in section 101(22) based on its common-law meaning: "[a]gency is the *fiduciary relationship* that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." 946 F.3d at 79 (citing RESTATEMENT (THIRD) OF AGENCY §1.01 (emphasis added)). The finding of an agency relationship "depends on the presence of factual elements," not the labels applied by the parties or the contract. *Lang* v. *Morant*, 867 A.2d 182, 186 (Del. 2005). As a result, whether an agency relationship exists "is thus a question usually reserved to the factfinder." *Id.*; *see also In re DBSI, Inc.*, 468 B.R. 663, 675 (Bankr. D. Del. 2011).

Although nominally referred to as the "Exchange Agent" in the Merger Agreement, the Form of Escrow Agreement between WRS and Western Alliance Bank on which Defendants rely expressly states that Western Alliance Bank was not "acting as agent or custodian for" WRS. 11 U.S.C. § 101(22); *see also* Beal Br., Ex. 1 at 211. That Form of Escrow Agreement also

provides that Western Alliance Bank "shall be obligated only to perform the duties specifically set forth in this Agreement, which shall be deemed **_purely ministerial_** in nature, and shall **_under no circumstances_** _be deemed to be **a fiduciary**_ to any Party or any other person." Beal Br., Ex. 1 at 211 (emphasis added). Thus, even if _Merit Management_ were not dispositive, the very agreement that Defendants rely on for their section 546(e) argument shows that they have no defense under that provision. The contractual arrangement between WRS and Western Alliance, by its very terms, did not create an agency relationship. _See In re NHI, Inc._, 320 B.R. 563, 570 (Bankr. D. Del. 2005) (holding that "[t]he plain language of the allegations in the Complaint does not support the conclusion that [bank] in any way controlled Defendants or that any party expressly or impliedly consented to an agency relationship"); _McCrann_ v. _RIU Hotels S.A._, No. 09 CIV. 9188 CM, 2010 WL 5094396, at *3 (S.D.N.Y. Dec. 6, 2010) ("But not every business contract creates an agency relationship; in fact, most do not." (citing Restatement (Third) of Agency § 1.01 cmt. g (2010))).

### B.   Defendants' Arguments Under Section 550 Are Premature and Contradict the Complaint's Well-Pled Allegations.

Defendants attempt to rewrite the Complaint's clear allegations in an effort to transform themselves into subsequent transferees under section 550(a), and also argue that their self-described good faith should be credited as a matter of law. As with many other arguments Defendants advance in their motions, these arguments are premature and directly contradicted by the Complaint's well-pled allegations.

### 1.   The Complaint Adequately Alleges That Defendants Are Initial Transferees.

Defendants' arguments that they are subsequent transferees of an initial transfer from FTX.com to Alameda to WRSS to WRS and a subsequent transfer to Defendants is contrary to the well-pled allegations of the Complaint, which must be taken as true on a motion to dismiss.

Under section 550(a) of the Bankruptcy Code, Plaintiffs may recover an avoided transfer either from an "initial transferee" or from "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). Defendants seek to rewrite the allegations of the Complaint and convince the Court that they are subsequent transferees, but that effort is unavailing. *See* Cooley Br. at 24.

The Complaint *does not* allege any initial transfer from FTX.com to Alameda. Rather, as discussed above in Section I above, the Complaint unambiguously alleges that the funds for the Embed Acquisition were transferred to Defendants from bank accounts in the names of Plaintiffs Alameda, WRSS and WRS, thereby making Defendants the initial transferees of the fraudulent transfers. Compl. ¶¶ 27, 49, 52-53. Defendants' attempt to reframe the allegations of the Complaint to introduce an allegedly omitted "initial" transfer from FTX.com to Alameda is contrary to well-settled law that the allegations of the Complaint must be accepted as true, with all reasonable inferences drawn in the *Plaintiffs'* favor on a motion to dismiss. *Black*, 835 F.3d at 364 (3d Cir. 2016); *see also Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*, No. 06-607, 2007 WL 1202760, at *3 n.4 (W.D. Pa. Apr. 12, 2007) ("Allowing the Defendants to reformulate [plaintiff]'s causes of action, however, would be inconsistent with both, (a) the rule that the Plaintiff is the master of its complaint, and (b) the court's obligation to take [plaintiff]'s allegations as true and construe facts in its favor."). Moreover, the Defendants' mischaracterized version of the Complaint would *still* mean the Defendants are initial transferees of the fraudulent transfers. *See* Cooley Br. at 5 (because the money came from FTX.com, Plaintiffs were "mere conduits"); *see also In re FBI Wind Down, Inc.*, 614 B.R. 460, 500 (Bankr. D. Del. 2020) (a party "who act[s] as a mere conduit in receiving a transfer solely for another and not for their own benefit" is not an "initial transferee").

-27-

In any event, as discussed below, whether Defendants are initial or subsequent transferees is irrelevant for purposes of the instant motions, and accordingly the Court need not reach the issue.

> **2.** **Defendants Cannot Obtain Dismissal at the Pleading Stage Based on the Purported Affirmative Defense That They Received the Transfers in Good Faith.**

Defendants urge this Court to credit their self-professed "good faith" in receiving the fraudulent transfers from Plaintiffs as a basis for dismissing the Complaint at the pleading stage. Cooley Br. at 24; Alumni Ventures Br. at 4. Defendants are wrong.

As an initial matter, "good faith is an affirmative defense under [both] Sections 548 and 550" of the Bankruptcy Code. *In re Bernard L. Madoff Investment Securities LLC*, 12 F.4th at 196; *see also In re Am. Tissue, Inc.*, No. 01-10370, Adv. No. 06-50929, 2007 WL 4178949, at *5 (Bankr. D. Del. Nov. 20, 2007). Defendants concede as much. *See* Cooley Br. at 28 (conceding that "the majority view [is] that section 550(b) is an affirmative defense"); Cooley Br. at 26 (citing *Kelly* v. *Opportunity Fin., LLC*, 562 B.R. 391, 401 (Bankr. D. Minn. 2016), which held that the 'for value' and 'in good faith' aspects of section 550 are affirmative defenses).

Because good faith is an affirmative defense, once the trustee has avoided a transfer, "the burden is on the defendant-transferee to plead and establish facts to prove the defense" of good faith. *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *9; *see also* 5 COLLIER ON BANKRUPTCY 550.03[05] ("once the trustee has avoided a transfer. . . the transferee has the burden to show that it took . . . for value, in good faith and . . . without knowledge of the voidability of the transfer."). The determination of whether the transferee has taken in "good faith" under section 548(c) or 550(b) requires "a fact-intensive inquiry" that must "be determined on a case-by-case basis." *See In re Bernard L. Madoff Investment Securities LLC*, 12 F.4th at 195; *see also In re Bernard L. Madoff Inv. Sec. LLC*, No. 20-cv-02586, 2022 WL 1304589, at *3 (S.D.N.Y. May 2,

2022) (good faith is a fact-based determination that "can only be made based on the entirety of the factual record after discovery[,] not from . . . inferences Appellees improperly seek to have drawn in their favor" (internal quotation marks and citation omitted)).  Defendants' attempt to rely on their supposed good faith fails for this reason.

## V.  THE COMPLAINT STATES A CLAIM FOR AVOIDANCE OF THE RETENTION PAYMENTS TO GILES AND OTHER FORMER EMPLOYEES.

The tens of millions of dollars in retention payments that the FTX Insiders gifted to Giles and promised to former Embed employees may be avoided under the Bankruptcy Code, and the Complaint more than adequately alleges that those payments and obligations are actually and constructively fraudulent.

### A.     The $55 Million Retention Payment to Giles is an Avoidable Preference.

Giles argues that the Plaintiffs' claim to recover the $55 million he received to stay at Embed until the closing of the acquisition should be dismissed because that payment was not on account of antecedent debt under section 547(b).  Cooley Br. at 45-46.  This is wrong.  The obligation to pay Giles this $55 million retention bonus was an unmatured or contingent debt at the time the Merger Agreement was executed and therefore qualifies as an antecedent debt.

Under the Bankruptcy Code, "debt" is defined as a "liability on a claim," with "claim" defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §§ 101(5), 101(12).  The Bankruptcy Code uses "the broadest possible definition of 'debt,'" *Crumpton* v. *McGarrity*, No. 8:11-cv-2649, 2012 WL 4466527, at *4 (M.D. Fla. Sept. 27, 2012), *aff'd sub nom. In re Northlake Foods, Inc.*, 518 F. App'x 604 (11th Cir. 2013), and the term "debt" applies "even if the claim is unliquidated, unmatured, unfixed or contingent." *In re Energy Coop., Inc.*, 832 F.2d 997, 1001 (7th Cir.1987);

*see also In re First Jersey Sec., Inc.*, 180 F.3d 504, 510 (3d Cir. 1999) (noting that the definition of "debt" includes "all legal obligations of the debtor, no matter how remote or contingent").

The obligation to pay Giles' $55 million retention bonus arose on June 10, 2022, when the Merger Agreement was signed.  Compl. ¶ 45.  The purpose of the bonus was to retain Giles as Embed's CEO through the closing of the acquisition.  *See id.*  As numerous courts have held, this type of contingent obligation created a debt at the time the Merger Agreement was signed.  In *Enron*, for example, the court considered whether a retention payment owed to a former employee under an earlier-signed employment agreement was paid on account of an antecedent debt.  *In re Enron Corp.*, 357 B.R. 32, 38 (Bankr. S.D.N.Y. 2006).  The court concluded that "[a] 'debt' was created at the time the [employment] agreement was signed" and preceded the relevant transfer because the employee "clearly did have an unmatured right to payment" of the retention payment at the time the employment agreement was signed.  *Id.* at 49.  Other courts have similarly held "that a debtor's debt is incurred and arises for Section 547(b)(2) purposes as soon as the debt exists, even [if] at that time it is still a contingent or unmatured debt."  *In re Dearborn Bancorp, Inc.*, 583 B.R. 395, 406 (Bankr. E.D. Mich. 2018); *see also In re PostRock Energy Corp.*, No. 16-11230, Adv. Pro. 18-01027, 2019 WL 137116, at *9 (Bankr. W.D. Okla. Jan. 8, 2019) ("This Court agrees with many courts that find that the 'debt' associated with bonus and retention plans arise when the contract, agreement or plan is formed and put in place rather than when the payment becomes due.").  Defendants fail to cite, let alone address or rebut, these cases.

**B.    The Obligations To Make Future Retention Payments to Former Embed Employees Are Also Avoidable.**

Defendants feign confusion over the timing of retention payments due to Embed employees and the concept that Plaintiffs can avoid obligations (as opposed to transfers) under the Bankruptcy Code and Delaware law.  Cooley Br. at 43-44.  The Complaint clearly alleges that

"numerous Embed employees were awarded retention payment agreements," which obligated them "to remain at Embed for two years after closing in order to receive their full bonuses." Compl. ¶ 47. The Complaint also alleges that those "bonuses are to be paid in five installments beginning on September 30, 2023." *Id.* ¶ 47 n.5. By their terms, sections 544(b), 548(a)(1)(A) and 548(a)(1)(B), and their state-law counterparts, allow Plaintiffs to avoid "any obligation incurred by the debtor." *See* 11 U.S.C. §§ 544(b), 548(a)(1)(A), 548(a)(1)(B). As is clear from the face of the Complaint, Plaintiffs seek to avoid the obligations to make future retention payments to Embed employees.

Defendants then assert that the "Incentive Agreements made clear that the obligation to make the post-closing retention payments lies with Embed, a non-Debtor, and that the exercise of that obligation does not require a transfer of Plaintiff' [sic] property." Cooley Br. at 44. But the agreements in fact state that *WRS* has an obligation to "cause [Embed] (***or, if applicable, another member of the FTX Group***) to pay or cause to be paid to Employee the Retention Incentive Payment." Cooley Ex. 2 at 2 (emphasis added). "FTX Group" is defined as "Buyer [WRS] and any of its Affiliates." Cooley Ex. 2 at 3. The retention agreements do not place any affirmative obligations on Embed itself to make retention payments; the retention payment obligations rest with WRS. Thus, the retention payment obligations are obligations that Plaintiffs may avoid.

Defendants' assertion that the retention payment obligations are neither actually or constructively fraudulent fail for the reasons explained above (*see supra* Sections II and III). The retention payments were an integral part of the overall Embed Acquisition, which the FTX Insiders used as part of their attempt to hinder, delay and defraud Plaintiffs' creditors and pursuant to which

Plaintiffs did not receive reasonable equivalent value.  For those reasons, any obligation Plaintiffs may have under these retention agreements can be avoided.

## VI.   BECAUSE PLAINTIFFS HAVE ADEQUATELY PLED AVOIDANCE CLAIMS, DEFENDANTS CANNOT EVADE PLAINTIFFS' SECTION 502(d) DISALLOWANCE OR SECTION 550 RECOVERY CLAIMS.

Defendants seek dismissal of Plaintiffs' section 502(d) disallowance and section 550 recovery claims based on their argument that all of Plaintiffs' substantive avoidance claims fail.  Cooley Br. 47; Paul Weiss Br. 24-25.  As demonstrated above, however, Plaintiffs have adequately pled all of their substantive claims.  Each of Plaintiffs' section 502(d) and section 550 claims "may become 'cognizable' after the fraudulent transfer claims are prosecuted to conclusion," because "the Section 502(d) claim is legitimately joined with the Plaintiffs' other claims . . . and is not subject to dismissal for failure to state a claim."  *In re Com. Fin. Servs., Inc.*, 322 B.R. 440, 452 (Bankr. N.D. Okla. 2003); *see also In re NWL Holdings, Inc.*, No. 08-12847, Adv. No. 10-53535, 2013 WL 2436667, at *8 (Bankr. D. Del. June 4, 2013) (denying dismissal of section 502(d) claim where complaint alleged fraudulent transfers); *see also In re S. Produce Distributors, Inc.*, 616 B.R. 667, 672 (Bankr. E.D.N.C. 2020), *aff'd sub nom. Adams* v. *S. Produce Distributors, Inc.*, No. 7:20-cv-53, 2022 WL 1055434 (E.D.N.C. Mar. 28, 2022) (holding section 502(d) claim "in abeyance pending the outcome of the six adversary proceedings trials").

## VII.   THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND THE COMPLAINT IF IT GRANTS DEFENDANTS' MOTIONS.

For the reasons discussed above, the Court should deny Defendants' motions in their entirety.  If, however, the Court grants the motions in whole or in part, the Court should grant Plaintiffs leave to amend the Complaint.

Federal Rule of Civil Procedure 15(a)(2), made applicable by Federal Bankruptcy Rule 7015, provides that where a party seeks leave to amend, "[t]he court should freely give leave

when justice so requires." Fed. R. Civ. P. 15(a)(2).  This reflects the "principle that the purpose

of pleading is to facilitate a proper decision on the merits.'" *Foman* v. *Davis*, 371 U.S. 178, 182

(1962).  "The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure

that 'a particular claim will be decided on the merits rather than on technicalities.'" *Robinson* v.

*Beckles*, No. CV 10-362-SLR, 2012 WL 13206064, at *1 (D. Del. Mar. 20, 2012) (quoting *Dole*

v. *Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990)).  "If the underlying facts or circumstances

relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity

to test his claim on the merits." *Foman*, 371 U.S. at 182.  A court's denial of leave to amend a

potentially viable claim requires a "justifying reason," including "undue delay, bad faith or dilatory

motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc." *Id.*  None of these reasons is present here.

   The Debtors continue to investigate the wide-ranging fraudulent scheme that led to

the FTX Group's collapse and the Chapter 11 Cases.  This investigation has included further

examination of the Embed Acquisition, including Embed's value at the time of the closing,

Defendants' knowledge of the fraudulent scheme, and the FTX Insiders' intent to use the Embed

Acquisition to hinder, delay, or defraud the FTX Group's creditors.  As a result, if given leave to

amend upon dismissal of any of their claims, Plaintiffs could plead additional facts in an amended

Complaint on various subjects, including the following:

- At the direction of the FTX Insiders, the FTX Group funneled customer deposits and withdrawals of fiat currency through bank accounts of Alameda.  At the same time, also at the FTX Insiders' direction, the FTX Group used those accounts for many other purposes, commingling and misusing vast sums of customer and corporate funds in the process.  In short, the FTX Group made no meaningful distinction between funds deposited by customers, Alameda funds and the funds of other FTX Group entities.

- The FTX Insiders understood that the fraudulent scheme required continually burnishing the FTX Group's reputation as a stable and successful player in the crypto market, and pursued the Embed Acquisition in furtherance of maintaining this façade;

- The FTX Insiders understood that the fraudulent scheme also required continually obtaining new customer funds, and they expected that the Embed Acquisition would give them access to a larger pool of customer deposits that they could misappropriate;

- Embed employees understood WRS's need for the platform to scale, but knew that it was not prepared for the volume of accounts WRS hoped for;

- Embed employees had serious misgivings about Bankman-Fried and the control he exerted over FTX, following a meeting during which, among other things, he described leveraging assets in a way that Embed personnel perceived to be potentially illegal; and

- Third-party auction participants declined to submit final bids because Embed's platform required significant work, even though Embed employees viewed the platform as having only improved after the acquisition, and the only post-auction offer was for even less than Giles' $1 million bid.

Plaintiffs expect that they could cure any pleading deficiencies identified by the Court in its decision on Defendants' motions, and therefore request leave to file an amended Complaint if the Court dismisses any of their claims.[10]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss in their entirety. If the Court grants Defendants' motions in whole or in part, Plaintiffs respectfully request leave to replead.

---

[10] Plaintiffs are mindful of this Court's recent decisions holding that requests for leave to amend made in opposition briefs may be procedurally improper in some circumstances. *See In re Our Alchemy, LLC*, 642 B.R. 155, 172 (Bankr. D. Del. 2022); *In re Daily Bread Winddown, LLC*, No. 20-11266, Adv. No. 20-50775, 2022 Bankr. LEXIS 3078, at *12-13 (Bankr. D. Del. Nov. 1, 2022). If, upon dismissal of any of Plaintiffs' claims, the Court prefers that Plaintiffs file a separate motion for leave to amend stating the particular grounds on which amendment is sought and attaching the proposed amended complaint, Plaintiffs are prepared to do so promptly.

Dated: September 22, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
        dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*