## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES, *et al.*,[2] | |
| Defendants. | |

**AMENDED COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS
AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 548, AND 550 AND DEL.
CODE ANN. TIT. 6, §§ 1304 AND 1305, AND FOR
<u>DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502</u>**

Plaintiffs Alameda Research Ltd. ("<u>Alameda</u>"), West Realm Shires, Inc.

("<u>WRS</u>"), and West Realm Shires Services, Inc. ("<u>WRSS</u>") (together, the "<u>Plaintiffs</u>"), through

their undersigned counsel, for their Amended Complaint against Michael Giles and certain

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]    Due to the large number of Defendants (defined below) in this adversary proceeding, a complete list is attached hereto as **<u>Exhibit A.</u>**

former holders of equity of Embed Financial Technologies Inc. ("Embed")[3] (together, the "Defendants"), state as follows:

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding ("Adversary Proceeding") pursuant to Sections 105, 544, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfers were made or obligations incurred, all transfers of property of Plaintiffs and all obligations of Plaintiffs to Defendants made on or around September 30, 2022, prior to commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On November 22, 2022, the Court entered an order authorizing joint administration of the Chapter 11 Cases [D.I. 128].  Accordingly,

---

[3]      Defendants include former holders of Embed (a) shares, (b) options, and (c) simple agreements for future equity ("SAFEs").  Although SAFEs are entitlements to receive equity upon the occurrence of a future conversion event, Plaintiffs are categorizing SAFE holders as equity holders for purposes of this Amended Complaint for ease of reference.  A separate adversary proceeding was commenced against the following additional former Embed equity holders:  Rocket Internet Capital Partners II SCS, Rocket Internet Capital Partners (Euro) II SCS, GFC Global Founders Capital GMBH, GFC Global Founders Capital GMBH & Co. Beteiligungs KG Nr. 1, William Hockey Living Trust, and 9Yards Capital Investments II LP.

Plaintiffs have the authority to prosecute this Adversary Proceeding. The Debtors' Plan of Reorganization was confirmed on October 7, 2024. [D.I. 26029; D.I. 26404].

3.      Prior to the filing of the Chapter 11 Cases, Alameda was a cryptocurrency trading firm owned by Samuel Bankman-Fried and Zixiao "Gary" Wang. Caroline Ellison was initially co-CEO and later the sole CEO of Alameda. WRS was a Delaware holding company owned by Samuel Bankman-Fried, Nishad Singh, and Gary Wang, with a number of subsidiaries, including WRSS, which did business as FTX.US, the cryptocurrency exchange founded by Bankman-Fried, Singh, and Wang to offer cryptocurrency trading services to U.S. customers. Bankman-Fried, Singh, Wang, and Ellison are referred to collectively herein as the "FTX Insiders."

4.      From the inception of the FTX Group of companies,[4] Bankman-Fried orchestrated a fraudulent scheme that included using Alameda to secretly loot hundreds of millions of dollars of customer funds. *See* Trial Tr. at 1353:20-25, ECF No. 366, *United States* v. *Bankman-Fried*, No. 22-cr-673 (S.D.N.Y. Oct. 16, 2023). At the same time, Bankman-Fried caused Alameda to borrow staggering sums of money through "open-term" loans from third-party lenders—*i.e.*, loans that the lenders could call for Alameda to repay in full at any time. As of mid-2022, Alameda had borrowed approximately $10 billion from third-party lenders. As Bankman-Fried and his cohort plunged the FTX Group deeper and deeper into insolvency, Ellison grew increasingly concerned that a downturn in the markets would expose the FTX

---

[4]      The FTX Group is comprised of four silos. These silos include: (a) a group composed of Plaintiffs and Debtors WRS, WRSS, and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda, Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

Group's true financial condition to lenders, investors, and customers. Ellison's concerns were well founded.

5.      Beginning in 2022, the massive fraud Bankman-Fried and the other FTX Insiders were perpetrating, which centered around Alameda's Ponzi-like funding arrangement, came under severe pressure. Both external market forces and Bankman-Fried's own profligate spending were making it increasingly hard to meet cash flow needs at the FTX Group. By mid-2022, Alameda's debts to third-party lenders were mounting, and Ellison estimated that Alameda had "borrowed" approximately $8 billion in customer funds. To stave off impending collapse, Bankman-Fried desperately sought to maintain the illusion that the FTX Group was growing and profitable, and to project a false image of strength to the market. Bankman-Fried saw expansion into regulated financial markets—and the appearance of legitimacy it would bring to the FTX Group—as an essential part of his efforts to sustain and prolong his fraudulent scheme.

6.      Bankman-Fried knew that if there was a downturn in the crypto markets, and a realization on the part of lenders, customers, and investors that the FTX Group was in distress, the FTX Group would suffer a liquidity crisis and the fraud would be revealed. It was therefore imperative to lull lenders, customers, and investors into believing that the FTX Group was financially sound and successful enough to continue as a going—and growing—concern. In furtherance of Bankman-Fried's desire to cultivate this façade of legitimacy, Bankman-Fried and others acting at his direction began discussions on or about March 15, 2022 about the idea of WRS acquiring Embed, a stock clearing firm and FINRA licensed broker-dealer founded by Michael Giles.

7.      Almost immediately thereafter, however, the so-called "crypto winter" set in. This sustained period of depression in the cryptocurrency markets accelerated the FTX Group's

financial distress.  As a result, it became imperative to consummate the Embed acquisition quickly to perpetuate the false appearance that FTX Group was a successful and growing business.  Alameda's lenders began threatening to call, and in some cases calling, their open-term loans, and the FTX Insiders had to conceal the FTX Group's true financial condition from lenders to stave off further demands for repayment that would cause the FTX Group to collapse and the fraudulent scheme to be revealed.  Beginning in June 2022 and continuing until the last days of the FTX Group, Bankman-Fried directed Ellison to provide Alameda's lenders with falsified balance sheets that concealed the extent of Alameda's massive liabilities.

8.      The Embed acquisition was part and parcel of perpetuating the FTX Group's façade of solvency.  Given the FTX Group's urgent need for additional liquidity to survive the market downturn, it was essential that the FTX Group's lenders, customers, and investors did not suspect that the FTX Group was in financial distress.  Because Ellison's doctored balance sheets alone were not sufficient to keep the company afloat, Bankman-Fried urgently needed to dupe lenders, customers, and investors into loaning or contributing additional capital by getting them to believe that the FTX Group was solvent, stable, and growing.  Whether or not Embed was worth the purchase price of more than $200 million—it was not worth anything remotely approaching that inflated figure—was beside the point.  What mattered was that Bankman-Fried could advertise the acquisition of a U.S. licensed broker-dealer, and create the false appearance that the FTX Group was poised to enter a new phase of rapid growth.  Bankman-Fried hoped that the Embed acquisition would deceive lenders, customers, and investors into believing that the FTX Group was successful and profitable enough to afford the lofty acquisition price and expand into new markets.

9.      As the Embed acquisition progressed toward closing, the FTX Group's true financial condition continued to worsen, and Bankman-Fried knew that the FTX Group could not afford to part with the funds needed to acquire Embed.  Nevertheless, Bankman-Fried understood that backing out of the Embed transaction would deal a fatal blow to the FTX Group. He knew that any sign of weakness, including the apparent inability to close an announced deal, would signal to lenders, customers, investors, and the market as a whole that the FTX Group was in jeopardy as a result of the cryptocurrency contagion and declining market trends, which, in turn, would bring about calls for repayment of loans and the return of customer and investor funds, causing the FTX Group to collapse.

10.     Ultimately, when Singh directly confronted Bankman-Fried about his unbridled spending and the FTX Group's increasing financial distress in September 2022, Bankman-Fried refused to pull out of the Embed transaction despite knowing that the FTX Group was so far in the red that it could not afford to complete the acquisition, much less satisfy its outstanding debts and other financial obligations.

11.     WRS ultimately paid Defendants $236,764,105.34 of Alameda's funds to acquire Defendants' equity interests in Embed.  The transaction closed on September 30, 2022—mere weeks before the Petition Date.  To document the supposed "source" of these funds, the FTX Insiders executed a series of phony "loan" documents and misleading on-exchange transfers to create the appearance that Alameda had transferred $200 million to Bankman-Fried, Singh, and Wang, who then transferred that same amount to WRSS and onto WRS.  In reality, the $200 million was simply transferred from an Alameda bank account to a WRSS bank account and finally into a WRS bank account.  WRS also agreed, in "Retention Incentive Award Agreements" effective as of September 30, 2022, to pay certain Defendants who were Embed

employees retention bonuses totaling $63,550,000, with Defendant Giles receiving a $55,000,000 "retention" bonus in full on the September 30, 2022 closing date of the transaction—paying him simply to remain at his company only until, but not after, it was sold.

12.     When the FTX Group inevitably collapsed in November 2022, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with one way or another." *See* Superseding Indictment ¶ 53, ECF No. 115, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

13.     Plaintiffs have determined, based on their analysis and investigation to date, that all of the aforementioned transfers and obligations, which are detailed in **Exhibit A**, are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code.

14.     Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to Plaintiffs all property that they received in transfers that are determined by the Court to be avoidable and/or recoverable.

15.     During the course of this Adversary Proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiffs intend to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Defendants or any other transferee and accordingly reserve the right to further amend this Amended Complaint to include, without limitation:  (i) further information regarding any property or transfers, (ii) additional plaintiffs or defendants, (iii) modifications of and/or revision to the defendants'

names, and (iv) additional causes of action, if applicable, that may become known at any time during this Adversary Proceeding, through formal discovery or otherwise.

## THE PARTIES

16.     Plaintiff Alameda is a British Virgin Islands company limited by shares.  It is a wholly-owned subsidiary of Debtor Alameda Research LLC, a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Wang.

17.     Plaintiff WRS is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.

18.     Plaintiff WRSS, doing business as FTX.US, is a Delaware corporation and a wholly-owned subsidiary of Plaintiff WRS.

19.     Defendant Michael Giles is the founder of Embed and served as CEO of the company until February 2023.

20.     The remaining Defendants are certain former holders of Embed equity and former employees of Embed.  A complete list of the Defendants and the transfers and obligations relevant to each of them is set forth in **Exhibit A**.

## OTHER RELEVANT PERSONS

21.     Samuel Bankman-Fried is a co-founder of Plaintiff Alameda and was its sole director until September 6, 2022.  He is also a co-founder of Plaintiffs WRS and WRSS, and was previously the CEO and sole director of Plaintiff WRS.

22.     Caroline Ellison was the co-CEO of Plaintiff Alameda from August 2021 until September 2022, when she was named the sole CEO and director.

23.     Nishad Singh is a co-founder of Plaintiffs WRS and WRSS.

24.     Gary Wang is a co-founder of Plaintiffs Alameda, WRS, and WRSS.

## JURISDICTION AND VENUE

25.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

26.     This Adversary Proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

27.     The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

28.     This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

29.     Venue of this Adversary Proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

30.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

31.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**FACTUAL ALLEGATIONS**

**I.      The FTX Insiders Defrauded Lenders, Investors and Customers.**

32.      Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1]; and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1].

33.      The FTX Insiders, among others, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, private homes and jets, political and "charitable" contributions, and various investments.  This spending spree was funded through a Ponzi-like arrangement whereby the FTX Insiders caused Alameda to borrow significant amounts of funds from third-party lenders and to repay those funds as needed by "borrowing"—*i.e.*, misappropriating—customer funds and to "lend" money borrowed from third-party lenders and customers to the FTX Insiders.  By mid-2022, Alameda had borrowed approximately $10 billion from third-party lenders, in many cases through open-term loans that the lenders could call at any time.  The FTX Insiders' fraudulent misappropriation and misuse of customer and investor assets, and Alameda's

overextended positions both to FTX Trading Ltd. ("FTX.com") and third-party investors and

lenders, resulted in a recurring need to expand the FTX Group to perpetuate a myth of success

and growth, using after-obtained capital to satisfy earlier-incurred liabilities in Ponzi-like

fashion.  At Bankman-Fried's criminal trial, Ellison testified that the FTX Insiders planned to use

customer deposits (among other assets) to repay third-party lenders, should the need arise.  *See*

Trial Tr. at 726:11-18, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y.

Oct. 10, 2023).  She was concerned, however, that if the FTX Insiders "used FTX customer

money to repay lenders, then [they] would have no source to repay the FTX customer money

[they] had borrowed unless [they] were able to find new loans, or, you know, make a lot of

money or something."  *Id*.

34.     All of the FTX Insiders have either pleaded to or been found guilty of crimes

perpetrated through the very practices that facilitated the acquisition of Embed.  On

December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud,

conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to

commit securities fraud; Ellison also pleaded guilty to conspiracy to commit money laundering.

*See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

On February 28, 2023, Singh pleaded guilty to the same felonies as Ellison and to conspiracy to

make unlawful political contributions and defraud the Federal Election Commission.  *See* Min.

Entry, Feb. 28, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On

November 2, 2023, a jury of his peers found Bankman-Fried guilty of multiple felonies for

defrauding lenders, customers, and investors, including wire fraud and conspiracies to commit

wire fraud, commodities fraud, securities fraud and money laundering.  *See* Jury Verdict, Nov. 2,

2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On March 28, 2024,

Bankman-Fried was sentenced to 25 years in prison.  *See* Min. Entry, Mar. 28, 2024, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

35.      During Bankman-Fried's trial, Wang, Ellison, and Singh testified about how they carried out the fraudulent scheme, and revealed how precarious the FTX Group's financial position was in the months preceding the Petition Date—the same time period in which the FTX Group, at the FTX Insiders' direction, diverted funds that could have been used to pay creditors to acquire Embed, in furtherance of the FTX Group's fraudulent scheme.

36.      As early as 2020, and continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank accounts controlled by Alameda, without disclosing to the banks that held those accounts or to FTX.com customers the true nature of the relationship between FTX.com and Alameda.  Trial Tr. at 655:1-17, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 10, 2023).  Wang testified that he conspired with Bankman-Fried to commit wire fraud by giving "special privileges to Alameda on FTX which allowed it to withdraw unlimited funds from [FTX.com]" and "l[ying] about this to the public."  Trial Tr. at 304:12-16, ECF No. 356, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 5, 2023).

37.      Beginning in September 2021, as Ellison grew increasingly concerned with the escalating misappropriation of FTX customer assets, Ellison attempted to manually track Alameda's net asset value.  In February 2022, Ellison recorded that without "Sam coins"— speculative, illiquid, and volatile cryptocurrencies peddled by Bankman-Fried—Alameda's net asset value was negative $7.8 billion.  By this time, in addition to "borrowing" billions of dollars of customer funds, Alameda had also taken out billions of dollars in loans from third-party lenders.  One such lender—Genesis Global Capital ("Genesis")—had lent substantial amounts to

Alameda.  Like many of the loans that Alameda had taken, approximately $500 million of the Genesis loans were open-term loans that could be called by the lender at any time.

38.     Ellison estimated that, by the spring of 2022, Alameda had $10 billion in outstanding loans from third-party lenders, and she understood that a market downturn would leave Alameda unable to satisfy its obligations to its lenders, including lenders like Genesis. Ellison also understood that the failure to repay debts would expose the FTX Insiders' fraudulent scheme.  *See* Trial Tr. at 724:8-14, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 10, 2023).  In internal spreadsheets, Ellison calculated that, were Alameda to make an additional $3 billion of investments and the market soured, "[t]he probability that Genesis recalls our loans goes up from 15 percent to 25 percent; and the probability that we're unable to make those loans payments goes up from 30 percent to 100 percent," and "there was no way we would be able to make the payments," even assuming Alameda "would be able to borrow FTX customer funds to make those payments."  Trial Tr. at 725:7-20, ECF No. 358, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 10, 2023).  Ellison's fears soon were realized.

39.     On April 15, 2022, while the bottom was starting to fall out at FTX, WRS and Embed signed a "Memorandum of Terms" for the acquisition of Embed, which ascribed a wildly inflated $220 million enterprise value to Embed and provided for $75 million in retention bonus payments to Embed employees, including $55 million to Giles simply for remaining employed for a few months until—but not after—the company was sold.

40.     From May 7 to May 12, 2022, the price of TerraUSD—a cryptocurrency stablecoin—de-pegged from the dollar after a selloff of TerraUSD triggered a so-called "death spiral."  Catalyzed by the collapse of TerraUSD, cryptocurrency prices on a market-wide basis

dropped precipitously.  Against this backdrop, the Embed "Agreement and Plan of Merger" was signed on June 10, 2022—even though the FTX Insiders were well aware that FTX was unable to fund the acquisition other than with funds misappropriated from customers.

41.     On June 13, 2022, as cryptocurrency prices continued to plummet, Genesis recalled approximately $400 million in open-term loans that it had extended to Alameda.  That same day, the FTX Insiders created a spreadsheet in an attempt to quantify the staggering scope of their fraud.  That spreadsheet revealed that the FTX Insiders had caused Alameda to misappropriate $8 billion in customer funds.

42.     On June 17, 2022, Three Arrows Capital—a cryptocurrency hedge fund to which Genesis had significant exposure—announced that it had been severely impacted by the market downturn.  On June 18, 2022, Genesis requested "updated equity/balance sheet[s] etc" from Alameda.  Trial Tr. at 783:12-14, ECF No. 360, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 11, 2023).

43.     Ellison testified that, at the same time the terms of the Embed acquisition were being finalized, she conspired with Bankman-Fried to "provide materially misleading financial statements to Alameda's lenders"—including Genesis—"that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties."  Plea Tr. 28:9-16, ECF No. 19, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022).  Ellison also agreed with Bankman-Fried and others "not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement." *Id.* at 28:19-21.  Ellison testified that on June 19, 2022, only nine days after Embed Agreement and Plan of Merger was signed, she prepared a spreadsheet with seven different alternative balance sheets that she could provide to Genesis.  Trial Tr. at 786-87, ECF No. 360, *United*

*States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 11, 2023). The fake balance sheets were designed to hide Alameda's insolvency. As the market crisis worsened, Genesis called approximately $500 million more in open-term loans from Alameda.

44.   Ellison testified that in mid-June "Alameda had lost a lot of money in the cryptocurrency market downturn" and it "didn't have the liquid assets to pay all of the money back," and so would have to take the money using its special privileges from FTX. Trial Tr. at 761:14-21, ECF No. 360, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 11, 2023). Bankman-Fried discussed trying to obtain even more loans to raise new capital, which could be used to pay existing obligations. Trial Tr. at 1345:14-23, ECF No. 366, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 16, 2023).

45.   If Ellison had provided lenders with accurate information regarding Alameda's financial condition and its relationship with FTX, the FTX Group would have spiraled into collapse much sooner than November of 2022. The idea of revealing Alameda's true financial condition to Genesis caused Ellison to "worr[y] that they would share the information with other people in the crypto markets and that might cause more widespread concern about Alameda and could even cause people to start withdrawing their money from FTX." Trial Tr. at 785-86, ECF No. 360, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 11, 2023). But for Ellison's provision of false and misleading balance sheets to lenders, which was done with the approval and at the direction of Bankman-Fried, WRS could not have proceeded with the Embed acquisition.

46.   As Ellison continued to defraud Alameda's lenders, Bankman-Fried set out to raise additional capital from investors to try to address the $8 billion dollar hole the FTX Insiders had created in Alameda's books. The importance of portraying the FTX Group as a solvent,

stable, and legitimate business on the ascent was more important than ever.  As a corollary, pulling out of the Embed acquisition would mean sudden death—any apparent weakness would cause a "bank run," exposing the FTX Insiders' wrongdoing.  And so, even as the FTX Group's true financial condition continued to deteriorate behind the scenes, Bankman-Fried rushed ahead with the Embed acquisition, wildly overpaying with money FTX did not have.

## II.    Minimal Due Diligence and Inflated Retention Bonuses Led to Severe Overpayment to Defendants.

47.    Bankman-Fried directed WRS representatives to acquire Embed at the end of March 2022, when Giles visited FTX headquarters in The Bahamas.  While there, Giles wrote to a senior Embed employee that the President of FTX.US had told him that they were empowered to write a check to acquire Embed "tomorrow" if they agreed to deal terms.  Giles added: "Obviously joking[,] but I think they would move fast[.]"  The speed at which Bankman-Fried completed the deal was intentional.  Whether or not Embed was worth the purchase price—it was not—and whether or not Embed's technology worked—it did not—was irrelevant to Bankman-Fried.  What mattered was that the faster the deal terms were finalized, the faster Bankman-Fried could publicize the acquisition of a U.S. licensed broker-dealer, and perpetuate the false appearance that the FTX Group was successful and growing.

48.    As described above, the April 15, 2022 "Memorandum of Terms" was finalized in less than two months, and the June 10, 2022 "Agreement and Plan of Merger" contained substantially the same terms.  Although the acquisition process itself spanned approximately six months, from April 2022 through September 2022, most of that time was spent securing regulatory approvals for the acquisition.  The essential terms of the transaction were negotiated and agreed upon in only two weeks.

49.     The $220 million enterprise value of Embed that WRS agreed to for purposes of the acquisition was proposed by Giles based on little more than his representation that it would "enable [him] to get a deal over the line with investors."  WRS did not retain an investment bank or any other outside advisor to conduct a valuation analysis of Embed, nor did it require Giles to make detailed representations about Embed's value as a going concern or as a future subsidiary of WRS.  WRS and Embed did not set up a "data room" for information sharing until weeks after the term sheet had been signed and, even then, WRS did not perform any meaningful due diligence concerning Embed's purported value or its crucial technology.

50.     When Giles was asked on April 19, 2022 by another senior Embed employee about the expected diligence process with WRS, Giles responded, "I don't think they are too worried."  According to Giles, WRS representatives had told him that they did not need to perform due diligence because a WRS subsidiary was already an Embed customer, although that relationship was barely a few months old and had not been fully implemented.  On that same day, Laurence Beal, Embed's Chief Technology Officer, asked another senior employee whether she had "an idea of what [WRS] want to do for due diligence."  After the other employee replied, "No, not yet," Beal said that WRS "didn't do a ton of dd [due diligence]" before its subsidiary became a customer of Embed.  He then added:  "I get a sense that they are [cowboy emoji] over there[.]"

51.     By May of 2022, the "crypto winter"—a sustained period of depression in the cryptocurrency markets—had set in, and closing the Embed transaction became even more urgent.  Because Alameda's lenders were threatening to call, and calling, open-term loans, concealing the FTX Group's true financial condition from lenders was imperative, and thus the Embed transaction became a key means of sustaining FTX Group's façade of solvency.

Regardless of Embed's actual capabilities and performance—which turned out to be dismal, and the company itself essentially worthless—what mattered to Bankman-Fried was what Embed represented within cryptocurrency markets. Bankman-Fried had appealed to customers, investors, and even regulators by portraying the FTX Group as a safe place to trade in a largely unregulated industry, and the Embed acquisition aligned with Bankman-Fried's dishonest sales pitch.

52.     In their haste, the FTX Insiders prioritized speed above all else in connection with the Embed acquisition, causing WRS to forgo due diligence—a decision that turned out to be extremely consequential. On May 9, 2022, a senior Embed employee wrote to Defendant Brandon Mann, a software engineer at Embed, that she was "so concerned with how many bugs" the President of FTX.US had noticed in Embed's platform. On May 10, 2022, Giles wrote to the same senior employee that "what will blow up the deal [with WRS] will be death by a thousand cuts issues with tech." According to Giles, Embed's platform was "experiencing multiple issues per day." That employee replied to Giles that "deep down, it's why I want to accelerate the signing of the DA [definitive agreement with WRS] . . . more issues are inevitable." Giles replied that "there shouldn't be this many issues."

53.     Because the FTX Insiders performed almost no due diligence on Embed and accepted the significant terms proposed by Giles—Embed's founder, CEO, and sole representative during negotiations, who personally received approximately $157 million in connection with the acquisition—WRS paid far more than fair or reasonably equivalent value for Embed. Included in the payments to Giles was an extravagant and unwarranted "retention" bonus of $55 million, not to retain him as an employee post-acquisition (which is how real

retention bonuses work), but simply to ensure that he would stay at his own company for a few more months until he sold it.

54.    On June 27, 2022, just a few weeks after WRS and Embed signed the definitive acquisition agreement, Beal and another senior employee exchanged messages regarding the Embed platform's inability to handle approximately 600 new user accounts as part of the gradual release of FTX Stocks, even though the "launch plan" called for Embed to handle 10,000 new accounts by that time.

55.    Beal acknowledged that WRS would not "pony up money to buy [Embed] if they thought we couldn't handle 1K accounts" and asked the other employee how many accounts Embed could handle given the FTX Stocks "launch plan" target of 10,000 new accounts.  That employee replied to Beal that the platform "can't really take ANY accounts . . . I get MG [Michael Giles] has to basically lie to get the deals he gets, but there's fallout, and we aren't managing it[.]"  Beal characterized the other employee's statement about Giles as "[f]air."  A faulty technology platform that could not handle "any" new accounts, let alone the 10,000 that WRS was anticipating, was not worth a fraction of what WRS paid for Embed.

56.    Had Bankman-Fried performed even the most basic level of due diligence, the technology issues at Embed would have been readily apparent.  Bankman-Fried's indifference to the true state of Embed reflected his desire for splashy headlines above all else.  And backing out of the deal was unacceptable to Bankman-Fried because it would have signaled to lenders, customers, investors, and the market as a whole that the FTX Group was in distress.

57.    An unaudited statement of financial condition for Embed as of March 31, 2022, which was included in the closing documents for the acquisition, reflects that Embed had **total assets of only approximately $37 million and a mere $25,000 in net revenue**.  Embed Clearing

LLC, a wholly-owned subsidiary of Embed, had never reported any revenue at all. Although Giles asserted that Embed was worth $220 million at that time, he revealed to a reporter at the *Wall Street Journal* on May 19, 2022 that a WRS subsidiary was Embed's "first big client." As a multiple of revenue, the purchase price that WRS paid for Embed was astronomical, particularly in view of Embed's minuscule customer base and the serious bugs plaguing its software platform at the time of the acquisition.

58.     To incentivize speedy negotiations, WRS not only agreed to pay an inflated price of $220 million for Embed, it also agreed in both the April 15, 2022 Memorandum of Terms and the June 10, 2022 Agreement and Plan of Merger to pay Giles a "retention" bonus of $55 million—one-quarter of Embed's purported value. The stated purpose of that $55 million payment was to retain Giles as CEO through the acquisition's closing, though he was not obligated to stay in his role beyond that date. The result was that, between the signing of the acquisition agreement on June 10, 2022 and the closing of the acquisition on September 30, 2022, Giles was being paid approximately ***$490,000 per day***, assuming he worked seven days every week. By contrast, during 2022, Giles' salary as Embed's CEO was ***$12,500 per month***. And the $55 million retention bonus awarded to Giles was on top of the approximately ***$103 million*** that Giles received at closing as Embed's largest shareholder.

59.     This unusual arrangement did not go unnoticed by Embed's other shareholders; a representative of Embed's second-largest shareholder, Defendant Propel Venture Partners, told Giles directly that he "ha[d] never seen so much of a deal this size go to a founder . . . just unusual proportions." Another representative of Propel Venture Partners indicated that he hoped Giles was getting paid in cash in light of turmoil in the cryptocurrency markets, stating:

"Hopefully[] there's limited risk to cash exchanging hands given what's going on in the crypto/broader markets."

60.    Although numerous Embed employees were awarded retention payment agreements, Giles was the only one who was paid his full retention bonus on the September 30, 2022 closing date.  The other employees, who were not involved in the negotiations, were obligated to remain at Embed for two years after closing in order to receive their full bonuses.[5] Giles knew that the deal he cut for himself was too good to be true, and he was afraid that the other Defendants would notice.  On June 23, 2022, Giles asked a senior Embed employee whether one of the documents provided to all Embed shareholders related to so-called "golden parachute" payments "show[s] how much I am getting [under the retention payment agreement.]"  She confirmed to Giles that the document reflected a $55 million bonus, due to him at closing, and then asked whether that was "what [he] was expecting."  Giles replied that it was, but that "hopefully people don't read it in too much detail[.]"

61.    On June 24, 2022, another senior employee at Embed wrote to his supervisor that he was concerned by the fact that the retention payment agreement stated that each Embed employee had been "encouraged" to seek their own legal counsel but that Giles had told them there was no need to consult independent counsel.  He wrote:  "Seemingly the only reason I can come up with to [explain Giles] tell[ing] us to not get legal counsel is if there is some fast track timeline he has that he's trying to rush through."  That same day, the employee's supervisor asked Giles when employees "need to sign their docs."  Giles replied:  "[A]s soon as possible[.]"

---

[5]    The Retention Incentive Award Agreements provide that the bonuses are to be paid in five installments beginning on September 30, 2023.

62.     When the Embed acquisition closed on September 30, 2022, WRS paid Defendants $236,764,105.34 of misappropriated FTX Group funds to acquire their interests in Embed, which included shares, options, and SAFEs (as set forth in **Exhibit A**).  At the time the Embed acquisition closed, the FTX Insiders well knew that the FTX Group was deeply insolvent. By proceeding with the acquisition—and paying out nearly $250 million that the FTX Group could not afford to part with—the FTX Insiders knew that the acquisition funds would not be available to pay creditors.  Just six weeks later, Alameda, WRS, and WRSS filed for Chapter 11 after it came to light that the FTX Insiders were engaged in a scheme to defraud creditors, including customers, lenders, and investors.

## III.   The Embed Acquisition Was Part and Parcel of the FTX Insiders' Fraudulent Scheme.

63.     As Ellison and Bankman-Fried conspired to dupe lenders into believing that Alameda was solvent, including by providing them with false and misleading balance sheets, Bankman-Fried was bent on continuing his campaign of reckless spending on attention-grabbing acquisitions.  As Ellison testified at Bankman-Fried's criminal trial, Bankman-Fried wanted "FTX to have the image of being [an] innovative place to trade on, similar to offshore exchanges, but also being safe, reliable, audited, and highly regulated, like other US exchanges."  Trial Tr. at 861:20-23, ECF No. 360, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 11, 2023).

64.     Bankman-Fried believed that having a seemingly improved platform and the prospect of new product offerings through the Embed acquisition would perpetuate and solidify the FTX Group's false image as a preeminent force in both cryptocurrency and traditional markets.  He also hoped that paying hundreds of millions of dollars cash for Embed would project a false image of profitability, growth, and legitimacy to sustain the fraudulent scheme by

deceiving lenders, customers, and investors into believing that the FTX Group was successful enough to afford the lofty acquisition price and expand into new markets.

65.     Bankman-Fried ensured that the Embed acquisition received ample press coverage to further the façade.  Contemporaneous commentary noted that the Embed acquisition was designed to "enhance and facilitate . . .  newly-launched stocks trading offering" and that FTX.US was attempting "to provide its clientele with a holistic, one-stop-shop trading experience,"[6] and "signal[ed]" the intent "to expand the financial services" offerings.[7]

66.     Beside the fact that Embed's technology was bug-ridden, unfinished, and nowhere near being able to fulfill these promises, these glossy headlines belied the truth in another way: unless Bankman-Fried could secure additional capital—and fast—the FTX Group would not be able to meet forthcoming calls for repayment from lenders.  News of an FTX Group default would not only destroy its reputation with lenders and investors, but would also expose the FTX Group to a "bank run" by existing customers.  Ellison testified that she was worried that, if Genesis learned Alameda's true financial condition and shared it with others in the cryptocurrency markets, that could cause more widespread concern about Alameda and lead customers to withdraw their money from FTX.  *See* Trial Tr. at 785:11-786:6, , ECF No. 360, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 11, 2023).

67.     Singh testified that, when he came to fully understand the nature of Alameda's liabilities to FTX.com, he approached Bankman-Fried about "reversing the Embed acquisition."

---

[6]     Tolu Ajiboye, *FTX US Acquires Embed Financial to Enhance New Stocks Trading Offering*, Coinspeaker, (June 21, 2022) https://www.coinspeaker.com/ftx-us-acquires-embed-financial-stocks-trading/.

[7]     FTX US, *FTX US Acquires Clearing Firm Embed to Enhance FTX Stocks*, PR Newswire (June 21, 2022), https://www.prnewswire.com/news-releases/ftx-us-acquires-clearing-firm-embed-to-enhance-ftx-stocks-301572039.html.

Trial Tr. at 1414:8-20, ECF No. 366, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y.

Oct. 16, 2023).  By September 2022, Singh was deeply concerned that if "either FTX or

Alameda was spending liquid funds to acquire more illiquid stuff[,] . . . that was necessarily

spending customer funds, not for customer benefit."  Trial Tr. at 1416:20-25, 1417:1-2, ECF No.

366, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 16, 2023).  Bankman-Fried

refused to halt or pull out of the Embed acquisition.

68.     Although Bankman-Fried knew that the Embed acquisition would only put the

FTX Group deeper into the hole created by the FTX Insiders' excessive open-term borrowing

and spending, he also knew that pulling out of the transaction would be far worse for the

continuation of his fraud scheme, raising red flags throughout the wider cryptocurrency market

that the FTX Group was in distress.  Lenders were already scrutinizing Alameda's balance

sheets, necessitating new means of deception.  Backing out of the Embed acquisition would be a

fatal blow, revealing the FTX Group's insolvency and the fraudulent scheme, and hastening the

FTX Group's collapse.  Bankman-Fried hoped that he could keep the scheme going by

perpetuating the false appearance of financial strength and growth through the well-publicized,

big-money, cash purchase of Embed.

## IV.   The FTX Insiders Created Misleading Records To Obscure Alameda's Role in Funding the Embed Acquisition.

69.     The FTX Insiders acquired the funds to purchase Embed in a self-dealing, opaque

manner designed to obscure the malfeasance that ultimately led Plaintiffs to file a Chapter 11

Case.  Specifically, the FTX Insiders created false and misleading records suggesting that the

funding for the Embed acquisition by WRS had come personally from Bankman-Fried, Singh,

and Wang, even though the funds used to acquire Embed had been transferred from an Alameda

bank account to a WRSS bank account and ultimately to a WRS bank account.  The FTX

Insiders in exchange received WRS shares.

70.     On July 25, 2022, Ellison, as CEO of Alameda, signed promissory notes for $200

million in "loans" to Bankman-Fried (Alameda's sole director through September 6, 2022),

Singh, and Wang.  Although these notes purported to memorialize massive "loans" to each

individual, they did not include any repayment schedule or other detailed terms regarding

repayment.  In fact, each document is only slightly more than a page in length.  The notes simply

required repayment on the five-year anniversary of the loans, at an annual "simple interest rate of

the mid-term AFR."  To date, none of the FTX Insiders has repaid so much as $1 on these

"loans."  The one-sided, scant terms and lack of any accountability or repayment schedule

demonstrate that these promissory notes were not intended to create meaningful or enforceable

obligations.  They were instead intended to paper over (however thinly) the FTX Insiders'

misappropriation.

71.     One day later, on July 26, 2022, the FTX Insiders engaged in a series of

transactions on the FTX.US exchange to create the appearance that Alameda had transferred a

total of $200 million to Bankman-Fried, Singh, and Wang, who then transferred that same

amount to WRS.  In reality, these on-exchange transactions did not involve transfers of any fiat

or cryptocurrency.  Instead, they were simply designed to create the illusion that amounts

corresponding to the $200 million in promissory notes had been transferred to WRS by

Bankman-Fried, Singh, and Wang.

72.     In fact, on July 26, 2022, $200 million was transferred from a bank account

controlled by Alameda at Signature Bank to a bank account controlled by WRSS at Signature

Bank.  Also on July 26, the WRSS account funneled the $200 million to a bank account

controlled by WRS at Signature Bank.  Journal entries from this transfer noted "[f]unds send

from Alameda to WRS, from WRS to WRSS."  At no point did WRSS or WRS exercise

dominion or control over the funds such that it could redirect the funds for their own purposes.

Instead, the rapid turnaround of funds and the contemporaneous journal entries reflect that the

money was earmarked and allocated for the Embed transaction.

73.    This same flow of funds was repeated on September 29, 2022, this time involving

a $50 million transfer made pursuant to a second round of "loans," with accompanying

promissory notes, from Alameda to Bankman-Fried, Singh, and Wang.  For unknown reasons,

the on-exchange transfers related to the $200 million transfer involving Bankman-Fried's,

Singh's, and Wang's accounts did not repeat for this $50 million transfer.

74.    All of the funds were transferred to Defendants and others to complete the

acquisition.  But no money used by WRS to acquire Embed originated with Bankman-Fried,

Singh, or Wang, notwithstanding the promissory notes purporting to reflect "loans" from

Alameda to those individuals and the on-exchange transfers to their personal accounts.  All of the

money came from Alameda, which by this time had been used by the FTX Insiders to borrow

billions from third-party lenders to whom false and misleading balance sheets were provided and

to misappropriate billions of dollars more from customers.

75.    Despite the fact that the funds ultimately used by WRS to acquire Embed came

from Alameda (via WRSS), Bankman-Fried, Singh, and Wang personally received SAFEs from

WRS, purportedly in consideration for the transfers, on both July 25, 2022 and September 30,

2022.  The SAFEs provided that each of Bankman-Fried, Singh, and Wang would

"automatically" receive an amount of WRS common stock in accordance with the size of their

supposed capital contributions to WRS no later than December 31, 2022, or upon an "earlier . . .

Dissolution Event[.]"  When WRS filed its Chapter 11 Case on November 14, 2022, the SAFEs automatically converted into WRS common stock.  On information and belief, Giles knew that the Embed acquisition was funded with cash that came from outside of WRS.

76.      Bankman-Fried, Singh, and Wang did not intend or have the ability to repay these funds to Alameda, and Alameda did not intend or have the ability to repay the funds that it had taken from FTX.com at the FTX Insiders' direction using the "special privileges" the FTX Insiders had created for Alameda.  In addition, it appears that neither Ellison nor anyone else at Alameda—other than Bankman-Fried acting as the sole (and interested) director of Alameda—ever considered whether the "loans" benefited Alameda as a corporate entity distinct from WRS. Any gains generated by the Embed acquisition above the amount of the "loans" (assuming they would ever be repaid) would have accrued directly to Bankman-Fried, Singh, and Wang via their equity stakes in WRS.

**V.      A Mere Four Months After WRS's $220 Million Acquisition of Embed, No Bidder Was Willing To Pay More Than $1 Million for the Company.**

77.      On January 12, 2023, as part of the Chapter 11 Cases, the Court authorized certain procedures proposed by the Debtors with respect to running a sale process for Embed in an attempt to recover assets for the Debtors' estates.  [D.I. 487].

78.      Less than four months after the closing of the Embed acquisition, the Debtors received twelve non-binding Initial Indications of Interest ("IOIs") to purchase the company, submitted after limited financial and commercial due diligence, with an average value of approximately $35 million—far less than the $220 million that WRS had paid for Embed only a few months earlier.

79.     The highest IOI was valued at $78 million, only about one-third of the price that WRS had paid for Embed.  The lowest IOI was valued at $10 million, less than one-twentieth of the price that WRS had paid.

80.     Giles himself submitted an IOI to purchase Embed valued at $11 million, but his final bid for Embed, submitted to the Debtors on March 23, 2023, was for only $1 million and was subject to potential reductions at closing.

81.     Of the eleven other potential bidders, only one submitted a final bid after conducting more comprehensive due diligence, for a mere $250,000, and only for Embed's assets; the Debtors would have been left responsible for all of Embed's liabilities.

82.     The potential bidders who did not submit final bids cited the fact that Embed's platform and technology had limited scope and features, and that it would take several years and significant resources to build Embed into an enterprise-grade company.

83.     The result of the bidding process—including Giles' own bid of $1 million, or 0.45% of the purchase price that WRS had paid just a few months before—leaves no doubt that the $220 million paid by WRS to acquire Embed was wildly inflated relative to the company's fair value, which Giles well knew.  The bidders had figured out what the FTX Group and FTX Insiders did not bother to assess prior to the Embed acquisition, namely, that Embed's vaunted software platform was essentially worthless.

**VI.     The Transfers Were Made When Plaintiffs Were Insolvent, and the FTX Insiders Knew It.**

84.     At the time of the Embed acquisition, each of the Plaintiffs:  (1) was insolvent;  (2) became insolvent as a result of the transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small

capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the

Plaintiff's ability to repay as such debts matured.

85.    On November 8 and November 9, 2022, Bankman-Fried and Wang attempted to

produce a reconciliation of WRSS's assets and liabilities, the vast majority of which were

customer deposits, at the urging of other FTX Group senior personnel.  Their reconciliation

showed a shortfall of WRSS's assets below its liabilities of approximately $46 million.  The

Debtors' preliminary analysis indicates that this shortfall may have been as much as $128 million

as of the Petition Date.  [D.I. 792-1].

86.    The other FTX Group entities involved in the acquisition of Embed were also

insolvent at all relevant times.  As Singh admitted in his guilty plea, by "early September 2022,"

the same month the Embed acquisition closed, Alameda "could not repay what it owed."  *See*

Plea Tr. 29:2-3, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102.

87.    Ellison made similar admissions in her guilty plea, stating that:  (a) from 2019

through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from

July 2022 through at least October 2022, she agreed with Bankman-Fried and others to provide

materially misleading financial statements to Alameda's lenders; and (c) she had understood that

Bankman-Fried and others had made investments with funds from FTX.com in the name of

Alameda in order to conceal the true source of those funds.

88.    On November 2, 2023, a jury of his peers found Bankman-Fried guilty of multiple

felonies for defrauding lenders, customers, and investors, including wire fraud and conspiracies

to commit wire fraud, commodities fraud, securities fraud and money laundering.  *See* Jury

Verdict, Nov. 2, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On

March 28, 2024, Bankman-Fried was sentenced to 25 years in prison.  *See* Min. Entry, Mar. 28, 2024, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

**VII.    The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent To Hinder, Delay, or Defraud Creditors.**

89.    As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the transfers made and obligations incurred in connection with the acquisition of Embed, including that:

i.    The transfers were part of a scheme to enrich and otherwise benefit the FTX Insiders;

ii.    The FTX Insiders contemporaneously misled Alameda's lenders by, among other things, providing them with false balance sheets;

iii.    Numerous material facts relating to the transfers were concealed, including the true source of funding;

iv.    The FTX Insiders removed or concealed Plaintiffs' assets;

v.    The FTX Insiders sought to use Embed's status as a registered broker-dealer of securities to convey the false impression that FTX was a "safe" place to trade cryptocurrency;

vi.    Once the FTX Insiders had identified Embed as a target for potential acquisition, the FTX Insiders prioritized speed above all else and were largely indifferent to the price paid for Embed or Embed's actual capabilities and value;

vii.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

viii.    Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made; and

ix.    The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

**CAUSES OF ACTION**

**COUNT ONE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(A)**

90.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 89 as if fully set forth here.

91.    Plaintiffs made the transfers and incurred the obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

92.    Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud present or future creditors.

93.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(B)**

94.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 93 as if fully set forth here.

95.    Plaintiffs made the transfers and incurred the obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

96.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers and obligations.

97.     Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

98.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT THREE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**

99.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 98 as if fully set forth here.

100.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

101.     Plaintiffs made the transfers and incurred the obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers

to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

102.    Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims.

103.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FOUR
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
### DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)

104.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 103 as if fully set forth here.

105.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

106.    Plaintiffs made the transfers and obligations addressed herein on or around September 30, 2022, as more specifically described in **Exhibit A**.  Each of the transfers to

Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

107.    Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations.

108.    Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

109.    Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

110.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FIVE**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**

111.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 110 as if fully set forth here.

112.    As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 544 and 548 of the Bankruptcy Code.

113.    Because Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SIX**
**DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**

114.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 113 as if fully set forth here.

115.    As alleged above, Defendants are transferees of transfers and recipients of obligations avoidable under Sections 544 and 548 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

116.    By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent that the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

117.    Enter an order that the transfers and obligations addressed herein are avoidable fraudulent transfers and obligations under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

118.    Award Plaintiffs under 11 U.S.C. § 550 no less than $236,764,105.34 (plus the value of any additional avoidable transfers that Plaintiffs learn, through formal discovery or otherwise, were made to Defendants);

119.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants relinquish to Plaintiffs the amount ordered as an award for avoidable transfers;

120.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

121.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: December 17, 2024
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       gluecksteinb@sullcrom.com
       decampj@sullcrom.com
       dunnec@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*