**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD. *et al.*,[1] | Case No. 22-11068 (JTD) |
| *Debtors.* | (Jointly Administered) |
| ALAMEDA RESEARCH LTD. *et al.*, | |
| *Plaintiffs,* | |
| -against- | Adv. Pro No. 23-50379 (JTD) |
| ROCKET INTERNET CAPITAL PARTNERS II SCS *et al.*, | |
| *Defendants.* | |
| ALAMEDA RESEARCH LTD. *et al.*, | |
| *Plaintiffs,* | |
| -against- | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES *et al.*, | |
| *Defendants.* | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTIONS TO DISMISS THE AMENDED COMPLAINTS**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Daniel A. Mason (Del. Bar No. 5206)
Elizabeth Wang (Del. Bar No. 6620)
1313 North Market Street, Suite 806
P.O. Box 32
Wilmington, DE 19899-0032
Telephone: (302) 655-4425
Fax: (302) 216-7884
Email: dmason@paulweiss.com
      ewang@paulweiss.com
William A. Clareman (*pro hac vice*)
Gregory F. Laufer (*pro hac vice*)
Kenneth S. Ziman (*pro hac vice*)
Max H. Siegel (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 492-0248
Email: wclareman@paulweiss.com
      glaufer@paulweiss.com
      kziman@paulweiss.com
      msiegel@paulweiss.com

Randall S. Luskey (*pro hac vice*)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Fax: (202) 204-7391
Email: rluskey@paulweiss.com

*Counsel to the Defendants Listed on Annex B*


Dated: January 15, 2025

SAUL EWING LLP
Lucian B. Murley (Del. Bar No. 4892)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6898
Email: luke.murley@saul.com

PALLAS PARTNERS (US) LLP
Joshua A. Naftalis (*pro hac vice*)
Duane L. Loft (*pro hac vice*)
Anastasia Cembrovska (*pro hac vice*)
Jingxi Zhai (*pro hac vice*)
Adair Kleinpeter-Ross (*pro hac vice*)

75 Rockefeller Plaza
New York, NY 10019
Telephone: (212) 970-2300
Email: joshua.naftalis@pallasllp.com
      duane.loft@pallasllp.com
      anastasia.cembrovska@pallasllp.com
      jingxi.zhai@pallasllp.com
      adair.kleinpeter-ross@pallasllp.com

*Counsel to the Defendants Listed on Annex A*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

SUMMARY OF ARGUMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 5

    I.    The Parties and Relevant Non-Parties.................................................................. 5

    II.    WRS's Acquisition of Embed .............................................................................. 6

    III.    These Actions ...................................................................................................... .7

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT .................................................................................................................... 9

    I.    PLAINTIFFS' ACTUAL FRAUDULENT TRANSFER CLAIMS (COUNT
        ONE AND THREE) FAIL TO STATE A CLAIM FOR RELIEF ...................... 9

        A.    Plaintiffs Do Not Adequately Allege Direct Evidence of
               Fraudulent Intent........................................................................................ 10

        B.    Plaintiffs Do Not Sufficiently Allege Badges of Fraud ............................ 14

    II.    THE SAFE HARBOR UNDER SECTION 546(e) OF THE BANKRUPTCY
        CODE BARS PLAINTIFFS' CONSTRUCTIVE FRAUDULENT
        TRANSFER CLAIMS UNDER THE BANKRUPTCY CODE (COUNTS
        TWO AD FOUR) AND ALL STATE LAW AVOIDANCE CLAIMS
        (COUNT THREE) ............................................................................................ 21

    III.    PLAINTIFFS' CLAIMS UNDER SECTION 550(A)(i) (COUNT FIVE)
        AND SECTION 502(d) (COUNT SIX) SHOULD BE DISMISSED, AS
        PLAINTIFFS HAVE NOT ALLEGED AN AVOIDABLE TRANSFER ........ 22

    IV.    DEFENDANTS INCORPORATE BY REFERENCE THE OTHER
        ARGUMENTS MADE IN THEIR MOTIONS TO DISMISS THE
        ORIGINAL COMPLAINTS ............................................................................. 22

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

*Adkins v. Rumsfeld*,
    389 F. Supp. 2d 579 (D. Del. 2005) ........................................................ 6

*Alpizar-Fallas v. Favero*,
    908 F.3d 910 (3rd Cir. 2018) .................................................................... 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 8

*In re Copeland*,
    291 B.R. 740 (Bankr. E.D. Tenn. 2003) ................................................ 20

*In re Cred Inc.*,
    650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024) ........................ 9, 16

*Drivetrain, LLC v. X. Com., Inc.*,
    2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) ............................. *passim*

*In re Elrod Holdings Corp.*,
    421 B.R. 700 (Bankr. D. Del. 2010) ...................................................... 15

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ............................................ 14, 15, 16

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ................................................................ 5, 9

*In re FTX Trading Ltd.*,
    2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) ............................ *passim*

*Geron v. Craig (In re Direct Access Partners, LLC)*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019) .................................................. 19

*Jiaxing Super Lighting Elec. Appliance Co., Ltd. v. Bruggeman*,
    2022 WL 17404300 (N.D. Cal. Dec. 2, 2022) ...................................... 20

*In re KB Toys Inc.*,
    736 F.3d 247 (3d Cir. 2013) .................................................................. 22

*Nat'l Tour Ass'n v. Rodriguez*,
    221 B.R. 1012 (Bankr. M.D. Fla. 1998) ................................................ 20

*Rockefeller Ctr. Props., Inc. Secs. Litig.*,
    184 F.3d 280 (3d Cir. 1999). .................................................................. 6

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
    528 F. Supp. 3d 219 (S.D.N.Y. 2021 ................................................... 13

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) ........................................................ 22

**STATUTES & RULES**

Fed. R. Bankr. P. 7009 ........................................................................................... 1, 9

Fed. R. Bankr. P. 7012 ............................................................................................... 1

Fed. R. Civ. P. 9(b) ............................................................................................... 1, 9

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 1, 8

4161-6566-2807, v. 6

The defendants listed on Annexes A and B hereto (collectively, "Defendants") respectfully submit this memorandum of law in support of their motions to dismiss the nearly identical amended complaints[1] ("Amended Complaints") filed in these two actions by plaintiffs Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services, Inc. ("WRSS") (collectively, "Plaintiffs"), pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rules 7012 and 7009 of the Federal Rules of Bankruptcy Procedure. Pursuant to Federal Rule of Bankruptcy Procedure 7012, Defendants do not consent to the entry of final orders or judgments by the Bankruptcy Court in this adversary proceeding.

## SUMMARY OF ARGUMENT

In their original complaints[2] ("Original Complaints"), Plaintiffs alleged that the Debtors' acquisition of Embed Financial Technologies Inc. ("Embed")—an arm's-length transaction in which no FTX Insiders were alleged to have received any consideration—was somehow an actual fraudulent transfer. In October 2024, this Court dismissed the two counts asserting those claims, ruling that the Original Complaints did not allege with particularity facts that supported a finding of fraudulent intent either directly or circumstantially.

The Amended Complaints fail to remedy that defect—and strikingly so. This is not an action brought by creditors who, prior to filing a complaint, lack access to a debtor's documents and other inside information and need to rely on circumstantial evidence like "badges of fraud" to support an actual fraudulent transfer claim. Quite the opposite in fact. Plaintiffs here are the very

---

[1] Adv. Pro. No. 23-50379, D.I. 194; Adv. Pro. No. 23-50380, D.I. 369. Unless otherwise noted, all docket references are to Adv. Pro. No. 23-50380, and paragraphs refer to paragraphs in the Amended Complaint in Adv. Pro. No. 23-50380.

[2] Adv. Pro. No. 23-50379, D.I. 1; Adv. Pro. No. 23-50380, D.I. 1.

Debtors whose executives conceived of and implemented the transaction at issue, and that made the purportedly fraudulent transfers. The Debtors have complete access to all the Debtors' documents about the Embed transaction; the record from the criminal trial of FTX Insider and founder Samuel Bankman-Fried, in which he was convicted of fraud; and most of the other FTX Insiders, who signed cooperation agreements in connection with their guilty pleas in which they promised to help the Debtors resolve their claw-back actions, including this very litigation. In fact, unlike a conventional fraudulent transfer case in which the defendant has all the facts and the plaintiff may not, it is Plaintiffs who know and have everything and Defendants who are, at least absent discovery, in the dark.

Yet, despite Plaintiffs' access to all this information, the Amended Complaints—like the Original Complaints—do not refer to a single document or statement of a single witness showing or even suggesting that the Embed transaction was a fraudulent transfer intended to hinder, delay, or defraud creditors.

Instead, Plaintiffs have added new, conclusory allegations—and deleted certain others—in the Amended Complaints to try to bolster the theory they advanced in defending the Original Complaints: that this case is analogous to *Drivetrain, LLC v. X. Com., Inc.*, 2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023). But Plaintiffs' reliance on *Drivetrain* is as misplaced now as it was before. In *Drivetrain*, the debtor created false revenue reports showing phony sales through various partners. To hoodwink the debtor's investors and maintain the illusion that those fictitious sales were real, the debtor made the commission payments to its partners that it would have owed if the sales had been real; those commission payments were the allegedly fraudulent transfers. The Court found direct evidence of fraudulent intent because the payments were made

to mislead the debtor's investors and perpetuate its broader fraud by creating a false "façade" that the debtor was running a successful business.

Here, by contrast, the Amended Complaints include no particularized allegations that the Debtors misled Alameda's lenders about the Embed acquisition or that the consideration that WRS paid for Embed somehow tricked Alameda's lenders into believing that Alameda, or the FTX Group more generally, was a healthy business.  All Plaintiffs can muster is the conclusory and nonsensical claim that the FTX Insiders were worried that the internal fraud at FTX was going to be exposed as the cryptocurrency market began to crash, and that WRS's acquisition of Embed, a licensed and regulated correspondent clearing broker-dealer of non-crypto securities, would somehow help reassure Alameda's lenders.

Leaving aside that Plaintiffs utterly fail to allege how *WRS's* acquisition of Embed would help reassure the lenders of *Alameda*—a totally separate corporate entity—Plaintiffs also fail to allege why WRS's expansion into traditional stock and futures trading helped further the FTX Insiders' fraud.  Unlike in *Drivetrain*, the Debtors' purchase of Embed was a legitimate purchase of a real business; there is no allegation that it was a fake transaction, let alone one designed to hinder, delay, or defraud creditors.  And again, despite having full access to all the relevant documents and witnesses who allegedly masterminded this scheme, Plaintiffs still offer no evidence that the Embed transaction was driven by fraudulent intent.  No documents, no testimony, no statements.

Plaintiffs also try to resurrect their actual fraudulent transfer claims by relying on circumstantial "badges of fraud" to raise an inference of fraudulent intent.  Here, again, they fall short, as they did in their Original Complaints.  Still missing are any specific allegations of the hallmarks of an actual fraudulent transfer: a concealed transfer to insiders who stood on both sides

of the transaction.  This is because WRS publicly disclosed the Embed acquisition more than three months before the deal closed, and because the deal was negotiated at arm's length—with sophisticated, unaffiliated parties and law firms on both sides.  Instead, Plaintiffs allege that the FTX Insiders misled Alameda's lenders by providing them with false balance sheets, concealed the "true source of funding" for the Embed transaction, used Embed's status as a registered correspondent clearing broker-dealer to convey a "false" impression that FTX was a safe place to trade, and "prioritized speed above all else" in making the acquisition.

But Plaintiffs fail to plead any sufficient facts to support these purported badges of fraud, and these new allegations make no sense.  The FTX Insiders provided false balance sheets to Alameda's lenders to cover up the misappropriation of FTX.com customer assets, but that fraud was not connected to WRS's purchase of Embed.  Similarly, the fact that the money WRS used to acquire Embed may have come from FTX.com customer accounts that Alameda misappropriated has nothing to do with whether WRS's payment to Embed's owners for the acquisition was a fraudulent transfer.  And the fact that WRS was buying a registered correspondent clearing broker-dealer did not create a "false" impression that FTX was a safe place to trade; given Embed's extensive licensing, that was true.  Nor is there any viable allegation that the acquisition proceeded unusually quickly.  The parties agreed on a term sheet in April 2022, and the transaction did not close until nearly six months later, at the end of September 2022, once all necessary regulatory approvals had been obtained.

In sum, the Amended Complaints fail for the same reason the Original Complaints did, no matter how much Plaintiffs change their theory of the case or creatively label the alleged fraud.  Plaintiffs' refusal to dismiss their meritless claims, against the backdrop of an approved amended plan of reorganization that will result in 98 percent of FTX creditors receiving

approximately 119 percent of their allowed claims, raises serious questions about Plaintiffs' basis

for continuing to pursue these cases.[3]

## STATEMENT OF FACTS[4]

### I.    The Parties and Relevant Non-Parties

Plaintiffs in this action—Alameda, WRS, and WRSS—are three members of a

group of companies the Amended Complaints refer to as the "FTX Group."  Am. Compl. ¶ 4 n.4.

Prior to the filing of the Chapter 11 cases, Alameda was a cryptocurrency trading

firm owned by Samuel Bankman-Fried (90%) and Zixiao "Gary" Wang (10%).  *Id.* ¶ 16.

WRS is a Delaware holding company owned principally by Bankman-Fried

(52.99%), Wang (16.93%), and Nishad Singh (7.83%).  *Id.* ¶ 17.

WRSS, a wholly-owned subsidiary of WRS that did business as FTX.US, is the

cryptocurrency exchange Bankman-Fried, Wang, and Singh founded to offer cryptocurrency

trading services to U.S. customers.  *Id.* ¶¶ 3, 18.

Non-party FTX Trading Ltd.—a separate entity in the FTX Group and also a Debtor

in this bankruptcy—did business as FTX.com, which was the principal international

cryptocurrency exchange the FTX Group operated.  *Declaration of John J. Ray III in Support of*

*Chapter 11 Petitions and First Day Pleadings*, Case No. 22-11068, D.I. 24, ¶ 33.

Non-party Embed is a financial technology company that WRS agreed to acquire

in April 2022 in a transaction that closed in September 2022.  Am. Compl. ¶¶ 58, 62.  Embed

offered fully integrated securities execution, clearing, settlement, and custody application software

---

[3] *See* Ex. A, MacKenzie Sigalos, *FTX creditors will make money on bankruptcy: $1.19 for every dollar*, CNBC (Oct. 7, 2024), https://tinyurl.com/FTX-Amended-Plan.

[4] The well-pleaded allegations in the Amended Complaints are assumed true solely for the purposes of this motion.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

for the financial industry. Embed Clearing LLC ("Embed Clearing"), the wholly-owned subsidiary of Embed, obtained licenses from a variety of U.S. regulators and clearinghouses, including the Financial Industry Regulatory Authority, Inc. ("FINRA"), which allowed it to serve as a clearing firm and custodian for equities, options, mutual funds, fractional equities, and over-the-counter equities. *See id.* ¶ 6.

Defendants are nearly 100 former shareholders and employees of Embed who received payments in exchange for their shares in connection with WRS's acquisition of the company, and Michael Giles, the founder and CEO of Embed until February 2023, who continued to serve as an advisor to Embed until May 2023. *See id.* ¶¶ 19–20, Ex. A.

## II.    WRS's Acquisition of Embed

WRS began negotiations to acquire Embed in March 2022. *Id*. ¶ 47. WRS had been an early customer of Embed and was therefore familiar with its unique infrastructure for clearing and custody services, which then-president of FTX.US Brett Harrison praised as "excellent." *Id.* ¶ 57; D.I. 100, Ex. 2. WRS sought to acquire Embed to help enhance and facilitate WRS's newly launched stock trading platform and provide its clientele with a "one-stop-shop" trading experience. Am. Compl. ¶ 65. FTX Insider Singh testified that WRS acquired Embed at the "behest" of Harrison, who is not alleged to have known about or been involved in the fraud committed by the FTX Insiders. *See* Ex. B, Trial Tr. at 1414:19–21, ECF No. 366, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Oct. 16, 2023).[5]

---

[5] Because the Amended Complaints quote directly from Singh's trial testimony, *see* Am. Compl. ¶ 67, and such testimony constitutes an integral part of the Amended Complaints, *see* D.I. 337 ¶ 3 (claiming that Plaintiffs' amendments are based on their "ongoing investigation of the . . . testimony and evidence" presented during Bankman-Fried's criminal trial), the Court may consider the full transcript in ruling on this motion to dismiss. *See In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 184 F.3d 280, 287 (3d Cir.1999) (court may consider "document[s] integral to or explicitly relied upon in the complaint" without converting a motion to dismiss to a motion for summary judgment); *Adkins v. Rumsfeld*, 389 F. Supp. 2d 579, 584 (D. Del. 2005) (same).

WRS and Embed signed a Memorandum of Terms on April 15, 2022, and an Agreement and Plan of Merger on June 10, 2023, with a purchase price of $220 million plus a retention bonus for Giles.  Am. Compl. ¶ 58.  WRS publicly announced the transaction in a June 21, 2022 news release.  *Id.* ¶ 65 n.7.  According to the Amended Complaints, WRS did not need to perform extensive due diligence because a WRS subsidiary was already an Embed customer.  *Id.* ¶ 50.  The transaction closed on September 30, 2022.  *Id.* ¶ 58.

While Plaintiffs allege that, from the inception of the FTX Group, Bankman-Fried orchestrated a fraudulent scheme that included using Alameda to secretly loot hundreds of millions of dollars of FTX.com customer funds, *id*. ¶ 4—a fraud for which Bankman-Fried was convicted after a criminal trial and as to which the other FTX Insiders pleaded guilty, *id.* ¶ 34—Plaintiffs do not allege that anyone at Embed knew about or participated in the fraud or knew that Bankman-Fried and the other FTX Insiders allegedly misappropriated the funds that WRS used for the acquisition from FTX.com customer accounts.

## III.    These Actions

Plaintiffs filed these two nearly identical adversary proceedings on May 17, 2023.  Adv. Pro. No. 23-50379, D.I. 1; Adv. Pro. No. 23-50380, D.I. 1.  On October 23, 2024, the Court issued a memorandum opinion dismissing the Original Complaints' actual fraudulent transfer claims.  *See In re FTX Trading Ltd.*, 2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024).  The Court held that there was "simply nothing in either the Complaints or the documents incorporated by reference that explains how the Embed acquisition furthered the fraudulent scheme," and therefore the Original Complaints had failed to "directly allege actual fraudulent intent."  *Id.* at *9.  The Court also held that Plaintiffs had not pled "badges of fraud" sufficient to infer fraudulent intent.  *Id.* at *9–10.

In addition, the Court noted that the Original Complaints made allegations that suggested "entirely different purposes for the acquisition" other than an effort to hinder, delay, or defraud creditors, including that (i) "the FTX Insiders purportedly pursued the Embed Acquisition because they believed it would help expand FTX US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders"; and (ii) "the FTX Insiders acquired the funds to purchase Embed in a self-dealing, opaque manner designed to obscure the malfeasance that ultimately led Plaintiffs to file a Chapter 11 case." *Id.* at *9.

On December 17, 2024, Plaintiffs filed their Amended Complaints.  Adv. Pro. No. 23-50379, D.I. 194; Adv. Pro. No. 23-50380, D.I. 369.  While Plaintiffs' docket entry refers to their new pleadings as an "Amended Complaint to Add additional fact information," in fact, a number of the changes in the Amended Complaints involve deleting—with no explanation—some, but not all, of the allegations that the Court found inconsistent with actual fraud.  *See, e.g.*, D.I. 337, Ex. D at 4, 12.  The Amended Complaints also include new allegations, mostly about the internal FTX fraud.  *See, e.g.*, Am. Compl. ¶¶ 4–6.  But, notably, despite Plaintiffs' access to all the Debtors' documents (including about the Embed acquisition and Embed's own documents), the transcript of the Bankman-Fried criminal trial, and cooperation agreements with nearly all of the FTX Insiders (other than Bankman-Fried), the Amended Complaints do not allege a single document or FTX Insider statement even suggesting that the Embed acquisition was in any way connected to any alleged fraud.

## LEGAL STANDARD

When reviewing a motion to dismiss under Rule 12(b)(6), courts must evaluate whether a complaint contains sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the complaint alleges "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although courts must accept factual allegations as true, that principle is "inapplicable to legal conclusions." *Id.* "In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211.

Actual fraudulent transfer claims must also satisfy the heightened pleading requirements of Rule 9(b), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7009, which requires a complaint to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also* Fed. R. Bankr. P. 7009; *In re Cred Inc.*, 650 B.R. 803, 834 (Bankr. D. Del. 2023); *aff'd*, 658 B.R. 783 (D. Del. 2024) ("Actual fraudulent transfer claims . . . must meet the elevated pleading standards of Federal Rule of Civil Procedure 9(b)." (internal quotation marks omitted)). "This has been interpreted to require that plaintiffs state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged and plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Alpizar-Fallas v. Favero*, 908 F.3d 910, 919 (3d Cir. 2018) (internal quotation marks and citation omitted).

## ARGUMENT

### I.  PLAINTIFFS' ACTUAL FRAUDULENT TRANSFER CLAIMS (COUNTS ONE AND THREE) FAIL TO STATE A CLAIM FOR RELIEF

The Court ruled in its October 2024 memorandum opinion that Counts I and III of the Original Complaints failed to state claims for actual fraudulent transfer because Plaintiffs did not allege facts showing any direct evidence of fraudulent intent or plead sufficient badges of fraud to give rise to an inference of fraudulent intent. *In re FTX Trading*, 2024 WL 4562675, at *8–10.

The Amended Complaints fail to address these deficiencies, and Counts I and III should be dismissed for the same reasons.

### A.     Plaintiffs Do Not Adequately Allege Direct Evidence of Fraudulent Intent

In Plaintiffs' opposition to Defendants' motions to dismiss the Original Complaints, Plaintiffs relied on *Drivetrain* to argue that the Embed transaction was "part of an elaborate ruse that played a critical role in the debtor's larger fraudulent scheme," D.I. 154, at 13 (quoting *Drivetrain*, 2023 WL 1804627, at *4), and thus provided direct evidence of fraudulent intent. The Court appropriately rejected this argument, ruling that it was "not supported by the facts alleged in the Complaint." *In re FTX Trading*, 2024 WL 4562675, at *8.

Plaintiffs try to fix that defect in their Amended Complaints by parroting the language of *Drivetrain* to make the conclusory allegation that WRS's acquisition of Embed was intended to create a "façade of legitimacy" to reassure Alameda's lenders during a downturn in the cryptocurrency market. Am. Compl. ¶ 6. But critically missing are any particularized allegations that the Embed transaction misled Alameda's lenders or that the consideration paid to Embed's shareholders was in furtherance of the FTX Insiders' scheme to steal FTX.com customer funds, as required by *Drivetrain*. *See In re FTX Trading*, 2024 WL 4562675, at *8 ("the complaint must explain how exactly the allegedly fraudulent transfers further the fraudulent scheme"). To the contrary, Plaintiffs concede that the acquisition was a legitimate effort by WRS to invest in an innovative, registered correspondent clearing broker-dealer that would enable its customers to trade traditional securities products. *See, e.g.*, Am. Compl. ¶ 65.

In *Drivetrain*, by contrast, the complaint alleged specific facts showing that the transfers at issue were made to trick investors by creating an illusion of profitability. As the court there described, the alleged scheme "played out as follows": Adam Rogas, the founder of the debtor/alleged fraudulent transferor—

> would cause the debtor to enter into various partnership agreements
> with several platform partners, including [defendant] Magento.
> Magento calculated its fees based on revenue reports submitted by
> the debtor detailing how much revenue was earned using Magento's
> services. Rogas would falsify these revenue reports to give the
> appearance of a profitable company, even claiming at one point that
> the debtor earned $26.5 million in revenue from customers obtained
> through Magento. Rogas would then use those same revenue reports
> as "proof" that the debtor was a successful business to attract
> additional investors.

2023 WL 1804627, at *1. To perpetuate the scheme, the debtor needed to meet its obligations

under its platform partnership contracts by paying the commissions that would have been due if

the falsified revenues had been real. These commission payments—the alleged fraudulent

transfers—were then shown to investors "to create a façade that Debtor was running a successful

business," when, in fact, the debtor was not engaged in any legitimate, revenue-generating activity.

*Id.*

The *Drivetrain* court found that the plaintiff had "sufficiently pled that the Magento

payments were made with the actual intent to defraud creditors" because the "goal" of the

payments was to "trick investors" through an "elaborate head fake," and the contracts "served *no*

*other purpose but* to allow Rogas and his associates to perpetuate fraud on Debtor's investors and

Board." *Id.* at *3 (emphasis added; internal quotation marks omitted).

The Amended Complaints' attempts to rely on and stretch *Drivetrain* fail. *First,*

Plaintiffs do not allege how the Embed transaction was used to mislead Alameda's lenders. In

*Drivetrain*, the transfers at issue allowed the debtor to represent, *falsely*, to its investors that it was

securing revenue from its platform partners. *See id.* at *3. Here, Plaintiffs do not allege that the

FTX Insiders made any representations to Alameda's lenders, let alone false ones, about WRS's

acquisition of Embed. All Plaintiffs can muster is the insufficient and conclusory claim that the

Embed transaction helped "to lull lenders, customers, and investors into believing that the FTX

Group was financially sound and successful enough to continue as a going—and growing—concern." Am. Compl. ¶ 6. But Plaintiffs concede that WRS publicly represented that the Embed transaction was designed to "enhance and facilitate . . . [its] newly-launched stocks trading offering," *id*. ¶ 65, and they do not allege that those representations were false.

Nor do Plaintiffs allege that Alameda's production of false accounting records, which were used to cover up Alameda's misappropriation of FTX.com customer funds and loans to FTX executives, *id*. ¶ 43, was connected in any way to the Embed transaction, or that these records were used to mislead Alameda's lenders about WRS's purchase of Embed. In *Drivetrain*, by contrast, the fraudulent commission payments were directly connected with the falsified revenue records, because they were needed to maintain the illusion that the debtor's revenue (which formed the basis for the fraudulent commission payments) was real. *See* 2023 WL 1804627, at *1.

The Amended Complaints also allege that the FTX Insiders created misleading records to obscure Alameda's role in funding the Embed acquisition by making it seem as though the funding had come personally from FTX Insiders Bankman-Fried, Singh, and Wang. Am. Compl. ¶¶ 69–76. But, unlike in *Drivetrain*, these records are not alleged to have been used to mislead WRS creditors. Rather, Plaintiffs claim that these records were used internally to justify giving Bankman-Fried, Singh, and Wang equity-like "SAFEs" (simple agreements for future equity) in WRS. *Id*. ¶ 75. These SAFEs would only have been beneficial to the FTX Insiders if WRS's acquisition of Embed was a *success*, not if it was an overpayment for a worthless enterprise, as Plaintiffs now allege that it was. *Id.* ¶ 85.

And, fundamentally, the Amended Complaints fail to allege specific facts that connect the company making the allegedly fraudulent transfer to the company whose investors

were purportedly defrauded.  In *Drivetrain*, the complaint alleged that it was the same company that created the allegedly fraudulent revenue records, paid the allegedly fraudulent commissions, and defrauded its investors.  *See* 2023 WL 1804627, at *1–2.  Here, by contrast, and contrary to any coherent theory of fraudulent intent, Plaintiffs allege that the creditors being defrauded were *Alameda's* lenders, *id.* ¶ 46, while the company that made the allegedly fraudulent transfer by acquiring Embed was *WRS*, *id.* ¶¶ 72–74.

       *Second,* Plaintiffs also do not plead that the transfer at issue "served *no other purpose but* to . . . perpetuate fraud."  *Drivetrain*, 2023 WL 1804627, at *3 (emphasis added; internal quotation marks omitted).  That is because, as noted, Plaintiffs admit that the Embed transaction allowed WRS to expand its business into traditional and legitimate stock trading.  *See, e.g.*, Am. Compl. ¶ 65.  The Embed deal did not represent a new fraud as the commission payments in *Drivetrain* did.  Without specific allegations that the Embed transaction furthered the FTX Insiders' fraud, the Amended Complaints cannot plead an actual fraudulent transfer under *Drivetrain*.  *See In re FTX Trading*, 2024 WL 4562675, at *8 ("while the *Drivetrain* Court concluded that 'the complaint fairly alleges that the debtor entered into these contracts as part of an elaborate head fake,' this conclusion was supported by specific allegations that detailed how entering into the contract at issue furthered the alleged fraud.") (internal citations omitted).

       Simply put, the Amended Complaints' efforts to shoehorn this case into *Drivetrain* fail.  Plaintiffs do not and cannot plead facts that support direct evidence of fraudulent intent, nor do they even allege a coherent theory of such intent.[6]

---

[6] This Court previously determined that the Original Complaints did not plead a Ponzi scheme.  *See In re FTX Trading*, 2024 WL 4562675, at *9 n.30.  The Amended Complaints make occasional reference to a 'Ponzi-like funding arrangement,' Am. Compl. ¶ 5, but they too fail to plead any of the requisite factors for a Ponzi scheme.  *See SIPC* v. *Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 237 (S.D.N.Y. 2021) ("In determining the applicability of the Ponzi scheme presumption, courts have considered whether (1) deposits were made by investors; (2) the debtor conducted little or no legitimate

In addition, it is striking that, despite the Amended Complaints' repeated references to testimony by FTX Insiders about their fear that the misappropriation of customer funds would be exposed and their belief that the Embed acquisition might allay those fears, the Amended Complaints do not quote a single FTX Insider saying: (i) that the Embed acquisition itself was a fraud necessary to cover up the FTX Insiders' larger fraudulent scheme; or (ii) that the FTX Insiders believed that Embed was worthless, its technology did not work, and WRS was overpaying for it.  Nor do Plaintiffs cite a single document stating or even circumspectly suggesting any of those things.  Rather, under Plaintiffs' own theory, the Embed acquisition made sense only because the FTX Insiders believed it was a legitimate transaction.

## B.    Plaintiffs Do Not Sufficiently Allege Badges of Fraud

Finally, Plaintiffs try but fail to support their claims of actual fraudulent transfer by alleging badges of fraud.[7]

In its October 2024 memorandum opinion, the Court held that the Original Complaints failed to adequately allege badges of fraud sufficient to support an inference of fraudulent intent.  The Court held that the two purported badges of fraud alleged in the Original Complaints—insolvency and lack of reasonably equivalent value—were not sufficient to support a claim of actual fraudulent transfer.  *In re FTX Trading*, 2024 WL 4562675, at *10.  The Court

---

business; (3) the debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.").  Furthermore, even if aspects of Alameda's operations were "Ponzi-like," Plaintiffs do not and cannot allege that the acquisition of Embed was in furtherance of this "Ponzi-like" arrangement.  In fact, quite the opposite.  As Plaintiffs' own allegations show, the Embed transaction was a legitimate new investment that stood to benefit WRS's creditors and investors, not a payment designed to scam investors into contributing new money that would be used to pay off earlier investors under a guise of profitability.

[7] The "badges of fraud" that courts often consider are: "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).

also noted that the Original Complaints alleged "entirely different purposes for the [Embed] acquisition" from an effort to hinder, delay, or defraud creditors, including that (i) "the FTX Insiders purportedly pursued the Embed acquisition because they believed it would help expand FTX US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders"; and (ii) "the FTX Insiders acquired the funds to purchase Embed in a self-dealing, opaque manner designed to obscure the malfeasance that ultimately led Plaintiffs to file a Chapter 11 case." *Id.* at *9.

The Amended Complaints fail to rectify either deficiency or allege other badges of fraud sufficient to support an inference of fraudulent intent.

### 1.   Plaintiffs Fail to Allege the Traditional Badges of Fraud

Plaintiffs' list of badges of fraud engages with only two of the traditional badges of fraud, the same two which were found by this Court to be insufficient together to support a claim of actual fraudulent transfer. *See In re FTX Trading*, 2024 WL 4562675, at *7; *see also In re Fedders N. Am.*, 405 B.R. at 545.

Like the Original Complaints, the Amended Complaints do not, and cannot, allege the central badge of fraud underlying many, if not most, viable claims of actual fraudulent transfer—that the FTX Insiders had a financial interest in Embed or retained control over the consideration transferred. *See In re Elrod Holdings Corp.*, 421 B.R. 700, 712 (Bankr. D. Del. 2010) ("Cases imputing a transferee's intent to a transferor have typically involved sole shareholders of the transferor, with complete control of the transferor, transferring assets to themselves as transferee.").

And as in the Original Complaints, there are no allegations that there was a close relationship between the FTX Group and Embed that is suggestive of fraud. This is necessarily

so, because the Embed acquisition was an arm's length transaction by sophisticated businesspeople, and the acquisition price was paid entirely to Embed's former shareholders and certain Embed employees, none of whom are alleged to have been FTX Insiders.  Am. Compl. ¶¶ 60–61; *see also In re Cred*, 650 B.R. at 834 (requiring a "close relationship" between debtors and defendants).

Plaintiffs also fail to allege another critical badge of fraud: secrecy or concealment of the transaction.  Again, Plaintiffs cannot do so because WRS itself publicly disclosed the transaction on June 21, 2022, Am. Compl. ¶ 65 n.7, which necessarily negates any inference of fraudulent intent, *see, e.g.*, *Fedders*, 405 B.R. at 545–46 (where debtor's borrowing from banks was "disclosed in a public filing with the SEC," debtor's "dealings with [defendant banks] were anything but concealed").

Notably, Plaintiffs also fail to make any new allegations concerning the consideration for the transfers at issue or the Debtors' insolvency that would provide a basis for the Court to revisit its prior conclusions as to these factors.  Indeed, of the six factors discussed by this Court, consideration and insolvency remain the only two badges of fraud truly alleged in the Amended Complaints.  And this Court has already held that those standing alone are insufficient to support a claim of actual fraudulent transfer, given their overlap with the factors for constructive fraudulent transfer.  *See In re FTX Trading*, 2024 WL 4562675, at *9 ("While allegations of insolvency and a lack of reasonably equivalent value were sufficient in that case to state a claim for constructive fraudulent transfer, they were not sufficient to state a claim for actual fraudulent transfer.").

And while the six badges of fraud mentioned in the Court's October memorandum opinion are not exhaustive, they are representative of "circumstances so commonly associated with

fraudulent transfers that their presence gives rise to an inference of intent." *Id.* at \*7.  Accordingly, Plaintiffs' inability to plead *any* of these factors, absent solvency and consideration, precludes an inference of fraudulent intent.

### 2. The Novel Badges of Fraud Cited by Plaintiffs Do Not Support a Finding of Actual Fraudulent Transfer

Unable to plead any of the established badges of fraud, Plaintiffs instead attempt to rely on badges they invented themselves—but these too are insufficient.  These invented badges of fraud are that: (i) the transfers "were part of a scheme to enrich and otherwise benefit the FTX Insiders"; (ii) "[t]he FTX Insiders contemporaneously misled Alameda's lenders by, among other things, providing them with false balance sheets"; (iii) the "true source of funding" for the transaction was purportedly concealed; (iv) "[t]he FTX Insiders sought to used Embed's status as a registered broker-dealer of securities to convey the false impression that FTX was a 'safe' place to trade cryptocurrency"; and (v) "[o]nce the FTX Insiders had identified Embed as a target for potential acquisition, the FTX Insiders prioritized speed above all else and were largely indifferent to the price paid for Embed or Embed's actual capabilities and value."  Am. Compl. ¶ 89 (i), (ii), (iii), (v), (vi).

Not only do Plaintiffs fail to plead these supposed badges with particularity, but they also do not support an inference of fraudulent intent.

*First*, Plaintiffs make only a conclusory claim that the transfers "were part of a scheme to enrich and otherwise benefit the FTX Insiders."  *Id*. ¶ 89(i).  While the Original Complaints alleged that the FTX Insiders "purportedly pursued the Embed Acquisition because they believed it would help expand FTX US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders," Plaintiffs deleted this allegation from the Amended Complaints.  *See* D.I. 337-4, at 12.  Instead, they now claim that the Embed transaction

was in furtherance of "perpetuating the FTX Group's façade of solvency" "to stave off further demands for repayment that would cause the FTX Group to collapse and the fraudulent scheme to be revealed." Am. Compl. ¶¶ 7, 8. These conclusory allegations fail to support any inference that the Embed acquisition was designed to enrich the FTX Insiders.

Indeed, as discussed above, given that Plaintiffs allege that FTX Insiders received SAFEs in WRS in connection with the funding of the Embed transaction, *id.* ¶ 75, the FTX Insiders would have been enriched by the transaction only if it increased the value of WRS—a scenario that completely contradicts Plaintiffs' allegations that Embed was worthless and that the transaction was intended to hinder, delay, and defraud the Debtors' creditors.

Notably, Plaintiffs expressly alleged in their Original Complaints that the FTX Insiders "expected [WRS shares] to appreciate in value as a result of the Embed acquisition," Original Compl. ¶ 49, but Plaintiffs deleted that allegation in the Amended Complaints without explanation. Plaintiffs also deleted their original allegation that WRS "got snookered into paying [the price it paid] for Embed," *id.* ¶ 43, which also contradicts the allegation that the transaction was intended to hinder, delay, and defraud creditors.[8]

*Second*, Plaintiffs fail to allege any facts that connect the allegedly false balance sheets that the FTX Insiders provided to *Alameda's* lenders to *WRS's* acquisition of Embed. Plaintiffs themselves allege that the FTX Insiders only began creating false balance sheets in June 2022 after a lender sought reassurances from Alameda during the cryptocurrency downturn,

---

[8] Similarly, in their Memorandum in Opposition to Defendants' Motions to Dismiss the [Original] Complaint, Plaintiffs argued that the FTX Insiders "acquired Embed with the naïve expectation . . . that Embed was a functioning platform that would allow the FTX Group to expand its operations," D.I. 153, at 16, which is also at odds with the theory that the Embed transaction was intended to hinder, delay, and defraud creditors. Plaintiffs steered clear of re-making these allegations in the Amended Complaints for obvious reasons.

*id.* ¶¶ 40–45, because they were afraid to provide Alameda's lenders with "accurate information regarding Alameda's financial condition and its relationship with FTX," *id.* ¶ 45, in light of their misappropriation of FTX.com customer funds.  The Amended Complaints fail to connect these allegedly false balance sheets, provided to third-party lenders by Alameda, to: (i) the Embed acquisition in any way—an acquisition which, as discussed above, was publicly disclosed; or (ii) WRS, the entity that acquired Embed.  *See Geron v. Craig (In re Direct Access Partners, LLC)*, 602 B.R. 495, 544 (Bankr. S.D.N.Y. 2019) ("fraudulent accounting" does not establish a fraudulent transfer absent evidence "to connect these particular accounting issues with any intentional scheme to make transfers that would hinder, delay, or defraud other creditors").

*Third*, while the Amended Complaints allege that the FTX Insiders concealed the "true source of funding" for the Embed acquisition, the alleged concealment relates only to improper transfers within the FTX Group.  Am. Compl. ¶ 11.  Plaintiffs do not claim that WRS's payment to acquire Embed—the only payment relevant to whether there was a fraudulent transfer—was concealed.

*Fourth*, Plaintiffs fail to allege facts that support the claim that the FTX Insiders sought to use Embed's status as a registered correspondent clearing broker-dealer "to convey the false impression that FTX was a 'safe' place to trade cryptocurrency."  *Id.* ¶ 89 (v).  Plaintiffs admit that Embed was a registered correspondent clearing broker-dealer of securities, not cryptocurrency.  *Id.* ¶ 6.  If the FTX Insiders believed acquiring a company that was not tied to cryptocurrency trading would bolster FTX's reputation, that does not make the investment fraudulent.  To the contrary, it is precisely because Embed enabled WRS to expand into traditional stock trading that the acquisition was so valuable to the FTX Group and consistent with WRS's legitimate business operations.

*Finally*, Plaintiffs fail to allege sufficient facts to support their claim that, once the FTX Insiders had identified Embed as a target for potential acquisition, they "prioritized speed above all else and were largely indifferent to the price paid for Embed or Embed's actual capabilities and value." *Id.* ¶ 52. Nearly all acquirors seek to close acquisitions quickly. And, in fact, the Embed acquisition did not take place so quickly as to suggest fraudulent intent. *See, e.g.*, *Jiaxing Super Lighting Elec. Appliance Co., Ltd. v. Bruggeman*, 2022 WL 17404300, at *4 (N.D. Cal. Dec. 2, 2022) (fraudulent sale made "at light speed after a single telephone call with the buyer") (cleaned up). WRS and Embed agreed to a term sheet on April 15, 2022, Am. Compl. ¶ 39, signed a merger agreement on June 10, 2022, *id.* ¶ 40, and did not close the transaction until September 30, 2022, *id.* ¶ 11, almost six months after the term sheet was signed and only after numerous regulatory bodies, including FINRA and others, had approved the transaction.

Moreover, the FTX Insiders' alleged "indifference" to the Embed purchase price or to Embed's actual capabilities reflected the Insiders' belief that "they did not need to perform due diligence because a WRS subsidiary was already an Embed customer." *Id*. ¶ 50. At worst, any failure to properly diligence the transaction reflected negligence, which is not a badge of fraud. *See In re Copeland*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003) (a "'dumb but honest' [debtor] does not satisfy the test" for fraudulent intent) (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)); *Nat'l Tour Ass'n v. Rodriguez*, 221 B.R. 1012, 1018 (M.D. Fla. 1998) ("The evidence shows Debtor's comedy of errors, including bad judgment, wishful thinking, and poor business management. Yet these acts do not rise to the level of fraudulent intent.").

In sum, as in the Original Complaints, the Amended Complaints do not allege badges of fraud sufficient to raise an inference of fraudulent intent as required for Plaintiffs' claims of actual fraudulent transfer.

\*      \*      \*

Thus, despite having access to all of the relevant documents concerning the Embed transaction, plea allocutions from and cooperation agreements with nearly all of the FTX Insiders, and extensive testimony and evidence from the criminal trial of Bankman-Fried, Plaintiffs do not adequately allege direct evidence of fraudulent intent or badges of fraud sufficient to raise an inference of fraudulent intent as required to plead a claim for actual fraudulent transfer. Accordingly, Counts I and III of the Amended Complaints should be dismissed with prejudice.

## II.     THE SAFE HARBOR UNDER SECTION 546(e) OF THE BANKRUPTCY CODE BARS PLAINTIFFS' CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS UNDER THE BANKRUPTCY CODE (COUNTS TWO AND FOUR) AND ALL STATE LAW AVOIDANCE CLAIMS (COUNT THREE)

Plaintiffs represented to the Court and the parties that they sought leave to file the Amended Complaints only "for the purpose of repleading Counts I and III" (the actual fraudulent transfers claims) and that the "additional facts" in the Amended Complaints "establish a basis for repleading Counts I and III" only.   D.I. 337 ¶¶ 2, 5.   According to Plaintiffs, nothing in the Amended Complaints amended the allegations related to Counts II and IV (the constructive fraudulent transfer claims) or the Court's prior decision denying Defendants' motions to dismiss Counts II and IV based on Section 546(e) of the Bankruptcy Code.   The safe harbor also precludes the state law claim (Count III) for actual fraudulent transfer and thus provides an independent basis for dismissal of that claim.   *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 817 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014).   Accordingly, and to preserve the issues for any appeal, Defendants hereby incorporate the arguments as to Counts II, III, and IV made in their motions to dismiss the Original Complaints. *See* Adv. Pro. No. 23-50380, D.I. 98, 99, 181; Adv. Pro. No. 23-50379, D.I. 43, 80.

III.    **PLAINTIFFS' CLAIMS UNDER SECTION 550(a)(1) (COUNT FIVE) AND SECTION 502(d) (COUNT SIX) SHOULD BE DISMISSED, AS PLAINTIFFS HAVE NOT ALLEGED AN AVOIDABLE TRANSFER**

Because Plaintiff's avoidance claims should be dismissed for the reasons explained above, Counts V and VI should also be dismissed.  Both of these claims rely on the existence of underlying avoidable transfers, none of which have been sufficiently alleged.  *See In re USDigital, Inc.*, 443 B.R. 22, 40 (Bankr. D. Del. 2011) (citing 11 U.S.C. § 550); *In re KB Toys Inc.*, 736 F.3d 247, 249 (3d Cir. 2013) (citing 11 U.S.C. § 502(d)).  Defendants incorporate by reference the arguments made in their motions to dismiss the Original Complaints as to those counts.[9]  *See* Adv. Pro. No. 23-50380, D.I. 98, 99, 181; Adv. Pro. No. 23-50379, D.I. 43, 80.

IV.    **DEFENDANTS INCORPORATE BY REFERENCE THE OTHER ARGUMENTS MADE IN THEIR MOTIONS TO DISMISS THE ORIGINAL COMPLAINTS**

To preserve the issues for appeal, Defendants incorporate by reference the other arguments made in their motions to dismiss the Original Complaints and which the Court ruled on in its October 2024 memorandum opinion, including, without limitation, that Plaintiffs have no enforceable interest in the funds they seek to recover, and Plaintiffs' claims are barred by Bankruptcy Code Section 550(b).  D.I. 98, at 19–30; *see also* Adv. Pro. No. 23-50380, D.I. 98, 99, 181; Adv. Pro. No. 23-50379, D.I. 43, 80.

---

[9] Count VI in the Amended Complaints and the Original Complaint in Adv. Pro. No. 23-50379, and Count VII in the Original Complaint in Adv. Pro. No. 23-50380.

## CONCLUSION

For the foregoing reasons, the Amended Complaints should be dismissed with prejudice.

Dated:  January 15, 2025
          Wilmington, Delaware

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Daniel A. Mason*
Daniel A. Mason (Del. Bar No. 5206)
Elizabeth Wang (Del. Bar No. 6620)
1313 North Market Street, Suite 806
P.O. Box 32
Wilmington, DE 19899-0032
Telephone: (302) 655-4425
Fax: (302) 216-7884
Email: dmason@paulweiss.com
      ewang@paulweiss.com

William A. Clareman (*pro hac vice*)
Gregory F. Laufer (*pro hac vice*)
Kenneth S. Ziman (*pro hac vice*)
Max H. Siegel (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 492-0248
Email: wclareman@paulweiss.com
      glaufer@paulweiss.com
      kziman@paulweiss.com
      msiegel@paulweiss.com

Randall S. Luskey (*pro hac vice*)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Fax: (202) 204-7391
Email: rluskey@paulweiss.com

*Attorneys for Defendants Listed on Annex B*

Respectfully submitted,

SAUL EWING LLP

*//s/ Lucian B. Murley*
Lucian B. Murley (Del. Bar No. 4892)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6898
Email: luke.murley@saul.com

-and-

PALLAS PARTNERS (US) LLP
Joshua A. Naftalis (*pro hac vice*)
Duane L. Loft (*pro hac vice*)
Anastasia Cembrovska (*pro hac vice*)
Jingxi Zhai (*pro hac vice*)
Adair Kleinpeter-Ross (*pro hac vice*)
75 Rockefeller Plaza
New York, NY 10019
Telephone: (212) 970-2300
Email: joshua.naftalis@pallasllp.com
      duane.loft@pallasllp.com
      anastasia.cembrovska@pallasllp.com
      jingxi.zhai@pallasllp.com
      adair.kleinpeter-ross@pallasllp.com

*Attorneys for Defendants Listed on Annex A*

**Annex A**

9Yards Capital Investments II LP
Aaron Frank
AAVCF3 LP
Adam Boryenace
Adapt VC LLC
Akhil Paul
Benjamin Londergan
Brandon Mann
Brent Johnson
Carol H. Duggan Revocable Living Trust
Cathexis Subsidiaries GP, LLC
Cathexis Ventures, LP
Christian Nordby
Christopher Harper
Christopher Young
Clayton Gardner
Craig Shindledecker
David Meents
Dena Wever
Derek Clark
EM Fund I, a series of Chris Golda Investments, LP
Embedfi June 2021, a series of Party Round LLC
Fairchild Fund III, LLC
Fund I, a series of 20VC, LP
Fund I, a series of Not Boring Capital, LP
Harland Group LLC
James Nichols
Joe Percoco
John Dwyer
Jonathan Duarte
Jonathan Weiner
Joshua Allen Slate
Justin Lovero
Kerr Investment Holdings Pty Ltd a/t/f The Kerr Family Trust
Kiara Baudoin
Kick the Hive LLC
KV5 Pty Ltd ATF KV5 Trust
Lindsey Boerner
Matthew Lyon
Michael Ferrari
Michael Giles
Michael McGee
Monique Saugstad
Motivate Ventures Fund I, LP

Motivate Ventures QP Fund I, LP
Operator Partners, LLC
Peter T. Lawler Living Trust
Philippe Jabre
PruVen Capital Partners Fund I, LP
S20, a series of Chris Golda Investments, LP
Silverstone Venture Investments Limited
Soma Capital Fund, III, LP
Soma Capital Fund III Partners LLC
Stanton Camp
Stephen Harper
Stuart Sopp
SWS Holding Company, LLC
Tana A. Lawler
The Gardner 2008 Living Trust
Thomas G. Miglis Revocable Trust
Tim Millar
TriplePoint Private Venture Credit Inc.
TriplePoint Venture Lending Fund, LLC
TriplePoint Ventures 5 LLC
VentureSouq Capital SPC o/b/o VSQ SP 59 (YCS20)
William Hocket Living Trust
Yaselleraph Finance Pty Ltd ATF Yaselleraph Finance Trust
Z Perret Trust

4161-6566-2807, v. 6

**Annex B**

The 2016 Karkal Family Trust
Acrew Capital Fund (A), L.P.
Acrew Capital Fund, L.P.
Acrew Capital MGP, LLC
Bain Capital Venture Fund 2019 LP
BCIP Venture Associates II, L.P.
BCIP Venture Associates II-B, L.P.
BCV 2019-MD Primary, L.P.
Buckley Ventures GP, LLC
Buckley Ventures, LP
Correlation Ventures II, LP
Fin VC Regatta I, LP
Homebrew Ventures III, LP
Jonathan Christodoro
Kamran Ansari
Launchpad Capital Fund I LP
LGF II, L.P.
Liquid 2 Ventures Fund II, L.P.
Propel Venture Partners, LLC
Propel Venture Partners US Fund I LP
Putnam (Warren Lowell Putnam & Brynn Jinnett Putnam, Tenants in Common)
Samuel Jones
Torch Capital II, LP
Transpose Platform o/b/o TI Platform Fund II
TI Platform NLI Venture Limited II
Transpose Platform Fintech Fund II, L.P.
TI Platform Fund II, LP
Treasury Fund I, LP
Y Combinator ES20, LLC
YCC20, L.P.