**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-50379 (JTD) |
| ROCKET INTERNET CAPITAL PARTNERS II SCS, *et al.*, | |
| Defendants. | |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-50380 (JTD) |
| MICHAEL GILES, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINTS**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND .............................................................................. 5

LEGAL STANDARD ......................................................................................... 9

ARGUMENT ..................................................................................................... 10

I.    THE AMENDED COMPLAINTS ADEQUATELY ALLEGE ACTUAL
      INTENT TO HINDER, DELAY, OR DEFRAUD CREDITORS ............................. 10

      A.    The Embed Transfers to Defendants Were Part and Parcel of the FTX
            Insiders' Fraudulent Scheme................................................................. 11

            1.    The Embed Transfers Were Accomplished by and in Furtherance
                  of the Fraud at the FTX Group ................................................. 11

            2.    The Embed Transaction Was Part of a Ponzi-Like Scheme To
                  Prolong the Larger Fraud at the FTX Group ............................. 19

      B.    The FTX Insiders Acted with Fraudulent Intent by Exposing Creditors to a
            Substantial Risk of Loss of Which They Were Intentionally Kept Unaware ....... 22

      C.    The FTX Insiders Acted, at a Minimum, with Intent To Hinder or Delay
            Creditors by Putting Hundreds of Millions of Dollars Beyond Their Reach ....... 27

II.   THE COURT'S PRIOR RULINGS WITH RESPECT TO ALL
      REMAINING CLAIMS AND PURPORTED AFFIRMATIVE DEFENSES
      REMAIN APPLICABLE ............................................................................. 28

CONCLUSION ................................................................................................... 28

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*ASARCO LLC* v. *Ams. Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ...................................................................25, 27

*In re Autobacs Strauss, Inc.*,
473 B.R. 525 (Bankr. D. Del. 2012) .....................................................................26

*In re Bayou Grp., LLC*,
439 B.R. 284 (S.D.N.Y. 2010)...............................................................15, 19, 22

*In re Bell & Beckwith*,
64 B.R. 620 (Bankr. N.D. Ohio 1986) ...........................................................14, 24

*Black* v. *Montgomery Cnty.*,
835 F.3d 358 (3d Cir. 2016)....................................................................................9

*In re Bullion Reserve of N. Am.*,
836 F.2d 1214 (9th Cir. 1988) .......................................................................19, 20

*In re Carrozzella & Richardson*,
237 B.R. 536 (Bankr. D. Conn. 1999) ..................................................................20

*In re DBSI, Inc.*,
477 B.R. 504 (Bankr. D. Del. 2012) .....................................................................21

*In re DBSI, Inc.*,
2011 WL 1810632 (Bankr. D. Del. May 5, 2011)...............................................20

*Drivetrain, LLC* v. *X. Com., Inc.*,
2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) .................................3, 16, 17, 19

*Hedges* v. *United States*,
404 F.3d 744 (3d Cir. 2005).....................................................................................9

*In re Indep. Clearing House*,
77 B.R. 843 (D. Utah 1987)............................................................................19, 20

*In re Live Well Fin., Inc.*,
652 B.R. 699 (Bankr. D. Del. 2023) ............................................................ *passim*

*In re Mallinckrodt PLC*,
2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) (Dorsey, J.) ........................10, 11

*In re Manhattan Inv. Fund Ltd.*,
    397 B.R. 1 (S.D.N.Y. 2007) ................................................................................20

*In re MarketXT Holdings Corp.*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ..........................................................24, 28

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) ...................................................................19

*In re Millennium Lab Holdings II, LLC*,
    2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ......................................25, 26

*In re Nat'l Audit Def. Network*,
    367 B.R. 207 (Bankr. D. Nev. 2007) ..................................................................20

*In re Paige*,
    2015 WL 1544996 (Bankr. M.D. Pa. Mar. 31, 2015) .........................................28

*In re Sentinel Mgmt. Grp., Inc.*,
    728 F.3d 660 (7th Cir. 2013) ...................................................................... *passim*

*Shapiro* v. *Wilgus*,
    287 U.S. 348 (1932) ............................................................................................28

*In re Syntax-Brillian Corp.*,
    573 F. App'x 154 (3d Cir. 2014) .......................................................................10

*In re Syntax-Brillian Corp.*,
    2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ..................................... *passim*

*In re Team Sys. Int'l, LLC*,
    2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) .............................................25

*Tiab Commc'ns Corp.* v. *Keymarket of NEPA, Inc.*,
    263 F. Supp. 2d 925 (M.D. Pa. 2003) .................................................................18

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ................................................................27

*W. Run Student Hous. Assocs., LLC* v. *Huntington Nat'l Bank*,
    712 F.3d 165 (3d Cir. 2013) ...............................................................................27

*Zazzali* v. *AFA Fin. Grp., LLC*,
    2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012) ......................................19, 21

**Statutes and Rules**

11 U.S.C. § 548(a) .................................................................................................................9

Del. Code Ann. tit. 6, § 1304(a)(1) ........................................................................................9

Fed. R. Civ. P. 9(b) ...........................................................................................................9, 10

Fed. R. Civ. P. 12(b)(6).........................................................................................................9

## PRELIMINARY STATEMENT

These actions arise out of the massive fraud orchestrated by the insiders who ran

the FTX Group[2] prior to its collapse.  As part of that fraud, the FTX Insiders caused West Realm

Shires, Inc. ("WRS") to acquire Embed Financial Technologies Inc. ("Embed") using nearly $300

million only six weeks before Plaintiffs filed for bankruptcy, at a time when they were deeply

insolvent.  These proceedings, which Plaintiffs Alameda Research Ltd. ("Alameda"), WRS, and

West Realm Shires Services, Inc. ("WRSS") commenced on May 17, 2023 (the "Initial

Complaints," Adv. D.I. 1),[3] seek to avoid the transfers made to Embed's founder, Michael Giles,

and other former Embed equity holders and employees in connection with that acquisition.

On October 23, 2024, the Court denied Defendants' motions to dismiss the Initial

Complaints as to all counts except Plaintiffs' actual fraudulent transfer and preference claims (the

"Opinion," "Op.").  [D.I. Adv. 288.]  Regarding the former, the Court observed that Plaintiffs'

description in their briefs of the Embed acquisition as part of the larger FTX Group fraud "might

very well be sufficient at this stage of the case to support a finding of actual intent" but "[wa]s not

supported by the facts alleged" in the Initial Complaints.  (Op. at 17.)  Plaintiffs subsequently

amended the Initial Complaints to replead their actual fraudulent transfer claims, including with

additional specific allegations regarding the FTX Insiders' intent to hinder, delay, and defraud

creditors (the "Amended Complaints," "AC").  [Adv. D.I. 369.]  Defendants moved to dismiss the

---

[2]    Capitalized terms used in this memorandum shall have the same meaning as those used in the Amended Complaints.  On February 11, 2025, this Court entered the *Order Granting the FTX Recovery Trust's Omnibus Motion to Substitute Plaintiffs in Adversary Proceedings* [D.I. 29554] (the "Substitution Order"), substituting the FTX Recovery Trust for all Plaintiffs in these Adversary Proceedings.  In accordance with the Substitution Order, Plaintiffs are filing a *Notice of Substitution of Plaintiff* in these Adversary Proceedings.

[3]    For ease of reference, all further docket cites shall refer to the underlying litigation in *Alameda Rsch. Ltd.* v. *Giles*, No. 23-50380 (Bankr. D. Del. 2023), unless otherwise specified.

Amended Complaints on January 15, 2025 (the "Motion," "Mot."). [Adv. D.I. 380.] Two Defendants also filed a separate motion "to emphasize one particular point" (the "Alumni Ventures Motion"). [Adv. D.I. 382.] Plaintiffs submit this memorandum of law in opposition to both motions.

The circumstances surrounding the Embed acquisition, when viewed in their totality, plainly demonstrate that the FTX Insiders knew that the acquisition would hinder, delay, or defraud FTX Group creditors, or at least should have seen this result as a natural consequence of their acts. The Amended Complaints adequately allege that the FTX Insiders acted with the requisite intent for at least four independently sufficient reasons.

*First*, the FTX Insiders accomplished the relevant transfers both by means of, and in furtherance of, the larger FTX Group fraud. The Court's Opinion on Defendants' motions to dismiss the Initial Complaints endorsed Plaintiffs' theory that the "Debtors engaged in the Embed acquisition as part of a larger fraudulent scheme designed to increase the FTX Group's influence and finance acquisitions that would project an image of growth." (Op. at 17.) The Court nevertheless dismissed Plaintiffs' actual fraudulent transfer claims because "the complaint must explain how exactly the allegedly fraudulent transfers further the fraudulent scheme." (Op. at 18.) In line with the Court's guidance, the Amended Complaints now directly connect the Embed acquisition and the underlying transfers to the broader fraudulent scheme, including based on Plaintiffs' continued investigation and evidence from Samuel Bankman-Fried's criminal trial.

Specifically, the Amended Complaints allege that the Embed acquisition was: (i) accomplished by means of the larger FTX Group fraud because the funds that were used to purchase Embed—and thus became unavailable to pay creditors—were fraudulently obtained from lenders and misappropriated from customers as part of that fraud; and (ii) in furtherance of the

larger fraud because the acquisition was intended to forestall disclosure of the fraud by perpetuating a false appearance of legitimacy and financial stability to creditors who would have otherwise called their loans or withdrawn assets.  For instance, the Amended Complaints allege that Bankman-Fried "hoped that paying hundreds of millions of dollars cash for Embed would project a false image of profitability, growth, and legitimacy to sustain the fraudulent scheme by deceiving lenders, customers, and investors into believing that the FTX Group was successful enough to afford the lofty acquisition price and expand into new markets." (AC ¶ 64.)  Moreover, after a downturn in the cryptocurrency market, FTX Insider Nishad Singh "approached Bankman-Fried about 'reversing the Embed acquisition,'" but "Bankman-Fried refused," despite knowing that the FTX Group "could not afford to complete the acquisition, much less satisfy its outstanding debts and other financial obligations."  (AC ¶¶ 10, 67.)  Bankman-Fried also knew that "the apparent inability to close an announced deal[] would signal to lenders, customers, investors, and the market as a whole that the FTX Group was in jeopardy," and he therefore went through with the acquisition to avoid "revealing the FTX Group's insolvency and the fraudulent scheme, and hastening the FTX Group's collapse."  (AC ¶¶ 9, 68.)

Defendants spend much of their brief attempting to distinguish *Drivetrain, LLC* v. *X. Commerce, Inc.*, 2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023), a case that Plaintiffs previously relied upon (and the Court endorsed) for the proposition that fraudulent intent exists where transfers are made to project a false image of profitability in furtherance of a larger fraudulent scheme.  But Defendants do not explain why this principle applies only to the precise set of facts in that case (it does not).  Nor is *Drivetrain* the only relevant in-circuit authority for the principle that fraudulent intent exists where transfers are made to perpetuate a fraudulent scheme and avoid its exposure.  *See In re Live Well Fin., Inc.*, 652 B.R. 699, 707 (Bankr. D. Del. 2023).

*Second*, and relatedly, fraudulent intent should be presumed because the Embed acquisition was related to and in furtherance of the FTX Insiders' Ponzi-like arrangement. The Amended Complaints are brimming with examples of this arrangement, whereby the FTX Insiders caused Alameda to misappropriate funds in order to repay existing creditors. For example, FTX Insider Caroline Ellison admitted in her guilty plea that "Alameda used FTX.com funds to finance investments or repay loans" (AC ¶ 87), or as Nishad Singh put it, "spending customer funds, not for customer benefit" (AC ¶ 67). The transfers made in connection with the Embed acquisition were funded with assets fraudulently borrowed or misappropriated as part of, and concealed in a manner characteristic of, the scheme. The acquisition also furthered the Ponzi-like scheme by attracting new investors and perpetuating a false image of profitability to keep the scheme going. Defendants address this entire argument in a single footnote, arguing that the Ponzi presumption cannot apply because Embed was a "legitimate new investment." (Mot. at 13-14 n.6.) This argument both contradicts the well-pleaded allegations in the Amended Complaints and misunderstands the caselaw outlining the Ponzi presumption, which does not require that the perpetrator have no legitimate business activity.

*Third*, the FTX Insiders acted with intent to hinder, delay, or defraud creditors by exposing them to a substantial risk of loss—which the FTX Insiders actively and illegally concealed—in pursuing the Embed acquisition. The FTX Insiders caused Plaintiffs to acquire Embed at a time when the FTX Group's liabilities exceeded its assets by billions (giving rise to a massive "hole" in the FTX Group's balance sheets) and the FTX Insiders were regularly providing lenders with falsified financial information to prevent them from calling their loans. (AC ¶¶ 33, 43-46.) The FTX Insiders funded the Embed acquisition using fraudulently misappropriated and commingled funds from FTX.com customers and Alameda's lenders, which they did not intend to

repay to Alameda, and which they knew Alameda could not afford to repay to creditors.  (AC ¶¶ 72, 74-76.)  Given these facts, and in light of the totality of the circumstances, there can be no doubt that the natural consequence of making the transfers in connection with the acquisition was to hinder, delay, or defraud FTX Group creditors.

*Fourth*, the FTX Insiders acted, at a minimum, with intent to hinder or delay creditors by funding the acquisition with fraudulently obtained and misappropriated assets, thereby putting assets that should have been readily available to creditors beyond their reach.

The motions to dismiss should both be denied.

## FACTUAL BACKGROUND

Prior to the FTX Group's collapse in November 2022, Bankman-Fried and the other FTX Insiders perpetrated one of the largest frauds in history, lavishly spending commingled FTX Group assets on personal luxuries, political and "charitable" contributions, and reckless, illiquid investments.  (AC ¶¶ 33, 36, 37, 67.)  The FTX Insiders funded this spending spree by causing Alameda to misappropriate billions of dollars from FTX.com customers and borrow billions more from third-party lenders.  (AC ¶¶ 33, 37.)  The FTX Insiders then "borrowed" from commingled customer and lender funds to finance their excessive spending, or to repay Alameda's earlier creditors, as necessary.  (AC ¶¶ 33, 44, 87.)  All the while, they concealed the true nature of the relationship between Alameda and FTX.com from customers, lenders, and the public.  (AC ¶¶ 36, 43, 87.)

Beginning in 2022, the FTX Group experienced severe financial distress.  Alameda had borrowed approximately $10 billion from third-party lenders (largely through "open-term" loans that lenders could call at any time) and misappropriated approximately $8 billion in customer funds.  (AC ¶¶ 4, 5.)  Bankman-Fried understood that if the FTX Group's true financial condition were exposed, lenders would call their loans, customers would seek to withdraw their money, new

funding would become impossible to obtain, and his fraud would come to light.  (AC ¶ 6.)  It was in this context that discussions about the acquisition of Embed began in March of 2022.  (AC ¶ 6.)

To ward off the FTX Group's collapse, Bankman-Fried needed to signal to creditors and the public that the FTX Group was growing, profitable, and a force in the marketplace, and he hoped that a well-publicized expansion into regulated financial markets would achieve this result. (AC ¶¶ 6, 68.)  Embed, a stock clearing firm and FINRA licensed broker-dealer, gave Bankman-Fried a vehicle for creating that false appearance.  (AC ¶¶ 4-6, 68.)  In pursuing the acquisition, Bankman-Fried prioritized speed above all else and conducted almost no due diligence.  (AC ¶¶ 47, 50, 52.)  Just a few weeks after discussions began, on April 15, 2022, WRS and Embed signed a "Memorandum of Terms" that ascribed a $220 million value to Embed and provided for $75 million in retention bonus payments to Embed employees—including a $55 million payment to Embed founder Michael Giles simply to stay employed at the company for less than four months until the sale was consummated.  (AC ¶ 58.)  This was a colossal overpayment, as Embed had only $37 million in assets, $25,000 in net revenue, no real customers, and serious technology shortcomings.  (AC ¶¶ 52, 54, 57.)  Even a basic due diligence process would have uncovered that Embed's technology was riddled with bugs and that its platform could not handle anywhere near the number of user accounts required to make it a success.  (AC ¶ 54.)

The speed at which Bankman-Fried completed the deal was intentional.  He was unconcerned about overpaying for Embed (he did) or ensuring that Embed's technology actually worked (it did not).  (AC ¶ 47.)  The faster the deal terms were finalized, "the faster Bankman-Fried could publicize the acquisition of a U.S.-licensed broker-dealer," thereby creating "a false appearance" of legitimacy and perpetuating the ruse that the FTX Group was stable and successful enough to afford the inflated acquisition price and continue to expand into new, regulated markets.

(AC ¶¶ 8, 47.)  But in May 2022, almost immediately after the Memorandum of Terms was signed, a "sustained depression in cryptocurrency markets began."  (AC ¶ 51.)  During this "crypto winter," cryptocurrency prices dropped precipitously, Alameda's lenders threatened to call, and in some cases did call, open-term loans, and concealing the FTX Group's true financial condition became even more "imperative."  (AC ¶¶ 7, 40-41, 51.)

At the same time the terms of the acquisition were being finalized, the FTX Insiders conspired to provide materially misleading financial statements—including false and misleading balance sheets—to Alameda's lenders that concealed the extent of Alameda's borrowing and the billions of dollars in "loans" that Alameda made to FTX executives and related parties.  (AC ¶ 43.) The FTX Insiders believed that these fraudulent balance sheets were necessary to avoid "more widespread concern about Alameda," which in turn could trigger a "bank run," exposing the FTX Insiders' wrongdoing.  (AC ¶¶ 45-46.)  Bankman-Fried also set out to raise additional capital from investors to try to plug the $8 billion "hole."  (AC ¶¶ 44, 46.)

Against this backdrop, the Embed "Agreement and Plan of Merger," which contained substantially the same terms as the Memorandum of Terms, was finalized on June 10, 2022.  (AC ¶ 48.)  By this time, the FTX Insiders were well aware that FTX was unable to fund the acquisition without using funds misappropriated from customers and borrowed from lenders who never would have loaned Alameda money if they had known the truth.  (AC ¶¶ 40, 44.)  As Ellison testified, Alameda "didn't have the liquid assets to pay all of the money back" at this time, and could not repay lenders or make large acquisitions without taking money from FTX customers. (AC ¶ 44.)  And as Singh testified, once he fully understood the nature of Alameda's liabilities, he approached Bankman-Fried about "reversing the Embed acquisition" because he was deeply concerned that if "FTX or Alameda was spending liquid funds to acquire more illiquid stuff," that

"was necessarily spending customer funds, not for customer benefit." (AC ¶ 67.) Yet Bankman-Fried refused to pull out of the Embed acquisition. (AC ¶ 67.) While he knew that the acquisition would only put the FTX Group deeper into the "hole," pulling out of the transaction would signal weakness to the market, revealing the FTX Group's insolvency and the FTX Insiders' fraud, and hastening the FTX Group's collapse. (AC ¶ 68.)

Singh admitted in his guilty plea that by "early September 2022," Alameda "could not repay what it owed." (AC ¶ 86.) The Embed acquisition closed later that same month,[4] at which time WRS paid Defendants nearly $300 million, including at least $250 million from Alameda. (AC ¶¶ 62, 72-73, Ex. A.) The FTX Insiders concealed the source of those funds through a series of phony "loan" documents and misleading on-exchange transfers to make it appear as though the funds came from the FTX Insiders, rather than Alameda. (AC ¶¶ 11, 69-76.) Specifically, Alameda papered sham "loans" to Bankman-Fried, Singh, and Zixiao "Gary" Wang with barebones promissory notes that did not include any repayment schedule or other detailed terms. (AC ¶ 70.)

By the time the transfers to Defendants were made, the "FTX Insiders well knew that the FTX Group was deeply insolvent," that the FTX Group could not afford to part with these assets, and that in turn, the funds used for the acquisition would not be available to pay creditors, including the lenders to whom they had recently provided false balance sheets. (AC ¶ 62.) Just six weeks later, Alameda, WRS, and WRSS filed for Chapter 11. (AC ¶ 62.)

---

[4] Although the acquisition process spanned approximately six months, from April 2022 through September 2022, most of that time was spent securing regulatory approvals. (AC ¶ 48.)

-8-

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), Defendants bear the burden of demonstrating that Plaintiffs have not stated a claim upon which relief can be granted. *Hedges* v. *United States*, 404 F.3d 744, 750 (3d Cir. 2005). The Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016).

Counts I and III of the Amended Complaints seek to avoid transfers made to Defendants in connection with the Embed acquisition under 11 U.S.C. § 548(a)(1)(A) and Del. Code Ann. tit. 6, § 1304(a)(1), which allow for the avoidance of transfers made "with actual intent to hinder, delay, or defraud" creditors. Defendants' Motion is riddled with inaccurate references to a pleading standard that would require Plaintiffs to plead fraudulent intent with particularity. (*See* Mot. at 1, 3, 9, 10, 17.) As this Court has already held, however, fraudulent intent may be pled generally. (Op. at 16.) The heightened pleading standard of Rule 9(b) applies only to the circumstances of the alleged fraud (Op. at 16), which is met where the complaint includes allegations "regarding the date, time, and amount" of each fraudulent transfer. *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 n.11 (Bankr. D. Del. Feb. 8, 2016).

**ARGUMENT**

I.   **THE AMENDED COMPLAINTS ADEQUATELY ALLEGE ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD CREDITORS.**

To state a claim for intentional fraudulent transfer, "a showing of any one of the three requisite states of mind—the intent to hinder, the intent to delay, or the intent to defraud—is sufficient." *Syntax*, 2016 WL 1165634, at *4. Only the intent of the transferor, not the transferee, must be established. *In re Live Well*, 652 B.R. at 704.[5] And pursuant to well-established law, the FTX Insiders' intent is imputed to Plaintiffs. *Syntax*, 2016 WL 1165634, at *6.

Because a debtor will "rarely admit" an intent to hinder, delay, or defraud creditors, "courts must usually infer it."[6] (Op. at 15.) An inference of actual intent is based on the "totality of the circumstances," drawing "all reasonable inferences" in favor of the plaintiff. *Syntax*, 2016 WL 1165634, at *6; *see In re Mallinckrodt PLC*, 2024 WL 206682, at *33 (Bankr. D. Del. Jan. 18, 2024) (Dorsey, J.). Consistent with the principle that "every person is presumed to intend the natural consequences of his acts," allegations demonstrating that the FTX Insiders "should have seen" the effect on creditors in making the transfers are sufficient. *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013). The relevant question is whether "it is reasonable to conclude that the hindrance [or delay or defrauding] of Debtors' creditors was substantially certain to occur

---

[5]   Citing no authority, the Alumni Ventures Motion argues that the Amended Complaints should be dismissed because Defendants are "innocent parties that were in no way involved with the unlawful and deceptive conduct by the FTX Insiders." (Alumni Ventures Motion at 3.) This argument misunderstands the requisite elements of a fraudulent transfer claim. *See In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014) ("[S]ection 548(a)(1)(A) and 6 Del.Code § 1304 unambiguously focus solely on the intent of the debtor.").

[6]   For this reason (among others), Defendants' argument that the Amended Complaints insufficiently plead fraudulent intent because they fail to cite documents directly evidencing such intent is nonsensical. (Mot. at 2, 3, 8, 14.) Nor is the pleading standard higher, as Defendants suggest, based on Plaintiffs' purported access to all relevant documents (Mot. at 1-2), which is nearly always the case in avoidance actions brought on behalf of a bankruptcy estate.

following the [transaction], considering the totality of the circumstances." *In re Mallinckrodt PLC*, 2024 WL 206682, at *33.

Defendants' Motion can be boiled down to two arguments, both of which reflect an unduly narrow interpretation of actual fraudulent intent. *First*, Defendants argue that the Amended Complaints somehow fail adequately to connect the fraudulent transfers to the FTX Insiders' broader scheme because the facts here are not perfectly analogous to those in *Drivetrain*. (Mot. at 2, 10, 11.) *Second*, Defendants argue that the Amended Complaints fail sufficiently to allege circumstantial evidence of fraudulent intent because Plaintiffs have not pled sufficient "badges of fraud" to give rise to such an inference. (Mot. at 3-4, 14-21.) Both arguments are meritless.

## A.   The Embed Transfers to Defendants Were Part and Parcel of the FTX Insiders' Fraudulent Scheme.

The Amended Complaints adequately allege that the transfers made in connection with the Embed acquisition were in furtherance of the larger fraud at the FTX Group, and thus, were made with the intent to hinder, delay, or defraud FTX Group creditors.

### 1.   The Embed Transfers Were Accomplished by and in Furtherance of the Fraud at the FTX Group.

As the Court noted in its Opinion, "[t]ransfers made in furtherance of a larger scheme to defraud may support an inference of fraudulent intent" where "the allegations of the complaint connect the specific transfers to the scheme." (Op. at 17-18.) In this regard, the Court endorsed the theory of fraudulent intent set forth in Plaintiffs' opposition to Defendants' motions to dismiss the Initial Complaints—*i.e.*, that "Debtors engaged in the Embed acquisition as part of a larger fraudulent scheme designed to increase the FTX Group's influence and finance acquisitions that would project an image of growth." (Op. at 17.) Specifically, the Court noted that this "might very well be sufficient at this stage of the case to support a finding of actual intent," but concluded that it was "not supported by the facts alleged in the [Initial] Complaints." (*Id.*)

The Amended Complaints expressly "connect the specific transfers to the scheme."

(*Id.* at 17-18.)  For example, the Amended Complaints allege:

- "Bankman-Fried orchestrated a fraudulent scheme that included using Alameda" to "borrow[] approximately $10 billion from third-party lenders" and "approximately $8 billion in customer funds."  (AC ¶¶ 4, 5, 33.)  Ellison admitted that, "from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans" and "planned to use customer deposits (among other assets) to repay third-party lenders."  (AC ¶¶ 33, 87.)

- The FTX Insiders agreed "not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement" and "conspired" to lie about this arrangement to the public.  (AC ¶¶ 36, 43.)  To that end, the FTX Insiders regularly "made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds."  (AC ¶ 87.)

- "Bankman-Fried knew that if there was a downturn in the crypto markets, and a realization on the part of lenders, customers, and investors that the FTX Group was in distress, the FTX Group would suffer a liquidity crisis and the fraud would be revealed.  It was therefore imperative to lull lenders, customers, and investors into believing that the FTX Group was financially sound and successful enough to continue as a going—and growing—concern."  (AC ¶ 6.)

- "Bankman-Fried saw expansion into regulated financial markets—and the appearance of legitimacy it would bring to the FTX Group—as an essential part of his efforts to sustain and prolong his fraudulent scheme."  (AC ¶ 5.)  "In furtherance of Bankman-Fried's desire to cultivate this façade of legitimacy, Bankman-Fried and others acting at his direction began discussions on or about March 15, 2022 about the idea of WRS acquiring Embed, a stock clearing firm and FINRA licensed broker-dealer founded by Michael Giles." (AC ¶ 6.)

- In pursuing the acquisition, "the FTX Insiders prioritized speed above all else . . . causing WRS to forgo due diligence."  (AC ¶ 52.)  "Whether or not Embed was worth the purchase price—it was not—and whether or not Embed's technology worked—it did not—was irrelevant to Bankman-Fried.  What mattered was that the faster the deal terms were finalized, the faster Bankman-Fried could publicize the acquisition of a U.S. licensed broker-dealer, and perpetuate the false appearance that the FTX Group was successful and growing."  (AC ¶ 47.)

- Bankman-Fried "hoped that paying hundreds of millions of dollars cash for Embed would project a false image of profitability, growth, and legitimacy to sustain the fraudulent scheme by deceiving lenders, customers, and investors into believing that the FTX Group was successful enough to afford the lofty acquisition price and expand into new markets."  (AC ¶ 64.)

- "Almost immediately thereafter, however, the so-called 'crypto winter' set in. This sustained period of depression in the cryptocurrency markets accelerated the FTX Group's financial distress." (AC ¶ 7.) In turn, "the Embed transaction became even more urgent. Because Alameda's lenders were threatening to call, and calling, open-term loans, concealing the FTX Group's true financial condition from lenders was imperative, and thus the Embed transaction became a key means of sustaining FTX Group's façade of solvency." (AC ¶ 51.)

- "[T]he FTX Group's true financial condition continued to worsen, and Bankman-Fried knew that the FTX Group could not afford to part with the funds needed to acquire Embed." (AC ¶ 9.)

- "Ellison testified that, at the same time the terms of the Embed acquisition were being finalized, she conspired with Bankman-Fried to 'provide materially misleading financial statements to Alameda's lenders.'" (AC ¶ 43.)

- By mid-June, Alameda "didn't have the liquid assets to pay all of the money back" to lenders and "would have to take the money using its special privileges from FTX." Bankman-Fried "discussed trying to obtain even more loans to raise new capital, which could be used to pay existing obligations." (AC ¶ 44.)

- Singh testified that "he approached Bankman-Fried about 'reversing the Embed acquisition'" because he knew that going forward with it would "necessarily [be] spending customer funds, not for customer benefit.'" (AC ¶ 67.)

- "Bankman-Fried refused to pull out of the Embed transaction despite knowing that the FTX Group was so far in the red that it could not afford to complete the acquisition, much less satisfy its outstanding debts and other financial obligations." (AC ¶ 10.) "[P]ulling out of the transaction would be far worse for the continuation of his fraud scheme, raising red flags throughout the wider cryptocurrency market that the FTX Group was in distress. Lenders were already scrutinizing Alameda's balance sheets, necessitating new means of deception." (AC ¶ 68.) "[T]he apparent inability to close an announced deal[] would signal to lenders, customers, investors, and the market as a whole that the FTX Group was in jeopardy as a result of the cryptocurrency contagion and declining market trends, which, in turn, would bring about calls for repayment of loans and the return of customer and investor funds." (AC ¶ 9.)

- Bankman-Fried thus went through with the acquisition to avoid "revealing the FTX Group's insolvency and the fraudulent scheme, and hastening the FTX Group's collapse." (AC ¶ 68.)

- "All of the money" used for the acquisition "came from Alameda, which by this time had been used by the FTX Insiders to borrow billions from third-party lenders

to whom false and misleading balance sheets were provided and to misappropriate billions of dollars more from customers." (AC ¶ 74.)

- To "obscure" the source of funds used for the acquisition, "the FTX Insiders created false and misleading records suggesting that the funding for the Embed acquisition by WRS had come personally from Bankman-Fried, Singh, and Wang, even though the funds used to acquire Embed had been transferred from an Alameda bank account." (AC ¶ 69.)

- "Bankman-Fried, Singh, and Wang did not intend or have the ability to repay these funds to Alameda, and Alameda did not intend or have the ability to repay the funds that it had taken from FTX.com at the FTX Insiders' direction using the 'special privileges' the FTX Insiders had created for Alameda." (AC ¶ 76.) "Singh admitted in his guilty plea, by 'early September 2022,' the same month the Embed acquisition closed, Alameda 'could not repay what it owed.'" (AC ¶ 86.)

The Amended Complaints thus plead that the Embed transfers were part of the FTX Insiders' fraudulent scheme in at least two independently sufficient ways.

*First*, the transfers to Defendants in connection with the acquisition were "accomplished by" and "the product of a deliberate fraud," and thus "any disposition of those funds must be considered to be part of a continuing course of conduct which was intended to defraud." *In re Bell & Beckwith*, 64 B.R. 620, 626, 629 (Bankr. N.D. Ohio 1986). Here, as shown above, the funds used to purchase Embed were only available as a result of the FTX Insiders' misappropriation of customer assets and fraudulent representations to lenders. Thus, the disposition of these misappropriated and fraudulently obtained funds, which was itself concealed from creditors (AC ¶¶ 11, 69-76), was part of the FTX Insiders' continuing fraud on their creditors. For this reason, Defendants' argument that the Embed transaction was separate and apart from the FTX Insiders' illegal misappropriation of customer funds (Mot. at 12-13) misses the mark. *See In re Bell & Beckwith*, 64 B.R. at 620 ("A general scheme or course of conduct that is designed to divert assets of a debtor without regard to the interests of creditors can constitute conduct from which intent to defraud can be found.").

*Second*, as also demonstrated above, the transfers made in connection with the Embed acquisition were intended "to prevent exposure" of the scheme or "to continue perpetuating the fraud." *In re Live Well*, 652 B.R. at 706-07; *see also In re Bayou Grp., LLC*, 439 B.R. 284, 302 (S.D.N.Y. 2010) (finding actual fraudulent intent where transfers were made "[t]o avoid detection of the fraud, to retain existing investors and to lure new investors") (citation omitted); *Syntax*, 2016 WL 1165634, at *5 (fraudulent intent sufficiently pled where obligations were "incurred to prolong the [insiders'] fraudulent scheme and to continue an unsustainable enterprise that was inevitably doomed to fail").

*In re Live Well* is particularly instructive.  There, Live Well (the debtor) received "repurchase loans" from lenders.  652 B.R. at 702.  If bond prices went up, Live Well could borrow more against the bonds; if prices went down, Live Well was obligated to make margin payments equal to the decrease in value.  *Id.*  Fluctuations in bond values caused a liquidity crisis for Live Well, which began inflating bond prices and drawing on its increased credit.  *Id.*  When one lender, Wedbush, sought to reduce its line of credit, Live Well did not have the cash on hand to repurchase the bonds, but borrowed money from new lenders to repay Wedbush.  *Id.* at 702-03.  These payments "prolonged the scheme, worsened Live Well's financial condition and increased the inevitable shortfall of assets available for Live Well's victims and creditors when the scheme finally collapsed."  *Id.* at 703.  If Live Well had defaulted on its agreement with Wedbush, other lenders would have demanded repayment, and "the scheme would have unraveled."  *Id.* at 705-07.  The Delaware Bankruptcy Court observed that Live Well "paid off suspecting lenders to prevent a default," "to prevent exposure," and because it "did not want its scheme to be discovered."  *Id.* at 706.  Rejecting the argument that such "allegations of fraud only relate to Debtor's intent in obtaining the funds not in making the transfers," the court concluded that "[r]eading the Complaint

-15-

in its entirety leads to the reasonable inferences that Live Well paid Wedbush in order to continue the fraudulent bond scheme." *Id.* at 706-07.  Plaintiff thus "sufficiently tie[d] Debtor's fraudulent intent to the specific transfers at issue." *Id.* at 707.  The facts alleged here are more egregious than those alleged in *Live Well* and warrant the same conclusion.

      *Drivetrain* is similarly instructive.  There, the debtor entered into a partnership agreement with the defendant, Magento, which entitled the debtor to various marketing and consulting services in exchange for a fee.  *Drivetrain*, 2023 WL 1804627, at *1.  The complaint alleged that, in reality, the partnership agreement provided no benefit to the debtor and was only entered into as part of a fraudulent scheme.  *Id.*  The debtor would provide falsified revenue reports to Magento, whose fees were based on the debtor's revenue, and "would then use those same reports as 'proof' that the debtor was a successful business to attract additional investors." *Id.*  The court concluded that the debtor's payments to Magento under the contract were made with actual fraudulent intent because "[t]he goal" of the contracts "was to trick investors into believing that the company was both successful enough to afford [the defendant's] services and was generating significant revenue from those services." *Id.* at *3.

      The Embed acquisition similarly was intended to "trick investors" into "believing the company was successful" and "generating significant revenue." *Id.*; (*see* AC ¶¶ 7, 41-43).  As set forth in detail above (*see supra* at 12-14), the Amended Complaints allege that the acquisition played a key role in maintaining the illusion that the FTX Group was growing, profitable, and a force in the cryptocurrency market.  (AC ¶ 47.)

      Defendants attempt to evade *Drivetrain* by suggesting that its reasoning can only apply in essentially identical factual scenarios.  (*See* Mot. at 3, 11-13.)  But the legal principle established in *Drivetrain*—that fraudulent intent exists where transfers are made to perpetuate a

false image of success and profitability in order to further a larger fraud—is not limited to the precise set of facts in that case. 2023 WL 1804627, at *4. Defendants do not explain why the purported distinctions between *Drivetrain* and this case should dictate a different outcome here (they should not), and their attempts to distinguish *Drivetrain* fail.

Defendants argue that unlike in *Drivetrain*, where the transfers allowed the debtor to falsely represent its revenues to investors, there are no allegations here that the FTX Insiders made misrepresentations to Alameda's lenders about the acquisition of Embed. (Mot. at 11-12.) The Amended Complaints *do* allege, however, that the FTX Insiders widely publicized the Embed acquisition to deceive lenders, customers, and investors into believing that the FTX Group was successful enough to afford the lofty acquisition price and expand into new, regulated markets, which in turn would prevent the fraud from coming to light. (AC ¶¶ 8, 9, 47, 68.) The Amended Complaints also allege that if Bankman-Fried had backed out of the acquisition it would signal weakness to the market and hasten the FTX Group's collapse. (AC ¶ 68.) Moreover, that the FTX Insiders did not make representations to Alameda's lenders "about WRS's acquisition of Embed" (Mot. at 11) was itself fraudulent—the FTX Insiders hid the fact that the acquisition funds came from Alameda.

Defendants next argue that Plaintiffs have somehow failed to "connect the company making the allegedly fraudulent transfer" (which, according to Defendants, is WRS) "to the company whose investors were purportedly defrauded" (which, according to Defendants, was Alameda). (Mot. at 3, 12-13.) Defendants cite no authority supporting such strict adherence to corporate forms, especially where the insiders who controlled the various entities observed few if any corporate formalities. (*See* Op. at 13-14 (noting "the Debtors' commingling of funds was so prolific that even the team of experts hired post-petition to disentangle the mess had difficulty

doing so").)  This argument also mischaracterizes the allegations in the Amended Complaints, including by suggesting that (i) only WRS would benefit from the appearance of legitimacy that the FTX Insiders hoped the Embed acquisition would bestow; and (ii) the FTX Insiders only intended to hinder, delay, or defraud Alameda's creditors as a result of the acquisition.

Because the FTX Group held itself out as a large group of companies with multiple arms or silos (AC ¶ 4 n.4), customers, lenders, and investors would be reassured by the FTX Group's collective success—or at least, that is what the FTX Insiders believed.  They pursued the Embed acquisition in furtherance of their larger scheme to defraud *all* FTX Group lenders, customers, and investors—not just those of Alameda—into believing that the FTX Group as a whole was successful and growing.  (*See, e.g.*, AC ¶¶ 9, 46, 47, 51.)  This is sufficient to plead intent to hinder, delay, or defraud.  *See Tiab Commc'ns Corp.* v. *Keymarket of NEPA, Inc.*, 263 F. Supp. 2d 925, 935 (M.D. Pa. 2003) ("Intent to defraud any creditor is sufficient.").

Finally, Defendants' argument that, unlike in *Drivetrain*, Plaintiffs do not plead that the transfers "served no other purpose" except to "perpetuate fraud" (Mot. at 13) is similarly unavailing.  The Amended Complaints allege that Embed's technology was essentially useless, that Bankman-Fried was "indifferen[t] to the true state of Embed," including "the price paid for Embed or Embed's actual capabilities and value," and that he only entered into the acquisition because he "hoped that he could keep the scheme going by perpetuating the false appearance of financial strength and growth through the well-publicized, big-money, cash purchase of Embed." (AC ¶¶ 56, 68, 89.)  As in *Drivetrain*, "[t]he goal was to trick investors into believing that the company was both successful enough to afford [the acquisition]" and that it would "generat[e] significant revenue from [it]."  2023 WL 1804627, at *3.  In any event, it is not necessary to plead that the Embed acquisition served ***no*** purpose other than to defraud creditors; allegations that the

acquisition was in furtherance of the larger fraud are sufficient. *See In re Maxus Energy Corp.*, 641 B.R. 467, 529 (Bankr. D. Del. 2022) ("[E]ven if YPF had a legitimate business purpose or purposes for the transfers, the undertaking of which was not to defraud, hinder, or delay [] creditors, courts have found that mixed intents are sufficient to find actual intent to defraud, hinder, or delay.").

> **2.    The Embed Transaction Was Part of a Ponzi-Like Scheme To Prolong the Larger Fraud at the FTX Group.**

The FTX Insiders' fraudulent intent may also be presumed.  Actual fraudulent intent is presumed where, as here, (i) "the debtor runs a Ponzi scheme or a similar illegitimate enterprise," *In re Bayou Grp., LLC*, 439 B.R. at 305-06, and (ii) "the transfers at issue were related to or in furtherance of the fraudulent scheme," *Zazzali* v. *AFA Fin. Grp., LLC*, 2012 WL 4903593, at *7 (Bankr. D. Del. Aug. 28, 2012).  This presumption is based in the principle that "[a] Ponzi scheme cannot work forever," and thus the perpetrator "must know all along, from the very nature of his activities, that investors at the end of the line will lose their money." *In re Indep. Clearing House*, 77 B.R. 843, 860 (D. Utah 1987).

The Amended Complaints sufficiently allege a Ponzi-like arrangement.  Courts will apply the Ponzi presumption where "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors" is alleged, *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988), even where the fraudulent enterprise does not reflect all the "typical" hallmarks of a Ponzi scheme (*e.g.*, artificially high dividends, no legitimate business activity), *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 11-12 (S.D.N.Y. 2007).[7]  For instance, in *In*

---

[7]    Defendants' only argument to try to rebut the Ponzi presumption is that the presumption cannot apply because Embed was a "legitimate new investment."  (Mot. at 13-14 n.6.)  Even if this fact-based argument were not contradicted by the Amended Complaints' well-pleaded allegations,

*re DBSI, Inc.*, the Ponzi presumption was applied based on allegations that insiders "directed that investor funds be used to meet pre-existing obligations and operating expenses by evading restrictions governing the use of investor funds."  2011 WL 1810632, at *1 (Bankr. D. Del. May 5, 2011) (rejecting argument that "existence of a Ponzi scheme must be an established fact before the presumption can be made").[8]

Here, the Amended Complaints adequately allege a Ponzi-like scheme that by its very nature would defraud creditors. *In re Indep. Clearing House*, 77 B.R. at 860.  Specifically, the Amended Complaints allege:

- The FTX Insiders operated a massive fraud that involved lavishly spending commingled and misappropriated customer funds and other FTX Group assets on personal luxuries, political and "charitable" contributions, and various reckless, illiquid investments.  (AC ¶¶ 33, 36, 37, 67.)

- "This spending spree was funded through a Ponzi-like arrangement whereby the FTX Insiders caused Alameda to borrow significant amounts of funds from third-party lenders and to repay those funds as needed by 'borrowing'—*i.e.*, misappropriating—customer funds" and purporting to "'lend' money borrowed from third-party lenders and customers to the FTX Insiders."  (AC ¶¶ 33, 44.)

- The true nature of the relationship between Alameda and FTX.com, including the misappropriation of customer funds, was concealed from lenders, other creditors, and the public, as was FTX Group's financial condition.  (AC ¶¶ 36, 43, 87.)

---

the Ponzi presumption may apply even where the company has legitimate underlying business activity. *See In re Bullion Reserve of N. Am.*, 836 F.2d at 1219 n.8.

[8]     *See also In re Live Well*, 652 B.R. at 706 (fraudulent intent sufficiently pled where complaint alleged that debtor's "bond trading business had turned into a de facto Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims"); *In re Nat'l Audit Def. Network*, 367 B.R. 207, 222 (Bankr. D. Nev. 2007) (insiders acted with fraudulent intent where they operated scheme that, while "technically not a Ponzi scheme," was "in many respects worse"—"[r]ather than passing on the new funds to old investors, [insiders] took or directed most of this money to themselves . . . or to the perpetuation of the scam"); *In re Carrozzella & Richardson*, 237 B.R. 536, 539 (Bankr. D. Conn. 1999) (recognizing existence of "Ponzi-like scheme" where "funds placed with a debtor by later depositors are secretly and illicitly utilized to pay returns, and repay principal, to earlier depositor").

- Ellison admitted that "Alameda used FTX.com funds to finance investments or repay loans," that "she agreed with Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders," and "Bankman-Fried and others had made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds." (AC ¶ 87.)

- The FTX Insiders understood that Alameda "didn't have the liquid assets to pay all of the money" it had borrowed back to lenders, that they were "spending customer funds, not for customer benefit," and that they needed constant access to new capital (whether in the form of capital raises, third-party loans, or additional customer deposits) to satisfy customer withdrawal requests and repay lenders. (AC ¶¶ 37-38, 44, 67.)

- In the days leading up to the Chapter 11 filings, Ellison "had an increasing dread of this day that was weighing on [her] for a long time." (AC ¶ 12.)

The Amended Complaints likewise adequately allege that transfers in connection with the Embed acquisition were "related to or in furtherance of the fraudulent [Ponzi-like] scheme." *Zazzali*, 2012 WL 4903593, at *7.  The Amended Complaints allege that the transfers were funded with assets acquired as part of that scheme, and concealed in the same manner as other illicit spending activities characteristic of the scheme (including through purported "loans" to the FTX Insiders).  (AC ¶¶ 33, 69-76.)  The Amended Complaints also allege that the purpose of the Embed acquisition was "to dupe lenders, customers, and investors into loaning or contributing additional capital by getting them to believe that the FTX Group was solvent, stable, and growing."  (AC ¶ 8.)

It is well settled that transfers made "for the purpose of attracting new investors to the scheme" satisfy the requirement that the transfers at issue be related to or in furtherance of the larger fraud.  *In re DBSI, Inc.*, 477 B.R. 504, 512 (Bankr. D. Del. 2012).  Transfers made to "forestall[] disclosure of the fraudulent scheme" likewise are sufficient to satisfy this requirement. *In re Bayou Grp., LLC*, 439 B.R. at 302.  The Amended Complaints clearly allege this as well: "As the Embed acquisition progressed toward closing, the FTX Group's true financial condition

-21-

continued to worsen, and Bankman-Fried knew that the FTX Group could not afford to part with the funds needed to acquire Embed." (AC ¶ 9.) Yet, Bankman-Fried nonetheless proceeded with the transaction because "[b]acking out of the Embed acquisition would be a fatal blow, revealing the FTX Group's insolvency and the fraudulent scheme, and hastening the FTX Group's collapse." (AC ¶¶ 9, 68.)

**B.    The FTX Insiders Acted with Fraudulent Intent by Exposing Creditors to a Substantial Risk of Loss of Which They Were Intentionally Kept Unaware.**

The Amended Complaints properly allege that the FTX Insiders knew that the natural consequence of the Embed acquisition would be to deprive FTX Group creditors of their assets—or at the very least, hinder or delay creditors in recovering them. A debtor or corporate insider acts with actual intent to defraud creditors where it "knowingly expose[s]" creditors "to a substantial risk of loss of which they were unaware." *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d at 668. That is exactly what the FTX Insiders did here when they used assets from Alameda (and in turn, misappropriated funds from customers and fraudulently obtained funds from lenders) to fund the Embed acquisition. The FTX Insiders not only kept FTX Group creditors in the dark about their source of funding for the Embed acquisition, but also actively concealed that parting with those funds for the acquisition created a substantial risk that creditors would not be repaid.

Specifically, the Amended Complaints allege that "[a]ll of the money" used for the Embed acquisition "came from Alameda, which by this time had been used by the FTX Insiders to borrow billions from third-party lenders to whom false and misleading balance sheets were provided and to misappropriate billions of dollars more from FTX.com customers." (AC ¶ 74); *see Syntax*, 2016 WL 1165634, at *6 ("The delay of payment to creditors was substantially certain

to occur when the Debtors incurred the Obligations at a time when they were purposefully concealing massive losses.").[9]

The FTX Insiders knew that going forward with the Embed acquisition meant "spending customer funds, not for customer benefit" but nonetheless went through with it to avoid calls for repayment from lenders and a "bank run" by existing customers and, consequently, disclosure of the FTX Group's true financial condition and fraud.  (AC ¶¶ 66-67.)  They used the commingled funds from Alameda to fund the acquisition without intending to repay the money to Alameda (AC ¶¶ 70, 76), and with knowledge that Alameda had a negative net asset value of many billions of dollars and would be unable to repay customers and lenders,  (AC ¶¶ 37, 38, 44, 62, 67, 76).

FTX Group creditors were not just "unaware" that their funds were being used for the Embed acquisition—the FTX Insiders went to lengths to actively (and illegally) conceal their use of misappropriated Alameda funds for the acquisition.  (AC ¶¶ 11, 69-76, 87, 89.)  As alleged in the Amended Complaints, the FTX Insiders created "false and misleading records" that made it appear that  the funding for the acquisition had come personally from the FTX Insiders, rather than Alameda.  (AC ¶¶ 69-70.)  The FTX Insiders papered over the acquisition funding  in furtherance of their conspiracy to hide the true nature of the relationship between FTX.com and Alameda and the FTX Group's true financial condition.  (AC ¶¶ 36, 43, 45.)

*Sentinel* is instructive.  There, an investment manager (Sentinel) moved over $500 million in client securities from segregated accounts into a "lienable" account to use as collateral

---

[9]    Defendants' argument that the fraudulent balance sheets provided to Alameda's lenders were "not connected to WRS's purchase of Embed" (Mot. at 4) entirely misses the point.  The fact that the FTX Insiders entered into the Embed acquisition at the same time they were fraudulently concealing the FTX Group's true financial condition from lenders shows that they knew the FTX Group could not afford to repay the funds used for the transfers.

for a loan.  728 F.3d at 663-65.  Although the district court found that Sentinel had misused the creditor assets, it nonetheless concluded that Sentinel did not have fraudulent intent because the transfers were motivated by "a desperate 'attempt to stay in business,'" not to defraud creditors. *Id.* at 667.  The Seventh Circuit reversed, concluding that "[s]uch a result too narrowly construes the concept of actual intent to hinder, delay, or defraud." *Id.*  While Sentinel's "primary purpose may not have been to render the funds permanently unavailable" to its clients, Sentinel "should have seen this result as a natural consequence of its actions." *Id.*  Indeed, "even if we assume that Sentinel had the best intentions for its [] clients" (*e.g.*, that Sentinel "intended to replace" the funds and "earn greater returns" for clients), "the fact remains that Sentinel knowingly exposed its [] clients to a substantial risk of loss of which they were unaware." *Id.* at 668.

As in *Sentinel*, Plaintiffs allege that the FTX Insiders misappropriated the funds used for the Embed acquisition, including from FTX customers (*see, e.g.*, AC ¶¶ 40, 45, 62, 74), which itself constitutes fraud.  *See also In re Bell & Beckwith*, 64 B.R. at 629 (debtor's "use of the customer funds for his own purposes was an unlawful theft").  Also as in *Sentinel*, the FTX Insiders misled creditors about how their funds were being used.  The FTX Insiders undoubtedly "should have seen" that their use of these funds for the Embed acquisition would result in creditors being permanently deprived of those funds, *In re Sentinel*, 728 F.3d at 667, or at least that their hinderance or delay would be "substantially certain to occur," *Syntax*, 2016 WL 1165634, at *6. For example, the Amended Complaints allege that:

- Plaintiffs completed the acquisition only six weeks before filing for Chapter 11, at a time when Plaintiffs were insolvent, "Alameda's lenders were threatening to call, and calling, open-term loans," and there was a $8 billion+ "hole" in Alameda's balance sheet.  (AC ¶¶ 4, 35, 38, 51, 62, 84-88; Op. at 25 n.32.)  *See Syntax*, 2016 WL 1165634, at *6 (finding persuasive that "the Debtors were insolvent at the time the Obligations were incurred," in light of "the totality of the circumstances"); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 405 (Bankr. S.D.N.Y. 2007) (noting

"desperate financial condition in which the Debtor found itself prior to the transfer" as a badge of fraud).

- The acquisition was pursued at a time when the FTX Insiders were concealing massive losses, including by providing lenders with false balance sheets, without which they would not have been able to fund the acquisition. (AC ¶¶ 63, 68, 74, 89); *see Syntax*, 2016 WL 1165634, at *6; *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *4 (Bankr. D. Del. Feb. 28, 2019) (finding indicative of fraudulent intent that "Millennium was aware that its Rating Agency Presentation, necessary to obtain and/or syndicate the $1,775 billion term loan, did not disclose the [] challenges to Millennium's business model and that information disseminated in connection with the loan, generally and to investors, was untruthful").

- The acquisition was entered into hastily and without meaningful due diligence because the FTX Insiders were focused on the publicity it would bring to the FTX Group and indifferent to the actual value of the company they were purchasing. (AC ¶¶ 8, 47-52, 64.) Bankman-Fried's motivation for the acquisition of Embed, a U.S.-licensed broker-dealer, was to project a false image of strength to the market. (AC ¶¶ 8, 47, 51, 64.) He knew that this was essential to (i) secure much needed additional capital to meet forthcoming calls for repayment from lenders, and (ii) avoid a "bank run by existing customers." (AC ¶ 66.)

- The FTX Insiders "knew that the FTX Group could not afford to part with the funds needed to acquire Embed" and, when Bankman-Fried was confronted about reconsidering the acquisition in light of "FTX Group's increasing financial distress," he "refused to pull out of the Embed transaction despite knowing that the FTX Group was so far in the red that it could not afford to complete the acquisition, much less satisfy its outstanding debts and other financial obligations." (AC ¶¶ 9-10); *see ASARCO LLC* v. *Americas Mining Corp.*, 396 B.R. 278, 384 (S.D. Tex. 2008) (insiders were "indifferent to the fact that [debtor] would be left without sufficient cash to pay its other past-due obligations, and consequently had intent to hinder and delay [debtor's] other creditors").

- The FTX Insiders concealed the source of funds used for the acquisition through a series of phony "loan" documents and misleading on-exchange transfers (AC ¶¶ 11, 69-76). This concealment was consistent with the agreement between Ellison and Bankman-Fried "not to publicly disclose the true nature of the relationship between Alameda and FTX." (AC ¶ 43); *see In re Team Sys. Int'l, LLC*, 2023 WL 1428572, at *10 (Bankr. D. Del. Jan. 31, 2023) (finding badge of fraud "amply present" where insiders "attempted to conceal the transfers by redacting the name of the recipient of various transfers and by falsifying business records to suggest that these transfers were actually payments for business expenses"); *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d at 667 (that Sentinel "falsely reported to both its [] clients and the CFTC

that the funds remained in segregation" suggested that Sentinel's purpose was to defraud).[10]

- The FTX Insiders' conduct in effecting the transfers was illegal, and thus "particularly egregious," because the FTX Insiders funded the acquisition using fraudulently obtained assets, which they further misappropriated by secretly transferring the assets to Defendants in connection with the acquisition (*see, e.g.*, AC ¶¶ 33-36); *see also In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d at 668 (Sentinel's conduct was "particularly egregious" because transfers were unlawful); *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *4 ("illegality of [debtor's] business model" was persuasive of fraudulent intent).

In fact, the case for fraudulent intent is stronger here than in *Sentinel* because there, the Seventh Circuit reasoned that Sentinel acted with fraudulent intent even assuming it intended to pay back customers. 728 F.3d at 668; *see also Syntax*, 2016 WL 1165634, at *6 (concluding that debtors incurred obligations with fraudulent intent even though obligations could potentially "be a reasonable way [for the debtor] to effectuate a turnaround plan or other related business decision"). Here, by contrast, Plaintiffs allege facts demonstrating that the FTX Insiders did not intend to repay Alameda the funds used to purchase Embed, as evidenced by, *inter alia*, the promissory notes' "one-sided, scant terms" and lack of accountability or repayment schedule, which meant that customers and lenders would not be repaid. (AC ¶¶ 70, 76.) Moreover, Sentinel received significant value in exchange for the pledged client funds, whereas here, "Plaintiffs have sufficiently pled a lack of reasonably equivalent value." (Op. at 26.)

---

[10]    Defendants argue that this badge of fraud has not been alleged because the Embed acquisition was "publicly disclosed" (Mot. at 16), but this ignores the fact that creditors were intentionally kept unaware that their funds were being used to acquire Embed. *See In re Autobacs Strauss, Inc.*, 473 B.R. 525, 566-67 (Bankr. D. Del. 2012) (failure to disclose details of "planned funding" for acquisition sufficient at pleading stage).

C.   **The FTX Insiders Acted, at a Minimum, with Intent To Hinder or Delay Creditors by Putting Hundreds of Millions of Dollars Beyond Their Reach.**

Even if the FTX Insiders did not know that the funds used for the Embed acquisition would become permanently unavailable to repay creditors, they at least knew that the Embed transaction would hinder or delay repayment to FTX Group creditors.  Put another way, under the totality of the circumstances, "the natural consequence" of these transfers "would, at a minimum, delay or hinder distributions to the creditor body." *Syntax*, 2016 WL 1165634, at *6.  The FTX Insiders acknowledged as much (AC ¶¶ 67, 87), but nonetheless proceeded with the Embed acquisition.  *See ASARCO LLC*, 396 B.R. at 388 (finding intent to hinder or delay where insider "knew that payments to some creditors would be hindered and delayed as a result of the transaction, but it closed the transaction anyway").  Indeed, the transfers necessarily hindered and delayed payment to creditors because assets that should have been instantly available to creditors were put even further beyond their reach.  *See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 249 (Bankr. S.D.N.Y. 2013) (transferors had "intent to 'hinder and delay'" creditors "when they transferred out and then spun off the oil and gas assets," which left debtors "insolvent and undercapitalized," and which "was not made for reasonably equivalent value").

The Motion repeatedly argues that Embed was a "legitimate new investment" that "stood to benefit WRS's creditors and investors."  (*See, e.g.*, Mot. at 14 n.6, 19.)[11]  This fact-based argument is not only contrary to the Amended Complaints' well-pleaded allegations (*see, e.g.*, AC ¶¶ 56, 68), but is also beside the point.  Even if the FTX Insiders *did* someday intend to repay FTX.com customers and Alameda lenders (*e.g.*, with hypothetical future profits from the

---

[11]   Defendants also improperly cite to the Initial Complaints in support of this argument.  (*E.g.*, Mot. at 18); *W. Run Student Hous. Assocs., LLC* v. *Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013) ("[A]mended complaint supersedes the original and renders it of no legal effect.").

acquisition), a "genuine belief" that a debtor can "weather a financial storm, and pay his debts in full . . . does not clothe him with a privilege to build up obstructions that will hold his creditors at bay." *Shapiro* v. *Wilgus*, 287 U.S. 348, 354 (1932); *see also In re MarketXT Holdings Corp.*, 376 B.R. at 408 (debtor's "intention to delay creditors is not immunized by the transferor's conviction that it is for the creditors' good").

## II.    THE COURT'S PRIOR RULINGS WITH RESPECT TO ALL REMAINING CLAIMS AND PURPORTED AFFIRMATIVE DEFENSES REMAIN APPLICABLE.

The Court previously held that Plaintiffs have sufficiently pleaded claims for constructive fraudulent transfer, recovery of property, and disallowance of Defendants' claims against the estate, and that the purported affirmative defense under Section 546(e) of the Bankruptcy Code does not now apply.[12]  (Op. at 24, 26, 31.)  Those rulings survive in full force. *See In re Paige*, 2015 WL 1544996, at *1 (Bankr. M.D. Pa. Mar. 31, 2015) (declining to reexamine counts on motion to dismiss amended complaint where court had already ruled that such counts were sufficiently pleaded in its disposition of initial complaint).  Because Defendants have incorporated their arguments from their prior motions to dismiss on those points in order to preserve the issues for any appeal (Mot. at 21-22), Plaintiffs also incorporate their arguments and supporting authorities from their prior briefing.

### CONCLUSION

For the foregoing reasons, the Court should deny both the Motion and the Alumni Ventures Motion in their entirety.

---

[12]    There is no dispute that Plaintiffs' constructive fraudulent transfer claims as to the $55 million retention payment to Defendant Giles would persist regardless of any future ruling that the Section 546(e) safe harbor applies to other transfers at issue. *See* Adv. D.I. 311 at 2 n.3 ("[T]hese arguments concern transfers that relate to the consideration paid in connection with the Embed acquisition, and not retention payments alleged to have been made to certain Defendants.").

Dated: February 14, 2025
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

*Counsel for Plaintiffs*

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       gluecksteinb@sullcrom.com
       decampj@sullcrom.com
       dunnec@sullcrom.com

*Counsel for Plaintiffs in Adv. Pro. No. 23-50380*

-and-

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Sascha N. Rand (admitted *pro hac vice*)
Isaac Nesser (admitted *pro hac vice*)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
E-mail: sascharand@quinnemanuel.com
        isaacnesser@quinnemanuel.com

William Burck
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
E-mail: williamburck@quinnemanuel.com

*Counsel for Plaintiffs in Adv. Pro. No. 23-50379*